**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>IMPAC MORTGAGE HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-10593<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED**
**FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY**
**ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION;**
**(IV) MODIFYING THE AUTOMATIC STAY; (V) AUTHORIZING THE DEBTORS' USE**
**OF CASH COLLATERAL; (VI) SCHEDULING A FINAL HEARING; AND**
**(VII) GRANTING RELATED RELIEF**

Impac Mortgage Holdings, Inc. ("Impac") and the above-referenced affiliated debtors

and debtors in possession (collectively, the "Debtors") under chapter 11 of title 11 of the United

States Code, §§ 101 *et seq.* (the "Bankruptcy Code"),[2] in these chapter 11 cases (the "Chapter

11 Cases"), by and through their undersigned counsel, hereby move (the "Motion") this Court

for entry of an interim order (substantially in the form attached hereto as **Exhibit A**, the "Interim

Order") and a final order (the "Final Order" and together with the Interim Order, the "Orders"):

(i) authorizing the Debtors to enter into the DIP Facility on the terms provided in the DIP

Documents; (ii) authorizing the Debtors to grant, subject and subordinate to the Carve-Out

and/or as otherwise set forth herein, senior liens and superpriority administrative expense status

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Impac Mortgage Holdings, Inc. (5505); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Funding Corporation (4495); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Service Corp. (2263); Impac Mortgage Corp. (3937); Impac Warehouse Lending, Inc. (0541); Synergy Capital Mortgage Corp. (9071); and Impac Warehouse Lending Group, Inc. (3488). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

[2]   All references herein to 'section' or '§' are to the Bankruptcy Code.

to Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1, including any permitted assignees or successors ("Hildene" or, in such capacity, the "DIP Lender") to secure the DIP Obligations; (iii) granting adequate protection; (iv) modifying the automatic stay imposed by § 362 and any other applicable stay (including Bankruptcy Rule 6004) to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents; (v) authorizing the Debtors' use of cash collateral; (vi) scheduling a final hearing (the "Final Hearing"); and (vii) granting related relief.

In support of this Motion, the Debtors submit the *Declaration of Eric J. Held in Support of the Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Authorizing the Debtors' Use of Cash Collateral; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "DIP Declaration"), attached hereto as **Exhibit B**. In further support of the Motion, the Debtors submit the *Declaration of George A. Mangiaracina in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference. In further support of the Motion, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**[3]

1.      The Debtors commenced these Chapter 11 Cases to preserve liquidity and pursue and consummate the value-maximizing restructuring transaction contemplated by the Restructuring Agreement. As of the date hereof (the "Petition Date"), the Debtors possess only

---

[3]   All capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to them below or in the DIP Agreement, as applicable.

minimal liquidity, an amount wholly insufficient to fund ongoing operations or administer these cases. Immediate access to postpetition financing is therefore essential to preserve enterprise value and avoid immediate and irreparable harm to the Debtors' estates.

2.      The relief requested in this Motion authorizes the Debtors to enter into a senior secured, superpriority debtor-in-possession financing facility that represents the only viable financing alternative available under the circumstances. The Debtors were unable to obtain financing on an unsecured, administrative-expense, or otherwise more favorable basis. Critically, any alternative financing would have required the consent of the Prepetition Lender to priming or require the Debtors to undertake a costly and protracted effort to prime the Prepetition Lender over its objection.

3.      The DIP Facility provides the liquidity necessary to stabilize the Debtors' business, fund these Chapter 11 Cases, and prosecute the restructuring transaction to completion. Without the DIP Facility, the Debtors would lack any viable path to continue operations or consummate the Restructuring Agreement, and the value of the estates would rapidly erode to the detriment of all stakeholders. The proposed financing therefore satisfies the requirements of § 364 and reflects the Debtors' sound exercise of business judgment.

4.      The DIP Facility also includes a limited roll-up of the Prepetition Bridge Note Obligations, which is an integral and reasonable component of the overall financing package. The Bridge Note was incurred in the weeks prior to the Petition Date solely to provide the Debtors with sufficient liquidity to bridge to these Chapter 11 Cases. But for the Debtors' precarious liquidity position at filing, those amounts would have been funded postpetition as part of the DIP Facility itself. The DIP Roll-Up Loan therefore does not refinance legacy debt,

but rather harmonizes the timing of a single, integrated financing transaction necessitated by exigent circumstances.

5.     In short, the DIP Facility is the product of good-faith, arm's-length negotiations, contains market-standard terms and protections, and is necessary to preserve value, avoid irreparable harm, and maximize recoveries for all parties in interest.  Accordingly, the Debtors respectfully submit that the relief requested herein is fair, reasonable, and in the best interests of the Debtors, their estates, and all stakeholders, and should be approved on an interim and final basis.

## SUMMARY OF REQUESTED RELIEF STATEMENT

6.     As of the Petition Date, the Debtors only have approximately $130,000 of liquidity on their balance sheet—an amount insufficient to carry on their business, fund the chapter 11 plan contemplated by the Restructuring Agreement, and pay their ordinary course operating costs and administrative expenses.  Thus, the Debtors seek authority to enter into a certain senior secured super-priority term loan credit facility provided by the DIP Lender.  By this Motion, the Debtors request entry of the Orders to, among other things:

(i)     Obtain senior secured postpetition financing in an aggregate principal amount not to exceed $5,000,000 (the "DIP Facility," and the loans provided to the Debtors thereunder, the "DIP Loans"), consisting of (a) the principal amount of $2,000,000 of Bridge Note Obligations, plus interest fees and other amounts due thereunder that will be deemed "rolled up" as loans hereunder on a dollar-for-dollar basis pursuant to the terms and subject to the conditions set forth in the DIP Agreement and the Interim Order (the "DIP Roll-Up Loan") and (b) new money term loans, in an aggregate principal amount such that, when combined with the rolled up loans, the total outstanding principal amount of the DIP Facility shall not exceed $5,000,000, which new money term loans shall be made available to the Debtors from time to time pursuant to the terms and subject to the conditions set forth in the DIP Agreement and the Orders (the "New Money Term Loan").

(ii)    Enter into (a) that certain Debtor-In-Possession Loan and Security Agreement (the "DIP Agreement"), substantially in the form attached to the Interim Order as Exhibit A, by and among the Debtors, certain subsidiaries of the Debtors identified as a guarantor on the signature page thereto, and the DIP Lender, and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

(iii)   Borrow, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to (a) the DIP Roll-Up Loan, plus (b) the $1,500,00 Initial Term Loan (the "Interim DIP Facility");

(iv)    Borrow, on a final basis, pursuant to the DIP Documents and the Final Order, postpetition financing in an aggregate principal amount of up to $5,000,000, upon entry of the Final Order;

(v)     Execute and deliver the DIP Agreement and the other DIP Documents to the DIP Lender pursuant thereto;

(vi)    Grant to the DIP Lender the DIP Liens on all of the DIP Collateral to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Orders, as applicable (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP Obligations"), subject only to prior payment of the Carve-Out;

(vi)    Grant to the DIP Lender allowed superpriority administrative expense claims in these Chapter 11 Cases for all DIP Obligations;

(vii)   Use the proceeds of the DIP Facility in accordance with the DIP Agreement, the DIP Documents and the Interim Order, in all cases in accordance with the Budget, a copy of which is attached to the Interim Order as Exhibit B, and as otherwise provided in the DIP Documents;

(viii)  Use any Prepetition Collateral, including the Cash Collateral, and provide adequate protection to those parties set forth herein that may have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution;

(ix)    Modify the automatic stay imposed by § 362 solely to the extent necessary to implement and effectuate the terms of the DIP Documents and the Interim Order;

(x)     Schedule a Final Hearing to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(xi)    Waive, to the extent applicable, any stay of the immediate effectiveness of an Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that the Interim Order shall be immediately effective upon its entry on the Court's docket.

