**EXHIBIT B**

**DIP Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>IMPAC MORTGAGE HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-10593<br><br>(Joint Administration Requested) |

**DECLARATION OF ERIC J. HELD IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) AUTHORIZING USE OF CASH COLLATERAL; (VI)  SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

I, Eric J. Held, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.    I am a Senior Managing Director at Development Specialists, Inc. ("DSI"), financial advisor to Impac Mortgage Holdings, Inc. ("Impac") and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors") under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in these chapter 11 cases (the "Chapter 11 Cases").

2.    I am authorized to execute this declaration (the "Declaration").  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein or I have acquired such knowledge through officers of the Debtors or employees of DSI acting under my supervision

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Impac Mortgage Holdings, Inc. (5505); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Funding Corporation (4495); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Service Corp. (2263); Impac Mortgage Corp. (3937); Impac Warehouse Lending, Inc. (0541); Synergy Capital Mortgage Corp. (9071); and Impac Warehouse Lending Group, Inc. (3488). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

in the ordinary course of business. If called upon to testify, I would testify competently to all of the facts set forth herein.

3.      I submit this Declaration in support of the *Debtors' Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Authorizing the Use of Cash Collateral; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "Motion"), whereby the Debtors seek authority to enter into that certain senior credit facility (the "DIP Facility", the applicable agreement, the "DIP Credit Agreement", and the operative documents, the "DIP Credit Documents") provided by Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1, including any permitted assignees and successors ("Hildene" or in its capacity as such, the "DIP Lender").

4.      For the reasons set forth below, I believe the relief requested in the Motion is necessary to ensure the Debtors possess critical liquidity and working capital to fund their Chapter 11 Cases so they can achieve their objectives under the Restructuring Support Agreement filed contemporaneously herewith, including, but not limited to, restructuring the Debtors' balance sheet. As such, I believe that the relief requested in the Motion is in the best interests of the Debtors' stakeholders and estates.  Absent such relief, I believe the Debtors will suffer serious and irreparable harm to their business and operations, thereby eroding their ability to achieve their objectives in these Chapter 11 Cases.

**QUALIFICATIONS**

5.      I am a Senior Managing Director in the Los Angeles office of DSI and bring more than two decades of experience in investment banking, private equity and management consulting, with a focus on crisis management, financial advisory and restructuring services in complex insolvency matters. Over the course of my career, I have been involved in significant restructuring engagements, bankruptcy proceedings and general assignments for the benefit of creditors, and have served as a financial advisor and expert witness to fiduciaries, investment firms, creditors and other stakeholders across a wide range of industries.

6.      Prior to joining DSI, I advised on numerous capital raising, corporate advisory and turnaround engagements. I also served as an Associate at GESD Capital Partners, a private equity firm, where I pursued new acquisition opportunities and assisted in the successful turnaround of portfolio companies, and as an Associate in the investment banking division of Citigroup Global Markets, where I participated in more than $10 billion of mergers and acquisitions transactions and capital markets offerings.

7.      I am a Certified Insolvency and Restructuring Advisor and a Certified Fraud Examiner. I hold a Master of Business Administration from the University of Chicago Booth School of Business and a Bachelor of Science from California Polytechnic State University, San Luis Obispo. My extensive transactional, advisory and restructuring experience underscores my qualifications to provide authoritative financial and restructuring advisory services in the context of debtor-in-possession and related fiduciary proceedings.

**DSI'S RETENTION**

8.      DSI was retained by the Debtors prepetition to assist in evaluating the Debtors' liquidity constraints and preparing the Debtors for their potential entry into chapter 11. DSI's

engagement included evaluating the Debtors' Restructuring Support Agreement, business plan, budgets and financial projections, and advising on measures necessary to preserve value for stakeholders during the contemplated restructuring process, including executing the transformative transactions contemplated in the Restructuring Support Agreement, including the Debtors' proposed exit financing.

9. DSI played a central role in the Debtors' preparation for these chapter 11 cases, including assisting with the proposed debtor-in-possession financing, budget and cash-management strategy, and first-day pleadings. DSI also advised on formulation of the plan and operational continuity during the transition to chapter 11 governance. The Debtors' retention of DSI prepetition ensured continuity of restructuring oversight and institutional knowledge at the outset of these cases and positioned the Debtors to pursue an orderly restructuring process immediately upon filing, as contemplated by the Restructuring Support Agreement.

## BACKGROUND

10. On the date hereof, (the "Petition Date"), the Debtors each commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code.

11. Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of George A. Mangiaracina In Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed concurrently herewith.

