**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>IMPAC MORTGAGE HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-10593<br><br>(Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER
(I) APPROVING THE DEBTORS' ASSUMPTION OF THE RESTRUCTURING
SUPPORT AGREEMENT, (II) AUTHORIZING THE DEBTORS TO PERFORM
THEIR OBLIGATIONS THEREUNDER, AND (III) GRANTING RELATED RELIEF**

Impac Mortgage Holdings, Inc. ("Impac") and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors") under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"),[2] in these chapter 11 cases (the "Chapter 11 Cases"), by and through their undersigned counsel, hereby move (the "Motion") this Court for entry of an order (substantially in the form attached hereto as **Exhibit A**, the "Proposed Order"): (i) approving the Debtors' assumption of that certain Restructuring Support Agreement (as may be amended, the "RSA"),[3] a true and correct copy of which is attached hereto as **Exhibit B**, by and among (a) the Debtors, (b) Hildene re SPC, Ltd. ("Hildene"), acting for and on behalf of the account of SP 1 (together with any of its successors or assigns, or any designee thereof, the "Plan Sponsor"),

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Impac Mortgage Holdings, Inc. (5505); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Funding Corporation (4495); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Service Corp. (2263); Impac Mortgage Corp. (3937); Impac Warehouse Lending, Inc. (0541); Synergy Capital Mortgage Corp. (9071); and Impac Warehouse Lending Group, Inc. (3488). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

[2] Unless otherwise specified herein, all references to "§" or "section" herein are to sections of the Bankruptcy Code. All references to the "Bankruptcy Rules" are to provisions of the Federal Rules of Bankruptcy Procedure. All references to the "Local Rules" are to provisions of the Local Rules of the United States Bankruptcy Court for the District of Delaware.

[3] Capitalized terms used but not otherwise defined in this Motion have the meanings ascribed to them in the RSA.

and in its capacity as the DIP Lender, and (c) Taberna Preferred Funding 1 LTD and Taberna Preferred Funding 2 LTD, as beneficial holders of the Subordinated Notes (the "Consenting Subordinated Noteholders," together with the Debtors, the Plan Sponsor, and the DIP Lender, the "RSA Parties"); (ii) authorizing the Debtors to perform their obligations thereunder; and (iii) granting related relief.

In support of the Motion, the Debtors submit the *Declaration of George A. Mangiaracina in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration") filed substantially contemporaneously herewith. In further support of the Motion, the Debtors respectfully state as follows:

## I.   PRELIMINARY STATEMENT

1. The Debtors commenced these prepackaged Chapter 11 Cases with the support of (i) Hildene, which is the Debtors' prepetition secured lender, proposed DIP Lender and the Plan Sponsor and (ii) the beneficial holders of all of the Debtors' Subordinated Notes.

2. That support is memorialized in the RSA, pursuant to which the Debtors are required to prosecute the Restructuring Transactions through the Plan, which was solicited before the Petition Date and accepted by the holders of 100% of the Debtors' funded debt, subject to the Debtors' rights to exercise a Fiduciary Out.

3. Under the RSA and the Plan, among other things, the Debtors will (a) obtain the DIP Facility to fund these Chapter 11 Cases, (b) maximize the value of their most substantial asset, estimated federal net operating losses of at least $850 million and California net operating losses of at least $600 million (the "Net Operating Losses"), (c) obtain an Exit Loan Facility sufficient to emerge from chapter 11, and (d) make a material distribution to unsecured creditors. Absent the RSA and the Plan, the Debtors would likely liquidate, resulting in the forfeiture of the Net

Operating Losses, the substantial or complete impairment of the Debtors' secured debt and no distribution to the Debtors' Subordinated Noteholders or other unsecured creditors.