**JURISDICTION AND VENUE**

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue of the Chapter 11 Cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      The statutory bases for the relief requested herein are §§ 105(a), 361, 362, 363, 364, 506(c), 507, and 552, Bankruptcy Rules 2002, 4001, 6003(b), 6004(a), 6004(h), 9013, and 9014, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

## BACKGROUND

### A.     General Background

9.      On the Petition Date, the Debtors each commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108.

10.      No trustee, examiner, or statutory committee has been appointed in these Chapter 11 Cases.

11.      Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

### B.     The Debtors' Prepetition Indebtedness

12.      The Debtors have three tranches of secured debt that are described below, namely the Prepetition Bridge Note Obligations, the Prepetition Loan Obligations, and the Life Insurance/Surety Bond Obligations.  In addition, the Debtors have unsecured Junior Subordinated Debt Obligations.

### i.     *Prepetition Bridge Note Obligations*

13.      Pursuant to that certain Secured Promissory Note, dated January 26, 2026 (as amended, restated, supplemented or otherwise modified from time to time, the "Bridge Note"), executed by certain Debtors, as the borrower, in favor of Hildene as successor-by-assignment to Trinity Park Investments, LLC ("Trinity Park"), certain loans and other financial accommodations were extended to the Debtors.  Pursuant to that certain Assignment and Assumption Agreement, dated as of April 20, 2026, Trinity Park assigned the Prepetition Bridge

Note to Hildene (in such capacity, the "Bridge Note Lender," and together with the Prepetition Lender, the "Prepetition Secured Parties").

14. The Bridge Note was issued upon demand by Debtors, with the first draw occurring in January 2026. As of the Petition Date, the outstanding balance under the Bridge Note is $2,000,000 in principal, plus accrued and unpaid interest and fees (the "Prepetition Bridge Note Obligations"). The Prepetition Bridge Note Obligations accrue interest at a rate of 12% per annum and all principal and interest are due on January 26, 2027.

15. The Prepetition Bridge Note Obligations are secured by liens on substantially all assets of each Debtor party to the Bridge Note, including: (i) all Accounts; (ii) all Chattel Paper; (iii) all Commercial Tort Claims; (iv) all Deposit Accounts; (v) all Documents; (vi) all Equipment; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter-of-Credit Rights; (xii) all other Goods; (xiii) all Intellectual Property Collateral; and (xiv) all money, income, royalties, payments, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing of any and all of the foregoing (collectively, the "Bridge Note Collateral").[4] With the consent of the Prepetition Lender, the Prepetition Bridge Note Obligations are secured by senior liens ranking *pari passu* with the senior liens securing the Prepetition Loan Obligations.

### ii. *Prepetition Loan Obligations*

16. In 2024, in connection with the Debtors' efforts to secure medium term financing to enhance opportunities for growth of its residential mortgage brokerage business, Impac successfully obtained access to a $20,000,000 facility made available by Hildene (in such

---

[4] All capitalized terms listed in (i)–(xiv) of this Paragraph 15 shall have the meaning set forth in the Bridge Note (including any defined terms incorporated by reference therein).

capacity, the "Prepetition Lender") pursuant to that certain Loan Agreement, dated as of May 6, 2024 (the "Prepetition Loan") among Impac as borrower and, excluding any borrower controlled entity that is a special purpose entity formed in connection with a mortgage loan securitization, all of the Impac's direct and indirect subsidiaries as guarantors (the "Prepetition Loan Guarantors").[5]  The Prepetition Loan is a revolving line that bears interest monthly at SOFR plus 7.5% and is compounded quarterly, unless Impac affirmatively elects to timely pay interest in cash.  Subject only to *pari passu* status with the liens securing the Bridge Note, the Prepetition Loan is secured by Impac's and the Prepetition Loan Guarantors' pledges of substantially all of their assets including: (i) all Accounts; (ii) all Chattel Paper; (iii) all Commercial Tort Claims; (iv) all Deposit Accounts; (v) all Documents; (vi) all Equipment; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter-of-Credit Rights; (xii) all other Goods; (xiii) all Intellectual Property Collateral; and (xiv) all money, income, royalties, payments, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing (collectively, the "Prepetition Loan Collateral," and together with the Bridge Note Collateral, the "Prepetition Collateral").[6]  A Security Agreement, dated May 6, 2024, is supported by subsidiary share pledges from Impac and the Prepetition Loan Guarantors, a Trademark Security Agreement, and UCC-1 filings in all applicable jurisdictions.

17.    As of the Petition Date, the outstanding balance under the Prepetition Loan is not less than $23,950,000, inclusive of all accrued and unpaid interest, fees, costs, and expenses.

---

[5]    Each of the Prepetition Loan Guarantors is a Debtor in these Chapter 11 Cases.

[6]    All capitalized terms listed in (i)–(xiv) of this Paragraph 16 shall have the meaning set forth in the Prepetition Loan (including any defined terms incorporated by reference therein).

Impac has also requested and obtained from the Prepetition Lender certain limited waivers of identified covenant defaults.

### iii.    *Life Insurance/Surety Bond Obligations*

18.    The third tranche of secured debt relates to obligations owed to Enterprise Bank & Trust ("Enterprise").

19.    Impac is the obligor solely as trustee on three amended and restated promissory notes in favor of Enterprise, each dated as of April 30, 2023 and maturing on April 30, 2026 (the "Enterprise Loans").  The outstanding amount on the Enterprise Loans is approximately $16,400,000.  To finance the acquisition and premium obligations of three life insurance policies issued by Allianz Life Insurance Company of North America (the "Life Insurance Policies"), the underlying trusts which hold the Life Insurance Policies obtained the Enterprise Loans.  Accrued interest on the Enterprise Loans is also rolled into the principal balance on a quarterly basis.  In addition, Impac executed a Continuing Limited Guaranty Agreement dated January 31, 2012 in favor of Enterprise guaranteeing the underlying trusts' obligations under the Enterprise Loans. The Enterprise Loans are secured by, among other things: (a) a collateral assignment of the Life Insurance Policies and (b) cash collateral contained in restricted cash accounts (the "EB&T Pledged Accounts").  The EB&T Pledged Accounts also secure obligations arising from an irrevocable standby letter of credit supporting surety bonds issued by Liberty Mutual Insurance Company.