### A. The Debtors' Prepetition Indebtedness

12. The Debtors have three tranches of secured debt that are described below, namely the Prepetition Bridge Note Obligations, the Prepetition Loan Obligations, and the Life

Insurance/Surety Bond Obligations.  In addition, the Debtors have unsecured Junior Subordinated Debt Obligations.

***Prepetition Bridge Note Obligations***

13.     Pursuant to that certain Secured Promissory Note, dated January 26, 2026 (as amended, restated, supplemented or otherwise modified from time to time, the "Bridge Note"), executed by certain Debtors, as the borrower, in favor of Hildene as successor-by-assignment to Trinity Park Investments, LLC ("Trinity Park"), certain loans and other financial accommodations were extended to the Debtors.  Pursuant to that certain Assignment and Assumption Agreement, dated as of April 20, 2026, Trinity Park assigned the Prepetition Bridge Note to Hildene (in such capacity, the "Bridge Note Lender," and together with the Prepetition Lender, the "Prepetition Secured Parties").

14.     The Bridge Note was issued with permitted principal borrowings of up to $2,000,000 and is payable on demand prior to maturity.  The first draw occurred on January 26, 2026, and as of the Petition Date, the outstanding balance under the Bridge Note was $2,000,000 plus accrued and unpaid interest (the "Prepetition Bridge Note Obligations").

15.     The Prepetition Bridge Note Obligations accrue interest at a rate of 12% per annum and all principal and interest are due on January 26, 2027.

16.     I am informed by the Debtors that the Prepetition Bridge Note Obligations are secured by valid and properly perfected liens on substantially all assets of each Debtor party to the Bridge Note, including: (i) all Accounts; (ii) all Chattel Paper; (iii) all Commercial Tort Claims; (iv) all Deposit Accounts; (v) all Documents; (vi) all Equipment; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter-of-Credit Rights; (xii) all other Goods; (xiii) all Intellectual Property Collateral; and (xiv) all money, income,

royalties, payments, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing of any and all of the foregoing (collectively, the "Bridge Note Collateral"). I am informed by the Debtors that the Prepetition Bridge Note Obligations are secured by senior liens ranking *pari passu* with the senior liens securing the Prepetition Loan Obligations.

### *Prepetition Loan Obligations*

17.    In 2024, in connection with the Debtors' efforts to secure medium term financing to enhance opportunities for growth of its residential mortgage brokerage business, Impac successfully obtained access to a $20,000,000 facility made available by Hildene (in such capacity, the "Prepetition Lender"), pursuant to that certain Loan Agreement, dated as of May 6, 2024 (the "Prepetition Loan") among Impac as borrower and, excluding any borrower controlled entity that is a special purpose entity formed in connection with a mortgage loan securitization, all of Impac's direct and indirect subsidiaries as guarantors (the "Prepetition Loan Guarantors"). The Prepetition Loan is a revolving line that bears interest monthly at SOFR plus 7.5% and is compounded quarterly, unless Impac affirmatively elects to timely pay interest in cash. I am informed by the Debtors that, subject only to *pari passu* status with the liens securing the Bridge Note, the Prepetition Loan is secured by valid and properly perfected liens on substantially all of the assets of Impac and the Prepetition Loan Guarantors, including: (i) all Accounts; (ii) all Chattel Paper; (iii) all Commercial Tort Claims; (iv) all Deposit Accounts; (v) all Documents; (vi) all Equipment; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter-of-Credit Rights; (xii) all other Goods; (xiii) all Intellectual Property Collateral; and (xiv) all money, income, royalties, payments, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing (collectively, the

"Prepetition Loan Collateral," and together with the Bridge Note Collateral, the "Prepetition Collateral"). A Security Agreement, dated May 6, 2024, is supported by subsidiary share pledges from Impac and the Prepetition Loan Guarantors, a Trademark Security Agreement, and UCC-1 filings in all relevant jurisdictions.

18.     As of the Petition Date, the outstanding balance under the Prepetition Loan is not less than $23,950,000, inclusive of all accrued and unpaid interest, fees, costs, and expenses.