4.      While the Debtors believe that the RSA and the Plan represent their best opportunity to reorganize, the Debtors retain the ability to pursue an Alternative Proposal, which the RSA permits the Plan Sponsor an opportunity to match.  In consideration of the significant benefits of the RSA to the Debtors' estates, the RSA requires that the Debtors reimburse the expenses of the Plan Sponsor in connection with these Chapter 11 Cases from the DIP Facility and also pay, among other things, a Breakup Fee/Reimbursement Amount to the Plan Sponsor in the event that the Debtors elect an Alternative Proposal (which the Plan Sponsor determines not to match) equal to 3% of the value of such Alternative Proposal, payable at the closing of such Alternative Proposal.  The RSA likewise requires that the Debtors seek to assume the RSA, absent which the various RSA Parties would not have entered into the RSA and would be free to terminate the RSA.

5.      Under these circumstances, the Debtors have determined, in the exercise of their business judgment, to seek to assume the RSA, as set forth in more detail below, and respectfully request that the Court grant the Motion.

## II.    JURISDICTION AND VENUE

6.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

7.      Venue of the Chapter 11 Cases and related proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3

8.     The predicates for the relief requested herein are: §§ 105(a), 363, 365, 503, and 507, and Bankruptcy Rules 2002, 6004, and 6006.

9.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court lacks Article III jurisdiction to enter such final judgment or order absent the consent of the parties.

### III.     BACKGROUND

#### A.  General Background

10.     On the date hereof (the "Petition Date"), the Debtors each commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their business and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108.

11.     No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases.

12.     Additional information regarding the Debtors, including their business and the events leading to the commencement of these Chapter 11 Cases is set forth in the First Day Declaration.

#### B.  Restructuring Support Agreement[4]

##### a.  Overview of the RSA.

13.     The RSA, attached as **Exhibit B**, is the lynchpin of the Debtors' prearranged restructuring.  Prior to the Petition Date, the RSA Parties extensively negotiated the RSA and the various Restructuring Transactions contemplated thereby.  The RSA is the culmination of the Debtors' consensual restructuring negotiations with various constituencies, including the Plan Sponsor, the DIP Lender, and the Consenting Subordinated Noteholders, and provides a clear path towards a prompt reorganization and emergence from these Chapter 11 Cases pursuant to the terms

---

[4] This summary is qualified in its entirety by reference to the applicable provisions of the RSA.  To the extent there is any inconsistency between this summary and the provisions of the RSA, the provisions of the RSA control.

and conditions of the Debtors' Plan.  The RSA serves as the mechanism pursuant to which the RSA Parties are obligated to deliver the bargain to which they agreed prior to the Petition Date in connection with the consensual restructuring of the Debtors' capital structure and obligations under the Senior Loan Agreement and Subordinated Notes Indentures through the Restructuring Transactions.

14.     The RSA is the product of good faith, arm's length negotiations among the RSA Parties.  Notwithstanding the Debtors' proposed assumption of the RSA, confirmation and consummation of the Plan will remain subject to all requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, including satisfaction of the requirements set forth in § 1129.

15.     The Debtors submit that the Restructuring Transactions contemplated by the RSA provide the Debtors with the best opportunity to maximize value and restructure their balance sheet.  However, the RSA contains a reasonable and customary Fiduciary Out provision, thus preserving the Debtors' flexibility to pursue an Alternative Transaction, should one arise.  As set forth in the RSA:

> Notwithstanding anything to the contrary herein, nothing in this Agreement shall require a Company's board of directors or similar governing body of a Company to take any action, or to refrain from taking any action, with respect to the Restructuring Transactions to the extent the Company's board of directors or similar governing body of the Company determines, after consulting with legal counsel, that taking such action, or refraining from taking such action, as applicable, would not be in compliance with applicable law or inconsistent with its fiduciary obligations under applicable law (any such action or inaction, a "Fiduciary Action or Inaction"); *provided*, however, that no Fiduciary Action or Inaction permitted by the foregoing shall be deemed to prevent the DIP Lender, the Plan Sponsor or the Consenting Subordinated Noteholders from taking actions they are permitted to take pursuant to this Agreement as a result of such Fiduciary Action or Inaction, including terminating their obligations hereunder (including pursuant to Section 10 hereof); *provided*, further, that if any Fiduciary Action or Inaction would otherwise be a breach of a covenant or obligation of the Companies under this Agreement, then the Companies shall deliver written notice of such determination to the DIP Lender, Plan Sponsor and the Consenting Subordinated Noteholders within one (1) Business Day of such determination (a "Fiduciary Out Notice").