20.    The three insured parties under the Life Insurance Policies are former executives of Impac, and the original beneficiaries of such policies were family members of the former executives or family trusts established by the former executives. Impac serves as both trustee and sole beneficiary of each of the three trusts that own the Life Insurance Policies. The Life

Insurance Policies have accrued substantial cash surrender value estimated at approximately $15,000,000.  Under the terms of the Enterprise Loans, Enterprise may periodically require the Debtors to increase the amount of security on deposit in the EB&T Pledged Accounts based on the difference between the outstanding loan balance and the cash surrender value of the Life Insurance Policies.

21.    The current cash amount in the EB&T Pledged Accounts is approximately $2,740,000, plus additional accrued interest. Including such cash collateral and the cash surrender value of the Life Insurance Policies, Enterprise is oversecured by approximately $1,400,000.

### iv.    Junior Subordinated Notes

22.    In 2005, the Debtors issued four series of trust preferred securities.  In response to the 2007 housing market crash and resulting 2008 global financial crisis, in 2008 and 2009, the Debtors retired or exchanged all four series of trust preferred securities for cash and/or new securities.  Further, in a continuing effort to preserve capital, the Debtors exchanged $51.3 million of trust preferred securities for $62 million interest only Junior Subordinated Indentures with Bank of New York, as indenture trustee, dated May 8, 2009 (the "Junior Subordinated Notes"), due March 30, 2034, with lower interest rates. During 2017, the Debtors exchanged $8.4 million of the remaining outstanding trust preferred securities for 412,264 shares of the Company's common stock with a then existing fair market value of approximately $5.6 million.

23.    In January 2024, the Debtors defaulted under the Junior Subordinated Notes by failing to make the required interest payment.  The Debtors requested, and subsequently entered into a Forbearance Agreement, dated January 31, 2024 (the "Junior Subordinated Notes Forbearance Agreement"), with HCMC III, LLC, a Delaware limited liability company, in its

capacity as collateral manager for the holders of the notes issued under the Junior Subordinated Indentures (the "Junior Subordinated Notes Collateral Manager").  The Junior Subordinated Notes Forbearance Agreement stayed the Junior Subordinated Notes Collateral Managers rights to enforce the default provisions under the Junior Subordinated Note agreements.  The Junior Subordinated Notes Forbearance Agreement had an initial termination date of February 29, 2024; however it has been amended multiple times and as of the Petition Date, the current termination date is March 2, 2026.

24.    The Junior Subordinated Notes had a stated outstanding principal balance of $62 million as of December 31, 2025, plus accrued interest, and mature on March 30, 2034.  As of the Petition Date, the Subordinated Notes remain outstanding and accrue interest at annual rate of SOFR + 375bps.

## C.    Summary of Terms of DIP Financing

25.    In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the below chart summarizes the significant terms of the proposed DIP Facility and DIP Documents.[7]

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Impac Mortgage Holdings, Inc. | DIP Agreement, 1. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | All Debtors, except IMH Assets Corp. and Impac Secured Assets Corp. | DIP Agreement, 1. |

---

[7]    The following summary of the terms of the DIP Agreement is subject entirely to the express terms of the DIP Agreement or Interim Order, as applicable.  If there are any inconsistencies between the summary below and the DIP Agreement, then the DIP Agreement shall control.  If there are any inconsistencies between the summary below and the Interim Order, then the Interim Order shall control.

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| **DIP Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | N/A | |
| **DIP Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1 | DIP Agreement, 1. |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(i)(A) and (B) | Senior secured super-priority term loan in an aggregate principal amount of up to $5,000,000, consisting of (i) the principal amount of $2,000,000 of Bridge Note Obligations, plus interest fees and other amounts due thereunder that will be deemed "rolled up" as a DIP Roll-Up Loan on a dollar-for-dollar basis pursuant to the terms and subject to the conditions set forth in the DIP Agreement and the Orders and (ii) New Money Term Loans, in an aggregate principal amount such that, when combined with the DIP Roll-Up Loan, the total outstanding principal amount of the DIP Facility shall not exceed $5,000,000, which New Money Term Loans shall be made available to the Debtors from time to time pursuant to the terms and subject to the conditions set forth in the DIP Agreement and the Orders.<br><br>The initial $1,500,000 of the Interim DIP Facility (the "Initial Term Loan") shall be funded within one (1) Business Day following the Court's entry of the Interim Order.  Upon entry of the Interim Order, all outstanding Prepetition Bridge Note Obligations in the principal amount of $2,000,000, plus interest fees and other amounts due thereunder, shall be rolled up and converted into DIP Obligations.<br><br>An amount of up to the remaining $1,500,000 shall be funded in one or more draws (each, a "Term Loan") pursuant to a mutually agreed upon Budget upon entry of the Final Order. | DIP Agreement, 1; § 2. |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B); | Up to (i) $5,000,000 upon entry of the Final Order, and (ii) the aggregate principal amount of up to (a) the DIP Roll-Up Loan, plus (b) the $1,500,000 Initial Term Loan, upon entry of the Interim Order. | DIP Agreement, §§ 2, 26. |

| SUMMARY OF MATERIAL TERMS OF DIP FACILITY | | |
|---|---|---|
| Local Rule 4001-2(a)(i)(A), (a)(iii) | | |
| **Budget** <br> Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(iii) | As of the Petition Date, the Borrower shall have delivered as set forth in the DIP Agreement to the DIP Lender, in form and substance acceptable to the DIP Lender, the budget (the "Budget").  The Budget may, with the prior written consent of the DIP Lender, be updated, modified or supplemented in accordance with Section 9(w) of the DIP Agreement.  As of the filing of this Motion, the Debtors believe the Budget will be adequate, considering all available assets, to pay administrative expenses during the period covered by the Budget. <br><br> The Debtors will use the proceeds from the DIP Loans to pay bankruptcy and operating expenses pursuant to the Budget. <br><br> The Budget is attached to the Interim Order as Exhibit B. | DIP Agreement, §§ 7(a)(ii), 9(t),9(w). |
| **Interest Rate** <br> Bankruptcy Rule 4001(c)(1)(B) | Interest on the outstanding principal balance of the Loans shall accrue daily, at a rate equal to 12% per annum (the "Non-Default Rate") from the date of funding of the Initial Term Loan until the Maturity Date.   Accrued interest shall be paid (i) on the Maturity Date (as described below) and (ii) on the date of any payment or prepayment made pursuant to, and in accordance with, Sections 4 and 5(a) of the DIP Agreement (each such date, a "Payment Date"). <br><br> Any amounts not paid or satisfied when due under the DIP Agreement shall bear interest, in addition to the Non-Default Rate, at a fixed rate equal to the lesser of (i) 3.00% per annum or (ii) the maximum rate permitted by applicable law (such rate, the "Default Rate") and shall be payable promptly upon demand in U.S. Dollars and in immediately available funds. | DIP Agreement, § 3. |