### Life Insurance/Surety Bond Obligations

19.     The third tranche of secured debt relates to obligations owed to Enterprise Bank & Trust ("Enterprise").

20.     Impac is the obligor solely as trustee on three amended and restated promissory notes in favor of Enterprise, each dated as of April 30, 2023 and maturing on April 30, 2026 (the "Enterprise Loans"). The outstanding amount on the Enterprise Loans is approximately $16,400,000. To finance the acquisition and premium obligations of three life insurance policies issued by Allianz Life Insurance Company of North America (the "Life Insurance Policies"), the underlying trusts which hold the Life Insurance Policies obtained the Enterprise Loans. Accrued interest on the Enterprise Loans is also rolled into the principal balance on a quarterly basis. In addition, Impac executed a Continuing Limited Guaranty Agreement dated January 31, 2012 in favor of Enterprise guaranteeing the underlying trusts' obligations under the Enterprise Loans. The Enterprise Loans are secured by, among other things: (a) a collateral assignment of the Life Insurance Policies and (b) cash collateral contained in restricted cash accounts (the "EB&T Pledged Accounts"). The EB&T Pledged Accounts also secure obligations arising from an irrevocable standby letter of credit supporting surety bonds issued by Liberty Mutual Insurance Company.

21.     The three insured parties under the Life Insurance Policies are former executives of Impac, and the original beneficiaries of such policies were family members of the former executives or family trusts established by the former executives. Impac serves as both trustee and sole beneficiary of each of the three trusts that own the Life Insurance Policies. The Life Insurance Policies have accrued substantial cash surrender value estimated at approximately $15,000,000. Under the terms of the Enterprise Loans, Enterprise may periodically require the Debtors to increase the amount of security on deposit in the EB&T Pledged Accounts based on the difference between the outstanding loan balance and the cash surrender value of the Life Insurance Policies.

22.     The current cash amount in the EB&T Pledged Accounts is approximately $2,740,000, plus additional accrued interest. Including such cash collateral and the cash surrender value of the Life Insurance Policies, Enterprise is oversecured by approximately $1,400,000.

*Junior Subordinated Notes*

23.     In 2005, the Debtors issued four series of trust preferred securities.  In response to the 2007 housing market crash and resulting 2008 global financial crisis, in 2008 and 2009, the Debtors retired or exchanged all four series of trust preferred securities for cash and/or new securities by exchanging $51.3 million of trust preferred securities for $62 million interest-only Junior Subordinated Indentures with Bank of New York, dated May 8, 2009 (the "Junior Subordinated Notes"), due March 30, 2034, with lower interest rates. During 2017, the Debtors exchanged $8.4 million of the remaining outstanding trust preferred securities for 412,264 shares of the Company's common stock with a then existing fair market value of approximately $5.6 million.

24.     In January 2024, the Debtors defaulted under the Junior Subordinated Notes by failing to make the required interest payment.  The Debtors requested, and subsequently entered

into a Forbearance Agreement, dated January 31, 2024 (the "Junior Subordinated Notes Forbearance Agreement"), with HCMC III, LLC, a Delaware limited liability company, in its capacity as collateral manager for the holders of the notes issued under the Junor Subordinated Indentures (the "Junior Subordinated Notes Collateral Manager"). The Junior Subordinated Notes Forbearance Agreement stayed the Junior Subordinated Notes Collateral Manager's rights to enforce the default provisions under the Junor Subordinated Note agreements. The Junior Subordinated Notes Forbearance Agreement had an initial termination date of February 29, 2024, however it has been amended multiple times and as of the Petition Date, the current termination date is June 1, 2026.

25.    The Junior Subordinated Notes had a stated outstanding principal balance of $62 million as of December 31, 2025, plus accrued interest, and mature on March 30, 2034. As of the Petition Date, the Subordinated Notes remain outstanding and accrue interest at annual rate of SOFR + 375bps.

**B. The Debtors' Need for Postpetition Financing**

26.    A critical need exists for the Debtors to obtain access to the DIP Facility in order to permit, among other things, the continued operation of the Debtors' business, to administer and preserve the value of the Debtors' estates, to satisfy administrative expenses, including fees and expenses of retained professionals as well as those of the DIP Lender, and to satisfy other ordinary course working capital and operational needs. The DIP Facility is also a requirement under the Restructuring Support Agreement and therefore necessary for the Debtors' successful balance sheet restructuring.

27.    The DIP Facility will provide the Debtors with up to $3,000,000 in new money borrowing capacity (up to $1,500,000 of which the Debtors propose to be made available on an

interim basis) to ensure the Debtors will have sufficient liquidity to satisfy administrative obligations. In the absence of the availability of the DIP Facility, the continued operation of the Debtors' business and the administration of these Chapter 11 Cases through the effective date of a chapter 11 plan would not be possible. The access of the Debtors to sufficient capital and liquidity through the DIP Facility is necessary and vital to maximize recovery opportunities for all stakeholders, and to consummate the value-maximizing transaction contemplated by the Restructuring Support Agreement.