RSA §6.06(a).  This provision ensures that, while the Debtors are contractually bound to comply with the RSA following assumption, the Debtors retain the right to pursue an alternative restructuring path in compliance with their applicable fiduciary duties.

16.     The RSA also contains certain protections for the benefit of the Plan Sponsor, including those set forth in Section 6.06 of the RSA. These plan sponsor protections provide that if the Debtors invoke their Fiduciary Out under the RSA, the Plan Sponsor is entitled to exercise a certain right of first refusal to match an Alternative Proposal. If the Plan Sponsor does not exercise such right, and the Debtors otherwise seek to breach or terminate the RSA in order to pursue an Alternative Proposal, the Court approves an Alternative Proposal, or the Debtors otherwise refuse or fail for any reason to consummate the Restructuring Transactions on the timeline set forth in the RSA or in any Financing Orders, then the Plan Sponsor is entitled to, in addition to any and all rights it has under the DIP Documents or the Plan, immediate payment and/or repayment of (i) the full amount of all reasonable and documented fees and expenses incurred by the Plan Sponsor in connection with the Transactions; plus (ii) a termination/break-up fee in an amount equal to 3% of the value of the Alternative Transaction; plus (iii) all principal, interest and other amounts outstanding under the DIP Loan and the Senior Indebtedness, including without limitation all non-contingent indemnification, advancement, contribution or similar ancillary obligations then due and owing thereunder (items (i)-(iii) above, the "Breakup Fee/Reimbursement Amount"), and pending receipt of such payments, the Plan Sponsor shall have an allowed claim pursuant to §§ 503(b) and 507(a)(2) (together with the other protections, the "Plan Sponsor Protections").

### b.   Obligations of the Debtors.

17.     In exchange for, among other things, funding the various elements of Plan consideration to be provided by Hildene in its capacities as Plan Sponsor and DIP Lender, and the

support of the Consenting Subordinated Noteholders for the Restructuring Transactions, the RSA

contains an agreement by the Debtors to prosecute approval and consummation of the DIP Facility

and the Plan, consistent with the Milestones set forth in the RSA.

18. Specifically, the RSA contemplates that the Restructuring Transactions will occur in accordance with the following Milestones by the Specified Deadline (each of which may be waived in accordance with the terms of the RSA):

| | **Chapter 11 Cases Milestone** | **Specified Deadline** |
|---|---|---|
| 1. | Commencement of the Chapter 11 Cases. | No later than April 26, 2026 (the "Petition Date") |
| 2. | The Debtor shall file: <ul><li>An application to retain a claims agent</li><li>The Financing Motion</li><li>A cash management motion</li><li>The NOL Motion</li><li>Such other first day papers as may be approved or requested by the Debtors or Plan Sponsor</li><li>Chapter 11 plan of reorganization</li><li>Disclosure statement</li><li>A tabulation with respect to votes solicited on the Plan before the Petition Date</li><li>A motion seeking to schedule and approve a combined hearing on the Plan and Disclosure Statement, set an objection deadline with respect thereto, and establish related confirmation procedures</li><li>A motion seeking the Bankruptcy Court's approval of the assumption of the RSA</li></ul> | The Petition Date |
| 3. | The Bankruptcy Court shall enter: <ul><li>The Prepack Scheduling Order</li><li>The Interim Financing Order</li><li>The interim order approving the NOL Motion</li><li>Orders approving First-Day Motions</li></ul> | No later than 1 day following the Petition Date |