| | | |
|---|---|---|
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(B), (M) | As consideration for the extension of the DIP Facility, the Debtors will pay DIP Lender a facility fee equal to 4% of the "new money" portion of the DIP Facility Amount (for the avoidance of doubt, excluding the Roll-Up Loan) (the "Facility Fee"), which shall be fully earned and non-refundable on the Interim Order Entry Date and shall be paid in full directly to the DIP Lender from the proceeds of the Initial Term Loan.<br><br>The proceeds advanced under the DIP Facility may also be used to: (i) pay the reasonable and documented fees and expenses, indemnities and other amounts owed to the DIP Lender under the DIP Agreement and to the Prepetition Lender under the Prepetition Loan Agreement, whether or not set forth in the Budget, (ii) pay certain costs, premiums, fees and expenses related to the Chapter 11 Cases, in accordance with the Budget, or (iii) other disbursements of the type and amount set forth in the Budget. | DIP Agreement, §§ 2(d),9(t)(i)–(ii), 9(w); Proposed Interim Order at ¶ 8. |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(ii); Local Rule 4001-2(a)(i)(B), (M), (a)(ii) | The DIP Facility will have a maturity date of the earlier of (i) ninety (90) days following the Petition Date; (ii) the effective date of the Plan; (iii) the date of filing or support by any Debtor of a plan of reorganization other than the plan contemplated by the Plan; (iv) entry of an order by the Bankruptcy Court converting the Chapter 11 Cases to a proceeding or proceedings under chapter 7 of the Bankruptcy Code or appointing a chapter 11 trustee; (v) entry of a final order by the Bankruptcy Court dismissing the Chapter 11 Cases; or (vi) the date of termination of the DIP Facility and the acceleration of any outstanding extensions of credit under the DIP Facility (including the DIP Roll-Up Loan) in accordance with the terms of the DIP Agreement. | DIP Agreement, § 26. |

| | | |
|---|---|---|
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | First priority lien on the DIP Collateral senior to all liens and security interests, except for Prior Permitted Liens.  The Prepetition Lender has consented to the priming of the Prepetition Liens.   Prior Permitted Liens are not being primed by the DIP Facility. | DIP Agreement, § 6. |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(H), (M) | The DIP Documents contain affirmative covenants as are usual and customary with respect to the Borrower in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Borrower. | DIP Agreement, § 9. |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(S) | Such events of default indicated in the DIP Agreement in Section 10 are customary and/or appropriate for transactions of this type, as agreed by the DIP Lender and Borrower, and include Milestones (discussed below) and a cross-default arising from any breach or default under the Restructuring Agreement. | DIP Agreement, § 10. |
| **Milestones** Bankruptcy Rule 4001(c)(1)(B)(vi) | The Debtors shall achieve each of the following milestones (as may be extended with the consent of the DIP Lender, the "Milestones"): (i)      Each of the Debtors shall commence the Cases no later than April 26, 2026. (ii)     File with this Court no later than the Petition Date (a) an application to retain a claims agent; (b) a motion for the Interim Order and Final Order; (c) a motion to continue cash management; (d) a motion to establish notice and hearing procedures that must be followed for (i) certain transfers of equity in Impac and Subordinated Notes Claims, and of any beneficial interest therein, and (ii) certain claims of worthlessness for federal or state tax purposes with respect to equity in Impac (the "NOL Motion"); (e) such other first day papers as may be approved or requested by the Debtors or the Prepetition Lender ("First Day Motions"); (f) a combined Plan and Disclosure Statement; (g) a motion seeking entry of an order (the "Prepack Scheduling Order") scheduling a combined hearing on approval of the Plan and Disclosure Statement, setting an objection deadline with respect thereto, establishing related confirmation procedures and approving the disclosure statement on | DIP Agreement, § 9(u). |

an interim basis; and (h) a motion seeking the Court's approval of assumption of the Restructuring Agreement.

(iii)     The Court shall enter no later than two (2) Business Days following the Petition Date: (i) the Interim Order, the Prepack Scheduling Order; the interim order approving the NOL Motion; and interim or final orders, as applicable, approving the other First Day Motions.

(iv)     File with the Court a motion to retain professionals and an interim compensation motion no later than ten (10) days following the Petition Date.

(v)     The Court shall enter no later than thirty (30) days following the Petition Date: (a) the Final Order, (b) an order authorizing the Debtors to assume the Restructuring Agreement, and (c) the final order approving the NOL Motion.

(vi)     The Court shall enter an order approving the disclosure statement and the Plan no later than forty-five (45) days following the Petition Date.

(vii)     The effective date of the Plan shall occur no later than sixty (60) days following the Petition Date.

| | | |
|---|---|---|
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(F), (M) | Upon the occurrence of an Event of Default and after the delivery by the DIP Lender of a Carve-Out Trigger Notice, the DIP Liens shall be subject only to a carve-out (the "Carve-Out") comprising the following:<br><br>(i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) (the "U.S. Trustee Fees");<br><br>(ii) to the extent allowed at any time, solely to the extent provided for in the Budget, all unpaid fees (including, without limitation, transaction fees paid upon the closing of the respective transaction but excluding success fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to §§ 327, 328, or 363 (the "Professionals") and any Committee professionals (the "Committee Professionals" and, together with the Professionals, the "Professional Persons") employed by the Committee (if the Committee professional is appointed in these Chapter 11 Cases pursuant to §§ 328 or 1103) at any time on or prior to delivery by or on behalf of the DIP Lender of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and<br><br>(iii) the Professional Fees in an aggregate amount not to exceed $125,000 for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed (the "Post-Carve-Out Trigger Notice Cap"). | Proposed Interim Order, ¶ 9(a). |
| **Prepayments**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(I) | The Borrower shall not have the right to prepay the Loans without the prior written consent of the DIP Lender. | DIP Agreement, § 5(a). |

| | | |
|---|---|---|
| **Conditions to Closing of DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(E) | <u>Conditions to the Initial Term Loan</u>.  The obligation of the DIP Lender to fund the Initial Term Loan is subject to the satisfaction of the following conditions precedent:<br><br>(i)     DIP Lender shall have received, in form and substance satisfactory to DIP Lender, the following: (1) executed copies of the DIP Agreement and the other DIP Documents; and (2) such other customary documents and other matters as the DIP Lender may reasonably deem necessary or appropriate;<br><br>(ii)     the Loan Parties shall have delivered to DIP Lender the initial Budget, which Budget shall be in form and substance satisfactory to DIP Lender;<br><br>(iii)     the Interim Order Entry Date shall have occurred not later than two (2) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Lender and shall not be subject to a stay;<br><br>(iv)     the Petition Date shall have occurred and each Loan Party shall be a debtor and debtor-in-possession in the Chapter 11 Cases; and<br><br>(v)     the "first day orders" sought by the Debtors shall be satisfactory in form and substance to the DIP Lender and shall have been entered not later than two (2) Business Days following the Petition Date and shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Lender and shall not be subject to a stay.<br><br><u>Conditions to Each Term Loan</u>. The obligation of the DIP Lender to make each Term Loan, including the Initial Term Loan, is subject to the following conditions:<br><br>(i)     the DIP Lender shall have received a request for such Term Loan, upon at least five (5) | DIP Agreement, § 7. |