## THE DIP FACILITY

### A. The DIP Facility Reflects The Best Financing Available

28.    The Debtors and their professionals have worked collaboratively to secure debtor-in-possession financing. In the weeks leading up to the Petition Date, I or members of my team contacted certain capital providers on a no-names basis to assess their willingness to provide debtor-in-possession financing on more favorable terms. No party was willing to enter into a confidentiality agreement, much less offer financing sufficient to support a restructuring of the Debtors' operations and businesses on terms more favorable than the DIP Facility. Based on my experience, knowledge of the Debtors' circumstances, and information made available to me, it is highly unlikely that there exists any financing reasonably attainable by the Debtors on more favorable terms than those provided under the DIP Facility, particularly where, as here, the Prepetition Lender must consent to priming or otherwise be primed over its objection.

29.    The Debtors' continued operations and the administration of these Chapter 11 Cases would not be possible in the absence of the availability of the DIP Facility. Thus, the ability of the Debtors to preserve and maintain the value of their assets and maximize the return for creditors is dependent on capital from the DIP Facility.

**B.  The Terms of the DIP Facility are Fair and Reasonable**

30.     The Debtors considered all terms of the proposed DIP Facility, including the proposed payment of certain fees and other payments to the DIP Lender, when determining whether entry into the DIP Facility constituted the best path forward for the company.  The Debtors will use proceeds of the DIP Facility only for purposes that are permissible under the Bankruptcy Code, in accordance with the Orders and the DIP Documents, and in accordance with the DIP Budget (subject to the permitted variances).

31.     Based on my experience with debtor-in-possession financing transactions and information made available to me, the DIP Facility is the best and only reasonable financing option currently available to the Debtors under the circumstances.  The proposed DIP Facility will provide the Debtors with access to crucial liquidity during these Chapter 11 Cases needed to avoid irreparable harm to their business and operations, and will allow the Debtors to maximize value by continuing operations. Under the circumstances, it is my opinion that the interest rates and fees reflected in the DIP Documents are reasonable under the circumstances and substantially in line with other debtor-in-possession financings generally.

32.     Further, additional funding was intended to come from the DIP Facility without the need for a new interim loan facility.  However, in the months leading up to the Petition Date, the Debtors faced an impending liquidity shortfall that required prompt funding in order to avoid a destabilizing default under the Prepetition Loan. To address that exigency, Hildene (through its affiliate Trinity Park) agreed to provide expedited financing in a modest amount on an interim basis to sufficiently stabilize the Debtors' operations and preserve value without overleveraging the Debtors' capital structure.  As a result, the Debtors were able to enter these Cases in an orderly manner, and the roll-up component of the DIP Facility, as set forth above, reflects a structure that

-11-

courts routinely approve where prepetition lenders provide incremental liquidity necessary to stabilize operations and preserve value shortly before a bankruptcy filing. The DIP Roll-Up Loan reflects a reasonable ration of approximately 2:3 (approximately 2:1.5 when considering the DIP Roll-Up Loan as a ratio of the Interim DIP Facility only) between the amount of Prepetition Bridge Note Obligations being rolled up and the amount of new money being provided under the DIP Facility, a structure that is fair and reasonable where, as here, the DIP Lender is providing substantial incremental liquidity that meaningfully exceeds the amount being rolled up.

33. In sum, the terms of the DIP Facility, taken as a whole, are fair and reasonable under the circumstances, were the product of good faith, arm's-length negotiations, and will benefit all stakeholders in these Chapter 11 Cases by providing the Debtors with the necessary liquidity to fund operations and avoid irreparable harm to the Debtors' business that would occur if financing were not available. For all of the reasons included in this Declaration, I believe it is appropriate for the Court to approve the DIP Facility as contemplated by the Motion.

## NEED FOR INTERIM RELIEF

34. In my opinion, the Debtors require immediate access to the DIP Facility, and the relief sought in the Motion, to avoid immediate and irreparable harm pending the final hearing on this matter. Without immediate access to the funds made available under the DIP Facility, the Debtors could face a value-destructive interruption to their business and lack the liquidity to pursue a value-maximizing chapter 11 process.

## CONCLUSION

35. I have reviewed the Motion. All of the facts set forth in the Motion are true and correct to the best of my knowledge and belief based upon: (i) my personal knowledge of the Debtors' operations and finances; (ii) information learned from my review of relevant documents;

(iii) information supplied to me by members of the Debtors' management team and the Debtors' advisors; and/or (iv) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition.  Accordingly, it is my opinion that the relief requested in the Motion constitutes a critical element of stabilizing and facilitating the Debtors' business and operations during the pendency of these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: April 26, 2026                              /s/ *Eric J. Held*
                                                   Eric J. Held
                                                   Senior Managing Director
                                                   Development Specialists, Inc.

-13-