7

| 4. | The Debtors shall file retention applications and an interim compensation motion (if required) | No later than 10 days following the Petition Date. |
| 5. | The Bankruptcy Court shall enter:<br><br>• The Final Financing Order<br>• An order authorizing the Debtors to assume the RSA<br>• The final order approving the NOL Motion | No later than 30 days following the Petition Date, |
| 6. | The Bankruptcy Court shall enter an order approving the Disclosure Statement and the Plan | No later than 45 days following the Petition Date. |
| 7. | The Plan Effective Date of the Plan shall occur | No later than 60 days following the Petition Date. |

### c.  *Obligations of the Plan Sponsor.*

19.     The RSA contains an agreement by the Plan Sponsor to take various actions, subject to the terms of the RSA.  Specifically, under the RSA, the Plan Sponsor commits to convert the obligations under the Senior Loan Agreement to equity under the Plan, as well as to fund the DIP Facility and the Exit Facility, in each case as set forth in the RSA.  The Debtors anticipate that (i) the DIP Facility is sufficient to fund these Chapter 11 Cases, and (ii) the Exit Facility will be sufficient to refinance the DIP Facility, fund the payments required to be made pursuant to the Plan and provide working capital to enable the Debtors to consummate the Plan and support their business plan following exit from chapter 11.

### d.  *Obligations of the Consenting Subordinated Noteholders.*

20.     The RSA contains an agreement by the Consenting Subordinated Noteholders to support the Plan and to exchange the obligations under the Subordinated Note Indentures for the Contingent Payment Certificate.  Recoveries on the Contingent Payment Certificate are tied to the performance of Reorganized Impac.  More specifically, the holders of the Subordinated Notes will receive, in the aggregate, a percentage of Reorganized Impac's profits over a three-year period

following consummation of the Plan, capped at a recovery of $5 million with a floor distribution of at least $250,000, payable following the conclusion of that three-year period.

## IV.   RELIEF REQUESTED

21.   The Debtors seek entry of the Proposed Order, approving the Debtors' assumption of the RSA and authorizing the Debtors to perform their obligations thereunder.

## V.   BASIS FOR RELIEF

### A.   Assumption of the RSA Constitutes a Sound Exercise of the Debtors' Business Judgment and Should Be Approved

22.   § 365(a) provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." § 365 allows a debtor in possession to maximize the value of its estate by assuming executory contracts or unexpired leases that benefit the estate and by rejecting those that do not. *See, e.g.*, *Cinicola v. Scharffenberger*, 248 F.3d 110 (3d Cir. 2001); *In re Trans World Airlines, Inc.*, 261 B.R. 103, 117 (Bankr. D. Del. 2001). Courts reviewing a debtor's decision to assume or reject an executory contract or unexpired lease apply a business judgment standard. *See In re Caribbean Petroleum Corp.*, 444 B.R. 263, 268 (Bankr. D. Del. 2010) ("Courts normally leave the decision to reject a contract to the debtor's sound business judgment."); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 162 (D. Del. 2006) (explaining that courts defer to a debtor's business judgment to reject a contract under 11 U.S.C. § 365(a)); *NLRB v. Bildisco & Bildisco* (*In re Bildisco*), 682 F.2d 72, 79 (3d Cir. 1982), *aff'd*, 465 U.S. 513 (1984) (recognizing courts' use of the business judgment standard in evaluating whether rejection of executory contracts or leases is appropriate).

23.   Indeed, debtors are afforded considerable discretion in determining whether to assume or reject an executory contract. *In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's decision to reject an executory contract must be summarily affirmed

9

unless it is the product of bad faith, or whim or caprice"). Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Computer Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (Bankr. D. Del. 2003) (explaining that under the business judgment standard, a court should defer to debtor's contract rejection, "unless that decision is the product of bad faith or a gross abuse of discretion."). Rather, there is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (holding that "the debtor can reasonably take . . . a business risk if in its sound business judgment, it is worth the risk"). Further, the "business judgment" standard requires only that the debtor establish that the proposed assumption will benefit the estate. *See In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) ("Section 365 enables the [debtor] to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not.").