| | | |
|---|---|---|
| | Business Days' prior written notice, before 12:00 p.m., New York City time executed by the Borrower;<br><br>(ii)    on the date on which each Term Loan is made and after giving effect to the making of such Loan: (1) the Term Loan amount shall not exceed the DIP Facility Availability, (2) all payments then due and payable by all Loan Parties under the DIP Agreement shall have been paid, (3) the representations and warranties set forth in Section 8 of the DIP Agreement shall be true and correct with the same effect as though made on and as of such date, (4) the Borrower and each other Loan Party shall be in material compliance with all the terms and provisions contained in the DIP Agreement to be observed or performed, (5) no Default or Event of Default shall have occurred and be continuing; and (6) the Debtors shall be in compliance with, and no default shall have occurred and be in existence as of the date of such Term Loan under, the Restructuring Agreement;<br><br>(iii)    the Chapter 11 Case of any of the Debtors shall have not been dismissed or converted to a case under chapter 7 of the Bankruptcy Code;<br><br>(iv)    no trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in § 1106(a)(3) and (4) shall have been appointed in any of the Chapter 11 Cases;<br><br>(v)    in the case of Term Loans other than the Initial Term Loan, the Debtor is in compliance with the Budget as provided for herein and the requested amount of such Loan is provided for in the Budget; and<br><br>(vi)    for each Loan requested after the Final Order has been entered by the Bankruptcy Court, the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the DIP Lender and shall not be subject to a stay. | |

| | | |
|---|---|---|
| **DIP Facility Super-Priority Claims** Bankruptcy Rule 4001(c)(1)(B)(i) | All DIP Obligations of the Borrower under the DIP Facility shall be secured by the DIP Liens granted in the DIP Documents (as defined in the DIP Agreement), and approved by the Court in the Interim Order and the Final Order.<br><br>The DIP Obligations shall, pursuant to § 364(c)(1), be entitled to superpriority administrative expense claim status in the Chapter 11 Cases (the "Superpriority Claim"), which Superpriority Claim in respect of the DIP Facility shall have priority over any and all claims against the Borrower.  No Loan Party shall incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the DIP Lender against any Loan Party, except for the Carve-Out, and as otherwise expressly stated in the Orders.<br><br>The Obligations are entitled to be allowed superpriority administrative expense claims in the Chapter 11 Cases pursuant to § 364(c)(1), having priority over any and all administrative expense claims of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114, in each case subject to and limited by the terms of the Orders.<br><br>The DIP Liens shall prime any and all other liens and security interests on the Collateral except for the Carve-Out and Prior Permitted Liens.  The Prepetition Liens are being primed with the consent of the Prepetition Lender. | DIP Agreement, §§ 6(d), 9(y); Proposed Interim Order,¶12(b). |
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(i) | The DIP Lender, Prepetition Bridge Note Lender, the Prepetition Lender and Enterprise (solely with respect to the EB&T Pledged Accounts, which the Debtors do not seek to use the cash collateral thereof). | |

| | | |
|---|---|---|
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) | The Prepetition Secured Parties shall receive (effective and perfected by operation of law immediately upon entry of the Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens, (ii) prior payment of the Carve-Out and (iii) any liens senior by operation of law or otherwise permitted under the Prepetition Loan Documents (solely to the extent that any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, or valid, non-avoidable senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by § 546(b)). | Proposed Interim Order, ¶ 12(a). |
| **Determination Regarding Prepetition Claims** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Prepetition Liens of the Prepetition Secured Parties shall constitute valid, binding, enforceable (other than with respect to the stay of an enforcement arising from § 362) and perfected liens with priority over any and all other liens in the Prepetition Collateral (except as otherwise provided in the Prepetition Loan Documents) and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, crossclaim, or claim (as defined in § 101(5)) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

The Debtors have waived, discharged, and released any right they may have to challenge the Prepetition Obligations and the Prepetition Liens on the Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or causes of action against the Prepetition Secured Parties with respect to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, or the Prepetition Collateral. | Proposed Interim Order,¶¶ D(iii)–(iv), 21. |

-23-

| | | |
|---|---|---|
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(U) | Subject to entry of the Final Order, the DIP Lender has a lien on Collateral which includes net cash proceeds actually recovered from Avoidance Actions, subject to the Carve-Out. | DIP Agreement, § 26, at Annex B. |

| | | |
|---|---|---|
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii), (vii), (viii) | Unless and until a party in interest with proper standing, as authorized by order of this Court to the extent required, has commenced an adversary proceeding or initiated a contested matter in accordance with the Bankruptcy Rules on or before the earlier of (i) seventy-five (75) calendar days after entry of this Interim Order or (ii) confirmation of a chapter 11 plan (as such period may be extended by written agreement of the Debtors and the Prepetition Secured Parties or by further order of this Court upon notice and a hearing), the Debtors' Stipulations and waivers shall become binding on third parties. | Proposed Interim Order,¶ 21. |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv); Local Rule 4001-2(a)(i)(S) | The DIP Agreement provides that upon the occurrence and during the continuation of an Event of Default, the Lender shall have the rights and remedies set forth therein and in the other Loan Documents; provided, however, that with respect to the enforcement of Liens or the exercise of remedies against the Collateral of the Loan Parties, the Lender shall provide the Borrower, the committee of unsecured creditors (if any) and the Office of the United States Trustee with not less than five (5) Business Days' prior written notice of the action contemplated thereby.<br><br>However, upon the occurrence and during the continuation of any Event of Default, at the option of the Lender and without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, the Lender may: (i) terminate the DIP Facility with respect to further Loans; (ii) reduce the Facility Amount from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan, to be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Loan Parties; or (iv) subject to Paragraph 11 of the DIP Agreement, exercise any other rights and remedies available to the Lender under the Loan Documents or at law or in equity, including remedies under the Bankruptcy Code. | DIP Agreement, § 11. |

| | | |
|---|---|---|
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Pursuant to the Orders, the DIP Lender will be indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such party's actual fraud, gross negligence, bad faith, or willful misconduct. | DIP Agreement, § 13. |
| **Section 506(c) Waiver and Section 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to the Final Order, the Debtors have provided the Prepetition Lender section 506(c) and 552(b) waivers as Adequate Protection. | Proposed Interim Order, ¶¶ G, 12(c), 23. |
| **Any Provision That Limits the Court's Power to Enter Future Orders**<br><br>Local Rule 4001-2(a)(i)(C) | N/A | |
| **Any Provision that Provides for the Funding of Non-Debtor Affiliates**<br><br>Local Rule 4001-2(a)(i)(D) | N/A | |

| | | |
|---|---|---|
| **Any Provision that Provides for Postpetition Liens on Unencumbered Assets**<br><br>Local Rule 4001-2(a)(i)(G) | Pursuant to § 364(c)(2), the DIP Lender is granted perfected first priority, senior liens on and security interests in all DIP Collateral that, as of the Petition Date, was not subject to any valid, perfected, and unavoidable lien, or was subject only to invalid, unperfected, or avoidable liens. | Proposed Interim Order, ¶3(d). |
| **In Jointly Administered Cases, any Provision Governing Joint Liability of the Debtors**<br><br>Local Rule 4001-2(a)(i)(J) | All Guarantors are jointly and severally liable with the Borrower for the DIP Obligations. | DIP Agreement, § 12(a). |
| **Any Provision that Requires the Debtor to Pay an Agent or Lender's Expenses and Attorneys' Fees with no Notice or Review by the UST and Committee**<br><br>Local Rule 4001-2(a)(i)(K) | N/A | Proposed Interim Order, § 8. |