24.    As courts have clarified, the business judgment standard "embodies the deference that is accorded to managerial decisions of a board of directors." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003). Accordingly, so long as a debtor exercises "reasonable" business judgment, a court should approve the proposed assumption or rejection. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Group of Inst. Inv'rs v. Chi., Milwaukee, St. Paul & Pac. R.R.*, 318 U.S. 523, 550 (1943); *In re Mkt. Square Inn, Inc.*, 978 F. 2d 116, 121 (3d. Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by

the bankruptcy court"); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39–40 (3d Cir. 1989); *Glenstone Lodge, Inc. v. Buckhead Am. Corp.* (*In re Buckhead Am. Corp.*), 180 B.R. 83, 88 (D. Del. 1995).

25.     The Debtors' assumption of the RSA is a sound exercise of their business judgment. Generally, the RSA will secure the necessary support and funding for the proposed Restructuring Transactions and Plan and position the Debtors to expeditiously emerge from the Chapter 11 Cases, while maximizing creditor recoveries.  More specifically, the elements of the RSA are well within the framework of established precedent.  The RSA addresses all levels of the Debtors' capital structure in a thoughtful manner: (a) the Plan Sponsor has committed to convert the Debtors' nearly $24 million of obligations under the Senior Loan Agreement to equity to and provide millions of additional dollars to the Debtors to fund the Debtors' restructuring and post-Effective Date operations through the DIP Facility and the Exit Facility; (b) the holders of the Junior Subordinated Notes (having a principal amount outstanding as of the Petition Date of not less than $62,000,000) have agreed to accept the Contingent Payment Certificate; (c) the Plan Sponsor has agreed to make a material cash distribution on account of Allowed General Unsecured Claims; and (d) the Plan Sponsor Protections are well within market norms—the payment of reasonable professional fees and a breakup fee in the event that the Debtors identify and close on a better Alternative Proposal.

26.     Based on the foregoing, the Debtors respectfully submit that assuming the RSA and performing their obligations thereunder is in the best interests of their estates.  Accordingly, the Debtors request that the Court approve the Debtors' assumption of the RSA and enter the Proposed Order.

**B.  Pursuant to § 363(b)(1), the Debtors Should Be Authorized to Use Estate Property to Fund Plan Sponsor Protections As Exercise of Business Judgment**

27.     § 363(b)(1) authorizes a debtor in possession to utilize property of the estate outside the ordinary course of business in the exercise of its business judgment.  *See* 11 U.S.C. §

363(b)(1) (permitting "trustee, after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate").

28.     Here, the Plan Sponsor Protections, including the Breakup Fee/Reimbursement Amount, are an essential inducement to the Plan Sponsor to participate in the Restructuring Transactions, which themselves are for the benefit of the Debtors' estates.  Therefore, use of estate property to fund the Plan Sponsor Protections is in the best interests of the Debtors' estates and represents a sound exercise of the Debtors' business judgment.  *See, e.g.*, *In re Mallinckrodt PLC*, No. BR 20-12522-JTD, 2022 WL 906458 (D. Del. Mar. 28, 2022) (approving similar fees and expenses under the business judgment standard).

29.     Furthermore, approval of termination fees in connection with a restructuring proposal has become an established practice in chapter 11 cases where a proposed fee provides a benefit to the estate and creditors as a whole.  *See generally In re Mallinckrodt PLC*, 2022 WL 906458, at *11-*13 (collecting cases and emphasizing that the relevant benefit should be for all creditors – not simply for the benefit of one particular creditor); *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 790414, at *23 (Bankr. S.D.N.Y. Mar. 15, 2022), *aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 756 (S.D.N.Y. 2022) (collecting cases in the context of restructuring support agreements).