| | | |
|---|---|---|
| **Any Provision that Prohibits the Use of Estate Funds to Investigate Liens and Claims of Prepetition Lenders**<br><br>Local Rule 4001-2(a)(i)(L) | The proposed Interim Order prohibits the use of DIP proceeds, DIP Collateral, Prepetition Collateral, Cash Collateral, and the Carve-Out to fund challenges or litigation against the DIP Lender or the Prepetition Secured Parties; however, it preserves a Committee's ability to investigate the liens of and claims against the Prepetition Secured Parties during the Challenge Period up to $25,000 in the aggregate. | Proposed Interim Order, ¶ 22, |
| **Any Provisions granting Cross-Collateralization**<br><br>Local Rule 4001-2(a)(i)(N) | N/A | |
| **Any Provisions Deeming Prepetition Debt to be Postpetition Debt**<br><br>Local Rule 4001-2(a)(i)(O) | Upon entry of the Interim Order, the Prepetition Bridge Note Obligations will be automatically rolled up on a cashless basis into the DIP Roll-Up Loan under the DIP Agreement, without the need for any further action or approval. The rolled-up amount will be governed by the terms of the DIP Agreement, and upon incurrence of the DIP Roll-Up loan, the Prepetition Bridge Note Obligations will be deemed irrevocably satisfied in full. | Proposed Interim Order, ¶ K; DIP Agreement, § 2(b). |
| **Any Provisions Priming Secured Liens Without Consent of Lienholder**<br><br>Local Rule 4001-2(a)(i)(P) | N/A | |

| | | |
|---|---|---|
| **Any Provisions Binding the Estate to Validity, Perfection or Amount of Secured Debt**<br><br>Local Rule 4001-2(a)(i)(Q) | The proposed Interim Order includes binding stipulations by the Debtors confirming the validity, enforceability, and priority of the Prepetition Obligations and Prepetition Liens, and acknowledges that such obligations are fully secured by perfected liens on substantially all of the Debtors' assets. Subject only to the limited Challenge Period rights reserved to any Committee, the Debtors waive and release any claims or defenses against the Prepetition Secured Parties. | Proposed Interim Order, ¶ D. |
| **Provisions that Immediately Approve All Terms and Conditions of the Underlying Loan Agreement**<br><br>Local Rule 4001-2(a)(i)(R) | N/A | |
| **Provisions Limiting What Parties-in-Interest May Raise at Emergency Hearings**<br><br>Local Rule 4001-2(a)(i)(T) | N/A | |
| **Provisions that Immediately Shield the Lender from the Equitable Doctrine of Marshalling**<br><br>Local Rule 4001-2(a)(i)(X) | N/A | |

**D.    The Debtors' Need for Postpetition Financing**

26.    A critical need exists for the Debtors to obtain access to the DIP Facility in order to permit, among other things, the continued operation of the Debtors' business, to administer and preserve the value of the Debtors' estates, to satisfy administrative expenses, including fees and expenses of retained professionals as well as those of the DIP Lender, and to satisfy other ordinary course working capital and operational needs.

27.    The DIP Facility will provide the Debtors with up to $3,000,000 in new money borrowing capacity, (up to $1,500,000 of which the Debtors propose to be made available on an interim basis) to ensure the Debtors will have sufficient liquidity to satisfy administrative obligations.  In the absence of the availability of the DIP Facility, the continued operation of the Debtors' business and the administration of these Chapter 11 Cases through the effective date of a plan of reorganization or liquidation would not be possible.  The access of the Debtors to sufficient capital and liquidity through the DIP Facility is necessary and vital to maximize recovery opportunities for all stakeholders, and to consummate the value-maximizing transaction contemplated by the Restructuring Agreement.

**E.    The Debtors' Efforts to Obtain Postpetition Financing**

28.    The Debtors and their professionals have worked collaboratively to secure debtor-in-possession financing.  In the weeks leading up to the Petition Date, DSI contacted certain capital providers on a no-names basis to assess their willingness to provide debtor-in-possession financing on more favorable terms. No party was willing to enter into a confidentiality agreement, much less offer financing sufficient to support a restructuring of the Debtors' operations and businesses on terms more favorable than the DIP Facility.  *See* DIP Declaration at ¶ 28.  Furthermore, based on the facts and circumstances of these Chapter 11

Cases, and the events leading thereto, it is highly unlikely that there exists any financing reasonably attainable by the Debtors on more favorable terms than provided through the DIP Facility, particularly where, as here, the Prepetition Lender must consent to priming or otherwise be primed over its objection. *See* DIP Declaration at ¶ 28.

29.     As set forth herein and in the declarations in support of the Motion, the Debtors' continued operations and the administration of these Chapter 11 Cases would not be possible in the absence of the availability of the DIP Facility. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors is dependent on capital from the DIP Facility.

## BASIS FOR RELIEF

### A.     Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment

30.     Section 364 authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant debtors considerable deference in acting in accordance with their business judgment in obtaining postpetition credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See*, *e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Barbara K. Enters., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, among other things, an exercise of "sound and reasonable business judgment"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994)

(approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

31.     Bankruptcy courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *In re Curlew Valley Assoc.'s*, 14 B.R. 506, 513–14 (Bankr. D. Utah. Oct 8, 1981).  To determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under the circumstances." *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

32.     In determining whether the Debtors have exercised sound business judgment in entering into the DIP Facility, the Court should consider the economic terms of the financing under the totality of circumstances.  *See* Hr'g Tr. at 734–35:24, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing that "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as they once were previously); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).  Moreover, the Court may appropriately take into consideration noneconomic

benefits to the Debtors offered under the proposed postpetition facility. *See In re ION Media Networks, Inc.*, No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (holding that "a business decision to obtain credit from a particular lender is almost never based purely on economic terms. . . . [r]elevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.").

33.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound business judgment.  As further discussed in the First Day Declaration and the DIP Declaration, the DIP Facility was a product of good faith arm's length negotiation among the Debtors and the DIP Lender, which was the best (and only) available source of postpetition financing under present circumstances and the Debtors have satisfied the legal requirements to incur the obligations under the DIP Facility on the terms and conditions set forth in the DIP Documents. The DIP Facility provides the only viable path forward to consummation of the value-maximizing transaction as contemplated by the Restructuring Agreement.

34.     The Debtors submit that the DIP Documents contain terms that are fair, reasonable, and in the best interests of the Debtors and their estates.  Accordingly, the Debtors respectfully submit that they should be authorized to enter into the DIP Facility and to obtain access to the DIP Facility.

**B.     The Debtors Should Be Authorized to Grant Liens and Superiority Claims**

35.     The Debtors propose to obtain postpetition financing under the DIP Facility by providing security interests and liens as set forth in the DIP Documents and described above. The Debtors satisfy the requirements for relief under § 364, which authorizes a debtor to incur secured or superpriority debt under certain circumstances.  Specifically, § 364(c) provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

36.     To satisfy the requirements of § 364(c), a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (finding that secured credit under § 364(c) is authorized, after notice and hearing, upon a showing that unsecured credit cannot be obtained). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986); *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (finding that superpriority administrative expenses should be authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (finding that credit was unavailable absent a senior priming lien because the debtor had made unsuccessful contact with other financial institutions in the relevant geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (finding that the fact that two national banks refused to grant

unsecured loans was sufficient to support the conclusion that the requirements of section 364 were met); *In re Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and finding that debtor made reasonable efforts to satisfy the requirements of section 364(c) by approaching four lending institutions, two of which refused to provide financing, and selecting the most favorable of the two offers it received).