30.     Here, the Plan Sponsor has provided a material benefit to the Debtors and other parties in interest, as it has provided a viable restructuring strategy through, among other things, its willingness to serve as the plan sponsor, and to fund the Debtors both before and after the Petition Date, neither of which it would have provided without the protection and inducement of the Plan Sponsor Protections.  *See In re Energy Future Holdings Corp.*, 575 B.R. 616 (Bankr. D. Del. 2017), *aff'd*, 904 F.3d 298 (3d Cir. 2018) (explaining that such protections are justified, even if they do not result in further competitive bidding, if they "increase the likelihood that the price at which the debtor is sold will reflect its true worth") (citation omitted).

31.     Indeed, courts have determined that if a potential purchaser will not submit a bid without the assurance of certain fees, such as the Plan Sponsor Protections, the *Mallinckrodt*

standard is satisfied. *See, e.g.*, *In re WorldSpace, Inc.*, Case No. 08-12412 (PJW), 2010 WL 4739929, at *4 (Bankr. D. Del. June 2, 2010) (approving break-up fee because, among other reasons, the "break-up fee is an essential inducement and condition of Buyer's entry into, and continuing obligations, under the APA. Unless it is assured that the break-up fee will be available, the Buyer is unwilling to remain obligated to consummate the Proposed Sale or otherwise be bound under the APA"); *In re BroadVision, Inc.*, No. 20-10701 (CSS) (Bankr. D. Del. Apr. 28, 2020) (authorizing assumption of Restructuring Support Agreement containing break-up fee); *see also In re LATAM Airlines Grp. S.A.*, 2022 WL 790414, at *23 (recognizing inducement as an acceptable factor to consider).

32.      Throughout the negotiation of the RSA and the Plan with the Debtors, the Plan Sponsor consistently insisted upon the Plan Sponsor Protections as an essential inducement to its entry into the RSA and would not agree to proceed in the absence of such protections. In fact, the RSA provides that the Plan Sponsor can terminate the RSA if the Court does not enter an order approving the Plan Sponsor Protections in a timely manner, further demonstrating that approval of these protections is essential to the Plan Sponsor's participation as plan sponsor and, in turn, the success of the Debtors' proposed restructuring and the Chapter 11 Cases.

33.      Further, the Plan Sponsor Protections are reasonable on an absolute value basis, reflect the time and reasonable costs incurred by the Plan Sponsor to negotiate and document the RSA, the Plan, and other related transaction documents, and provide the Debtors with, among other things, consensual use of cash collateral and debtor-in-possession and exit financing in the Chapter 11 Cases. Moreover, the Plan Sponsor Protections will not burden the Debtors' estates, since they may be paid only from the proceeds of the closing of an Alternative Proposal. Thus, in reality, the Plan Sponsor Protections are payable, with certain exceptions, only if the Debtors invoke the Fiduciary Out in favor of a higher and/or better alternative. As such, the Plan Sponsor Protections do not present an imposition on the Debtors' estates, as they are conditional and only payable upon a value-maximizing Alternative Proposal, in which scenario the Plan Sponsor should be entitled to the Plan Sponsor Protections as a result of the time and effort it expended in

13

negotiating the RSA and the Restructuring Transactions.  If no such Alternative Proposal manifests, then the Plan Sponsor Protections will not be payable.  In light of the foregoing, the Plan Sponsor Protections should be approved, as they are essential requirements for the Debtors' Restructuring Transactions, as contemplated by the RSA and the Plan.