37.     Courts have articulated a three-part test to determine whether a debtor is entitled to enter into financing under § 364(c).  Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under § 364(b) (*i.e.*, by allowing an administrative claim);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re L.A. Dodgers LLC*, 457 B.R. at 313; *In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991); *In re Ames Dep't Stores*, 115 B.R. at 37–40; *In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

38.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under § 503(b)(1), § 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in §§ 503(b) or 507(b); (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).

39.     As set forth in the First Day Declaration and the DIP Declaration, the Debtors believe, having consulted with their advisors, that the DIP Facility represents the best option available to address their immediate liquidity needs.  The Debtors only received one actionable proposal—from the Prepetition Lender.  As a result, the Debtors submit that they could not have

obtained financing on more favorable terms from sources other than the DIP Lender and are similarly unable to obtain adequate unsecured credit allowable under § 503(b)(1) as an administrative expense.

40.     Further, § 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Here, the Prepetition Lender has consented to the priming of its Prepetition Liens conditioned upon the adequate protection in the proposed Interim Order, including the Adequate Protection Liens and the Adequate Protection Superpriority Claims described in the summary chart above.

41.     Further, as set forth above, the Debtors are not aware of any available financing on equal or better terms than provided by the DIP Lender.  Therefore, the Debtors submit that the requirement under § 364 that alternative financing on more favorable terms be unavailable has been satisfied.

**C.     The Proposed "Roll Up" of the Prepetition Bridge Note Obligations is Appropriate and Should Be Approved**

42.     Section 363(b) permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986). The business judgment rule shields such business decisions from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of

a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

43.     The repayment of prepetition funded indebtedness with postpetition financing (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  Courts in this jurisdiction and other jurisdictions have approved similar DIP financing features, including on an interim basis on the first day of the case.  *See, e.g.*, *In re Rite Aid Corp., et al.*, No. 23-18993 (MBK) (Bankr. D.N.J. Jun. 19, 2024) (authorizing approximately $3.25 billion in DIP financing that included a roll-up of a $2.85 billion prepetition ABL facility and a $400 million FILO facility); *In re Cyxtera Techs., Inc*., No. 23-14853 (JKS) (Bankr. D.N.J. June 6, 2023) (authorizing an approximately $200 million DIP financing that included a roll-up of up to $36 million in prepetition first lien term loans debt pursuant to interim order); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 23, 2019) (authorizing an approximately $240 million DIP financing that included a roll-up of $70 million in prepetition term loans debt and up to $82 million of prepetition ABL debt pursuant to interim order).

44.     Here, the DIP Facility includes negotiated roll-up features: (a) upon entry of the Interim Order, the Prepetition Bridge Note Obligations shall be automatically deemed (on a cashless basis) to constitute a DIP Roll-Up Loan under the DIP Agreement, which such DIP Roll-Up Loan shall be due and payable in accordance with the terms and conditions set forth in the DIP Agreement; and (b) upon the incurrence of the foregoing DIP Roll-Up Loan, the outstanding Prepetition Bridge Note Obligations shall be automatically and irrevocably deemed satisfied in full and the amount of the DIP Roll-Up Loan advanced under the DIP Agreement.

45.     The DIP Roll-Up Loan is a required and integral component of the DIP Facility and does not reflect the refinancing of ordinary prepetition indebtedness.  The Bridge Note was incurred immediately prior to the Petition Date solely to provide the Debtors with the minimum liquidity necessary to fund operations and effectuate the commencement of these Chapter 11 Cases.  But for the Debtors' constrained liquidity position at the time of filing, the amounts advanced under the Bridge Note would have been funded post-petition as part of the DIP Facility itself.

46.     Accordingly, the Bridge Note represents a temporary, pre-filing advance that functioned as a bridge into chapter 11 and is properly viewed as a subset of—and economically indistinguishable from—the DIP financing, rather than legacy prepetition debt.  The DIP Roll-Up Loan therefore does not elevate or refinance historical obligations, but instead harmonizes the timing of a single, integrated financing transaction that was necessitated to be partially funded pre-petition solely due to the Debtors' liquidity position.

47.     As set forth above and in the DIP Declaration, additional funding was intended to come from the DIP Facility without the need for a new interim loan facility.  *See* DIP Declaration at ¶32.  However, in the months leading up to the Petition Date, the Debtors faced an impending liquidity shortfall that required prompt funding in order to avoid a destabilizing default under the Prepetition Loan. *Id*.  To address that exigency, Hildene (through its affiliate Trinity Park) agreed to provide expedited financing in a modest amount on an interim basis to sufficiently stabilize the Debtors' operations and preserve value without overleveraging the Debtors' capital structure. *Id*.  As a result, the Debtors were able to enter these Cases in an orderly manner, and the roll-up component of the DIP Facility, as set forth above, reflects a structure that courts routinely approve where prepetition lenders provide incremental liquidity

necessary to stabilize operations and preserve value. The DIP Roll-Up Loan reflects a reasonable ration of approximately 2:3 (approximately 2:1.5 when considering the DIP Roll-Up Loan as a ratio of the Interim DIP Facility only) between the amount of Prepetition Bridge Note Obligations being rolled up and the amount of new money being provided under the DIP Facility, a structure that is fair and reasonable where, as here, the DIP Lender is providing substantial incremental liquidity that meaningfully exceeds the amount being rolled up. *See* DIP Declaration at ¶ 32.

48.     The DIP Roll-Up Loan is therefore reasonable and should be approved.

**D.     The Carve-Out is Appropriate**

49.     The liens and superiority claims granted to the DIP Lender and the Prepetition Lender pursuant to the Proposed Orders, are subject and subordinate to the Carve-Out (and the Permitted Prior Liens). The Carve-Out contains similar terms to others that the Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated is restricted. *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of this Chapter 11 Case by ensuring that assets remain for the payment of fees to the U.S. Trustee and professional fees. Accordingly, the Carve-Out is appropriate and should be approved.

**E.      The Rates and Fees of the DIP Facility Are Reasonable**

50.      The Debtors have agreed, subject to Court approval, to pay certain fees and other payments to the DIP Lender.  The Debtors considered the fees when determining in their sound business judgment whether entry into the DIP Facility constituted the best path forward, and the Debtors determined that paying such fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates.

51.      Under the circumstances, the interest rates and fees reflected in the DIP Documents are reasonable and substantially in line with other debtor-in-possession financings generally, including debtor-in-possession financings recently approved by the Court in other comparable chapter 11 cases.  Accordingly, the Court should authorize the Debtors to pay the fees under the DIP Facility.

**F.      The Milestones, Conditions Precedent and Events of Default Imposed by the DIP Facility are Reasonable**

52.      As set forth in the chart above, the DIP Agreement also contemplates, as a condition to providing the DIP Facility, certain (i) conditions precedent; (ii) milestones (the "Milestones") in connection with these Chapter 11 Cases; and (iii) events of default, all of which are customary for postpetition financing in chapter 11.