### C. The Motion Does Not Request and the Proposed Order Does Not Provide for Approval of the Terms of the Plan Itself

34.      The sole question before the Court with respect to the relief requested herein is whether assumption of the RSA, pursuant to § 365, is a valid exercise of the Debtors' business judgment.  Courts routinely confirm that assumption of a restructuring support agreement is not equivalent to confirmation of a plan.  *See generally*, *In re Dendreon Corp.*, No. 14-12515 (PJW) (Bankr. D. Del. Dec. 23, 2014); *see also In re ResCap Liquidating Tr. Litig.,* 428 F. Supp. 3d 53, 70 (D. Minn. 2019), *aff'd sub nom. ResCap Liquidating Tr. v. Primary Residential Mortg., Inc.,* 59 F.4th 905 (8th Cir. 2023) ("As its name suggests, a plan support agreement (or 'PSA') is pre- or post-petition contract between the debtor and certain creditors, in which the parties agree to support a proposed reorganization plan, subject to specific terms or conditions. '[P]lan support agreements ... are meant to lock up support for a pro-posed plan in *advance* of the plan confirmation hearing.'") (emphasis added) (citing Isaac Sasson, JUDICIAL REVIEW OF PLAN SUPPORT AGREEMENTS: A REVIEW AND ANALYSIS, 9 N.Y.U. J.L. & LIBERTY 850, 851–52 (2015)); *In re: Genco Shipping & Trading Ltd.*, 509 B.R. 455, 459 (Bankr. S.D.N.Y. 2014) ("This ruling is without prejudice to any party's right to object to the plan at confirmation."); *In re EI Wind Down, Inc.*, No. 14-10066-BLS, 2010 WL 11820288, at *1 (Bankr. D. Del. Feb. 17, 2010) ("Nothing in this Order shall be interpreted as Court approval of any provision of any plan to be filed pursuant to the Plan Support Agreement or otherwise. All plan provisions shall be subject to the plan confirmation process under the Bankruptcy Code and Bankruptcy Rules.").  Although confirmation of the Plan is a Milestone under the RSA, any such confirmation issues can and will be reserved for the confirmation hearing.  Parties in interest may object to the Plan on any number of grounds, irrespective of the Debtors' assumption of the RSA.

35.     Moreover, notwithstanding that the RSA and the Plan currently contemplate consummation of the Restructuring Transactions with the Plan Sponsor, the RSA also contains a reasonable and customary Fiduciary Out provision, a right of first refusal, and other Plan Sponsor Protections, thus preserving the Debtors' flexibility to pursue an Alternative Proposal, should one arise that is more beneficial to the Debtors' estates.  Together, these provisions ensure that, while the Debtors are contractually bound to comply with the RSA as provided therein, the Debtors retain the right to pursue an alternative restructuring path in compliance with their applicable fiduciary duties.

## VI.     WAIVER OF STAY

36.     In order to implement the foregoing successfully, and to the extent applicable, the Debtors request that the Proposed Order:  (i) provide that notice of the relief requested herein satisfies the notice requirements of Bankruptcy Rule 6004(a); and (ii) waive any 14-day stay period under the Bankruptcy Rules.

## VII.     NOTICE

37.     Notice of this Motion shall be given to the following parties: (a) the Office of the United States Trustee; (b) counsel for the DIP Lender; (c) the Debtors' thirty largest unsecured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the United States Attorney's Office for the District of Delaware; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 or Local Rule 2002-1(b).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## VIII.     CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Proposed Order: (i) approving the Debtors' assumption of the RSA; (ii) authorizing the Debtors to perform their obligations thereunder; and (iii) granting related relief.

15

Dated: April 26, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal
Timothy Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Tel:     (302) 652-4100
Email:  ljones@pszjlaw.com
        debertenthal@pszjlaw.com
        tcairns@pszjlaw.com

-and -

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* pending)
Van C. Durrer, II (DE Bar No. 3827)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email:  tania.moyron@dentons.com
        van.durrer@dentons.com

John D. Beck (*pro hac vice* pending)
Geoffrey M. Miller (*pro hac vice* pending)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Email:  john.beck@dentons.com
        geoffrey.miller@dentons.com

*Proposed Counsel for Debtors and Debtors in Possession*