53.      The DIP Facility is a critical component of the Debtors' chapter 11 efforts because it provides the Debtors with the stability and certainty needed to fund its case and pursue the transaction contemplated by the Restructuring Agreement.  The continued operation of the Debtors' business during this case would not be possible absent access to the DIP Facility. The DIP Facility will prevent interruptions to the Debtors' operations, preserve the Debtors' ability to maintain ordinary course relationships with key vendors and counterparties, and satisfy working capital needs in the ordinary course during the Chapter 11 Cases.

54.     Moreover, the Milestones, conditions precedent, and events of default are reasonable and appropriately tailored to protect the DIP Lender, maintain the status quo of the business and ensure transparency, accountability, and progress in the chapter 11 process, without unduly constraining the Debtors' ability to operate their business or administer these cases.  The provisions of the DIP Agreement are not designed to create technical defaults or render the Debtors disproportionately susceptible to a breach.  The Milestones, in particular, reflect a realistic and achievable timeline developed in constructive cooperation with the DIP Lender and are intended to facilitate, rather than impede, a successful restructuring pursuant to the Restructuring Agreement.

55.     Accordingly, the Milestones and the related conditions precedent and events of default are fair, reasonable, and should be approved.

**G.     The DIP Lender Should Be Deemed a Good Faith Lender under Section 364(e)**

56.     Section 364(e) protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

57.     Here, the DIP Documents are the result of: (i) the Debtors' reasonable business judgment that the DIP Lender providing the best (and only) reasonable postpetition financing

alternative available under the circumstances; and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lender.  *See* DIP Declaration at ¶ 33.  Under the circumstances, the terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the Orders and the DIP Documents, and in accordance with the Budget (subject to the permitted variances).  Further, no consideration is being provided to any party other than as described herein, in the DIP Documents, the First Day Declaration, and the DIP Declaration.

58.     Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of § 364(e) and that the DIP Lender thus is entitled to all of the protections afforded therein.

**H.      Modification of the Automatic Stay is Warranted**

59.     The relief requested herein contemplates a modification of the automatic stay to permit, among other things: (i) the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) upon the occurrence of an Event of Default (as defined in the DIP Documents), subject to the notice periods set forth in the DIP Agreement, the DIP Lender to exercise any available remedies under the DIP Documents and applicable law; and (iii) the Debtors to implement the terms of the Orders, including payment of all amounts provided under the DIP Documents.

60.     Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' business judgment, are appropriate under the present

circumstances. Accordingly, the Debtors request that the Court modify the automatic stay solely to the extent contemplated by the DIP Documents and the Orders.

**I.      The Debtor Should be Authorized to Use Cash Collateral**

61.      Section 363(c)(2) provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

62.      The Debtors have an urgent need for the immediate use of Cash Collateral and seek to use all Cash Collateral existing on or after the Petition Date (except for the EB&T Pledged Accounts, which the Debtors do not seek to use the cash collateral thereof) pursuant to the terms of the DIP Documents. The Debtors need the Cash Collateral to pay operating, including essential vendors, to ensure continued services essential to the Debtors' business, as well as fund these Chapter 11 Cases so the Debtors can pursue the value-maximizing transaction as contemplated by the Restructuring Agreement.

63.      The Debtors believe that the terms and conditions of their use of Cash Collateral (including the provision of adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. Furthermore, the Prepetition Lender has consented to the Debtors' use of the Cash Collateral subject to the terms and conditions of the DIP Documents and the proposed Interim Order. Therefore, the Debtors submit that they should be authorized to use the Cash Collateral on the terms set forth in the DIP Documents.

**J.      Interim Approval Should Be Granted**

64.      Bankruptcy Rule 4001(c)(2) provides that, with respect to motions for authority to obtain credit:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).

65.      Similarly, to the extent the Debtors are seeking authority to use, sell, or otherwise incur an obligation regarding property of their estates, Bankruptcy Rule 6003(b) provides that the Court may only grant immediate relief to the extent it is necessary to avoid immediate and irreparable harm.

66.      Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens a debtor's ability to reorganize. *See In re Ames*, 115 B.R. at 36, n.2. Granting the relief requested on an interim basis is left to the Court's discretion as informed by the facts of the case. In examining requests for interim relief, courts apply the same business judgment standard applicable to other business decisions, and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974; *In re Ames*, 115 B.R. at 40. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. *In re Ames*, 115 B.R. at 36.

67.      The Debtors seek expedited approval of the relief requested for the Interim DIP Facility, in light of the immediate and irreparable harm that the Debtors' estates will incur unless

the Debtors obtain the financing necessary to sustain their business.  Absent sufficient funds, the Debtors' business and assets will quickly erode to the detriment of the Debtors' estates and stakeholders.  For the reasons set forth herein, the Debtors submit that immediate access to the DIP Facility is necessary to preserve the value of the Debtors' estates for the benefit of all parties-in-interest.

## REQUEST FOR FINAL HEARING

68.     Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2) the Debtors request that the Court set a date for consideration of entry of the Final Order (the "Final Hearing") that is as soon as practicable, in accordance with the Milestones, and fix the time and date prior to the Final Hearing for parties in interest to file objections to this Motion.

69.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## WAIVER OF BANKRUPTCY RULES 6004(a) AND (h)

70.     The Debtors respectfully request that the Court waive any stay of the effectiveness of the Orders.  Pursuant to Bankruptcy Rule 6004(h), "[u]nless the court orders otherwise, an order authorizing the use, sale, or lease of property (other than cash collateral) is stayed for 14 days after the order is entered."  The Debtors submit that granting this Motion such that it is effective immediately is essential to prevent irreparable damage to the Debtors and their estates.

71.     Accordingly, the Debtors respectfully submit that the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

72.     Finally, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) because the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' estates, is narrowly tailored to the exigencies of these Chapter 11 Cases, and any delay resulting from compliance with the notice requirements would materially prejudice the Debtors, their estates, and stakeholders by jeopardizing the Debtors' access to critical financing and their ability to continue operations in the ordinary course.

## NOTICE

Notice of this Motion shall be given to the following parties: (i) the U.S. Trustee; (ii) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); (iii) counsel to the DIP Lender and to the Prepetition Lender; (iv) all known holders of liens upon the Debtors' assets; (v) the attorneys general in the states in which the Debtors conduct their business; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission; and (viii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002, in each case by facsimile transmission, email, overnight courier and/or hand delivery.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Orders: (i) granting the relief requested herein; and (ii) granting the Debtors such other and further relief as the Court deems just and proper.

Dated: April 26, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

/s/ *Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal
Timothy Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Tel:    (302) 652-4100
Email: ljones@pszjlaw.com
          debertenthal@pszjlaw.com
          tcairns@pszjlaw.com

-and-

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* pending)
Van C. Durrer, II (DE Bar No. 3827)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Tel:    (213) 623-9300
Email: tania.moyron@dentons.com
          van.durrer@dentons.com

John D. Beck (*pro hac vice* pending)
Geoffrey M. Miller (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020
Tel:    (212) 768-6700
Email: john.beck@dentons.com
          geoffrey.miller@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*