## **EXHIBIT B**

(Restructuring Support Agreement)

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

**RESTRUCTURING SUPPORT AGREEMENT**

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits and schedules attached hereto and in accordance with **Section 3**, this "*Agreement*") is made and entered into as of April 22, 2026, by and among the following parties:  (a) Impac Mortgage Holdings, Inc. ("*Impac*"), Impac Funding Corporation ("*IFC*"), Impac Mortgage Corp. ("*IMC*"), Copperfield Financial, LLC ("*CFLLC*"), IMH Assets Corp. ("*IMHAC*"), Integrated Real Estate Service Corp. ("*IRES*"), Integrated Warehouse Lending Group, Inc. ("*IWLG*"), Copperfield Capital Corporation ("*CCC*"), Impac Commercial Capital Corporation ("*ICCC*"), Impac Secured Assets Corp. ("*ISAC*"), Synergy Capital Mortgage Corp. ("*Synergy*") and Impac Warehouse Lending, Inc. ("*Warehouse*"  and together with Impac, IFC, IMC, CFLLC, IMHAC, IRES, IWLG, CCC, ICCC, ISAC, and Synergy, each a "*Company*" and collectively the "*Companies*"); (b) Hildene re SPC, Ltd., acting for and on behalf of the account of SP 1 (together with any of its successors or assigns, or any designee thereof, the "*Plan Sponsor*" and in its capacity as lender under the DIP Facility, the "*DIP Lender*"); and (c) the undersigned beneficial holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that are beneficial holders (the "*Consenting Subordinated Noteholders*") of the Junior Subordinated Notes due March 30, 2034 issued by Impac (each of the foregoing, a "*Party*" and, collectively, the "*Parties*").

## RECITALS

**WHEREAS**, the Companies, Plan Sponsor, the DIP Lender and the Consenting Subordinated Noteholders have in good faith and at arm's length negotiated certain restructuring and recapitalization transactions with respect to the Companies' capital structure, including the Companies' respective obligations under: (a) that certain Loan Agreement dated as of May 6, 2024 (the "*Senior Loan Agreement*") by and among Impac, as borrower, the Subsidiary Guarantors (as defined therein) and the Plan Sponsor, as lender; (b) the Bridge Note (as defined below) and (c) those certain Junior Subordinated Indentures, each dated as of May 8, 2009 (collectively, the "*Subordinated Notes Indentures*") by and among Impac and The Bank of New York Mellon Trust Company, NA in its capacity as indenture trustee (the "*Subordinated Notes Indenture Trustee*").

**WHEREAS**, the Companies intend to file voluntary chapter 11 petitions (the "*Chapter 11 Cases*") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court to effect certain restructuring transactions (the "*Restructuring Transactions*") through a prepackaged chapter 11 plan of reorganization (as may be amended, modified, or supplemented from time to time in accordance with the terms of this Agreement, the "*Plan*") in substantially the form annexed hereto as **Exhibit A**.

**WHEREAS**, the Restructuring Transactions are summarized below, subject in each instance in all respects to the terms and conditions set forth below and in the Definitive Documents (defined below):[1]

(i) Impac, IMC and Dagdafi, Inc. dba First Agentic ("*Dagdafi*") executed and delivered the Secondment Agreement, dated as of March 17, 2026 and the related Technology Rights Agreement, between IMC and Dagdafi of even date with such Secondment Agreement (together, the "*Secondment Agreement*");

(ii) upon the filing of the Chapter 11 Cases, the DIP Lender will make available to the Companies the DIP Facility on terms and conditions set forth in the DIP Facility Documents for funding pursuant to the Budget;

(ii) on the Plan Effective Date:

 (a) unless otherwise provided in the Plan, the Assets of each Estate shall vest in the applicable Reorganized Debtor, as the case may be, free and clear of all claims, liens, encumbrances, charges and other interests, and the Plan shall provide for the assumption of the Key Executive Employment Agreements (as defined below) and the Secondment Agreement and their assignment to the Reorganized Debtor, and the Enterprise Obligations shall be reinstated as provided in the Plan;

 (b) the Reorganized Debtors shall issue the Plan Sponsor Common Stock to the Plan Sponsor, which shall be distributed as set forth in the Plan and without the need for any further corporate action by the Reorganized Debtors;

---

[1] Capitalized terms used but not otherwise defined herein shall the meanings ascribed to such terms in the Definitive Documents.

US_ACTIVE\131907971

(c) all issued and outstanding securities in the Debtors (other than the Interests in Debtor Subsidiaries), and all rights to receive any securities in the Debtors, shall be cancelled and all classes of stock in Impac shall be eliminated with the exception of the New Common Stock;

(d) consistent with its Amended Certificate and Bylaws, any Debtors not already incorporated in, or organized under the laws of, Delaware shall be redomiciled as Delaware corporations or limited liability companies, as applicable;

(e) the Reorganized Debtors shall cause the Administrative and Priority Claims Reserve to be funded in Cash from Cash on hand and the Exit Facility in the amount of the aggregate Administrative and Priority Claims Reserve Estimate. On or after the Plan Effective Date, the Reorganized Debtors shall, subject to and in accordance with the terms and conditions of the Plan, pay Allowed Administrative Claims, Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims, each as provided for in the Plan;

(f) the DIP Lender shall provide the Exit Facility, which shall be used, among other ways, to fund: (i) the GUC Consideration; (ii) all transactions necessary to implement the Plan, including, but not limited to, (a) payment of all Allowed Claims that are to be satisfied in cash under the Plan (other than General Unsecured Claims), and (b) payment of Administrative Claims paid on the Effective Date, which shall include amounts owed (1) under the Amended and Restated Key Executive Employment Agreement, between Impac and George A. Mangiaracina, and the Amended and Restated Key Executive Employment Agreement, between Impac and Joe Joffrion, both dated as of October 7, 2025, as further amended by those certain First Amendments thereto both dated April 21, 2026 (collectively, as amended, the "*Key Executive Employment Agreements*") and (2) Contractual Incentive Payments to certain employees, as collectively set forth on the schedule attached hereto as **Exhibit B,** which both (1) and (2) have been approved by the Plan Sponsor; (iii) additional Contractual Incentive Payments as provided on the schedule attached hereto as **Exhibit B** in an aggregate amount of $200,000 to employees who were employed both as of the Petition Date and the time of such payment, to the extent approved by the Board, on or about September 22, 2026; and (iv) the working capital needs of the Reorganized Debtors;

(g) Reorganized Impac shall be deemed to adopt the Management Incentive Plan, which shall provide for the issuance of stock appreciation rights representing the economic equivalent of a percentage of the New Common Stock on a fully-diluted basis, as set forth in the Management Incentive Plan, to employees and officers of Reorganized Impac that are designated and approved as participants in the Management Incentive Plan;

(h) Except for all Interests in the Debtor Subsidiaries, which shall be reinstated as provided for in the Plan, the Senior Loan Documents (as defined in the Plan), the Subordinated Notes and the Subordinated Notes Indenture, together with all Interests in Impac, shall be deemed, and shall be, cancelled and shall be of

US_ACTIVE\131907971

no further force and effect, whether surrendered for cancellation or otherwise. Similarly, on the Plan Effective Date, except (a) as otherwise specifically provided for in the Plan; (b) with respect to any assumed Executory Contracts and Unexpired Leases; (d) for purposes of evidencing a right to Distributions under the Plan; or (e) with respect to any Claim that is Allowed under the Plan, on the Plan Effective Date, any instruments or documents evidencing any Claims or Interests shall be deemed automatically canceled and deemed surrendered without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtors under the agreements, instruments, and other documents, indentures, and certificates of designations governing such Claims and Interests, as the case may be, shall be discharged;

(i) To the extent the Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments, and equity securities under or in connection with the Plan; (b) the creation, assignment, recordation, or perfection of any lien, pledge, other security interest, or other instruments of transfer; (c) the making or assignment of any contracts or leases; (d) the creation, execution, and delivery of any agreements or other documents creating or evidencing the formation of the Reorganized Debtors or the issuance or ownership of any interest in the Reorganized Debtors; and/or (e) the making or delivery of any deed or other instrument of transfer under the Plan in connection with the vesting of the Estate's Assets in the Reorganized Debtors pursuant to or in connection with the Plan, including, without limitation, merger agreements, stock purchase agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, and transfers of tangible property pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax;

(j) Holders of allowed Subordinated Notes Claims shall receive their pro rata share of the Contingent Payment Certificate (as defined below) in full and final and satisfaction of the Subordinated Notes Claims; and

(k) the boards of directors of the Reorganized Debtors, as applicable, shall consist of those individuals set forth in the Plan Supplement, and CFLLC shall continue to be member managed in accordance with its applicable operating agreement and other governing documents, as may be amended.

**WHEREAS**, in a good faith effort to assist the Companies in preparing for the Restructuring Transactions and the Chapter 11 Cases, the DIP Lender has agreed to make available to the Companies the DIP Facility and the Exit Facility on and subject to the terms thereof.

**WHEREAS**, the Plan Sponsor has agreed to consent to the Companies' use of cash collateral and to the imposition of the priming liens and claims contemplated under the DIP Facility during the Chapter 11 Cases on the terms set forth in the DIP Facility Documents in exchange for the adequate protection set forth in the Financing Orders.

4

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**AGREEMENT**

**Section 1.**     *Definitions and Interpretation*.

1.01.   <u>Definitions</u>. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Plan, or as the context otherwise requires.

As used in this Agreement, the following terms have the following meanings:

a.     "*Agreement*" has the meaning set forth in the Preamble of this Agreement (as may be amended, modified, or supplemented in writing from time to time in accordance with the terms hereof) and, for the avoidance of doubt, includes all of the exhibits, annexes, and schedules attached hereto.

b.     "*Agreement Effective Date*" has the meaning set forth in **Section 2** hereof.

c.     "*Alternative Proposal*" has the meaning set forth in **Section 6.06** hereof.

d.     *"Alternative Transaction"* has the meaning set forth in **Section 6.06** hereof.

e.     "*Amended Certificate and Bylaws*" means the amended and restated certificate[s] of incorporation and bylaws for the Reorganized Debtors, if so amended, or, in the case of CFLLC, the amended and restated limited liability company agreement for CFLLC, in each case in the form[s] and substance satisfactory to the Plan Sponsor, to be filed with the Plan Supplement.

f.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

g.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, pursuant to 28 U.S.C. § 151, the United States District Court for the District of Delaware.

h.     "*beneficial ownership*" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, any Claims or Interests subject to this Agreement or the right to acquire such Claims or Interests.

i.     "*Breakup Fee/Reimbursement Amount*" has the meaning set forth in **Section 6.06(f).**

j.      "*Bridge Note*" means that certain Secured Promissory Note, dated January 26, 2026, issued by the Companies to Hildene as successor-by-assignment to Trinity Park Investments, LLC.

k.      "*Budget*" means that certain budget in the and in the form attached hereto as **Exhibit C** with respect to amounts needed to be funded via the DIP Facility, as it may be amended from time to time by agreement in writing between the Companies and the Plan Sponsor.

l.      "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

m.      "*Chapter 11 Cases*" has the meaning set forth in the Recitals of this Agreement.

n.      "*Claim*" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code, which Claim is against a Company.

o.      "*Companies*" has the meaning set forth in the Preamble of this Agreement.

p.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan in the Chapter 11 Cases in satisfaction of the applicable provisions of the Bankruptcy Code, and approving the Disclosure Statement as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code.

q.      "*Consenting Subordinated Noteholders*" has the meaning set forth in the Preamble of this Agreement.

r.      "*Contingent Payment Certificate*" means a contingent payment certificate due no later than 120 days following the end of the third taxable year following the Plan Effective Date (including the taxable year in which the Plan Effective Date occurs), the obligations under which will constitute an unsecured obligation of Impac, the amount payable on which shall be equal to 10% percent of the consolidated positive earnings of Impac and its subsidiaries for the three taxable years of Impac following the Plan Effective Date, provided that such amount shall not exceed $5 million or be less than $250,000.  For the avoidance of doubt, the amount of the Contingent Payment Certificate shall be reduced dollar-for-dollar by any cash tax liability of Impac and its subsidiaries.

s.      "*Contractual Incentive Payments*" are those incentive payments identified on **Exhibit B** attached hereto.

t.      "*Dagdafi*" has the meaning set forth in the Preamble of this Agreement.

u.      "*Debtors*" means each of the Companies, in each case, solely in its capacity as a debtor in possession under the Bankruptcy Code.

v.      "*Definitive Documents*" has the meaning set forth in **Section 4.01** hereof.

6

w.      "*DIP Loan Agreement*" means the credit agreement evidencing the DIP Facility substantially in the substantially the form attached hereto as **Exhibit D**.

x.      "*DIP Facility*" has the meaning set forth in **Section 6.01** hereof.

y.      "*DIP Facility Documents*" means the DIP Loan Agreement and all other documents memorializing the terms of the DIP Facility, including without limitation the Financing Orders.

z.      "*DIP Obligations*" means all amounts due and owing under the DIP Facility as of the Plan Effective Date, including all principal, interest, fees and expenses due and owing thereunder.

aa.     "*Disclosure Statement*" means the related disclosure statement with respect to the Plan.

bb.     *"Enterprise"* means Enterprise Bank & Trust, a Missouri chartered trust company.

cc.     *"Enterprise Claim"* means any claim held by Enterprise related to the Enterprise Obligations and the Enterprise Surety Obligations.

dd.     *"Enterprise Obligations"* means the obligations owing by Impac (including as trustee for life insurance trusts and pursuant to the Continuing Limited Guaranty Agreement, dated January 31, 2012 issued by Impac to Enterprise) to Enterprise as also memorialized by the Former Executive 1 Loan Documents, the Former Executive 2 Loan Documents, the Former Executive 3 Loan Documents and the Enterprise Surety Documents.

ee.     *"Enterprise Surety Obligations"* means obligations, as amended from time to time, originally arising from an irrevocable standby letter of credit supporting surety bonds issued by Liberty Mutual Insurance Company.

ff.     "*Exit Loan Agreement*" means that certain Loan and Security Agreement dated as of the Plan Effective Date pursuant to which the Exit Loan Facility will be made available to the Reorganized Debtors by the Plan Sponsor on and after the Plan Effective Date.

gg.     *"Exit Loan Amount"* equals an aggregate amount equal to the DIP Obligations, plus the Exit Loan New Money Amount.

hh.     "*Exit Loan Facility*" has the meaning set forth in **Section 4.03** hereof.

*ii.*    "*Exit Loan New Money Amount*" means $5,000,000.

jj.     "*Fiduciary Action or Inaction*" has the meaning set forth in **Section 6.06** hereof.

kk.     "*Fiduciary Out*" has the meaning set forth in **Section 10.02(c)** hereof.

ll.     "*Fiduciary Out Notice*" has the meaning set forth in **Section 6.06** hereof.

7

mm.    "*Final Financing Order*" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases authorizing the Debtors to enter into the DIP Facility and to use cash collateral.

nn.    "*Financing Motion*" means the motion filed in the Chapter 11 Cases seeking authority for the Debtors to enter into the DIP Facility and to use cash collateral.

oo.    "*Financing Orders*" means, collectively, the Interim Financing Order and the Final Financing Order.

pp.    "*First Day Pleadings*" means the motions, petitions, pleadings, draft orders and other documents that the Debtors file at the commencement of the Chapter 11 Cases.  First Day Pleadings include related orders as entered by the Bankruptcy Court.

qq.    "*Former Executive 1 Loan Documents*" means that certain Fifth Amended and Restated Promissory Note, dated as of April 30, 2023, in the principal amount of $7,850,000 which matures on April 30, 2026, secured by Allianz Life Insurance Policy Number 60049553 and other collateral, as described in such note and related documents.

rr.    "*Former Executive 2 Loan Documents*" means that certain Fourth Amended and Restated Promissory Note, dated as of April 30, 2023, in the principal amount of $6,225,000 which matures on April 30, 2026, secured by Allianz Life Insurance Policy Number 60049113 and other collateral, as described in such note and related documents.

ss.    "*Former Executive 3 Loan Documents*" means that certain Fourth Amended and Restated Promissory Note, dated as of April 30, 2023, in the principal amount of $3,100,000 which matures on April 30, 2026, secured by Allianz Life Insurance Policy Number 60049112 and other collateral, as described in such note and related documents.

tt.    "*GUC Consideration*" means $300,000 cash to be deposited in a segregated account by the Reorganized Debtors for the purpose of (i) paying the reasonable fees and expenses (as approved by the Bankruptcy Court) of any fiduciary appointed on behalf of the holders of General Unsecured Claims, whether before or after confirmation of the Plan, and (ii) making distributions on account of allowed General Unsecured Claims.

uu.    "*GUC Schedule*" means the schedule of all General Unsecured Claims known by the Companies as of the Agreement Effective Date, as set forth hereto on **Exhibit E**.

vv.    "*Interests*" means all previously issued and outstanding interests (whether legal, equitable, contractual or other rights) of any Holders of any class of equity securities of any of the Debtors represented by shares of common or preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such Interests.

ww.    "*Interim Advance*" means the initial $3,500,000 of the DIP Facility to be funded by the DIP Lender within three (3) business days after the Court's entry of an interim DIP Order in form and substance acceptable to the Plan Sponsor.

8

US_ACTIVE\131907971

xx.    "*Interim Financing Order*" means the interim order entered by the Bankruptcy Court in the Chapter 11 Cases authorizing the Debtors to enter into the DIP Facility and to use cash collateral, in substantially the form attached hereto as **Exhibit F**.

yy.    "*IRC*" means the Internal Revenue Code of 1986, as amended.

zz.    *"Key Executive Employment Agreements"* has the meaning set forth in the Recitals of this Agreement.

aaa.    "*Management Incentive Plan*" means the Management Incentive Plan, in the form approved by the Plan Sponsor and be filed with the Plan Supplement, to be implemented in accordance with **Section 4.06** hereof.  For the avoidance of doubt, the Management Incentive Plan contemplates incentive compensation arising from performance following the Plan Effective Date, and expressly excludes payments under the Key Executive Employment Agreements and the Contractual Incentive Payments due on the Plan Effective Date.

bbb.    "*Milestones*" means those milestones as set forth on **Exhibit G** hereof.

ccc.    "*New Common Stock*" means the common stock of Reorganized Impac to be issued pursuant to the terms of the Plan.

ddd.    "*New Stock Documentation*" means any and all documentation required to implement, issue, and distribute the New Common Stock, which shall be consistent with the terms and conditions set forth in the Plan and shall be in form and substance satisfactory to the Companies and the Plan Sponsor.

eee.    "*NOL Motion*" means a motion to establish notice and hearing procedures that must be followed for (i) certain transfers of equity in Impac and Subordinated Notes Claims, and of any beneficial interest therein, and (ii) certain claims of worthlessness for federal or state tax purposes with respect to equity in Impac, are deemed effective.

fff.    "*Owned Company Claims/Interests*" has the meaning set forth in **Section 8.02(a)** hereof.

ggg.    "*Person*" means any "person" as defined in section 101(41) of the Bankruptcy Code, including, without limitation, any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof or other entity.

hhh.    "*Plan*" has the meaning set forth in the Recitals of this Agreement.

iii.    "*Plan Effective Date*" means the occurrence of the effective date of the Plan pursuant to its terms.

jjj.    "*Plan Sponsor/DIP Lender Expenses Amount*" means the Plan Sponsor's and DIP Lender's reasonable and documented transaction fees and expenses, including the fees and expenses of counsel, investment bankers, advisors and other professionals.

9

kkk. "*Plan Sponsor Common Stock*" means the New Common Stock to be issued on the Plan Effective Date to the Plan Sponsor, which shall be equal to 100% of the total issued and outstanding New Common Stock, in exchange for and in full satisfaction of the DIP Obligations and the Senior Indebtedness.

lll. "*Plan Supplement*" means (if any) such exhibits, documents, lists or schedules not Filed with the Plan but as may be Filed at least seven (7) days prior to the deadline to object to Confirmation of the Plan or such other date as may be approved by the Bankruptcy Court."

mmm. "*Prepack Scheduling Order*" means an order to be entered by the Bankruptcy Court setting a combined hearing on the Plan and Disclosure Statement, setting an objection deadline with respect thereto, and establishing related confirmation procedures.

nnn. "*Professional Fee Escrow Account*" means the account held by an escrow agent agreed by the Parties and funded from the DIP Facility pursuant to the terms of the Plan, the DIP Order and the DIP Budget, to satisfy Allowed Fee Claims in accordance with the Plan.

ooo. "*Professional Fee Reserve Amount*" means the total aggregate amount of the Professionals' estimated Fee Claims, as provided for in the DIP Budget.

ppp. "*Restructuring Transactions*" has the meaning set forth in the Recitals of this Agreement.

qqq. "*Rolled Bridge Note Obligations*" means the portion of the DIP Obligations utilized to refinance the Bridge Note in full.

rrr. "*RSA Order*" means a Final Order of the Bankruptcy Court authorizing the Companies to assume this Agreement.

sss. "*Secondment Agreement*" has the meaning set forth in the Recitals of this Agreement.

ttt. "*Securities Act*" means the Securities Act of 1933, as amended.

uuu. "*Senior Indebtedness*" means the obligations owed by the Debtors to the Plan Sponsor pursuant to the Senior Loan Documents.

vvv. "*Senior Indebtedness Claims*" means all Claims arising from or related to the Senior Indebtedness.

www. "*Senior Loan Agreement*" means that certain Loan Agreement dated as of May 6, 2024 by and among Impac, as borrower, the Subsidiary Guarantors (as defined therein) and the Plan Sponsor, as lender.

xxx. "*Senior Loan Documents*" means the Senior Loan Agreement and all schedules, exhibits, certificates, notices, perfection certificates, security agreements, guaranties,

10

intercreditor agreements, and any other documents related to the Senior Loan Agreement, any subordination agreement, any note, or notes, and any other present or future agreement by any of the Debtors with or for the benefit of the Plan Sponsor in connection with the Senior Loan Agreement, all as amended, restated, or otherwise modified in accordance with the terms thereof

yyy.     "*SOFR*" means the Secured Overnight Financing Rate as published on the website of the Federal Reserve Bank of New York.

zzz.     "*Solicitation Materials*" means all solicitation materials in respect of the Plan.

aaaa.    "*Subordinated Notes*" means the Debtors' Junior Subordinated Notes due March 30, 2034.

bbbb.    "*Subordinated Notes Indentures*" has the meaning set forth in the recitals.

cccc.    "*Subordinated Notes Claims*" means all Claims arising from or related to the Subordinated Notes or the Subordinated Notes Indenture.

dddd.    "*Subordinated Notes Indenture Trustee*" has the meaning set forth in the recitals.

eeee.    "*Support Period*" means the period commencing on the Agreement Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated pursuant to **Section 10** hereof and (ii) the Plan Effective Date.

ffff.    "*Tax Preservation Rights Plan*" means, to the extent requested by the Plan Sponsor, a tax preservation rights plan for Reorganized Impac, in form and substance satisfactory to the Plan Sponsor, to be filed with the Plan Supplement.

gggg.    "*Terminating Consenting Subordinated Noteholders*" has the meaning set forth in **Section 10.01**.

1.02.    Interpretation. For purposes of this Agreement:

a.      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

b.      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

c.      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, modified, or supplemented from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

11

d. unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

e. the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

f. captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

g. the use of "include" or "including" is without limitation, whether stated or not; and

h. the phrase "counsel to" any Party refers in this Agreement to each counsel specified in **Section 12.09**.

**Section 2.** *Agreement Effective Date*. This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the date on which: (a) the counterparty signature pages to this Agreement shall have been executed and delivered by (i) the Companies, (ii) Consenting Subordinated Noteholders, (iii) the DIP Lender and (iv) the Plan Sponsor; (b) the Companies shall have provided the GUC Schedule to the Plan Sponsor; (c) the Companies shall have provided the Budget to the Plan Sponsor and the DIP Lender in a form agreed to by the Plan Sponsor and the DIP Lender, and (d) the Companies have given notice to the Consenting Subordinated Noteholders, the DIP Lender and the Plan Sponsor (and counsel to each of them, to the extent applicable), in accordance with **Section 12.09** that each of the foregoing conditions set forth in this **Section 2** has been satisfied and this Agreement is effective (such date, the "*Agreement Effective Date*").

**Section 3.** *Exhibits Incorporated by Reference*. Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits. In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern.

**Section 4.** *Definitive Documentation*.

4.01. The definitive documents and agreements governing the Restructuring Transactions (collectively, the "*Definitive Documents*") shall include, without limitation, the following: (a) the Plan and its exhibits, ballots, the Plan Supplement, and solicitation procedures; (b) the Confirmation Order; (c) the Disclosure Statement and the other Solicitation Materials; (d) the Prepack Scheduling Order; (e) the DIP Loan Agreement, the Financing Motion, and the Financing Orders; (f) the First Day Pleadings; (g) any other material pleadings or material motions the Companies file in connection with the Chapter 11 Cases, and all orders sought pursuant thereto; (h) the New Stock Documentation; (i) Exit Loan Agreement; (j) the Management Incentive Plan; (k) the Amended Certificates and Bylaws; (l) the Tax Preservation Rights Plan (to the extent requested by the Plan Sponsor); and (m) such other agreements and documentation reasonably desired or necessary to consummate and document the transactions contemplated by this Agreement and the Plan.

US_ACTIVE\131907971

4.02. Notwithstanding anything to the contrary herein, the Definitive Documents not executed or in a form attached to this Agreement will, after the Agreement Effective Date, remain subject to negotiation and completion in good faith by the Parties, and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and, including with respect to any modifications, amendments, or supplements thereof, shall be in form and substance reasonably satisfactory to each of the Debtors, the Plan Sponsor and the Consenting Subordinated Noteholders in their sole discretion. For the avoidance of doubt, to the extent that any Definitive Documents are filed, with the consent of the Parties, on the docket of the Chapter 11 Cases, this Agreement shall be deemed amended (and the Parties expressly consent to this Agreement being so conformed) to reference such Definitive Documents by docket number in the Chapter 11 Cases in lieu of the original Exhibit attached to this Agreement.

4.03. <u>Exit Loan Facility Definitive Documents</u>.

a. The Exit Loan Facility Definitive Documents shall provide that the Exit Loan Facility will be a multi-draw term loan facility to be made by the DIP Lender to the Reorganized Debtors on and after the Plan Effective Date, pursuant to the Exit Loan Agreement in the principal amount up to the Exit Loan Amount (the "*Exit Loan Facility*") and (i) accruing interest at a rate of SOFR plus 4% per annum, plus an additional 3% in the event of default; (ii) with a facility fee of 1% of the Exit Loan New Money Amount, which shall be deducted from the initial proceeds of the Exit Loan Facility; (iii) secured by a first priority security interest in and liens on all assets of the Reorganized Debtors; (iv) maturing thirty-six (36) months after the Plan Effective Date; (v) be treated as Paid-in-Kind (PIK), unless quarterly interest payments are made at the option of Reorganized Debtors, and (vi) including customary approval and other rights and covenants for the benefit of the DIP Lender.

b. The Exit Loan Facility Definitive Documents will grant the DIP Lender at least the following approval and other rights with respect to the following matters: (i) changing any of the Companies' business purpose, (ii) declaring bankruptcy or insolvency or liquidating, dissolving or winding up any Company; (iii) incurrence of indebtedness in excess of a mutually agreed threshold; (iv) entering into material contracts providing for payments or expenditures in excess of a mutually agreed threshold; (v) any merger, consolidation or other business combination transaction, or sale of all or substantially all of the Companies' assets; (vi) acquiring or disposing of any business, entity, equity interests, property or assets, including via any merger or consolidation; (vii) equity issuances; (viii) hiring, terminating employment of and setting compensation for management of the Companies in excess of an amount certain; (ix) approving a business plan or operating budget; (x) entering into or approving a related party transaction; (xi) any redemption or repurchase of equity interests in any Company or any successor, including as a result of any merger, consolidation, reorganization or other transaction; (xii) any public offering; (xiii) amendments to the organizational documents of any of the Companies; (xiv) change in entity characterization of Impac for tax purposes; (xv) making or approving any distributions; or (xv) agreeing to any of the foregoing.

13

c.        The Exit Loan Facility Definitive Documents will include a customary rights and covenants package for the benefit of the DIP Lender, including, without limitation, those set forth in the DIP Loan Agreement and as follows:  (i) mandatory prepayments (100% cash sweep); (ii) minimum liquidity covenants; (iii) timely financial reporting and inspection rights; (iv) insurance maintenance requirements (including D&O, E&O, key man, if any); (v) maintenance of a DACA; (vi) right of first refusal on any debt issuance; and (vii) budget approval on a quarterly basis by the DIP Lender.

d.        The Reorganized Debtors will use the proceeds of the Exit Loan Facility to refinance the DIP Obligations and pay certain other expenses to be approved by the Plan Sponsor and the DIP Lender, and otherwise in accordance with the Plan.

4.04.    New Stock Documentation.  The New Stock Documentation will make clear that, after the Plan Effective Date, except as provided in the Tax Preservation Rights Plan, Reorganized Impac will be capitalized only by the New Common Stock, which shall be subject to dilution only as set forth in the Management Incentive Plan, and that all other classes of capital stock of Impac existing before the Petition Date are eliminated.

4.05.    Amended Certificates and Bylaws. The Definitive Documents with respect to the Amended Certificates and Bylaws shall provide that:

a.        Reorganized Impac shall be reorganized under Delaware law, to the extent not already organized in Delaware, and will no longer be subject to OTC Marketplace reporting requirements.

b.        On the Plan Effective Date, the boards of directors of the Reorganized Debtors shall consist of three (3) directors, all of whom shall be nominated by the Plan Sponsor and shall serve three-year terms.  The identities of the initial board of directors of the Reorganized Debtors shall be set forth in the Plan Supplement.  Such initial board members shall also serve as the board of directors for each of the other corporate Reorganized Debtors.  After the initial term of a Reorganized Impac director expires, each director shall be elected in accordance with the terms of the Amended Certificate and Bylaws.  Reorganized Impac shall serve as manager of any Reorganized Debtor that is a limited liability company.

c.        Reorganized Impac's Bylaws shall provide that all post-Plan Effective Date matters requiring the approval of Reorganized Impac's stockholders will require a quorum of not less than a majority of Reorganized Impac's issued and outstanding stock entitled to vote threat, and all matters brought before the stockholders shall be approved by the affirmative vote of greater than fifty-one percent (51%) of the voting power of the then outstanding common stock of Reorganized Impac, voting as a single class.

d.        All decisions of the Reorganized Impac's board of directors will be approved by a simple majority vote of directors.

4.06.    Management Incentive Plan. The Management Incentive Plan shall provide for the issuance of stock appreciation rights to employees and officers of Reorganized Impac that are designated and approved as participants in the Management Incentive Plan.  The amounts, structure, awards, and terms of the Management Incentive Plan shall be set forth in the

14

Management Incentive Plan, which shall be a part of the Plan Supplement, and approved by the Court pursuant to the Confirmation Order.  All awards issued under the Management Incentive Plan will be dilutive of all other equity interests in Reorganized Impac issued in connection with the Plan.

4.07.   The Plan Sponsor acknowledges and agrees that it will use commercially reasonable efforts to provide advance initial draft copies of the Definitive Documents to counsel for the Consenting Subordinated Noteholders and the Companies at least three (3) business days prior to the date when any Debtor is required by the Milestones, Bankruptcy Court Order, or Bankruptcy Rules to file the applicable Definitive Documents with the Bankruptcy Court; provided that if three (3) business days in advance is not reasonably practicable, such initial draft Definitive Document shall be provided as soon as reasonably practicable prior to filing, but in no event later than twenty-four (24) hours in advance of any filing thereof.

**Section 5.**   *Agreements of the Consenting Subordinated Noteholders*.

5.01.   <u>Covenants in Support of the Restructuring Transactions</u>. During the Support Period, subject to the terms and conditions hereof, each of the Consenting Subordinated Noteholders agrees, severally and not jointly, that it shall:

a.   use its commercially reasonable efforts to support the Restructuring Transactions, and to negotiate and otherwise act in good faith and take any and all reasonable actions necessary to consummate the Restructuring Transactions, in a manner consistent with this Agreement;

b.   refrain from initiating or supporting (or directing or encouraging the Collateral Agent or any other party to initiate or support) any actions, including legal proceedings, that are inconsistent with the Restructuring Transactions;

c.   if solicited to do so, timely vote (pursuant to the Plan) or cause to be voted all of its Claims and Interests, as applicable, to accept the Plan by delivering its duly executed and completed ballot or ballots accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code;

d.   opt in to (and not object to) the releases set forth in the Plan by delivering its duly executed and completed ballot(s) indicating such election and not filing any objection to the releases set forth in the Plan with the Bankruptcy Court;

e.   negotiate in good faith with the Companies the forms of the Definitive Documents (to the extent such Consenting Subordinated Noteholder is a party thereto) and, subject to the consent requirements specified herein, execute the Definitive Documents to the extent such Consenting Subordinated Noteholder is a party thereto;

f.   not directly or indirectly, through any Person (including any administrative agent, collateral agent or trustee), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, financing, consummation, or prosecution of any Alternative Proposal;

15

g.        not vote in support of any Alternative Proposal;

h.        not change or withdraw its votes to accept the Plan (or cause or direct such vote to be changed or withdrawn);

i.        negotiate in good faith additional or alternative provisions to this Agreement, in the event any objection, proceeding, or impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions;

j.        consent to usage of cash collateral, the approval of the DIP Facility and entry of the Financing Orders in substantially the form attached hereto as **Exhibit F** (with appropriate changes for the Final Financing Order);

k.        support the release provisions of the Plan and not opt out of granting any third-party releases provided for thereunder to the Companies, the Plan Sponsor or their respective Related Parties;

l.        support and take all reasonable actions necessary or reasonably requested by the Companies to confirm such Consenting Subordinated Noteholder's support for the Restructuring Transactions in accordance with the terms of this Agreement;

m.        not to (and cause any of its affiliates not to) (i) claim any worthless stock deduction with respect to the Company Parties or any direct or indirect subsidiary thereof for any tax year ending on or prior to the Plan Effective Date, as applicable; (ii) pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or  , directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Company Parties or any direct or indirect subsidiary thereof, to the extent such pledge, encumbrance, assignment, sale, or other transaction or event may result in an "ownership change" of any Company Party, or any direct or indirect subsidiary thereof, for purposes of Section 382 of the IRC; or (iii) acquire any outstanding indebtedness of the Company Parties, or any direct or indirect subsidiary thereof, to the extent such acquisition would be expected to impair or adversely affect any of the tax attributes of the Company Parties or any direct or indirect subsidiary thereof under Sections 108 or 1017 of the IRC;

n.        cooperate with respect to the structure of the Restructuring Transactions that (A) minimizes any current taxes payable by the Plan Sponsor and the Company as a result of the consummation of the Restructuring Transactions and (B) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) of the Restructuring Transactions to the Plan Sponsor and the Company, in each case as determined by the Plan Sponsor in good faith; and

o.        not directly or indirectly, through any Person (including any administrative agent, collateral agent or trustee), object to or contest the Claims or Interests of any other Consenting Subordinated Noteholder, or the rights or distributions of any such Claims or Interests under the Plan or as provided for under this Agreement.

16

5.02.    <u>Transfers</u>.  Each Consenting Subordinated Noteholder agrees that, for the duration of the Support Period, such Consenting Subordinated Noteholder shall not sell, transfer, loan, issue, participate, pledge, hypothecate, assign or otherwise dispose of, directly or indirectly, in whole or in part, any of its Claims or Interests, including any beneficial ownership in any such Claims or Interests, or any option thereon or any right or interest therein (including grant any proxies, deposit any Claims or Interests into a voting trust, or entry into a voting agreement with respect thereto).

5.03.    <u>Preservation of Rights</u>. Notwithstanding the foregoing, nothing in this Agreement, and neither a vote to accept the Plan by any Consenting Subordinated Noteholder, nor the acceptance of the Plan by any Consenting Subordinated Noteholder, shall: (a) be construed to limit consent and approval rights provided in this Agreement and the Definitive Documents; (b) be construed to prohibit any Consenting Subordinated Noteholder from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documents, or exercising rights or remedies specifically reserved herein or therein; (c) be construed to prohibit any Consenting Subordinated Noteholder from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, or from consulting with any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); provided that during the Support Period, such appearance or consultation, and the positions advocated in connection therewith, must not be inconsistent with this Agreement and must not be for the purpose of (or could not reasonably be expected to) hindering, delaying, or preventing the consummation of the Restructuring Transactions; (d) subject to **Section 5.04** hereof, limit the ability of any Consenting Subordinated Noteholder to assert any rights, claims, and/or defenses under the Subordinated Notes or the Subordinated Notes Indentures; or (e) affect the ability of any Subordinated Noteholder to consult with any other Subordinated Noteholder or the Companies.

5.04.    <u>Negative Covenants</u>. The Consenting Subordinated Noteholders agree that, for the duration of the Support Period, each Consenting Subordinated Noteholder shall not take any action inconsistent with, or omit to take any action required by, the Subordinated Notes or the Subordinated Notes Indentures, except to the extent that any such action or inaction is expressly contemplated or permitted by this Agreement, the Plan, or any of the other Definitive Documents.

5.05.    <u>Forbearance</u>. For the duration of the Support Period applicable to such Consenting Subordinated Noteholder and except as expressly contemplated by this Agreement, including in **Section 5.04** hereof , each Consenting Subordinated Noteholder agrees to forbear from exercising its rights (including any right of set-off) or remedies it may have under the Subordinated Notes or the Subordinated Notes Indentures, and to defer any claims that have become automatically due and payable thereunder as a result of the commencement of the Chapter 11 Cases, as applicable, and under applicable U.S. or foreign law or otherwise. Each Consenting Subordinated Noteholder further agrees that if any applicable trustee or collateral agent, takes any action inconsistent with such Consenting Subordinated Noteholder's obligations under this Agreement or the Plan, such Consenting Subordinated Noteholder shall use commercially reasonable efforts to direct such administrative agent or collateral agent to cease, withdraw, and refrain from taking any such action.

5.06.    <u>Certain Conditions</u>. The obligations of the Consenting Subordinated Noteholders set forth in this **Section 5** are subject to the following conditions:  (a) this Agreement shall have

US_ACTIVE\131907971

become effective in accordance with the provisions of **Section 2** hereof; and this Agreement shall not have been terminated in accordance with the terms of **Section 10** hereof.

**Section 6.**  *Agreements of the Companies*.

6.01.  <u>DIP Facility</u>. The Companies will incur a senior secured super-priority debtor-in-possession facility in a principal amount of up to $5 million, inclusive of the Rolled Bridge Note Obligations (the "*DIP Facility*"), to be provided by the DIP Lender, and the DIP Lender hereby commits to provide the DIP Facility to the Companies on the terms set forth in this **Section 6.01**. The DIP Facility will be subject to a non-default interest rate of 12%, a default interest rate of an additional 3%, a 4% facility fee to be deducted from the proceeds of the DIP Facility, and a maturity date that is the earlier of 90 days after the Petition Date or the Plan Effective Date, all on the terms and conditions set forth more fully in the DIP Loan Agreement.  The Companies acknowledge and agree that the maximum amounts to be made available under the DIP Facility are sufficient and appropriate.  In its capacity as issuer of the Bridge Loan, the DIP Lender consents to the refinancing of the Bridge Loan through the DIP Facility.

6.02.  <u>Payment of Plan Sponsor/DIP Lender Expenses Amount</u>.  The Companies agree to pay the Plan Sponsor/DIP Lender Expenses Amount from the proceeds of the DIP Facility immediately on the Plan Effective Date or such earlier date as may be provided under the DIP Loan Documents; provided, however, and subject to the terms of **Section 6.06(f)** hereof and the DIP Loan Documents, that the Companies shall have no obligation to reimburse Plan Sponsor and the DIP Lender for the Plan Sponsor/DIP Lender Expenses Amount if Plan Sponsor does not consummate the Restructuring Transactions contemplated by this Agreement on the Plan Effective Date other than for a reason permitted by this Agreement (including without limitation a Plan Sponsor Termination Event contemplated under Section 10.03 hereof).

6.03.  <u>Exit Loan Facility</u>.  The Companies acknowledge and agree that the Companies or the Reorganized Debtors, as applicable, shall fund from the Exit Loan Facility all transactions necessary to implement the Plan, for the occurrence of the Plan Effective Date, and all post-Plan Effective Date transactions.  This includes, and is not limited to, all payments necessary to implement the Plan and for the Plan Effective Date to occur, including payment in full of all Allowed Other Secured Claims, Allowed Priority Non-Tax Claims, Allowed Priority Tax Claims, and Allowed Administrative Claims (including Allowed Fee Claims to the extent not already satisfied from amounts held in the Professional Fee Escrow Account, and United States Trustee Fee Claims) and to fund the GUC Consideration.

6.04.  <u>Affirmative Covenants in Support of the Restructuring Transactions</u>.  During the Support Period, subject to the terms and conditions hereof, each of the Companies agrees that it shall:

a.  utilize the DIP Facility only in accordance with the Budget, including for the fees and expenses of the Companies' professionals as provided for in the Budget;

b.  utilize the proceeds of the DIP Facility only to pay bankruptcy and operating expenses pursuant to the Budget and in accordance with the Financing Orders;

c.  establish and fund the Professional Fee Escrow Account;

18

US_ACTIVE\131907971

d.        support and take all commercially reasonable actions necessary, or requested by the Plan Sponsor, to obtain entry of, the RSA Order and implement and consummate the Restructuring Transactions in a timely manner (including, but not limited to, obtaining and/or supporting, as the case may be, the Bankruptcy Court's approval of the Definitive Documents, solicitation of votes on and confirmation of the Plan and the consummation of the Restructuring Transactions pursuant to the Plan) consistent with the terms of this Agreement and in accordance with the Milestones;

e.        file a motion seeking the Debtors' assumption of this Agreement on the Petition Date;

f.        file the Financing Motion on the Petition Date;

g.        file the NOL Motion on the Petition Date;

h.        timely file a formal objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or (C) dismissing the Chapter 11 Cases;

i.        timely file a formal objection to any motion filed with the Bankruptcy Court by any party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization;

j.        provide to the Plan Sponsor full access during normal business hours, and upon reasonable advance notice, to the Companies' facilities, records, key employees, lenders and advisors for the purpose of completing the Plan Sponsor's due diligence review, which will include, but is not limited to, a complete review of the Companies' financial, legal and tax records and agreements, and any other matters the Plan Sponsor's accountants, tax and legal counsel, and other advisors deem relevant, subject to the Companies' rights to preserve attorney-client privilige;

k.        prosecute and defend any appeals of the Confirmation Order;

l.        negotiate in good faith with the DIP Lender, the Plan Sponsor and Consenting Subordinated Noteholders the forms of the Definitive Documents and execute the Definitive Documents;

m.        execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions;

n.        support the release provisions of the Plan and ensure that the Plan's release provisions shall grant a release by the Companies and their estates to the DIP Lender, the Plan Sponsor and the Consenting Subordinated Noteholders and each of their respective Related Parties of all claims or causes of action held by or on behalf of the Companies or their estates, including derivative claims;

19

o.      with the assistance of the Plan Sponsor, use its commercially reasonable efforts to obtain, file, submit, or register any and all required regulatory and/or third- party approvals for the Restructuring Transactions;

p.      subject to the requirements of the Bankruptcy Court, operate its business in the ordinary course and in a manner designed to facilitate the Restructuring Transactions, including without limitation by filing any tax returns or amended tax returns necessary to preserve any net operating losses or other tax attributes of any of the Companies;

q.      cooperate with respect to the structure of the Restructuring Transactions that (A) minimizes any current taxes payable by the Plan Sponsor and the Company as a result of the consummation of the Restructuring Transactions and (B) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) of the Restructuring Transactions to the Plan Sponsor and the Company, in each case as determined by the Plan Sponsor in good faith; and

r.      promptly notify the DIP Lender, the Plan Sponsor and Consenting Subordinated Noteholders (and in any event within two (2) Business Days after obtaining actual knowledge thereof) of (A) any pending, existing, instituted or threatened lawsuit; (B) any breach by a Company in any respect of any of its obligations, representations, warranties or covenants set forth in this Agreement or the other Definitive Documents; (C) the happening or existence of any event that a Company's board of directors or similar governing body of a Company determines, in good faith and based upon advice of legal counsel, is likely to make any of the conditions precedent set forth in (or to be set forth in) any of the Definitive Documents incapable of being satisfied in accordance with the Milestones; and (D) the occurrence of any Termination Event.

6.05.    <u>Negative Covenants in Support of the Restructuring Transactions</u>.  During the Support Period, subject to the terms and conditions hereof, each of the Companies agrees, severally and not jointly, it shall not, directly or indirectly, do or permit to occur any of the following:

a.      seek, support, encourage, propose, assist, consent to, file, or vote for, or enter or participate in any discussions or any agreement with any Person regarding, directly or indirectly, any Alternative Proposal; subject to **Section 6.06** hereof;

b.      oppose, delay, impede, or take any other action that is materially inconsistent with this Agreement, the Restructuring Transactions or any of the Definitive Documents, or that would, or would reasonably be expected to, prevent, interfere with, delay or impede the implementation, solicitation, confirmation, or consummation of the Restructuring Transaction (including, but not limited to, the Bankruptcy Court's approval of the Definitive Documents (if applicable), the solicitation, and confirmation of the Plan);

c.      execute, deliver and/or file any Definitive Document (including any amendment, supplement or modification of, or any waiver to, any Definitive Document) that, in whole or in part, is not consistent in all material respects with this Agreement or is not otherwise reasonably acceptable to the Plan Sponsor and Consenting Subordinated Noteholders, or file any pleading seeking authorization to accomplish or effect any of the foregoing;

20

d.      enter into any commitment or agreement with respect to debtor-in-possession financing, exit financing and/or other financing arrangements, other than with the DIP Lender or the Plan Sponsor or otherwise without the consent of Plan Sponsor;

e.      abandon, sell, assign, or grant a security interest in, any property owned by a Company outside the ordinary course of business;

f.      take any action, or as to insiders, permit any action, that would result in an "ownership change" as such term is used in section 382 of the IRC;

g.      issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock or limited liability company interests;

h.      split, combine or reclassify any outstanding shares of its capital stock or other equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

i.      redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock or limited liability company interests;

j.      acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of a Company;

k.      file any motion, without the consent of the Plan Sponsor, which consent shall not be unreasonably withheld or delayed, (a) authorizing or directing the assumption or rejection of an executory contract or unexpired lease, except for those that shall be assumed pursuant to the Plan, or (b) authorizing the settlement of any claim or controversy that would be inconsistent with the Plan or would reduce the value of the Companies or the reorganized Companies in the reasonable opinion of the Plan Sponsor or would require payment of any amounts by the Debtors, the Reorganized Debtors or the Plan Sponsor that are not provided for in the Budget;

l.      cause or permit to occur the sale, disposal or other transfer of the Debtors' material assets or take any action in support of, or to cause, any of the foregoing, in each case without the express written consent of the Plan Sponsor in their sole discretion;

m.      make any changes to a Company Party's accounting or tax policies, procedures or principles, including any changes to a Company Party's tax elections, except as required by applicable Law; or

n.      except for any Fiduciary Action or Inaction, take any action that would result (or that with the giving of notice or the passage of time, or both, would result) in a Termination Event.

21

6.06.   <u>Fiduciary Action or Inaction; Alternative Proposals</u>.

a.      Notwithstanding anything to the contrary herein, nothing in this Agreement shall require a Company's board of directors or similar governing body of a Company to take any action, or to refrain from taking any action, with respect to the Restructuring Transactions to the extent the Company's board of directors or similar governing body of the Company determines, after consulting with legal counsel, that taking such action, or refraining from taking such action, as applicable, would not be in compliance with applicable law or inconsistent with its fiduciary obligations under applicable law (any such action or inaction, a "*Fiduciary Action or Inaction*"); *provided*, however, that no Fiduciary Action or Inaction permitted by the foregoing shall be deemed to prevent the DIP Lender, the Plan Sponsor or the Consenting Subordinated Noteholders from taking actions they are permitted to take pursuant to this Agreement as a result of such Fiduciary Action or Inaction, including terminating their obligations hereunder (including pursuant to **Section 10** hereof); *provided*, further, that if any Fiduciary Action or Inaction would otherwise be a breach of a covenant or obligation of the Companies under this Agreement, then the Companies shall deliver written notice of such determination to the DIP Lender, the Plan Sponsor and the Consenting Subordinated Noteholders within one (1) Business Day of such determination (a "*Fiduciary Out Notice*").

b.      The Companies represent and warrant to the DIP Lender, the Plan Sponsor and the Consenting Subordinated Noteholders that there are no pending agreements (oral or written) or understandings, with respect to any plan of reorganization or liquidation, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or equity interests, tender offer, or in or out-of-court restructuring (other than the Restructuring Transactions) involving the Companies, or any of their assets, properties or businesses (an "*Alternative Proposal*").

c.      During the Support Period, the Companies and their advisors may not, directly or indirectly, solicit, initiate or knowingly encourage, or take any other action designed to facilitate, any inquiries or the making of any proposal that constitutes, or may reasonably be expected to lead to, any Alternative Proposal from any person or group of persons other than the Plan Sponsor or provide any non-public information to any third party in connection with an Alternative Proposal or enter into any agreement, arrangement or understanding requiring it to abandon, terminate or fail to consummate the Restructuring Transactions.

d.      If the Companies receive a proposal or expression of interest (written or oral) regarding an Alternative Proposal, the Companies shall promptly (and in any case no later than twenty-four (24) hours) notify counsel to the Consenting Subordinated Noteholders (and if none, to the Consenting Subordinated Noteholders at the notice address set forth below) and counsel to the DIP Lender and the Plan Sponsor of the receipt of any such proposal or expression of interest relating to an Alternative Proposal, with such notice to include the material terms thereof and, if applicable, a copy of such proposal, expression of interest, or Alternative Proposal, including the identity of the person or group of persons submitting such proposal (it being understood and agreed that the Companies shall not

22

US_ACTIVE\131907971

enter into any confidentiality or other agreement that would prohibit the Companies' obligations under this **Section 6.06(d)**).

e.        In the event the Companies determine to terminate this Agreement to move forward with a *bona fide*, committed Alternative Proposal or otherwise in a purported exercise of their fiduciary duties, the Companies shall first provide the Plan Sponsor with at least three (3) Business Days' notice, of the material terms and conditions of such Alternative Proposal and/or their intent to terminate this Agreement, during which time the Plan Sponsor shall have a right of first refusal to match the terms of such *bona fide*, committed Alternative Proposal or otherwise to seek any available relief (if any) from the Bankruptcy Court; provided that the Plan Sponsor shall have no obligation to match such terms; and provided further, for the avoidance of doubt, that the Plan Sponsor's timeframe to exercise their right of first refusal shall not begin to run until the later of (i) the date that notice of such Alternative Proposal is provided to the Plan Sponsor or (ii) the date on which the documents memorializing such Alternative Proposal have been signed by both the Companies and the Alternative Proposal counterparty.

f.        In the event the Plan Sponsor does not exercise its rights of first refusal as described above in **Section 6.06(e)** hereof, the Companies otherwise seek to breach or terminate this Agreement in order to pursue an Alternative Proposal, the Bankruptcy Court approves an Alternative Proposal, or the Companies otherwise refuse or fail for any reason to consummate the Restructuring Transactions on the timeframes set forth herein or in any Financing Orders, then the DIP Lender and the Plan Sponsor, in addition to any and all rights that they have under the DIP Documents or the Plan, shall be entitled to the payment and/or repayment of (i) the full amount of all fees and expenses incurred by the DIP Lender and the Plan Sponsor in connection with the Transaction; plus (ii) a termination/break-up fee in an amount equal to 3% of the value of the Alternative Proposal, all determined and payable at closing of such transaction (the "*Alternative Transaction*"); plus (iii) all principal, interest and other amounts outstanding under the DIP Loan and the Senior Indebtedness, including without limitation all non-contingent indemnification, advancement, contribution or similar ancillary obligations then due and owing thereunder (items (i)-(iii) above, the "*Breakup Fee/Reimbursement Amount*").  Pending receipt of such payments, the DIP Lender and the Plan Sponsor shall have an allowed claim pursuant to sections 503(b) and 507(a)(2), (b) of the Bankruptcy Code for such amounts, in addition to all of their rights, claims and liens under Senior Indebtedness Documents and the DIP Loan Documents (including, for the avoidance of doubt, all superpriority claims and liens granted pursuant to any of the Financing Orders).

g.        If the Companies become obligated to pay the Breakup Fee/Reimbursement Amount, the Companies will thereafter own the work product associated with the expenses and be able to utilize that work product in consummating an Alternate Proposal, provided that the Companies are not otherwise in breach of this Agreement, and provided, further, that nothing contained herein will cause or permit (i) the Companies to own any work product containing any information protected under the attorney-client privilege or other privilege benefiting the DIP Lender or the Plan Sponsor, and (ii) a waiver of any attorney-client or other privilege benefitting the DIP Lender or the Plan Sponsor.

US_ACTIVE\131907971

6.07.   <u>Automatic Stay</u>. Each Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and each Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice); *provided*, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

6.08.   <u>Certain Conditions</u>.  The obligations of the Companies set forth in this **Section 6** are subject to the following conditions:

a.      this Agreement shall have become effective in accordance with the provisions of **Section 2** hereof; and

b.      this Agreement shall not have been terminated in accordance with the terms of **Section 10** hereof.

**Section 7.      *Agreements of the Plan Sponsor.***

7.01.   <u>Restructuring Transactions Commitments</u>. Subject to the terms and conditions set forth herein, including those set forth in **Section 7.03** hereof, and provided that the Companies and Consenting Subordinated Noteholders are not in default of their obligations hereunder, and in all respects to facilitate the Restructuring Transactions, the Plan Sponsor agrees:

a.      except as otherwise agreed by the Companies and the Plan Sponsor in writing (which writing may be an e-mail) to prepare all initial drafts of the Definitive Documents for the Companies' review and comment;

b.      upon the Plan Sponsor's conclusion of diligence and reasonable determination that (i) no ownership change of Impac has occurred as contemplated by 26 U.S.C. § 382, and (ii) Impac's federal net operating losses exist in the amount of not less than $800 million, and upon Plan Sponsor's receipt of the Budget, and provided that Companies are otherwise in compliance with the terms and conditions of this Agreement and are working and cooperating to the reasonable satisfaction of the DIP Lender and Plan Sponsor toward the effectuation of the Restructuring Transactions, to cause the DIP Lender to fund the DIP Facility to the Companies subject to and in accordance with the terms of the DIP Loan Documents, the proceeds of which shall be used only in accordance with the Budget, including to fund amounts necessary to fund the Professional Fee Escrow Account. For the avoidance of doubt, upon termination or expiration of this Agreement in accordance with its terms, the commitment of the Plan Sponsor to cause the DIP Lender to fund the DIP Facility pursuant to this **Section 7.01(b)** shall terminate;

c.      to support and take all actions necessary or reasonably requested by the Companies to facilitate the implementation and consummation of the Restructuring Transactions in a timely manner, including without limitation supporting approval of the Financing Orders, the filing of the Plan, an accompanying Disclosure Statement and all other Definitive Documents required to be filed in connection with the solicitation of votes on, and confirmation of, the Plan; provided that nothing herein shall impose on the Plan Sponsor

24

any requirement to agree to (i) extend the Milestones, or (ii) increase or provide any funding or loan to the Companies not otherwise contemplated by this Agreement, or (ii) waive or modify any material condition or provision of this Agreement, or any Definitive Document;

d.      support the release provisions of the Plan and opt in to granting any third party releases provided for thereunder to the Companies, the DIP Lender, the Consenting Subordinated Noteholders and their respective Related Parties;

e.      deem all Allowed General Unsecured Claims to reject the Plan, provided that amounts paid in respect of the satisfaction of the Allowed General Unsecured Claims shall be paid solely from the GUC Consideration, and if Allowed General Unsecured Claims are less than GUC Consideration, excess proceeds will be used to repay the Exit Facility; and

f.      not to (and cause any of its affiliates not to) (i) claim any worthless stock deduction with respect to the Company Parties or any direct or indirect subsidiary thereof for any tax year ending on or prior to the Plan Effective Date, as applicable; (ii) pledge, encumber, assign, sell, or otherwise transfer, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, directly or indirectly, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Company Parties or any direct or indirect subsidiary thereof, to the extent such pledge, encumbrance, assignment, sale, or other transaction or event may result in an "ownership change" of any Company Party, or any direct or indirect subsidiary thereof, for purposes of Section 382 of the IRC; or (iii) acquire any outstanding indebtedness of the Company Parties, or any direct or indirect subsidiary thereof, to the extent such acquisition would be expected to impair or adversely affect any of the tax attributes of the Company Parties or any direct or indirect subsidiary thereof under Sections 108 or 1017 of the IRC;

g.      cooperate with respect to the structure of the Restructuring Transactions that (A) minimizes any current taxes payable by the Plan Sponsor and the Company as a result of the consummation of the Restructuring Transactions and (B) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes) of the Restructuring Transactions to the Plan Sponsor and the Company, in each case as determined by the Plan Sponsor in good faith; and

h.      subject to occurrence of the Plan Effective Date and subject to the other terms and conditions of the Plan and this Agreement, to enter into the Exit Loan Agreement and to fund the Exit Loan Amount in accordance with the terms of the Plan and Exit Loan Agreement.

7.02.   Funding Limitations.  For the avoidance of doubt, neither the Plan Sponsor nor the DIP Lender shall be required to fund any amount in connection with the Plan or the Restructuring Transactions except for the Exit Loan Amount and the DIP Facility, in each case on the terms set forth in the Exit Loan Agreement and the DIP Loan Documents.

25

7.03.  <u>Certain Conditions</u>.  The obligations of the Plan Sponsor to consummate the Restructuring Transactions pursuant to the Plan and on the terms set forth in this **Section 7** are subject to the following conditions:

a.      this Agreement shall have become effective in accordance with the provisions of **Section 2** hereof;

b.      this Agreement shall not have been terminated in accordance with the terms of **Section 10** hereof;

c.      the board of directors (or manager, as applicable) of each of the Companies shall have approved the Restructuring Transactions;

d.      each of the Definitive Documents shall be in form and substance acceptable to the Plan Sponsor;

e.      the Debtors shall have met the Milestones set forth on **Exhibit G** hereto;

f.      with respect to the DIP Facility, the Bankruptcy Court shall have entered the Interim Financing Order and Final Financing Order, as applicable, in form and substance acceptable to DIP Lender and the Plan Sponsor and the Debtors shall be in compliance with the covenants in the DIP Facility Documents;

g.      the Debtors shall have obtained entry of an order by the Bankruptcy Court approving the NOL Motion on terms reasonably satisfactory in form and substance to the Plan Sponsor;

h.      the Bankruptcy Court shall have entered an order approving the Debtors' assumption of this Agreement;

i.      Plan Sponsor tax counsel shall have issued an opinion that the transactions contemplated by the Plan, individually and in the aggregate, will not result in the application of Section 382(a) of the IRC to Impac;

j.      with respect to the Plan:

(i)      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a final and non-appealable order;

(ii)      all conditions precedent to the occurrence of the Plan Effective Date shall have been satisfied;

(iii)      the Consenting Subordinated Noteholders approving the Restructuring Transaction shall have provided reasonable and customary releases to the Companies and the DIP Lender and Plan Sponsor pursuant to the Plan;

(iv)      the Debtors shall have received any necessary regulatory approvals and material third party consents, on terms reasonably satisfactory to the Plan Sponsor; and

US_ACTIVE\131907971

(v)      to the extent requested by the Plan Sponsor, the Bankruptcy Court shall have authorized the Debtors to adopt the Tax Preservation Rights Plan for Reorganized Impac and to amend the Impac certificate of incorporation on the terms provided in such Tax Preservation Rights Plan;

k.      Impac shall have been delisted from the OTC Marketplace (Pink Sheets) and not subject to any OTC Marketplace reporting requirements;

l.      Impac shall have represented and warranted to the Plan Sponsor the amount of net operating losses and capital loss carryovers available (including the amount, the year the loss incurred, and the expiration period) and shall have provided to the Plan Sponsor a detailed capitalization disclosures and a list of its largest shareholders as of the Plan Effective Date as well as its latest financial statements and disclosures around its list of bank accounts, prior taxes paid and any existing liens;

m.      the Exit Loan Facility shall be sufficient to satisfy all payments necessary to implement the Plan and for the Plan Effective Date to occur, including payment in full of all Allowed Other Secured Claims, Allowed Priority Non-Tax Claims, Allowed Priority Tax Claims, and Allowed Administrative Claims (including Allowed Fee Claims to the extent not already satisfied from amounts held in the Professional Fee Escrow Account, and United States Trustee Fee Claims), and the GUC Consideration; and

n.      the Companies shall have maintained insurance policies deemed necessary or appropriate by the Plan Sponsor, including without limitation, general liability, D&O, E&O and key man, if any, insurance policies, if any.

**Section 8.**      *Representations and Warranties*.

8.01.    Each of the Parties, severally, and not jointly, represents and warrants to each other Party that the following statements are complete and correct as of the date hereof:

a.      <u>Enforceability</u>. It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

b.      <u>No Consent or Approval</u>. Except as expressly provided in this Agreement, the Plan, or the Bankruptcy Code, no consent or approval is required by any other Person in order for it to effectuate the Restructuring Transactions contemplated by, and perform the respective obligations under, this Agreement.

c.      <u>Power and Authority</u>. Except as expressly provided in this Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement.

US_ACTIVE\131907971

d.     Governmental Consents. Subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transaction, the execution, delivery and performance by it of this Agreement does not require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

e.     No Conflicts. The execution, delivery, and performance of this Agreement does not: (i) violate any provision of law, rules or regulations applicable to it in any material respect; (ii) violate its certificate of incorporation, bylaws, or other organizational documents; or (iii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring Transactions.

8.02.   Each Consenting Subordinated Noteholder, severally, and not jointly, represents and warrants to each other Party that the following statements are complete and correct as of the date hereof:

a.     it is the beneficial owner of the face amount of the Company Claims and Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims and Interests, as reflected in such Consenting Subordinated Noteholder's signature block to this Agreement (such Company Claims and Interests, the "*Owned Company Claims/Interests*");

b.     it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Company Claims/Interests;

c.     the Owned Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Subordinated Noteholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

d.     (i) it is one of (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) an institutional accredited investor (as defined in Rule 501 of Regulation D under the Securities Act), or (C) a non-U.S. person who (x) is at the time of executing this Agreement, and has been at all times during the negotiation hereof, located outside the United States acquiring any securities of the Company Party in connection with the Restructuring Transactions in an offshore transaction (as each of those terms is used in Regulation S under the Securities Act) and (y) is a person or other entity to whom any securities of the Company Party may be offered and sold in the Restructuring Transactions in the manner contemplated herein without registration, qualification, filing or other governmental, stock exchange or regulatory approval or notification or similar process in its jurisdiction of incorporation, place of business or domicile or residence, if different, and (ii) any securities of any Company Party acquired by the applicable Consenting Subordinated Noteholder in connection with the Restructuring Transactions will have been

US_ACTIVE\131907971

acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

e.    as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person, would prevent it from taking any action required of it under this Agreement.

8.03.    Each Company, severally, and not jointly, represents and warrants to each other Party that the following statements are complete and correct as of the date hereof:

a.    based on the facts and circumstances actually known by such Company, the Company's entry into this Agreement is consistent with the fiduciary duties of the Company and any directors or officers of the Company under applicable law; and

b.    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

8.04.    The Plan Sponsor represents and warrants to each other Party that, as of the date hereof, it has the financial wherewithal, ability and/or any necessary commitments to consummate the Restructuring Transactions in accordance with the timeframes and deadlines set forth in this Agreement, including, but not limited to, the timely fulfillment of its obligations.

**Section 9.**    *Acknowledgement*. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code. The Companies will not solicit acceptances of any Plan from Consenting Subordinated Noteholders in any manner inconsistent with the Bankruptcy Code or applicable non-bankruptcy law.

**Section 10.**    *Termination Events*.

10.01.    Consenting Subordinated Noteholder Termination Events. This Agreement may be terminated by any Consenting Subordinated Noteholder ("*Terminating Consenting Subordinated Noteholders*") by delivery of a written notice in accordance with **Section 12.09**, in the exercise of their sole discretion, upon the occurrence and continuation of any of the following events; provided that the Terminating Consenting Subordinated Noteholders (or any of them) shall provide the Companies and Plan Sponsor notice and an opportunity to cure of not less than five (5) business days for each of the following events:

a.    the material breach (which remains uncured) by any Party other than the Terminating Consenting Subordinated Noteholders of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would materially and adversely affect the Restructuring Transactions or the recovery of any Consenting Subordinated Noteholder;

29

b.       the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order enjoining, the consummation of a material portion of the Restructuring Transactions or that materially impacts or impairs any of the Consenting Subordinated Noteholders' rights or anticipated distributions as set forth in this Agreement;

c.       the entry of an order by the Bankruptcy Court (or any other court of competent jurisdiction), or the filing of a motion or application by any Company seeking an order (without the consent of the Consenting Subordinated Noteholders), (i) converting one or more of the Chapter 11 Cases of a Company to a case under chapter 7 of the Bankruptcy Code, (ii) appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases of a Company, (iii) rejecting, voiding, or deeming unenforceable this Agreement pursuant to section 365 of the Bankruptcy Code or otherwise or (iv) approving an Alternative Proposal;

d.       the Bankruptcy Court grants relief that is inconsistent in any material respect with this Agreement, the Definitive Documents or the Restructuring Transactions, and such inconsistent relief is not dismissed, vacated or modified to be consistent with this Agreement during the cure period provided for herein and materially impacts the recovery of any Consenting Subordinated Noteholder and that materially impacts or impairs any of the Consenting Subordinated Noteholders' rights or anticipated distributions as set forth in this Agreement;

e.       any Company (i) files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document, in a manner that is materially inconsistent with, or constitutes a material breach (which remains uncured) of, this Agreement and is adverse to the Terminating Consenting Subordinated Noteholder (including with respect to the consent rights afforded the Consenting Subordinated Noteholders under this Agreement), without the prior written consent of the Consenting Subordinated Noteholders, (ii) withdraws the Plan without the prior consent of the Consenting Subordinated Noteholders, or (iii) publicly announces its intention to take any such acts listed in the immediately preceding clause;

f.       on or after the Agreement Effective Date, any of the Companies consummates, announces, or enters into a definitive agreement evidencing any merger, consolidation, disposition of material assets, acquisition of material assets, or similar transaction, pays any dividend, or incurs any indebtedness for borrowed money, in each case outside the ordinary course of business, in each case other than: (i) the Restructuring Transactions or (ii) with the prior consent of the Consenting Subordinated Noteholders;

g.       a Company's board of directors or similar body of a Company exercises a Fiduciary Out, or a Fiduciary Out Notice is delivered (or required to be delivered) to the Consenting Subordinated Noteholders;

h.       any of the following shall have occurred: (i) the Companies or any affiliate of the Companies shall have filed any motion, application, adversary proceeding or cause of

US_ACTIVE\131907971

action (A) challenging the validity, enforceability, or priority of, or seek avoidance or subordination of the Subordinated Notes Claims, or (B) otherwise seeking to impose liability upon or enjoin the Consenting Subordinated Noteholders (in each case, other than with respect to a breach of this Agreement); (ii) the Companies or any affiliate of the Companies shall have supported any application, adversary proceeding or cause of action referred to in clause (i) filed by another person, or consents (without the consent of the Consenting Subordinated Noteholders) to the standing of any such person to bring such application, adversary proceeding or cause of action; or (iii) the Bankruptcy Court shall have entered an order that materially impacts or impairs any of the Consenting Subordinated Noteholders' rights or anticipated distributions as set forth in this Agreement; or

i.        the Bankruptcy Court enters an order amending, modifying, staying or vacating any of the Definitive Documents in the form approved by the Consenting Subordinated Noteholders in a manner that materially and adversely affects the Restructuring Transactions or the Consenting Subordinated Noteholders (including their recoveries pursuant to the Restructuring Transactions or the value thereof).

10.02.  Company Termination Events. Any Company may terminate this Agreement (the "*Terminating Company*") as to all Parties (except as expressly provided below) upon delivery of a written notice in accordance with **Section 12.09**, in the exercise of their sole discretion, upon the occurrence and continuation of any of the following events; provided that the Terminating Company (or any of them) shall provide the Consenting Subordinated Noteholders and Plan Sponsor notice and an opportunity to cure of not less than five (5) business days for each of the following events:

a.        the Consenting Subordinated Noteholders', the DIP Lender's or Plan Sponsor's material breach (which remains uncured) of any of their obligations under this Agreement;

b.        the breach (that remains uncured) by one or more of any Consenting Subordinated Noteholders or by the Plan Sponsor of any of the representations, warranties, or covenants of such breaching Party as set forth in this Agreement that would materially and adversely affect the Restructuring Transactions;

c.        a Company's board of directors or similar governing body of a Company determines, after consulting with legal counsel, to terminate this Agreement as a result of a Fiduciary Action or Inaction (a "*Fiduciary Out*");

d.        the Bankruptcy Court grants relief that would reasonably be expected to materially frustrate the purpose of this Agreement, except as may be permitted to in writing by the Companies; or

e.        the termination of this Agreement by (a) the Consenting Subordinated Noteholders, or (b) the Plan Sponsor.

10.03.  Plan Sponsor Termination Events.  This Agreement may be terminated by the Plan Sponsor by delivery of a written notice in accordance with **Section 12.09**, in the exercise of their sole discretion, upon the occurrence and continuation of any of the following events; provided that

31

US_ACTIVE\131907971

the Plan Sponsor shall provide the Companies and Consenting Subordinated Noteholders notice and an opportunity to cure of not less than five (5) business days for each of the following events:

a.        the Companies or Consenting Subordinated Noteholders' material breach (which remains uncured) of any of their obligations under this Agreement;

b.        any of the following shall have occurred: (i) the Companies or any affiliate of the Companies shall have filed any motion, application, adversary proceeding or cause of action (A) challenging the validity, enforceability, or priority of, or seek avoidance or subordination of the Senior Indebtedness Claims, or (B) otherwise seeking to impose liability upon or enjoin the Plan Sponsor or the DIP Lender (in each case, other than with respect to a breach of this Agreement); (ii) the Companies or any affiliate of the Companies shall have supported any application, adversary proceeding or cause of action referred to in clause (i) above filed by another person, or consents (without the consent of the Consenting Subordinated Noteholders) to the standing of any such person to bring such application, adversary proceeding or cause of action; or (iii) the Bankruptcy Court shall have entered an order that materially impacts or impairs any of the DIP Lender's or the Plan Sponsor's rights or anticipated distributions as set forth in this Agreement;

c.        the Plan Sponsor reasonably determine that an "ownership change" as such term is used in section 382 of the IRC has occurred;

d.        the Companies fail to comply with, satisfy, or timely to achieve any Chapter 11 Cases Milestone;

e.        the occurrence of an event of termination under the Financing Orders;

f.        the Companies fail to provide the Plan Sponsor and its agents with reasonable access to Companies' books, records, and management through the Plan Effective Date as provided for herein;

g.        any of the Companies' material assets, are sold, assigned, licensed, pledged, collaterally assigned or otherwise transferred, or the Companies or any Consenting Subordinated Noteholder takes any action in support of, or to cause, any of the foregoing, in each case without the written consent of the Plan Sponsor in their sole discretion;

h.        a Company's board of directors or similar governing body of a Company exercises a Fiduciary Out, or a Fiduciary Out Notice is delivered (or required to be delivered) to the Plan Sponsor;

i.        the Companies file any pleading to secure post-petition financing from any party other than the DIP Lender or Plan Sponsor, including financing that provides for super-priority claims or priming liens on any collateral of the DIP Lender or Plan Sponsor after extension of the DIP Facility without the DIP Lender and Plan Sponsor's consent in writing in its sole and absolute discretion;

US_ACTIVE\131907971

j.  any of the Definitive Documents filed in the Chapter 11 Cases contain terms and conditions materially inconsistent with this Agreement or the Restructuring Transaction, except as may be permitted in writing by the Plan Sponsor;

k.  conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, appointment of a chapter 11 trustee, a responsible officer, or an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the Companies, or dismissal of the Chapter 11 Cases;

l.  the Bankruptcy Court grants relief that would reasonably be expected to materially frustrate the purpose of this Agreement, except as may be permitted in writing by the Plan Sponsor;

m.  the Companies accept, file for approval of or otherwise support any Alternative Proposal or other transaction that is inconsistent with the Plan or the Restructuring Transactions;

n.  any Company (i) files, amends, or modifies, or files a pleading seeking approval of, any Definitive Document or authority to amend or modify any Definitive Document, in a manner that is materially inconsistent with, or constitutes a material breach (which remains uncured) of, this Agreement without the prior written consent of the Plan Sponsor, (ii) withdraws the Plan without the prior consent of the Plan Sponsor, or (iii) publicly announces its intention to take any such acts listed in the immediately preceding clause;

o.  on or after the Agreement Effective Date, any of the Companies consummates, announces, or enters into a definitive agreement evidencing any merger, consolidation, disposition of material assets, acquisition of material assets, or similar transaction, pays any dividend, or incurs any indebtedness for borrowed money, in each case outside the ordinary course of business, in each case other than: (i) the Restructuring Transactions or (ii) with the prior consent of the Plan Sponsor;

p.  the Financing Orders or any of the orders approving the Plan, or the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Plan Sponsor;

q.  the Plan Sponsor shall reasonably determine, after consultation with the Companies, that any of the conditions to the occurrence of Confirmation or the Plan Effective Date, including without limitation those conditions identified in **Section 7.03** above, will be impossible to satisfy (*e.g.*, the Plan Sponsor reasonably determine that the Exit Loan Facility will be insufficient to satisfy the payments contemplated to be paid therefrom); or

r.  the Bankruptcy Court's approval of an Alternative Proposal or other transaction that is inconsistent with the terms of the Restructuring Transaction.

10.04.  Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated in writing by mutual agreement among the Consenting Subordinated Noteholders, the Plan Sponsor, and each of the Companies.

33

10.05.   Termination Upon Completion of the Restructuring Transactions. This Agreement, and the obligations of all Parties hereunder, shall terminate automatically without any further required action or notice on the Plan Effective Date.

10.06.   Effect of Termination. No Party may terminate this Agreement if such Party failed to perform or comply in any material respect with the terms and conditions of this Agreement, with such failure to perform or comply in such material respect causing, or resulting in, the occurrence of one or more termination events specified herein. The date on which termination of this Agreement as to a Party is effective in accordance with this **Section 10** shall be referred to as a "*Termination Date*". Except as set forth below, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as between the terminating Party and the other Parties, and each Party subject to such termination shall be released from its obligations, commitments, undertakings, and agreements under or related to this Agreement (or any documents, instruments, or agreements related hereto) and shall have the rights and remedies that it would have had, had it not entered into this Agreement (or any documents, instruments, or agreements related thereto), and shall be entitled to take any and all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement (or any documents, instruments, or agreements related thereto); provided that **Sections 6.06(f), 10, 11 and 12** shall survive the termination of this Agreement. For the avoidance of doubt, if any class of Consenting Subordinated Noteholders terminates this Agreement, the remaining Consenting Subordinated Noteholders shall remain bound by this Agreement unless it is separately terminated by the remaining classes of Consenting Subordinated Noteholders, the DIP Lender, Plan Sponsor or Companies, as applicable. Upon the occurrence of a Termination Date, any and all consents or ballots tendered by the Terminating Consenting Subordinated Noteholders, or in the event of termination by a Company, any and all consents or ballots tendered by any Party, before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit the DIP Lender, the Plan Sponsor, the Companies or any of the Consenting Subordinated Noteholders from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement (or any documents, instruments, or agreements related thereto) that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company or the ability of any Company to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Subordinated Noteholder; (b) any right of any Consenting Subordinated Noteholder, or the ability of any Consenting Subordinated Noteholder to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Debtor or Consenting Subordinated Noteholder; or (c) any right of the DIP Lender or Plan Sponsor or the ability of the DIP Lender or Plan Sponsor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company or Consenting Subordinated Noteholder.  Nothing in this **Section 10.06** shall restrict any Party's right to terminate this Agreement in accordance with this **Section 10**.

34

**Section 11.** *Amendments; Waivers*. This Agreement may not be modified, amended, restated, or supplemented in any manner except in writing signed by all of: (a) the Consenting Subordinated Noteholders; (b) the Plan Sponsor; (c) the DIP Lender; and (d) each of the Companies. Any proposed modification, amendment, restatement, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*. No failure or delay by a Party in enforcing any of such Party's rights under this Agreement will be deemed to be a waiver of such rights. No single or partial exercise of a Party's rights will be deemed to preclude any other or further exercise of such Party's rights under this Agreement. No waiver of any of a Party's rights under this Agreement will be effective unless it is in writing and signed by the Parties.

**Section 12.** *Miscellaneous*.

12.01. Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other documents, instruments, and agreements, and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions in accordance with the terms of this Agreement, as applicable.

12.02. Headings. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

12.03. GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the Southern District of New York or any court located in the State of New York (the "*Chosen Courts*"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto; provided, however, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court for the duration of the Chapter 11 Cases or as long as the Bankruptcy Court exercises jurisdiction over the Debtors.

12.04. Disclosure; Publicity. The Companies shall submit drafts of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement, or otherwise relating to the Restructuring Transactions, to the Consenting Subordinated Noteholders, the DIP Lender and Plan Sponsor and their counsel (if any) at least two (2) Business Days prior to making any such disclosure. Subject to this **Section 12.04**, none of Consenting Subordinated Noteholder, DIP Lender or Plan Sponsor shall, without the prior written consent of the Companies, make any public announcement or otherwise communicate (other than to decline to comment) with any Person with respect to this Agreement or the Restructuring Transactions or any of the transactions contemplated hereby or thereby, other

35

than as may be required by applicable law and regulation or by any governmental or regulatory authority or as may be required in connection with an annual report or to any representative of any Party who reasonably needs to know such information or by a Party or any of its affiliates as part of such Person's ordinary course internal or external reporting or review procedure or to such Person's equity and debt investors or any current or prospective investors, in each case (to the extent applicable) so long as such Person is obligated to keep such information confidential on terms at least as protective as contained herein. This **Section 12.04** shall not apply with respect to any information that is or becomes available to the public other than as a result of a disclosure in violation of any Party's obligations under this Agreement.

12.05.  Trial by Jury Waiver. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.06.  Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic (including via .PDF) signature and delivery. Each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

12.07.  Interpretation and Rules of Construction. This Agreement and the exhibits hereto are the product of negotiations among the Companies, Plan Sponsor, the DIP Lender and the Consenting Subordinated Noteholders, and in the enforcement or interpretation hereof, are to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any exhibit hereto, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Companies, Plan Sponsor, the DIP Lender and the Consenting Subordinated Noteholders were each represented by counsel, or had the opportunity to be represented by counsel, during the negotiations and drafting of this Agreement and the exhibits hereto and continue to be represented by counsel or to have the opportunity to be represented by counsel. In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

12.08.  Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person.

12.09.  Notices. All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail (provided that no undeliverable message is received by the sender), courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

If to the Debtors:

Impac Mortgage Holdings, Inc.

36

19800 MacArthur Blvd., Suite 500, Irvine, CA 92612
Attention: Legal Department
Email: GeneralCounselDG@impacmail.com

with a copy to

PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones
919 North Market Street, 17th Floor
Wilmington, DE  19899
Telephone:  (302) 652-4100
Email:  ljones@pszjlaw.com

-and -

DENTONS US LLP
Tania M. Moyron
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email:  tania.moyron@dentons.com

If to the Plan Sponsor, the DIP Lender or the Reorganized Debtors:

Hildene re SPC, Ltd.
333 Ludlow Street
South Tower, 5th Floor
Stamford, Connecticut  06902
Attn:  Justin Gregory
E-mail:  corporateactions@hildenecap.com

with a copy to

Lowenstein Sandler LLP
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
Attn:  Daniel B. Besikof
E-mail:  dbesikof@lowenstein.com

US_ACTIVE\131907971

If to the Consenting Subordinated Noteholders

Taberna Preferred Funding 1 LTD
Taberna Preferred Funding 2 LTD
333 Ludlow Street
South Tower, 5th Floor
Stamford, Connecticut  06902
Attention:  Jennifer Nam
E-mail:  jnam@hildenecap.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.

Any notice given by mail or courier shall be effective when received.

12.10.  Independent Due Diligence and Decision Making. Each Party hereby confirms that its decision to execute and deliver this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Companies.

12.11. Waiver. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

12.12. Prior Negotiations; Entire Agreement. This Agreement (including the exhibits hereto and made a part hereof) constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, written and oral, between the Parties with respect to the transactions contemplated hereby.

12.13. Specific Performance. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

12.14. Several, Not Joint, Claims. The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

12.15. Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

US_ACTIVE\131907971

12.16. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

*[Signature Pages Follow]*

Dated: April 22, 2026

IMPAC MORTGAGE HOLDINGS, INC., on behalf of itself and all other Debtors

By: /s/ _____

George A. Mangiaracina
Chief Executive Officer

*Signature Page to RSA*

Dated: April 21, 2026

HILDENE RE SPC, LTD., ACTING FOR AND ON BEHALF OF THE ACCOUNT OF SP 1

BY: HILDENE CAPITAL MANAGEMENT, LLC, as its investment manager

By: _____
Name: Dushyant Mehra
Title: Co-Chief Investment Officer

*Signature Page to RSA*

Dated: April 21, 2026

TABERNA PREFERRED FUNDING I, LTD.
By: HCMC III, LLC, as its collateral manager

By: _Jennifer Nam_____
      Jennifer Nam Vice President


TABERNA PREFERRED FUNDING II, LTD.
By: HCMC III, LLC, as its collateral manager

By: _Jennifer Nam_____
      Jennifer Nam Vice President

*Signature Page to RSA*

**Exhibit A**

**Plan**

*Form of Chapter 11 Plan*

**IMPORTANT: THE SOLICITATION MATERIALS ACCOMPANYING THE PLAN OF REORGANIZATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a).  THE DEBTORS EXPECT TO SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THE PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IMPAC MORTGAGE HOLDINGS, INC., *et al.*,[1] | ) Case No. 26-_____ (__) |
| | ) |
| | ) |
| | ) (Joint Administration Requested) |
| Debtors. | ) |
| | ) |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF**
**IMPAC MORTGAGE HOLDINGS, INC. AND AFFILIATES THEREOF**

**PACHULSKI STANG ZIEHL & JONES LLP**

Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal
Timothy Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
Wilmington, DE 19899
Telephone: (302) 652-4100
Email: ljones@pszjlaw.com
debertenthal@pszjlaw.com
tcairns@pszjlaw.com

**DENTONS US LLP**

Tania M. Moyron (*pro hac vice* pending)
Van C. Durrer, II (DE Bar No. 3827)
601 S. Figueroa Street #2500
Los Angeles, CA 90017
Telephone:  (213) 623-9300
Email: tania.moyron@dentons.com
van.durrer@dentons.com

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Impac Mortgage Holdings, Inc. (5505); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Funding Corporation (4495); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Services Corp. (2263); Impac Mortgage Corp. (3937); Impac Warehouse Lending, Inc. (0541); Synergy Capital Mortgage Corp. (9071); and Impac Warehouse Lending Group, Inc. (3488). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

# TABLE OF CONTENTS

SECTION 1 DEFINITIONS, RULES OF CONSTRUCTION AND EXHIBITS ........................ 1

    1.1    Definitions. ..................................................................................................... 1

    1.2    Interpretation; Application of Definitions and Rules of Construction. .................. 18

    1.3    Exhibits. ........................................................................................................ 18

SECTION 2 CLASSIFICATION OF CLAIMS AND INTERESTS .......................................... 19

    2.1    General. ......................................................................................................... 19

    2.2    Unclassified Claims (Not Entitled to Vote on the Plan). ...................................... 19

    2.3    Classification of Claims and Interests. .................................................................. 19

    2.4    Unimpaired Class of Claims. ................................................................................ 20

    2.5    Impaired Classes of Claims and Interests. ............................................................ 20

    2.6    Vacant and Abstaining Classes. ........................................................................... 20

SECTION 3 TREATMENT OF CLAIMS AND INTERESTS ................................................. 21

    3.1    Satisfaction of Claims and Interests. .................................................................... 21

    3.2    Treatment of Unclassified Claims. ....................................................................... 21

    3.3    Provisions for Treatment of Classified Claims. ..................................................... 23

SECTION 4 ACCEPTANCE OR REJECTION OF THE PLAN ............................................. 26

    4.1    Acceptance by a Class of Claims. ......................................................................... 26

    4.2    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cram Down." ........................................................................................................... 27

    4.3    Confirmation of All Cases. ................................................................................... 27

    4.4    Intercompany Claims and Interests in Debtor Subsidiaries. .................................. 27

SECTION 5 MEANS FOR IMPLEMENTATION OF THE PLAN .......................................... 27

    5.1    Corporate Governance and Action. ..................................................................... 27

    5.2    Effective Date Transactions ................................................................................. 29

    5.3    Funding of the Plan. ........................................................................................... 31

5.4    General Settlement of Claims and Interests ....................................................... 31

SECTION 6 PRESERVATION AND PROSECUTION OF CAUSES OF ACTION
          HELD BY THE DEBTORS ............................................................................... 32

6.1    Preservation and Prosecution of Causes of Action. .............................................. 32

SECTION 7 PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS ............................ 32

7.1    Allowance of Claims. .......................................................................................... 32

7.2    Claims Administration Responsibilities. .............................................................. 33

7.3    No Payment or Distribution Pending Allowance. .................................................. 33

7.4    Disputed Distributions. ....................................................................................... 34

7.5    Estimation. .......................................................................................................... 34

7.6    Late Filed Claims; Amendments to Claims. ......................................................... 34

7.7    Disallowance of Claims. ...................................................................................... 34

7.8    Reserve Provisions for Disputed Claims. ............................................................. 35

7.9    Adjustment to Claim or Interests without Objection. ........................................... 35

SECTION 8 DISTRIBUTIONS UNDER THE PLAN .............................................................. 35

8.1    Distributions Generally. ...................................................................................... 35

8.2    Limitation to Full Recovery. ................................................................................ 35

8.3    Timing of Distributions. ...................................................................................... 35

8.4    Saturdays, Sundays, or Legal Holidays. ............................................................... 36

8.5    Distribution Record Date. .................................................................................... 36

8.6    Delivery of Distributions. .................................................................................... 36

8.7    Method of Cash Distributions. ............................................................................. 37

8.8    Unclaimed Property. ............................................................................................ 37

8.9    Compliance with Tax Requirements. .................................................................... 37

8.10    Setoff or Recoupment ........................................................................................ 38

8.11    Documentation Necessary to Release Lien.......................................................... 38

8.12    Distributions Under Twenty-Five Dollars. ....................................................... 38

8.13    No Postpetition Interest. ..................................................................................... 38

8.14    Time Bar to Distributions. .................................................................................. 39

8.15    Rounding. ............................................................................................................ 39

8.16    Books and Records. ............................................................................................ 39

8.17    Plan Administrator. ............................................................................................ 39

8.18    Distribution Procedures for General Unsecured Claims. ................................... 41

SECTION 9 EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
             INDEMNIFICATION OBLIGATIONS ................................................. 42

9.1     Rejection / Assumption. ..................................................................................... 42

9.2     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. ........ 43

9.3     Preexisting Obligations to the Debtors under Executory Contracts and
             Unexpired Leases. .......................................................................................... 44

9.4     Bar Date for Filing Proofs of Claim Relating to Executory Contracts and
             Unexpired Leases Rejected Pursuant to the Plan. .......................................... 44

9.5     Treatment of Rejection Claims. .......................................................................... 45

9.6     Reinstatement and Continuation of Insurance Policies. ..................................... 45

SECTION 10 EFFECT OF CONFIRMATION ................................................................... 45

10.1    Continued Corporate Existence. ......................................................................... 45

10.2    Continued Operations with an Enhanced Business Model. ................................. 45

10.3    Discharge of Claims Against and Interests in the Debtors. ................................. 46

10.4    Injunction. ........................................................................................................... 46

10.5    Releases. .............................................................................................................. 47

10.6    Exculpation and Limitation of Liability. ............................................................ 48

10.7    Subordination of Claim and Interests Under Section 510. .................................. 49

10.8    Post-Confirmation Liability of the Plan Administrator. ...................................... 49

SECTION 11 RETENTION OF JURISDICTION ........................................................................ 50

SECTION 12 CONDITIONS AND EFFECTIVENESS OF THE PLAN ................................... 51

    12.1    Conditions to Confirmation of the Plan. ................................................................... 51

    12.2    Conditions to the Effective Date. .............................................................................. 52

    12.3    Notice of Occurrence of Effective Date. ................................................................... 53

    12.4    Waiver of Conditions Precedent and Bankruptcy Rule 30209(3) Automatic Stay. ......................................................................................................................... 53

    12.5    Consequences of Non-Occurrence of Effective Date. .............................................. 53

SECTION 13 MISCELLANEOUS PROVISIONS ..................................................................... 53

    13.1    Binding Effect of Plan. ............................................................................................. 53

    13.2    Severability. .............................................................................................................. 54

    13.3    Governing Law. ........................................................................................................ 54

    13.4    Notices. ..................................................................................................................... 54

    13.5    Filing of Additional Documents. .............................................................................. 55

    13.6    Time. ......................................................................................................................... 55

    13.7    Exhibits/Schedules. .................................................................................................. 55

    13.8    Defenses with Respect to Impaired or Unimpaired Claims. ..................................... 56

    13.9    No Injunctive Relief. ................................................................................................ 56

    13.10    No Admissions. ........................................................................................................ 56

    13.11    Extension of Time. ................................................................................................... 56

    13.12    Conflict. ................................................................................................................... 56

    13.13    Reservation of Rights. ............................................................................................. 56

    13.14    Modification and Amendments. ............................................................................... 56

    13.15    Continuing Exclusivity and Solicitation Period. ..................................................... 57

    13.16    Revocation, Withdrawal, or Non-Consummation. ................................................... 57

    13.17    Successors and Assigns. ........................................................................................... 57

13.18   Tax Exemption. .................................................................................................. 58

13.19   Implementation. ................................................................................................. 58

13.20   Record Date. ....................................................................................................... 58

13.21   Certain Actions. ................................................................................................. 58

13.22   Waiver of Fourteen-Day Stay. .......................................................................... 59

13.23   Entire Agreement. .............................................................................................. 59

SECTION 14 SUBSTANTIAL CONSUMMATION ..................................................... 59

14.1   Substantial Consummation. ................................................................................ 59

14.2   Final Decree. ...................................................................................................... 59

**JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF
IMPAC MORTGAGE HOLDINGS, INC. AND AFFILIATES THEREOF**

Impac Mortgage Holdings, Inc. and the above-captioned affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby propose the following joint prepackaged plan of reorganization, pursuant to section 1121(a) of the Bankruptcy Code (as may be modified and/or amended from time to time, the "Plan"). Capitalized terms used herein and not otherwise defined have the meanings ascribed to such terms in Section 1 of the Plan.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the restructuring transactions described herein on the Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Section 2 of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. Further, the Plan groups the Debtors together solely for purposes of describing treatment under the Plan, confirmation of the Plan, voting on the Plan, and making distributions in accordance with the Plan. Accordingly, for such limited purposes only, the Debtors will be deemed, and not actually, consolidated. Notwithstanding the foregoing, such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets or liabilities among them. No substantive consolidation of the Debtors or their Estates shall be deemed to have occurred for any purpose other than the limited consolidation solely for voting and distributions under the Plan described herein.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, properties and operations, projections for those operations, risk factors, a summary and analysis of the Plan, and certain related matters including, among other things, certain tax matters, and the securities and other consideration to be issued and/or distributed under the Plan. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to its substantial consummation.

**ALL HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ARE STRONGLY ENCOURAGED TO READ THE PLAN, THE DISCLOSURE STATEMENT, AND THEIR RESPECTIVE EXHIBITS IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

**SECTION 1
DEFINITIONS, RULES OF CONSTRUCTION AND EXHIBITS**

1.1     Definitions.

Unless otherwise provided in the Plan, all terms used herein shall have the meanings ascribed to such terms in the Bankruptcy Code or the Bankruptcy Rules. For the purposes of the Plan, the following terms (which appear in the Plan in capitalized form) shall have the meanings

US_ACTIVE\132544249

set forth below, and such meanings shall be equally applicable to the singular and to the plural form of the terms defined, unless the context otherwise requires:

"510(b) Claims" means all Claims arising pursuant to section 510(b) of the Bankruptcy Code.

"Administrative Claim(s)" means a Claim for any (a) cost or expense of administration of the Chapter 11 Cases, of the kind specified in section 503(b), including sections 503(b)(9) and 507(a)(2) of the Bankruptcy Code, including, but not limited to (i) any actual and necessary post-petition costs or expenses of preserving the estates of the Debtors, (ii) any actual and necessary costs and expenses of operating the businesses of the Debtors, (iii) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses, (iv) amounts owed to vendors providing goods and services to the Debtors during the Chapter 11 Cases, (v) all compensation and reimbursement of expenses of Professionals or other Persons for services rendered or expenses incurred in the Chapter 11 Cases to the extent Allowed by the Bankruptcy Court under sections 328, 330, 331, or 363 of the Bankruptcy Code, whether fixed before or after the Effective Date (including Fee Claims), and (vi) United States Trustee Fee Claims.

"Administrative Claims Bar Date" means the applicable last date, at 5:00 p.m. Eastern time, set by the Bankruptcy Court for a Creditor to file a request for payment of any Administrative Claim (excluding Professional Fee Claims) arising on or after the Petition Date, through and including the Effective Date, which shall be thirty (30) days after the Effective Date.

"Administrative and Priority Claims Reserve Estimate" means a good faith estimate by the Debtors of the total amount of Administrative Claims (other than Professional Fee Claims), Priority Non-Tax Claims, and Priority Tax Claims that may be Allowed against the Debtors.

"Administrative and Priority Claims Reserve" means the reserve established on the Effective Date by the Debtors under the Plan and approved by the Bankruptcy Court in the Confirmation Order for purposes of satisfying Allowed Administrative Claims (other than Professional Fee Claims), Allowed Priority Non-Tax Claims, and Allowed Priority Tax Claims.

"Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"Allowed" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim that has been scheduled by the Debtors on the GUC Schedule as other than disputed, contingent, or unliquidated and, as to which, the Debtors, the Plan Administrator or other party in interest has not Filed an Objection on or before the Claim Objection Deadline; (b) a Claim that is set forth in a timely Filed Proof of Claim as to which no Objection has been Filed on or before the Claim Objection Deadline and which is not otherwise a Disputed Claim; (c) a Claim that has been allowed by a Final Order; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation of amount and nature of Claim executed by the Plan Administrator on or after the Effective Date; (iii) in any stipulation of amount and nature of any Administrative Claim, Priority Non-Tax Claim, or Priority Tax Claim executed by (y) the Debtors and approved by the Bankruptcy Court, or (z) the Plan Administrator; or (iv) in any contract, instrument, indenture or other agreement entered into or assumed by the Debtors in connection with and in

-2-

accordance with the Plan; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a Proof of Claim has been timely Filed by the Creditor before the applicable Rejection Bar Date for such claim or has otherwise been deemed timely Filed under applicable law; or (f) a Claim that is allowed pursuant to the terms of the Plan.

"Allowed Claim" or "Allowed … Claim" means a Claim that has been Allowed.

"Amended Certificate and Bylaws" means the amended and restated certificates of incorporation and bylaws for the Reorganized Debtors, if so amended, or, in the case of CFLLC, the amended and restated limited liability company agreement for CFLLC, in each case in the form(s) set forth in the Plan Supplement.

"Assets" means all assets of the Debtors' Estates, including "property of the estate" as described in section 541 of the Bankruptcy Code, including Cash, any Causes of Action that may be asserted by the Debtors, securities, proceeds of insurance and insurance policies, all rights and interests, all real and personal property, and all files, books and records of the Debtors' Estates, including documents that are subject to any applicable privilege.

"Avoidance Actions" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the Estates, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

"Bankruptcy Code" means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases.

"Bankruptcy Rules" means (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under 28 U.S.C. § 2075, (b) the applicable Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, to the extent applicable, and (c) any other local rules and standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Cases or proceedings therein, as the case may be.

"Bridge Note" means that certain Secured Promissory Note, dated January 26, 2026, issued by Impac Mortgage Holdings, Inc., Integrated Real Estate Service Corp., Impac Commercial Capital Corporation, Impac Funding Corporation, Impac Mortgage Corp., Impac Warehouse Lending, Inc., Impac Warehouse Lending Group, Inc., Synergy Capital Mortgage Corp, Copperfield Capital Corporation, and Copperfield Financial, LLC to Hildene as successor-by-assignment to Trinity Park Investments, LLC.

-3-

"Business Day(s)" means any day which is not a Saturday, a Sunday, a "legal holiday" as defined in Bankruptcy Rule 9006(a), or a day on which banking institutions in the State of New York are authorized or obligated by law, executive order or governmental decree to be closed.

"Cash" or "$" means the lawful currency of the United States of America and its equivalents including bank deposits and checks.

"Cause(s) of Action" means any and all actions, proceedings, obligations, judgments, debts, accounts, claims, rights, defenses, third-party claims, damages, executions, demands, crossclaims, counterclaims, suits, causes of action (including against insiders), choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever (and any rights to any of the foregoing), whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, then existing or thereafter arising, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, including, without limitation, any Avoidance Action or other recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any similar provisions of applicable state or federal law. For the avoidance of doubt, Causes of Action does not include claims, challenges or other matters barred or otherwise released in the DIP Order.

"CCC" means Copperfield Capital Corporation, a Debtor.

"CFLLC" means Copperfield Financial, LLC, a Debtor.

"Chapter 11 Cases" means the Chapter 11 cases commenced when the Debtors Filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on the Petition Date (each a "Chapter 11 Case") and with the following lead case number:  [•] ([•]).

"Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) against the Debtors, including, but not limited to: (a) any right to payment from the Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Claims Agent" means Kurtzman Carson Consultants LLC d/b/a Verita Global, which the Debtors will seek to appoint as the Debtors' claims, noticing, and balloting agent.

"Claim Objection Deadline" has the meaning ascribed to it in Section 7.3.

"Claims Register" means the official register of Claims maintained in the Chapter 11 Cases by the Claims Agent (or, if no such agent is appointed, the Clerk of the Bankruptcy Court) pursuant to section 156(c) of title 28 of the United States Code and Bankruptcy Rule 5003(b), as such register may be amended, modified, or supplemented from time to time.

-4-

US_ACTIVE\132544249

"Class" means a category of Holders of Claims or Interests, as set forth in Section 2 of the Plan.

"Closing" means the closing of the transactions contemplated under Section 5.2 of the Plan.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

"Confirmation" means the entry of the Confirmation Order, subject to all conditions specified in Section 12.1 hereof having been (a) satisfied or (b) waived pursuant to Section 12.4.

"Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"Combined DS and Confirmation Hearing" means the hearing at which the Bankruptcy Court will consider approval of the Disclosure Statement and confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consenting Subordinated Noteholders" means Taberna Preferred Funding 1 LTD and Taberna Preferred Funding 2 LTD as beneficial holders of the Subordinated Notes and signatories to the RSA, together with HCMC III, LLC, in its capacity as collateral manager for each of the foregoing.

"Consummation" or "Consummate" means the occurrence of the Effective Date.

"Contingent Claim" means any Claim for which a Proof of Claim has been Filed but was not stated in a sum certain and which Claim has not been estimated, fixed, or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date, or a Claim that has accrued but nonetheless remains dependent on the occurrence of a future event that may never occur.

"Contingent Payment Certificate" means a contingent payment certificate to be issued by the Debtors to the Holders of the Subordinated Notes Claims.

"Contractual Incentive Payments" means the amounts owed to certain employees, as collectively set forth on Schedule 2 hereto.

"Creditor" means any Holder of a Claim against any Debtor as specified in section 101(10) of the Bankruptcy Code.

"Cure Amount" means all amounts required to be paid, as ordered by the Bankruptcy Court or otherwise agreed upon by a counterparty to an Executory Contract or Unexpired Lease, to assume an Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

US_ACTIVE\132544249

"Cure Notice" means a notice sent to non-Debtor counterparties to Executory Contracts and Unexpired Leases indicating the proposed Cure Amounts to be paid to such counterparties to satisfy any cure obligations for assumption pursuant to section 365(b) of the Bankruptcy Code of the Executory Contracts and Unexpired Leases listed thereon.

"Dagdafi" means Dagdafi, Inc. d/b/a First Agentic.

"Debt" means liability on a Claim.

"Debtor Released Parties" means, collectively, each of, and in each case in its capacity as such, (a) the Debtors, (b) the DIP Lender, (c) the Plan Sponsor, (d) the Subordinated Noteholders, (e) each Holder of a Claim or Interest that opts in to the Third Party Release to the extent they do not hold a Disputed Claim, (f) Professionals and (g) each of the Related Persons of each of the Entities in the foregoing clauses (a)-(f); *provided*, *however*, that in each case a person or entity shall not be a Debtor Released Party if it objects to the Plan's release provisions; *provided further*, notwithstanding any of the foregoing, strictly as to the scope of the subject release by the parties covered under the preceding clause (g), the subject release will apply only to claims and causes of action of such party that (i) are derivative of the claims held by the Debtors to whom the party is related, or (ii) solely to the extent such party would be obligated to grant a release under applicable non-bankruptcy law if they were so directed by the Debtors to whom they are related.

"Debtor Subsidiaries" means, collectively, IFC, IMC, CFLLC, IMHAC, IRES, IWLG, CCC, ICCC, ISAC, Synergy, and Warehouse.

"Debtors" means Impac, IFC, IMC, CFLLC, IMHAC, IRES, IWLG, CCC, ICCC, ISAC, Synergy, and Warehouse, as debtors and debtors in possession in the Chapter 11 Cases.

"Debtor/Estate Release" has the meaning set forth in Section 10.5 hereof.

"DIP Budget" means the budget for the use of cash and the proceeds of the DIP Facility as approved pursuant to the DIP Order, as it may be amended, supplemented or altered in accordance with the DIP Facility Documents and the DIP Order.

"DIP Claims" means all Claims associated with the DIP Obligations.

"DIP Facility" means the $5,000,000 senior secured super-priority debtor-in-possession term loan credit facility dated as of April [•], 2026 and made available to the Debtors by the DIP Lender.

"DIP Facility Documents" means the DIP Loan Agreement and all other documents memorializing the terms of the DIP Facility, including without limitation the DIP Orders.

"DIP Lender" means Hildene in its capacity as lender under the DIP Facility Documents.

"DIP Loan Agreement" means the credit agreement evidencing the DIP Facility substantially in the form attached to the DIP Motion as may be modified in the DIP Order.

US_ACTIVE\132544249

"DIP Obligations" means all amounts due and owing under the DIP Facility as of the Effective Date, including all principal, interest, fees and expenses due and owing thereunder.

"DIP Order" means (a) the Interim DIP Order, unless and until the Final DIP Order is entered, and (b) thereafter, the Final DIP Order.

"Disallowed" means any Claim against the Debtors which, in whole or in part, (a) has been disallowed by a Final Order; (b) has been withdrawn by agreement of the Holder thereof and the Debtors; (c) has been withdrawn by the Holder thereof; (d) is listed in the Schedules as a zero amount or as Disputed, contingent or unliquidated and in respect of which a Proof of Claim has not been timely Filed or deemed timely Filed pursuant to the Plan, the Bankruptcy Code or any Final Order or other applicable law; (e) has been reclassified, expunged, subordinated or estimated resulting in a reduction in the Filed amount of any Proof of Claim; (f) is a Claim for which a Proof of Claim was required to be Filed, but for which no Proof of Claim was timely (or ever) Filed; (g) is unenforceable against the Debtors and the Property of the Debtors, under any agreement or applicable law for a reason other than because such Claim is contingent or unmatured; (h) includes unmatured interest, penalties or late charges; (i) is for reimbursement or contribution that is contingent as of the time of allowance or disallowance of such claim; and/or (j) is a Claim or portion thereof for any fine, penalty, forfeiture, attorneys' fees (to the extent such attorneys' fees are punitive in nature), or for multiple, exemplary or punitive damages, to the extent that such fine, penalty, forfeiture, attorneys' fees or damages does not constitute compensation for the Creditor's actual pecuniary loss. In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation pursuant to the Plan, applicable law and/or Court order.

"Disallowed Claim" means a Claim that is Disallowed, or the Disallowed portion thereof.

"Disclosure Statement" means the disclosure statement for the Plan, including all exhibits, schedules, or supplements thereto, as it may be amended, modified, or supplemented from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable Law.

"Disputed" means: (i) any Claim or portion of a Claim as to which an Objection to the allowance thereof has been interposed as of any deadline fixed under the Plan or by order of the Bankruptcy Court, which Objection has not been withdrawn or determined by Final Order; (ii) any Claim scheduled by the Debtors in the GUC Schedule as disputed, contingent, or unliquidated and as to which no Proof of Claim has been timely Filed; or (iii) a Claim that is not listed in the GUC Schedule and as to which no Proof of Claim has been timely Filed.  To the extent an Objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the Objection.

"Disputed Distribution" means any dispute that arises as to the identity of a Holder of an Allowed Claim who is to receive any Distribution.

"Distribution(s)" means Cash, property, interests in property or other value distributed under the Plan to the Holders of Allowed Claims.

"Distributable GUC Assets" means the GUC Consideration.

-7-

"Distributable GUC Assets Account" means one or more segregated accounts established and maintained by the Plan Administrator for the sole purpose of holding, managing, and disbursing the Distributable GUC Assets in accordance with the Plan.

"Distribution Agent" means the Debtors and/or the Plan Administrator, or the designees or agents of the foregoing.

"Distribution Dates" means collectively the Initial Distribution Date, any Subsequent Distribution(s) Date, and the date of the Final Distribution.

"Distribution Record Date" means the close of business on the Business Day immediately preceding the Effective Date.

"Effective Date" means the first Business Day on which all conditions to the Effective Date of the Plan have been satisfied or waived or such other later date as may be mutually agreed by the Debtors and the Plan Sponsor.

"Effective Date Notice" means a notice of the occurrence of the Effective Date that shall be Filed on the docket of the Bankruptcy Court, substantially in the form attached to the Confirmation Order.

"Enjoined Matters" has the meaning set forth in Section 10.4 hereof.

"Enterprise" means Enterprise Bank & Trust, a Missouri chartered trust company.

"Enterprise Claim" means any Claim held by Enterprise related to the Enterprise Obligations and the Enterprise Surety Obligations.

"Enterprise Obligations" means the obligations owing by Impac to Enterprise as memorialized by the Former Executive 1 Loan Documents, the Former Executive 2 Loan Documents, the Former Executive 3 Loan Documents and the Enterprise Surety Documents.

"Enterprise Surety Obligations" means obligations arising from an irrevocable standby letter of credit supporting surety bonds issued by Liberty Mutual Insurance Company.

"Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

"Estates" means the estates of the Debtors in the Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Exculpated Parties" means collectively (a) the Debtors, (b) the Debtors' respective officers, directors, members and managers who serve currently or served any post-petition period, and (c) Bankruptcy Court-approved Professionals in their respective capacities as such.

"Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

-8-

"Exit Loan Agreement" means that certain Loan and Security Agreement dated as of the Effective Date pursuant to which the Exit Loan Facility will be made available to the Reorganized Debtors by the DIP Lender on and after the Effective Date.

"Exit Loan Amount" equals an aggregate amount equal to the DIP Obligations, plus the Exit Loan New Money Amount.

"Exit Loan Facility" means a multi-draw term loan facility to be made by the DIP Lender to the Reorganized Debtors on and after the Effective Date, pursuant to the Exit Loan Agreement in the principal amount up to the Exit Loan Amount and (i) accruing interest at a rate of SOFR plus 4% per annum, plus an additional 3% in the event of default; (ii) with a facility fee of 1% of the Exit Loan New Money Amount, which shall be deducted from the initial proceeds of the Exit Loan Facility; (iii) secured by a first priority security interest in and liens on all assets of the Reorganized Debtors; (iv) maturing thirty-six (36) months after the Effective Date; (v) be treated as Paid-in-Kind (PIK), unless quarterly interest payments are made at the option of the Reorganized Debtors and (vi) including customary approval and other rights and covenants for the benefit of the DIP Lender.

"Exit Loan New Money Amount" means $5,000,000.

"File" or "Filed" means, with respect to any document, that such document has been electronically submitted to the Bankruptcy Court through the Court's electronic case filing system (or, if applicable, delivered to the Claims Agent or Clerk of the Bankruptcy Court) in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules of the Bankruptcy Court.

"Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

"Final DIP Order" means the final order entered by the Bankruptcy Court in the Chapter 11 Cases authorizing the Debtors to enter into the DIP Facility and to use cash collateral.

"Final Distribution" means the last payment to holders of Allowed Claims in accordance with the provisions of the Plan.

"Final Order" means an order, ruling, judgment, the operation or effect of a judgment or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other court of competent jurisdiction which has not been reversed, vacated, stayed, modified or amended, and as to which (a) the time to appeal or petition for review, rehearing, certiorari, reargument or retrial has expired and as to which no appeal or petition for review, rehearing, certiorari, reargument or retrial is pending, or (b) any appeal or petition for review, rehearing, certiorari, reargument or retrial has been finally decided and no further appeal or petition for review, rehearing, certiorari, reargument or retrial can be taken for granted.

"Former Executive 1 Loan Documents" means that certain Fifth Amended and Restated Promissory Note, dated as of April 30, 2023, by Impac Mortgage Holdings, Inc., Trustee (and any successor trustee) of a trust with respect to such former executive, Dated December 15, 2011 in favor of Enterprise in the principal amount of $7,850,000 which matures on April 30, 2026, secured by Allianz Life Insurance Policy Number 60049553 and other collateral, as described in such note and related documents.

US_ACTIVE\132544249

"Former Executive 2 Loan Documents" means that certain Fourth Amended and Restated Promissory Note, dated as of April 30, 2023, by Impac Mortgage Holdings, Inc., Trustee (and any successor trustee) of a trust with respect to such former executive, Dated December 15, 2011 in favor of Enterprise in the principal amount of $6,225,000 which matures on April 30, 2026, secured by Allianz Life Insurance Policy Number 60049113 and other collateral, as described in such note and related documents.

"Former Executive 3 Loan Documents" means that certain Fourth Amended and Restated Promissory Note, dated as of April 30, 2023, by Impac Mortgage Holdings, Inc., Trustee (and any successor trustee) of a trust with respect to such former executive, Dated December 15, 2011 in favor of Enterprise in the principal amount of $3,100,000 which matures on April 30, 2026, secured by Allianz Life Insurance Policy Number 60049112 and other collateral, as described in such note and related documents.

"General Unsecured Claim" means any Claim against the Debtors or the Estates that is not a DIP Claim, an Administrative Claim (including a Professional Fee Claim or United States Trustee Fee Claim), a Priority Tax Claim, a Priority Non-Tax Claim, Senior Indebtedness Claim, Subordinated Notes Claim, Enterprise Claim, Unimpaired Secured Claim, Intercompany Claim, or 510(b) Claim.  For the avoidance of doubt, General Unsecured Claims include any and all Claims arising from, related to, or in connection with the Debtors' mortgage loan repurchase obligations, including, without limitation, Claims for payment, damages, reimbursement, contribution, indemnification, or other recovery, whether contingent, unliquidated, disputed, matured, or unmatured.

"Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"GUC Bar Date" has the meaning set forth in Section 8.18(b) herein.

"GUC Consideration" means $300,000 cash to be deposited into the GUC Distribution Escrow Account by the Reorganized Debtors for the purpose of making distributions on account of allowed General Unsecured Claims and paying the GUC Expenses.

"GUC Distribution Escrow Account" means an interest-bearing bank account or money-market account to be established and held by the Plan Administrator on or after the Effective Date for the purpose of holding the Distributable GUC Assets to be distributed pursuant to the Plan and any interest, dividends, or other income earned upon the investment of the Distributable GUC Assets.

"GUC Expenses" means the reasonable fees and expenses of the Plan Administrator or any Committee, whether incurred before or after confirmation of the Plan.

"GUC Schedule" means the schedule of all General Unsecured Claims known by the Debtors as of the Petition Date, as set forth hereto on Schedule 1.

"Hildene" means Hildene re SPC, Ltd., acting for and on behalf of the account of SP 1, together with any of its successors or assigns, or any designee thereof.

-10-

"Holder" means the legal or beneficial holder of a Claim or Interest (and, if used in conjunction with a Class or type of Claim or Interest, means a holder of a Claim or Interest in such Class or of such type).

"ICCC" means Impac Commercial Capital Corporation, a Debtor.

"IFC" means Impac Funding Corporation, a Debtor.

"IMC" means Impac Mortgage Corp, a Debtor.

"IMHAC" means IMH Assets Corp, a Debtor.

"Impac" means Impac Mortgage Holdings, Inc., a Debtor.

"Impaired" means with respect to a Claim or Class of Claims, a Claim or Class of Claims that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"IRES" means Integrated Real Estate Service Corp., a Debtor.

"ISAC" means Impac Secured Assets Corp., a Debtor.

"IWLG" means Integrated Warehouse Lending Group, Inc., a Debtor.

"Indemnified Parties" has the meaning set forth in Section 10.8 hereof.

"Initial Distribution Date" means the Effective Date, or in the case of Holders of Allowed General Unsecured Claims as soon as practicable thereafter, when the initial distribution of Cash shall be made to the Holders of Allowed Claims, as determined by the Debtors or the Plan Administrator, as applicable.

"Insider" means an insider of the Debtors, as defined in section 101(31) of the Bankruptcy Code.

"Insurance Policies" means all insurance policies maintained by the Debtors as of the Petition Date, including but not limited to director and officer insurance policies.

"Intercompany Claims" means any Claim held by a Debtor or a non-Debtor Affiliate against any Debtor, whether arising before or after the Petition Date, including any Claim arising from loans, advances, guarantees, intercompany payables or receivables, cost-sharing arrangements, tax allocations, management fees, cash management activities, or other transactions between or among such entities.

"Interests" means all previously issued and outstanding interests (whether legal, equitable, contractual or other rights) of any Holders of any class of equity securities of any of the Debtors represented by shares of common or preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, or any option, warrant or right, contractual or otherwise, to acquire any such Interests.

-11-

"Interim DIP Order" means the interim order entered by the Bankruptcy Court in the Chapter 11 Cases authorizing the Debtors to enter into the DIP Facility and to use cash collateral, in substantially the form attached to the RSA as Exhibit F.

"IRS" means the Internal Revenue Service.

"Key Executive Employment Agreements" means the (i) Amended and Restated Key Executive Employment Agreement, dated October 7, 2025, between Impac Mortgage Holdings, Inc. and George A. Mangiaracina and (ii) Amended and Restated Key Executive Employment Agreement, dated October 7, 2025, between Impac Mortgage Holdings, Inc. and Joe Joffrion, both as further amended by those certain First Amendments thereto both dated April 21, 2026.

"Lien" means, with respect to any Asset (or the Cash, rent, revenue, income, profit or proceeds therefrom), and in each case, whether the same is consensual or nonconsensual or arises by contract, operation of law, legal process or otherwise: (a) any and all mortgages, liens, pledges, attachments, charges, leases evidencing a capitalizable lease obligation, conditional sale or other title retention agreement, or other security interest or encumbrance or other legally cognizable security devices of any kind in respect of any asset or Property, or upon the Cash, rents, revenues, income, profits or proceeds therefrom; or (b) any arrangement, express or implied, under which any Asset is transferred, sequestered or otherwise identified for the purpose of subjecting or making available the same for the payment of debt or performance of any other obligation senior in priority to the payment of General Unsecured Claims.

"Litigation" means the interest of the Estates, the Debtors, or the Plan Administrator, as applicable, in any and all claims, rights, and Causes of Action that have been or may be commenced by the Debtors or Reorganized Debtors, as applicable, except to the extent concerning any Released Parties. Litigation includes, without limitation not otherwise stated herein, any action: (i) to avoid and recover any transfers of property determined to be preferential, fraudulent, or avoidable pursuant to sections 544, 545, 547, 548, 549(a), and 550 of the Bankruptcy Code; (ii) for the turnover of property to the Debtors; (iii) for the recovery of property or payment of money that belongs to or can be asserted by the Debtors; (iv) for compensation for damages incurred by the Debtors; and (iv) equitable subordination actions against Creditors.

"Management Incentive Plan" means the Management Incentive Plan, in the form of a stock appreciation rights plan to be Filed with the Plan Supplement, to be implemented in accordance with Section 5.2(g) of the Plan. For the avoidance of doubt, the Management Incentive Plan contemplates incentive compensation arising from performance following the Effective Date, and expressly excludes payments under the Key Executive Employment Agreements and the Contractual Incentive Payments due on the Effective Date.

"New Common Stock" means the common stock of Reorganized Impac to be issued pursuant to the terms of the Plan.

"New Stock Documentation" means any and all documentation required to implement, issue, and distribute the New Common Stock, which shall be consistent with the terms and conditions set forth in the Plan and shall be in form and substance satisfactory to the Debtors and the Plan Sponsor.

-12-

"Objection" means any objection, application, motion, complaint or other legal, equitable or administrative proceeding brought by any party (including arbitration, mediation, summary proceeding, adversary proceeding or other litigation if applicable) seeking to disallow, determine, liquidate, classify, reclassify or establish the priority, expunge, avoid, subordinate, estimate or otherwise limit recovery, in whole or in part, with respect to any Claim (including any request for payment of any Administrative Claim).

"Person(s)" means a corporation, governmental unit and person, each as respectively defined in sections 101(9), (27) and (41) of the Bankruptcy Code, including a natural person, individual, partnership, corporation, or other domestic or foreign entity or organization.

"Petition Date" means April 26, 2026, the date on which the Debtors Filed their respective voluntary petitions for relief commencing the Chapter 11 Cases.

"Plan Administrator" means the Person selected by the Debtors, with the consent of the Plan Sponsor, to administer the Distributable GUC Assets in accordance with the Plan.

"Plan Document(s)" means collectively the Plan, the Disclosure Statement, or any exhibit, appendix, schedule or annex thereto, including, but not limited to, the Plan Supplement.

"Plan Sponsor" means Hildene in its capacity as sponsor of this Plan.

"Plan Sponsor Common Stock" means the New Common Stock to be issued on the Effective Date to the Plan Sponsor, which shall be equal to 100% of the total issued and outstanding New Common Stock, in exchange for and in full satisfaction of the Senior Indebtedness.

"Plan Supplement" means (if any) such exhibits, documents, lists or schedules not Filed with the Plan but as may be Filed at least seven (7) days prior to the deadline to object to Confirmation of the Plan or such other date as may be approved by the Bankruptcy Court.

"Priority Claim" means a Priority Non-Tax Claim or a Priority Tax Claim.

"Priority Non-Tax Claim" means any Claims entitled to priority in payment pursuant to sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

"Priority Tax Claim" means any Claims of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority in payment pursuant to sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means proportionately so that, with respect to a Claim, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim to (ii) the Allowed amount of the Claim, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims in such Class or Classes.

-13-

"Professional(s)" means shall mean any professional retained by the Debtors or any Committee by order of the Bankruptcy Court in the Chapter 11 Cases in accordance with sections 327, 328, 330, 363, or 1103 of the Bankruptcy Code.

"Professional Fee Claim" means those fees and expenses claimed by Professionals pursuant to sections 330, 331, or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

"Professional Fee Escrow Account" means the account held by [CSC Trust Company] and funded from the DIP Facility pursuant to the terms of the DIP Order and the DIP Budget, to satisfy Allowed Professional Fee Claims in accordance with the Plan.

"Professional Fee Reserve Amount" means the total aggregate amount of the Professionals' estimated Professional Fee Claims, as provided for in the DIP Budget.

"Proof(s) of Claim" means a proof of claim Filed pursuant to claim procedures to be adopted by the Plan Administrator pursuant to Section 8.18 of the Plan, together with supporting documents.

"Quarterly Fees" means fees due and payable pursuant to section 1930 of title 28 of the U.S. Code.

"Reinstated" means, with respect to any Claim or Interest, that such Claim or Interest shall be left unaltered or rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

"Rejection Bar Date" has the meaning set forth in Section 9.4 herein.

"Related Persons" means, subject to any exclusions expressly set forth in the Plan, with respect to a specific Person, said Person's successors and assigns, and as applicable, its current and former shareholders, Affiliates, subsidiaries, employees, agents, investment managers, subagents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, and consultants.

"Release Opt-In Election Form" means a form for Holders of Claims to opt in to being a Releasing Party in connection with the Third Party Release.

"Releasing Parties" means, individually and collectively: (i) each party to the RSA; (ii) each Holder of a Claim or Interest that opts in to the Third Party Release; and (iii) with respect to each of the foregoing Entities in clauses (i) and (ii), such Entities' or Persons' successors, assigns, transferees, and such Entities' or Persons' officers and directors, agents, members, financial and other advisors, attorneys, employees, partners, affiliates, and representatives (in each case in their capacity as such), and any and all other entities who may purport to assert any cause of action, by, through, for, or because of such Entities or Persons; provided that, notwithstanding any of the foregoing, strictly as to the scope of the subject release by the parties covered under the preceding clause (iii), the subject release will apply only to claims and causes of action of such party that (a) are derivative of the claims held by the primary Releasing Party to whom the party is related, or (b) solely to the extent such party would be obligated to grant a release under applicable non-bankruptcy law if they were so directed by the Releasing Party to whom they are related.

US_ACTIVE\132544249

"Released Parties" means, collectively, the Debtor Released Parties and the Third-Party Released Parties.

"Reorganized Debtors" means the Debtors on and after the Effective Date.

"Rolled Bridge Note Obligations" means the portion of the DIP Obligations utilized to refinance the Bridge Note in full.

"RSA" means that certain Restructuring Support Agreement, dated April 22, 2026, by and among the Debtors, the Plan Sponsor, the DIP Lender and the Consenting Subordinated Noteholders (as amended, supplemented, or otherwise modified from time to time).

"Schedule of Assumed Executory Contracts" means the schedule attached to the Plan Supplement identifying the Executory Contracts to be assumed by the Debtors, as it may be modified by the Debtors or the Reorganized Debtors from time to time pursuant to the terms hereof.

"Secondment Agreement" means the Secondment Agreement, dated as of March 17, 2026 executed between Impac, IMC and Dagdafi and the related Technology Rights Agreement, between IMC and Dagdafi of even date with such Secondment Agreement.

"Secured Claim" means any Claim, other than an Enterprise Claim, that is secured in whole or part, as of the Petition Date, by a Lien which is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

"Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

"Senior Indebtedness" means the obligations owed by the Debtors to the Plan Sponsor pursuant to the Senior Loan Documents.

"Senior Indebtedness Claims" means all Claims arising from or related to the Senior Indebtedness.

"Senior Loan Agreement" means that certain Loan Agreement dated as of May 6, 2024 by and among Impac, as borrower, the Subsidiary Guarantors (as defined therein) and the Plan Sponsor, as lender.

"Senior Loan Documents" means the Senior Loan Agreement and all schedules, exhibits, certificates, notices, perfection certificates, security agreements, guaranties, intercreditor agreements, and any other documents related to the Senior Loan Agreement, any subordination agreement, any note, or notes, and any other present or future agreement by any of the Debtors with or for the benefit of the Plan Sponsor in connection with the Senior Loan Agreement, all as amended, restated, or otherwise modified in accordance with the terms thereof.

US_ACTIVE\132544249

"SOFR" means the Secured Overnight Financing Rate as published on the website of the Federal Reserve Bank of New York.

"Solicitation Order" means that certain Order entered by the Bankruptcy Court on [•] (D.I. [•]) approving the *Debtors' Motion for Entry of an Order (I) Scheduling a Combined Hearing on (A) Adequacy of Disclosure Statement, (B) Confirmation of Plan, and (C) the Assumption of Executory Contracts, Unexpired Leases, Cure Amounts, and Objection Deadlines Related Thereto; (II) Approving Form and Manner of Notice of (A) Combined Hearing, (B) Commencement of Chapter 11 Cases, and (C) Assumption of Executory Contracts and Cure Amounts Related Thereto, and Objection Deadlines; (III) Establishing Procedures for Objecting to (A) Disclosure Statement, (B) Plan, and (C) Proposed Assumption or Rejection of Executory Contracts, Unexpired Leases, and Cure Amounts; (IV) Conditionally Directing the United States Trustee Not to Convene a Section 341 Meeting of Creditors; and (V) Granting Related Relief* (D.I. [•])

"Subsequent Distribution Date" means any date after the Initial Distribution Date upon which the Debtors, Reorganized Debtors, or Plan Administrator (as applicable) make a distribution to any Holders of Allowed Administrative, Secured, Priority, or General Unsecured Claims.

"Subordinated Notes" means the Debtors' Junior Subordinated Notes due March 30, 2034.

"Subordinated Notes Indentures" means (i) that certain Junior Subordinated Indenture, dated as of May 8, 2009 by and among Impac and the Subordinated Notes Indenture Trustee, as trustee; and (ii) that certain Junior Subordinated Indenture, dated as of May 8, 2009 by and among Impac and the Subordinated Notes Indenture Trustee, as trustee, in each case as may be amended, restated, amended and restated, replaced, supplemented or otherwise modified from time to time.

"Subordinated Noteholders" means the beneficial holders of the Subordinated Notes.

"Subordinated Notes Claims" means all Claims arising from or related to the Subordinated Notes or the Subordinated Notes Indenture.

"Subordinated Notes Indenture Trustee" means The Bank of New York Mellon Trust Company, NA in its capacity as indenture trustee under the Subordinated Notes Indentures.

"Synergy" means Synergy Capital Mortgage Corp., a Debtor.

"Tax(es)" means any tax, charge, fee, levy, or other assessment by any federal, state, local or foreign governmental authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax, together with any interest, penalties, fines or additions attributable to, imposed on, or collected by any such federal, state, local or foreign governmental authority.

"Tax Claim" means all or that portion of an Allowed Claim held by a Governmental Unit for a Tax assessed or assessable against the Debtors.

-16-

"Tax Documentation" means the tax identification number, Form W-9, or other tax information required by law to be received by the Reorganized Debtors to avoid withholding any portion of a Distribution for tax purposes.

"Tax Preservation Rights Plan" means, to the extent requested by the Plan Sponsor, a tax preservation rights plan for Reorganized Impac, in form and substance satisfactory to the Plan Sponsor, to be Filed with the Plan Supplement.

"Terminating Consenting Subordinated Noteholders" has the meaning set forth in Section 10.01 of the RSA.

"Third Party Release" has the meaning set forth in Section 10.5(b) hereof.

"Third-Party Released Parties" means, collectively, each of, and in each case in its capacity as such, (a) the Debtors, (b) the DIP Lender, (c) the Plan Sponsor, (d) the Subordinated Noteholders, (e) each Holder of a Claim or Interest that opts in to the Third Party Release to the extent they do not hold a Disputed Claim, (f) Professionals and (g) each of the Related Persons of each of the Entities in the foregoing clauses (a)-(f); *provided, however*, that in each case a person or entity shall not be a Third-Party Released Party if it objects to the Plan's release provisions; *provided further*, notwithstanding any of the foregoing, strictly as to the scope of the subject release by the parties covered under the preceding clause (g), the subject release will apply only to claims and causes of action of such party that (i) are derivative of the claims held by the primary Releasing Party to whom the party is related, or (ii) solely to the extent such party would be obligated to grant a release under applicable non-bankruptcy law if they were so directed by the Releasing Party to whom they are related.

"Unclaimed Property" means any unclaimed Distribution of Cash or any other Assets made pursuant to the Plan to the Holder of an Allowed Claim pursuant to the Plan, including checks that are either not cashed for ninety (90) days after issuance or which are returned as undeliverable without a proper forwarding address, and any Distribution not delivered because no mailing address was available as of the applicable distribution date.

"Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"Unimpaired Claim" means a Claim that is not Impaired.

"Unimpaired Secured Claims" means any Secured Claim other than a DIP Claim or Senior Indebtedness Claim.

"United States Trustee" means the United States Trustee appointed under section 581(a)(2) of title 28 of the United States Code to serve in the Chapter 11 Cases.

"Warehouse" means Impac Warehouse Lending, Inc., a Debtor.

"Withheld Amount" has the meaning given in Section 8.9 of the Plan.

-17-

1.2   Interpretation; Application of Definitions and Rules of Construction.

(a)   Whenever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neuter.

(b)   The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular paragraph, subparagraph, or clause contained in the Plan.

(c)   The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included.

(d)   The captions and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.

(e)   Any term used in the Plan that is not defined in the Plan, either in Section 1 of the Plan or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules (with the Bankruptcy Code controlling in the case of a conflict or ambiguity).  Without limiting the preceding sentence, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the Plan, unless superseded herein.

(f)   To the extent that the description of the Plan or any Plan Document is inconsistent with the actual terms or conditions of the Plan or any Plan Document, the terms and conditions of the Plan or Plan Document, as the case may be, shall control.

1.3   Exhibits.

Any and all exhibits or schedules to the Plan and any documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full herein, regardless of when Filed.  The Debtors reserve the right to make non-substantive changes and corrections to such exhibits in advance of the Combined DS and Confirmation Hearing.  If any exhibits are changed or corrected, the replacement exhibits will be Filed with the Bankruptcy Court prior to the commencement of the Combined DS and Confirmation Hearing.  All references to "the Plan" herein shall be construed, where applicable, to include references to this document and any amendments and exhibits hereto, the Plan Supplement and any amendments thereto, and all of their respective exhibits, appendices, schedules and annexes.

US_ACTIVE\132544249

## SECTION 2
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.1   General.

Pursuant to section 1122 of the Bankruptcy Code, a Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of the Class and is classified in a different Class to the extent the Claim or Interest qualifies within the description of that different Class.  A Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

2.2   Unclassified Claims (Not Entitled to Vote on the Plan).

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims and United States Trustee Fee Claims), DIP Claims and Priority Tax Claims, are not classified.  The treatment accorded Administrative Claims (including Professional Fee Claims and United States Trustee Fee Claims), DIP Claims and Priority Tax Claims is set forth in Section 3.2 of the Plan.

2.3   Classification of Claims and Interests.

The provisions of this Section 2.3 govern Claims against and Interests in the Debtors.  Any Class that is vacant will be treated in accordance with Section 2.6.

The following table designates the Classes of Claims against, and Interests in, the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (iii) deemed to accept or reject the Plan.  A Claim or portion thereof is classified in a particular Class only to the extent that such Claim or portion thereof qualifies within the description of such Class and is classified in a different Class to the extent that the portion of such Claim qualifies within the description of such different Class.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (presumed to accept) |
| 2(a) | Enterprise Claims | Unimpaired | No (presumed to accept) |
| 2(b) | Unimpaired Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Senior Indebtedness Claims | Impaired | Yes |
| 4 | Subordinated Notes Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | No (presumed to reject) |
| 6 | Intercompany Claims | Impaired | No (presumed to reject) |

-19-

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 7 | 510(b) Claims | Impaired | No (presumed to reject) |
| 8(a) | Interests in Impac | Impaired | No (presumed to reject) |
| 8(b) | Interests in Debtor Subsidiaries | Unimpaired | No (presumed to accept) |

2.4    Unimpaired Class of Claims.

The following Classes of Claims are unimpaired and, therefore, presumed to have accepted the Plan and are not entitled to vote on the Plan under section 1126(f) of the Bankruptcy Code, unless otherwise provided in this Section.

Class 1:  Class 1 consists of all Priority Non-Tax Claims.

Class 2(a):  Class 2(a) consists of Enterprise Claims.

Class 2(b):  Class 2(b) consists of Unimpaired Secured Claims.

Class 8(b):  Class 8(b) consists of Interests in Debtor Subsidiaries.

2.5    Impaired Classes of Claims and Interests.

The following Classes of Claims are impaired and, therefore, are either deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code or are entitled to vote on the Plan, unless otherwise provided herein.

Class 3:  Class 3 consists of the Senior Indebtedness Claims and is Impaired.

Class 4:  Class 4 consists of the Subordinated Noteholder Claims and is Impaired.

Class 5: Class 5 consists of General Unsecured Claims and is Impaired.

Class 6:  Class 6 consists of Intercompany Claims and is Impaired.

Class 7:  Class 7 consists of 510(b) Claims and is Impaired.

Class 8(a):  Class 8(a) consists of Interests in Impac and is Impaired.

2.6    Vacant and Abstaining Classes.

Any Class of Claims or Interests that does not include, as of the commencement of the Combined DS and Confirmation Hearing, an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

US_ACTIVE\132544249

**SECTION 3**
**TREATMENT OF CLAIMS AND INTERESTS**

3.1     Satisfaction of Claims and Interests.

The treatment of and consideration to be received by Holders of Allowed Claims or Allowed Interests pursuant to the Plan shall be in full satisfaction, release, extinguishment and discharge of their respective Claims against or Interests in the Debtors and the Debtors' Assets.

3.2     Treatment of Unclassified Claims.

3.2.1     Administrative Claims.

(a)     Except to the extent that a Holder of an Allowed Administrative Claim agrees to less favorable treatment, or as otherwise provided for in the Plan, the Reorganized Debtors shall pay to each Holder of an Allowed Administrative Claim Cash in an amount equal to the amount of such Allowed Administrative Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date; and (ii) the first Business Day after the date that is fifteen (15) calendar days after the date an Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is reasonably practicable.

(b)     Holders of Administrative Claims (but excluding Professional Fee Claims, which are described in Section 3.2.2 below) must file any requests for payment of such claims by the Administrative Claims Bar Date.  Any such requests that are not properly filed and served by the Administrative Claims Bar Date shall be disallowed automatically without the need for any objection from the Reorganized Debtors or action by the Bankruptcy Court.

(c)     All fees due and payable under 28 U.S.C. § 1930 prior to the Effective Date that have not been paid shall be paid on or before the Effective Date.

3.2.2     Professional Fee Claims.

(a)     Final Fee Applications.  Any Professional seeking an award by the Bankruptcy Court of compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date must file and serve on the Reorganized Debtors and their counsel, the Plan Sponsor and their counsel, the United States Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other applicable order(s) of the Court, its final fee application for allowance of such compensation and/or reimbursement by no later than thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; provided, however, that a Professional retained by the Debtors under section 363 of the Bankruptcy Code shall not be required to file an application for allowance of compensation and/or reimbursement of expenses.  Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Professional Fee Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Professional Fee Claims must be Filed and served on the Reorganized Debtors and their counsel,

-21-

the Plan Sponsor and its counsel, the Plan Administrator and its counsel, the United States Trustee, and the requesting party no later than the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

The Reorganized Debtors may, without application to or approval by the Bankruptcy Court, retain professionals and pay reasonable professional fees and expenses in connection with services rendered to the Reorganized Debtors after the Effective Date.

(b)     Professional Fee Escrow Account. Consistent with the terms of the Plan, the DIP Order and DIP Budget, the Debtors shall have funded the Professional Fee Escrow Account with proceeds of the DIP Facility equal to the Professional Fee Reserve Amount in accordance with the DIP Budget.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals for Allowed Professional Fee Claims and for no other Person until all Allowed Professional Fee Claims have been irrevocably paid in full to the Professionals.  No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or the funds held therein.  The funds held in the Professional Fee Escrow Account shall not be property of the Estates of the Debtors or the Reorganized Debtors.  The Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed amounts owing to the Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the full amount of the Allowed Professional Fee Claims, any affected Professional shall have an Allowed Administrative Claim for the deficiency, which shall be satisfied in accordance with Section 3.2.1 of the Plan.

### 3.2.3   United States Trustee Fees.

All Quarterly Fees due and payable to the United States Trustee prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Reorganized Debtors shall pay all Quarterly Fees when due and payable.  The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Reorganized Debtors shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Each of the Debtors and Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the United States Trustee until the earliest of that particular Reorganized Debtor or Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.  The United States Trustee shall not be required to file any Administrative Claim in the Chapter 11 Cases and shall not be treated as providing any release under the Plan.

### 3.2.4   DIP Claims.

The Proceeds of the Exit Loan Facility shall be used to refinance the DIP Claims on account of, in full and complete discharge of, and in exchange for, such DIP Claims.

### 3.2.5   Priority Tax Claims.

US_ACTIVE\132544249

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, or the Bankruptcy Court has previously ordered otherwise, each Holder of an Allowed Priority Tax Claim shall receive, in full and complete satisfaction, release and discharge of, and in exchange for such Allowed Priority Tax Claim, at the sole option of the Reorganized Debtors, (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Priority Tax Claim; or (b) such other treatment consistent with the provisions of section 1129(a) of the Bankruptcy Code. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business. The Reorganized Debtors shall retain the right to pay any Allowed Priority Tax Claim, or any remaining balance of such claim, in full at any time without premium or penalty.

     3.3    <u>Provisions for Treatment of Classified Claims</u>.

      3.3.1   <u>Class 1—Priority Non-Tax Claims</u>.

     (a)    Classification. Class 1 consists of all Priority Non-Tax Claims.

     (b)    <u>Treatment</u>. The legal, equitable and contractual rights of the Holders of Allowed Class 1 Priority Non-Tax Claims are unaltered by the Plan. Except to the extent a Holder of a Priority Non-Tax Claim agrees to different treatment or the Bankruptcy Court has previously ordered otherwise, each Holder of an Allowed Priority Non-Tax Claim shall receive, on account of, in full and complete satisfaction, release and discharge of, and in exchange for such Allowed Priority Non-Tax Claim, the Allowed Amount of such Allowed Priority Non-Tax Claim in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Non-Tax Claim becomes an Allowed Claim.

     (c)    <u>Impairment and Voting</u>. Class 1 is Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and the votes of such Holders will not be solicited.

      3.3.2   <u>Class 2(a)—Enterprise Claims</u>.

     (a)    Classification. Class 2(a) consists of all Enterprise Claims.

     (b)    <u>Treatment</u>. The Enterprise Obligations will be Reinstated under the Plan, subject to a consensual extension of the maturity date on the Enterprise Obligations to April 30, 2029.

     (c)    <u>Impairment and Voting</u>. Enterprise Claims are conclusively presumed to have accepted the Plan, are Unimpaired, and the Holders of such Claims are not entitled to vote to accept or reject the Plan on account of such Claims and will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

      3.3.3   <u>Class 2(b)—Unimpaired Secured Claims</u>.

US_ACTIVE\132544249

(a)    <u>Classification</u>.  Class 2(b) consists of all Unimpaired Secured Claims.

(b)    <u>Treatment</u>.  Each Holder of an Allowed Unimpaired Secured Claim against the Debtors shall receive on or as soon as reasonably practicable after the Effective Date, on account of, in full and complete satisfaction, release and discharge of, and in exchange for, such Allowed Unimpaired Secured Claims, at the option of the Reorganized Debtors: (i) payment in full in Cash; (ii) the collateral securing its Allowed Unimpaired Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) reinstatement of such Allowed Unimpaired Secured Claim; or (iv) such other treatment rendering such Allowed Unimpaired Secured Claim unimpaired.

(c)    <u>Impairment and Voting</u>.  Allowed Unimpaired Secured Claims are conclusively presumed to have accepted the Plan, and the Holders of such Claims are not entitled to vote to accept or reject the Plan on account of such Claims and will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.3.4    <u>Class 3—Senior Indebtedness Claims</u>.

(a)    <u>Classification</u>.  Class 3 consists of the Senior Indebtedness Claims.

(b)    <u>Treatment</u>.  Each Holder of an Allowed Senior Indebtedness Claim against the Debtors shall receive on or as soon as reasonably practicable after the Effective Date, on account of, in full and complete satisfaction, release and discharge of, and in exchange for, such Allowed Senior Indebtedness Claim, its pro rata share of the Plan Sponsor Common Stock on the terms set forth in Section 5.2(b) of the Plan.

(c)    <u>Impairment and Voting</u>.  The Senior Indebtedness Claims are Impaired and Holders are entitled to vote to accept or reject the Plan.

3.3.5    <u>Class 4— Subordinated Notes Claims</u>.

(a)    <u>Classification</u>.  Class 4 consists of Subordinated Notes Claims.

(b)    <u>Treatment</u>.  Each Holder of a Subordinated Notes Claim against the Debtors shall receive on or as soon as reasonably practicable after the Effective Date, on account of, in full and complete satisfaction, release and discharge of, and in exchange for, such Allowed Subordinated Notes Claims, its pro rata share in the Contingent Payment Certificate.

The Contingent Payment Certificate will mature one-hundred twenty (120) days following the end of the third taxable year following the Effective Date (including the taxable year in which the Effective Date occurs), the obligations under which will constitute an unsecured obligation of Impac, the amount payable on which shall be equal to 10% of the consolidated positive earnings of Impac and its subsidiaries for the three taxable years of Impac following the Effective Date, provided that such amount shall not exceed $5 million or be less than $250,000.  For the avoidance of doubt, the amount of the Contingent Payment Certificate shall be reduced dollar-for-dollar by any cash tax liability of Impac and its subsidiaries during and relating to the three taxable year period after the Effective Date.

-24-

The Contingent Payment Certificate shall provide that Holders thereof shall report the value of the Contingent Payment Certificate as $250,000 as of the date of issuance and shall not take any position inconsistent with that valuation for any financial reporting or tax purposes, unless required to do so by applicable regulatory or administrative authorities. The Contingent Payment Certificate shall be treated as a contingent payment right to the Holders of the Subordinated Notes Claims and not as an equity interest in Impac.

(c) Impairment and Voting. The Subordinated Notes Claims are Impaired and Holders are entitled to vote to accept or reject the Plan.

3.3.6   Class 5—General Unsecured Claims.

(a) Classification. Class 5 consists of all General Unsecured Claims. Class 5 Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, the Plan Administrator (as applicable), which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date.

(b) Treatment. Each Holder of an Allowed General Unsecured Claim shall receive on account of, in full and complete satisfaction, release and discharge of, and in exchange for its Allowed General Unsecured Claim, a Pro Rata share of the GUC Consideration after payment in full of all GUC Expenses.

(c) Impairment and Voting. General Unsecured Claims are Impaired, and the Holders of Allowed General Unsecured Claims are conclusively presumed to reject the Plan and the votes of such Holders will not be solicited.

3.3.7   Class 6—Intercompany Claims.

(a) Classification. Class 6 consists of all Intercompany Claims.

(b) Treatment. On the Effective Date, each Intercompany Claim shall, at the option of the applicable Debtor or Reorganized Debtor, be adjusted, Reinstated, or canceled and released without any distribution; except as necessary or appropriate for tax efficiency, provided, however, that no Distribution will be in Cash.

(c) Impairment and Voting. Holders of Intercompany Claims are Unimpaired or Impaired, as applicable, and such Holders of Intercompany Claims are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

3.3.8   Class 7—510(b) Claims.

(a) Classification. Class 7 consists of all 510(b) Claims.

-25-

(b)    Treatment.  On the Effective Date, each 510(b) Claim shall be canceled, released and discharged and the Holders of such 510(b) Claims shall receive no distribution on account of such 510(b) Claims.

(c)    Impairment and Voting.  Holders of 510(b) Claims are Impaired and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, Holders of Class 7 Claims are not entitled to vote to accept or reject the Plan.

3.3.9    Class 8(a)—Interests in Impac.

(a)    Classification.  Class 8(a) consists of all Interests in Impac.

(b)    Treatment.   All Interests in Impac will be cancelled, released, and extinguished, and will be of no further force or effect, and the Holders of Interests in Impac will receive no distribution on account of such Interests.

(c)    Impairment and Voting.  Holders of Class 8(a) Interests are Impaired and are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, Holders of Class 8(a) Interests are not entitled to vote to accept or reject the Plan.

3.3.10   Class 8(b)—Interests in the Debtor Subsidiaries.

(a)    Classification.  Class 8(b) consists of all Interests in the Debtor Subsidiaries.

(b)    Treatment.  On the Effective Date, Interests in the Debtor Subsidiaries shall be Reinstated without any distribution.

(c)    Impairment and Voting.   In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Class 8(b) Interests in Debtor Subsidiaries are Unimpaired, Holders of such Interests are presumed to accept the Plan, and the votes of such Holders will not be solicited.

**SECTION 4**
**ACCEPTANCE OR REJECTION OF THE PLAN**

4.1    Acceptance by a Class of Claims.

In accordance with section 1126(c) of the Bankruptcy Code, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims will be deemed to accept the Plan if the Plan is accepted by the Holders of Claims in such Class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan as provided for in the Solicitation Order.

US_ACTIVE\132544249

4.2    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cram Down."

Because Classes 5, 6, 7 and 8(a) are deemed to reject the Plan, the Debtors will seek confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

4.3    Confirmation of All Cases.

Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.

4.4    Intercompany Claims and Interests in Debtor Subsidiaries.

Distributions on account of the Intercompany Claims and Interests in the Debtor Subsidiaries are not being received by Holders of such Intercompany Claims and Interests in the Debtor Subsidiaries on account of their Claims and Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the various subsidiaries of the Debtors.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Claims and Interests in the Debtor Subsidiaries shall be held or owned by the same Reorganized Debtor that corresponds with the Debtor that held or owned such Intercompany Claims and Interests in the Debtor Subsidiaries prior to the Effective Date.

**SECTION 5**
**MEANS OF PLAN IMPLEMENTATION**

5.1    Corporate Governance and Action.

5.1.1    Reorganized Debtors' Initial Board of Directors.  Upon the Effective Date and without further authorization or documentation, the authority of (i) the members of the board of directors for each of the Debtors; and (ii) each of the Debtors' officers shall terminate and the members of the board of directors of each of the Reorganized Debtors shall be appointed as provided for herein.  The boards of directors of the Reorganized Debtors shall consist of three (3) directors, all of whom shall be nominated by the Plan Sponsor and shall serve three (3) year terms.  The identities of the initial board of directors of the Reorganized Debtors shall be set forth in the Plan Supplement.  Such initial board members shall also serve as the board of directors for each of the other corporate Reorganized Debtors.  After the initial term of a Reorganized Impac director expires, each director shall be elected in accordance with the terms of the Amended Certificate and Bylaws.  CFLLC shall continue to be member managed in accordance with its applicable operating agreement and other governing documents, as may be amended.  Reorganized Impac shall serve as manager of CFLLC and any Reorganized Debtor that is a limited liability company.

5.1.2    Stockholder Approval Matters.  Reorganized Impac's Bylaws shall provide that all post-Effective Date matters requiring the approval of Reorganized Impac's stockholders will require a quorum of not less than a majority of Reorganized Impac's issued and outstanding

US_ACTIVE\132544249

stock entitled to vote threat, and all matters brought before the stockholders shall be approved by the affirmative vote of greater than fifty-one percent (51%) of the voting power of the then outstanding common stock of Reorganized Impac, voting as a single class.

    5.1.3 <u>Corporate Action</u>.

   All decisions of the Reorganized Debtors' boards of directors shall be by simple majority.

   The boards of directors of the Reorganized Debtors shall be authorized to appoint officers for the Reorganized Debtors in accordance with the terms of each Reorganized Debtor's organizational documents, including the Amended Certificate and Bylaws.

   On and after the Effective Date, the members of the boards of directors of the Reorganized Debtors, or, where member managed, the managing member, are authorized to, and may direct an officer to, issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such action as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those required pursuant to the Plan.

   The adoption of the Amended Certificate and Bylaws or other organizational documents of the Reorganized Debtors, if so amended, the selection of directors and officers of Reorganized Debtors, and all other actions contemplated by the Plan shall be authorized and approved in all respects (subject to the provisions of the Plan) by the Confirmation Order.  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors of the Reorganized Debtors in connection with the Plan, shall be deemed to have timely occurred in accordance with applicable law and shall be in effect, without any requirements or further action by the security holders, members, directors, managers or officers of the Debtors or Reorganized Debtors.

   On the Effective Date, as applicable, the appropriate officers of the Debtors and/or Reorganized Debtors and members of the boards of directors or managers of the Debtors and/or Reorganized Debtors are authorized and directed to issue, execute and deliver, and cause the Reorganized Debtors to perform, the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of the Debtors and/or Reorganized Debtors.

   On and after the Effective Date, the Reorganized Debtors shall have full authority and are authorized to take such actions and execute such documents as may be necessary to effectuate the transactions provided for in the Plan.  The Reorganized Debtors' post-Effective Date authority shall include the right to operate their business as a going concern to purchase and/or sell assets; to commence and prosecute actions and proceedings; to open, maintain and close bank accounts and/or other investments on behalf of the Estates; to make and file Objections to, or otherwise contest the amount, validity and/or priority of, all Claims other than the Senior Indebtedness Claims (which are Allowed Pursuant to the Plan), Subordinated Notes Claims (which are Allowed pursuant to the Plan) and the General Unsecured Claims (which shall be administered solely by the Plan Administrator); to calculate and make Distributions consistent with the Plan; to prosecute and resolve Objections regarding all Claims other than the Senior Indebtedness Claims (which are

-28-

Allowed pursuant to the Plan), Subordinated Notes Claims (which are Allowed pursuant to the Plan) and the General Unsecured Claims (which shall be administered solely by the Plan Administrator); to engage in arbitration or mediation; to engage or retain Professionals and to pay the fees and disbursements thereof; to file tax information and returns as required and, in connection therewith, to make such determinations of tax liability, challenge assessments, make tax elections, pay taxes and take other, related actions; to hold and dispose of any unclaimed Distributions; and to close the Chapter 11 Cases and any related proceedings. Subsequent to the Effective Date, the Debtors' charters, as applicable, shall be amended to prohibit the issuance of non-voting securities and to otherwise comply with the terms and conditions of section 1123(a)(6) of the Bankruptcy Code.

5.2 <u>Effective Date Transactions</u>. The Closing of the transactions required and contemplated under the Plan shall take place by electronic exchange of documents on the Effective Date. All documents to be executed and delivered by any party as provided in this Section 5 and all actions to be taken by any party to implement the Plan as provided herein shall be in form and substance satisfactory to the Debtors and the Plan Sponsor. The following actions shall occur at or before the Closing (unless otherwise specified), and shall be effective on the Effective Date:

a. <u>Vesting of Assets</u>.

On the Effective Date and unless otherwise provided in the Plan, the Assets of each Estate shall vest in the applicable Reorganized Debtor, as the case may be, free and clear of all claims, liens, encumbrances, charges and other interests.

b. <u>Issuance of Plan Sponsor Common Stock</u>.

On the Effective Date, and consistent with its Amended Certificate and Bylaws, the Debtors other than CFLLC and CCC shall be redomiciled as Delaware corporations. CFLLC and CCC currently are organized in Delaware.

On the Effective Date, all issued and outstanding securities in the Debtors (other than the Interests in Debtor Subsidiaries), and all rights to receive any securities in the Debtors, shall be cancelled and all classes of stock in Impac shall be eliminated with the exception of the New Common Stock.

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue the Plan Sponsor Common Stock to the Plan Sponsor, which shall be distributed as set forth in the Plan. The issuance of the Plan Sponsor Common Stock under the Plan is authorized by the Reorganized Debtors without the need for any further corporate action by the Reorganized Debtors.

c. <u>Securities Registration Exemption</u>.

As of the Effective Date, Reorganized Impac shall take such steps to cease to be publicly traded and, to the extent applicable, shall take such steps be delisted from any public exchange and no longer be subject to any over-the-counter (OTC) marketplace reporting requirements.

US_ACTIVE\132544249

The securities to be issued pursuant to the Plan are to be issued without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code. To the extent section 1145 of the Bankruptcy Code is inapplicable, these issuances are exempt from registration under the Securities Act or any similar federal, state or local law in reliance on the exemption set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

       d.        The Contingent Payment Certificate.

On the Effective Date, the Debtors shall issue the Contingent Payment Certificate to Holders of allowed Subordinated Notes Claims, who shall receive their Pro Rata share thereof in full and final and satisfaction of the Subordinated Notes Claims.

       e.        Funding of the Administrative and Priority Claims Reserve.

On the Effective Date, the Reorganized Debtors shall cause the Administrative and Priority Claims Reserve to be funded in Cash from Cash on hand on the Effective Date and the proceeds of the Exit Loan Facility in the amount of the aggregate Administrative and Priority Claims Reserve Estimate. On or after the Effective Date, the Reorganized Debtors shall, subject to and in accordance with the terms and conditions of the Plan, pay Allowed Administrative Claims, Allowed Priority Non-Tax Claims, and Allowed Priority Tax Claims, each as provided for in the Plan.

       f.        Satisfaction of DIP Obligations.

Pursuant to Section 3.2.4 of the Plan, the Proceeds of the Exit Loan Facility shall be used to refinance the DIP Claims on account of, in full and complete discharge of, and in exchange for, such DIP Claims.

       g.        Management Incentive Plan.

On the Effective Date or as soon as reasonably practicable thereafter, without further order of the Court or approval by the Board of Directors or stockholders of Reorganized Impac, Reorganized Impac shall be deemed to adopt the Management Incentive Plan. The amounts, structure, awards, and terms of the Management Incentive Plan shall be set forth in the Management Incentive Plan, which shall be in the form of a stock appreciation rights plan as a part of the Plan Supplement, and approved by the Court pursuant to the Confirmation Order. All awards issued under the Management Incentive Plan will be dilutive of all other equity interests in Reorganized Impac issued in connection with the Plan.

       h.        Cancellation of Existing Securities and Agreements.

Except for all Interests in the Debtor Subsidiaries, which shall be Reinstated as provided for in the Plan, on the Effective Date, the Subordinated Notes and all Interests in Impac, shall be deemed, and shall be, cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Similarly, on the Effective Date, any instruments or documents evidencing any Claims or Interests shall be deemed automatically canceled and deemed surrendered without further act or action under any applicable agreement, law, regulation, order,

-30-

or rule and the obligations of the Debtors under the agreements, instruments, and other documents, indentures, and certificates of designations governing such Claims and Interests, as the case may be, shall be discharged; except (a) Interests in Debtor Subsidiaries; (b) as otherwise specifically provided for in the Plan; (c) with respect to any assumed Executory Contracts and Unexpired Leases; (d) for purposes of evidencing a right to Distributions under the Plan; or (e) with respect to any Claim that is Allowed under the Plan.

      i.       <u>Exemption from Taxes</u>.

To the extent the Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments, and equity securities under or in connection with the Plan; (b) the creation, assignment, recordation, or perfection of any lien, pledge, other security interest, or other instruments of transfer; (c) the making or assignment of any contracts or leases; (d) the creation, execution, and delivery of any agreements or other documents creating or evidencing the formation of the Reorganized Debtors or the issuance or ownership of any interest in the Reorganized Debtors; and/or (e) the making or delivery of any deed or other instrument of transfer under the Plan in connection with the vesting of the Estate's Assets in the Reorganized Debtors pursuant to or in connection with the Plan, including, without limitation, merger agreements, stock purchase agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, and transfers of tangible property pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

      j.       <u>Obligations Incurred After the Effective Date</u>.

Payment obligations incurred after the Effective Date, including, without limitation, the professional fees of the Reorganized Debtors, will not be subject to application or proof of claim and shall be paid by the Reorganized Debtors in the ordinary course of business and without further Bankruptcy Court approval.

5.3    <u>Exit Loan Facility</u>.  The DIP Lender shall provide the Exit Loan Facility, which shall be used, among other ways, to fund: (i) the GUC Consideration; (ii) all transactions necessary to implement the Plan, including, but not limited to, (a) payment of all Allowed Claims that are to be satisfied in cash under the Plan (other than General Unsecured Claims), and (b) payment of amounts owed under the Key Executive Employment Agreements and Contractual Incentive Payments; and (iii) working capital needs of the Reorganized Debtors.

5.4    <u>General Settlement of Claims and Interests.</u>  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, settlements contained in the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the relevant Plan provisions.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises and settlements under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlements and compromises are fair, equitable, reasonable, and in

US_ACTIVE\132544249

the best interests of the Debtors and the Estates.  All Plan Distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final. For the avoidance of doubt, the Plan itself shall not be deemed to be a settlement.

## SECTION 6
## PRESERVATION AND PROSECUTION OF CAUSES OF ACTION HELD BY THE DEBTORS

6.1     Preservation and Prosecution of Causes of Action.

In accordance with section 1123(b) of the Bankruptcy Code, except as explicitly provided in the Plan, all Causes of Action of the Debtors and Reorganized Debtors are retained and preserved and shall revest in the Reorganized Debtors.  Except as explicitly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver, release, or relinquishment of any Causes of Action, including, without limitation, any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses (including, for avoidance of doubt, any cause of action to avoid a transfer under sections 303(c), 544, 547, 548, or 553(b) of the Bankruptcy Code, or under any similar state law) that the Debtors or the Reorganized Debtors, or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable non-bankruptcy law.

Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors shall retain and may enforce all rights to commence, prosecute, settle, or abandon as appropriate, any and all Causes of Action, notwithstanding the occurrence of the Effective Date.  No entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation Order or the occurrence of the Effective Date.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action against any entity shall vest in the Reorganized Debtors.

## SECTION 7
## PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

7.1     Allowance of Claims.

After the Effective Date, each of the Plan Administrator or Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

-32-

7.2     Claims Administration Responsibilities.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the authority and standing to:  (1) file, withdraw, or litigate to judgment, objections to Claims or Interests with respect to which it disputes liability, priority, and/or amount other than the Senior Indebtedness Claims (which are Allowed pursuant to the Plan), Subordinated Notes Claims (which are Allowed pursuant to the Plan) or General Unsecured Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Administrator shall have the authority and standing to:  (1) file, withdraw, or litigate to judgment, objections solely to General Unsecured Claims with respect to which it disputes liability, priority, and/or amount; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

The costs of pursuing the objections to Claims shall be borne by the Reorganized Debtors from its available cash or the Plan Administrator from the Distributable GUC Assets Account, as applicable.  From and after the Effective Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent, the Reorganized Debtors or Plan Administrator, as applicable, elect(s) to withdraw any such objection or the Reorganized Debtors or Plan Administrator, as applicable, and the Creditor elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court.

7.3     Objections to Claims.

Any Objections to Claims that have been filed or scheduled on or before the Effective Date shall be served and filed as soon as practicable, but, in each instance, no later than: (a) 180 days after the Effective Date; or (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof (the "Claim Objection Deadline").  The Filing of a motion to extend the Claim Objection Deadline, which may be made by the Plan Administrator or Reorganized Debtors, as applicable, shall automatically extend such Claim Objection Deadline until a Final Order is entered on such motion.  In the event that such a motion to extend the Claim Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, such objection deadline shall be the later of the current Claim Objection Deadline (as previously extended, as applicable) or 30 days after entry of a Final Order denying the motion to extend the objection deadline.

7.4     No Payment or Distribution Pending Allowance.

Notwithstanding any other provision in the Plan, if any portion of a Claim is a Disputed Claim, no payment or Distribution of Assets provided for hereunder shall be made on account of

-33-

such Claim unless and until the Disputed Claim becomes an Allowed Claim. To the extent a Disputed Claim is Disallowed in whole or in part, the Holder of such Claim will not receive any Distribution on account of the portion of such Claim (including the whole, if applicable) that is a Disallowed Claim. The Plan Administrator or Reorganized Debtors, as applicable, shall have no obligations with respect to any Disallowed Claims, including, without limitation, any obligation to pay any deductibles or self-insured retentions associated with any insurance coverage in respect of such Claims.

7.5     Disputed Distributions.

If any dispute arises as to the identity of a Holder of an Allowed Claim who is to receive any Distribution, in lieu of making a distribution to such Person, the Distribution Agent may reserve or deposit the Distribution at issue (or the disputed portion thereof) into a segregated account for Disputed Distributions until the disposition thereof is determined by a Final Order or by written agreement among the interested parties to such dispute.

7.6     Estimation.

The Plan Administrator or Reorganized Debtors, as applicable, shall have the right, but not the obligation, at any time to seek an order of the Bankruptcy Court, after notice and a hearing (which hearing may be held on an expedited basis), estimating for final Distribution purposes any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Plan Administrator or Reorganized Debtors, as applicable, previously objected to such Claim. If the Bankruptcy Court estimates any contingent, Disputed or unliquidated Claim, the estimated amount shall constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided*, *however*, that if the estimate constitutes the maximum limitation on such Claim, the Plan Administrator or the Reorganized Debtors as the case may be, may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim. On or after the Effective Date, Claims that have been estimated may be compromised, settled, withdrawn, or otherwise resolved without further order of the Bankruptcy Court.

7.7     Late Filed Claims; Amendments to Claims.

Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed or amended after the applicable Bar Date shall be deemed Disallowed Claims and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, and any Holders of such Disallowed Claims may not receive any distributions on account of such Claims, unless the Holder of such late Claim has obtained a final order granting leave to file such late Claim in advance of the filing of any such late Claim.

7.8     Disallowance of Claims.

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or Entities that are transferees of transfers avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, provided that such Cause of Action is retained by the Reorganized Debtors, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any

-34-

Distributions on account of such Claims until such time as such Causes of Action the Debtors hold or may hold against any Entity have been resolved or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Estates by that Entity have been turned over or paid to the Reorganized Debtors.

7.9     Reserve Provisions for Disputed Claims.

On or by each Distribution Date with respect to the Distributable GUC Assets, the Plan Administrator shall reserve from Distributable GUC Assets for GUC Expenses and distribution on Disputed Claims as if such Claims were Allowed as Filed with any Disputed Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Debtors or the Plan Administrator (the "Disputed Claim Reserve").

The property in the Disputed Claim Reserve shall be held in trust for the benefit of the Holders of Disputed Claims that are ultimately determined to be Allowed.  The Disputed Claim Reserve shall be closed and extinguished when all Distributions and other dispositions of Cash of other property required to be made hereunder will have been made in accordance with the terms of the Plan.

7.10     Adjustment to Claim or Interests without Objection.

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

**SECTION 8**
**DISTRIBUTIONS UNDER THE PLAN**

8.1     Distributions Generally.

The Reorganized Debtors shall make all distributions to Holders of Allowed Claims other than General Unsecured Claims.  The Plan Administrator shall make distributions to the appropriate Holders of Allowed General Unsecured Claims in accordance with the terms of the Plan.

8.2     Limitation to Full Recovery.

Notwithstanding anything herein to the contrary, no Holder of any Claim will be entitled to a Distribution in excess of 100% of the Allowed amount of its Claims, plus applicable interest required to be paid hereunder.

8.3     Timing of Distributions.

Distributions to Holders of Allowed Claims shall be made on one or more Distribution Dates.  With respect to General Unsecured Claims, the Plan Administrator may, in its discretion, make full or partial Pro Rata Distributions to Holders of General Unsecured Claims on any Distribution Date. Any Distribution not made on a Distribution Date because the Claim relating to

-35-

US_ACTIVE\132544249

such Distribution had not yet been Allowed shall be made on a subsequent Distribution Date after such Claim becomes Allowed.  No interest shall accrue or be paid on account of any delayed Distribution.

Distributions under the Plan shall be made (i) as set forth in the Plan or as soon as reasonably practicable thereafter; or (ii) as agreed between the Plan Administrator or Reorganized Debtors, as applicable, and the particular Creditor, or as soon as reasonably practicable thereafter. If a Claim is not an Allowed Claim as of the Effective Date, Distributions will be made only if and when the Claim is Allowed and, to the extent a Disputed Claim is the subject of estimation in accordance with Section 7.6 of the Plan, in an amount no greater than the estimated amount of such Claim.

8.4     Saturdays, Sundays, or Legal Holidays.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

8.5     Distribution Record Date.

Except as otherwise provided in a Final Order, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001(e) and Filed with the Bankruptcy Court on or prior to the Distribution Record Date will be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer may not have expired by the Distribution Record Date.  As of the close of business on the Distribution Record Date, any transfer ledgers, transfer books, registers and any other records will be closed and, for purposes of the Plan, there shall be no further changes in the record Holders of such Claims.  The Plan Administrator or the Reorganized Debtors, as applicable, shall have no obligation to recognize the transfer of any Claim occurring after the Distribution Record Date, and will be entitled for all purposes to recognize and deal only with those Holders of Claims and Interests as of the close of business on the Distribution Record Date, as reflected on the ledgers, books, registers or records of the Debtors and the Bankruptcy Court.

8.6     Delivery of Distributions.

Subject to the treatment of Disputed Distributions as set forth in Section 7 of the Plan, Distributions shall be made to Holders of Allowed Claims at the addresses set forth on the Debtors' books and records or the Proofs of Claim, if any, Filed by such Creditors or at the last known addresses of such Creditors or, in the case of transferred Claims, on the notice of transfer Filed with the Bankruptcy Court pursuant to Bankruptcy Rule 3001, each as of the Distribution Record Date. If any such Creditor's Distribution is returned as undeliverable, no further Distribution shall be made to such Creditor unless and until the Distribution Agent is notified of such Creditor's then-current address, at which time any missed Distribution shall be made to such Creditor to the extent of available Cash; provided that in no event is the Distribution Agent required to make Distributions to a Creditor whose Distribution is returned as undeliverable and becomes Unclaimed Property.  Notwithstanding anything to the contrary in the foregoing, Distributions on

-36-

account of the Subordinated Notes Claims shall be made directly to the applicable Subordinated Noteholders.

8.7    Method of Cash Distributions.

The Distribution Agent shall make all Distributions contemplated by the Plan.  Any Cash payment to be made pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Distribution Agent.  If a Creditor holds more than one Claim in any one Class, all Allowed Claims of the Creditor in that Class may, at the Plan Administrator's or the Reorganized Debtors' option, as applicable, be aggregated and one Distribution may be made with respect thereto.

8.8    Unclaimed Property.

Except with respect to property held in a Disputed Claim Reserve, all Assets distributed on account of Claims must be claimed within the later of ninety (90) days after (i) the Effective Date and (ii) the date such Distribution is made to such Holder provided, however, in the case of a Distribution made in the form of a check, must be negotiated or a request for reissuance made directly to the Plan Administrator or Reorganized Debtors, as applicable, by the Creditor that was originally issued such check and shall be made within ninety (90) days after the date the Distribution is made to the applicable Creditor.  Nothing contained in the Plan shall require the Plan Administrator or Reorganized Debtors, as applicable, to attempt to locate any Holder of an Allowed Claim, other than as provided herein.  Pursuant to Bankruptcy Code sections 347(b) and 1143, all Claims in respect of Unclaimed Property shall be deemed a Disallowed Claim and the Holder of any Disallowed Claim is forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtors or the Estates.

8.9    Compliance with Tax Requirements.

In connection with each Distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Plan Administrator or Reorganized Debtors, as applicable, shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such Distribution or effect any such withholding and deposit all moneys so withheld as required by law.  With respect to any Person from whom Tax Documentation has not been received by the Reorganized Debtors within thirty (30) days from the date of any request for Tax Documentation, the Reorganized Debtors may, at their option, withhold the amount required (the "Withheld Amount") and distribute the balance of such distribution to such Person, or decline to make any such Distribution until the information is received; provided, however, that in the event that such Tax Documentation is not received within ninety (90) days from the date that the Tax Documentation is requested, the Reorganized Debtors shall have no obligation to distribute any such Withheld Amount or make any such Distribution at all, the Claim associated with any such Withheld Amount or any such Distribution, as applicable, shall be a Disallowed Claim, and the Holder of any such Disallowed Claim shall be forever barred, expunged, estopped and enjoined from asserting such Disallowed Claim in any manner against the Debtors or the Estates.

8.10    Setoff or Recoupment

The Plan Administrator or Reorganized Debtors, as applicable, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), setoff or recoup against any Distribution amounts related to any Claim before any Distribution is made on account of such Claim and any and all of the Causes of Action of any nature that the Debtors, the Estates or the Reorganized Debtors may hold against the Holder of such Claim, to the extent that (a) the Plan Administrator or Reorganized Debtors, as applicable, provide the Holder of an applicable Claim seven (7) days' notice of the Plan Administrator's or Reorganized Debtors' intent to apply a setoff or recoupment and such Holder of a Claim does not object; or (b) the Plan Administrator's or Reorganized Debtors' right to setoff or recoupment is otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided, however, that neither the failure to effect such a setoff or recoupment, the allowance of any Claim hereunder, any other act or omission of the Plan Administrator or Reorganized Debtors, nor any provision of the Plan (other than Section 10 of the Plan) will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Causes of Action that the Debtors or the Reorganized Debtors may possess against such Holder.

8.11    Documentation Necessary to Release Lien

Except as otherwise agreed to by the Reorganized Debtors, each Creditor who is a Holder of a Lien satisfied, discharged and released under the Plan and who is to receive a Distribution under the Plan shall not receive such Distribution until such Creditor executes and delivers any documents necessary to release all Liens arising under any applicable security agreement or non-bankruptcy law (in recordable form, if appropriate) in connection with such Claim and such other documents as the Reorganized Debtors may reasonably request to document satisfaction of the Lien.

8.12    Distributions Under Twenty-Five Dollars.

Notwithstanding anything herein to the contrary, except with respect to Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and Unimpaired Secured Claims, no Distribution of Cash in an amount less than twenty-five dollars ($25.00) will be made by the Distribution Agent to any Holder of an allowed Claim unless a request is made in writing to the Distribution Agent. If no such request is made, all such Distributions will be treated as Unclaimed Property.

8.13    No Postpetition Interest.

Unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, postpetition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim or Interest. Additionally, and without limiting the foregoing, unless otherwise specifically provided for in this Plan or as otherwise required by section 506(b) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made, when and if such Disputed Claim becomes an Allowed Claim.

-38-

8.14    Time Bar to Distributions.

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to Holders of Allowed Claims shall be made to the address of the applicable Creditor set forth in the GUC Schedule, unless superseded by an address in a Filed proof of claim, or to the Creditor's last known address if the Debtors or the Plan Administrator receive written notice of a change of address. If a Distribution is returned as undeliverable, the Distribution Agent may, in its discretion, undertake reasonable efforts to determine the Creditor's current address; provided, however, that no further Distribution shall be made unless and until a current address is identified. Any such delayed Distribution shall be made without interest. Amounts attributable to undeliverable Distributions shall be returned to, and held in trust by, the Distribution Agent pending claim or treatment as Unclaimed Property pursuant to section 347(b) of the Bankruptcy Code. Nothing herein shall require the Debtors, the Plan Administrator, or the Distribution Agent to locate any Holder of an Allowed Claim.

8.15    Rounding.

Whenever any payment of a fraction of a cent would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest cent.

8.16    Books and Records.

Upon the Plan Administrator's request and to the extent thereof, the Debtors shall provide copies of all of their books and records, in whatever form, manner or media, relating to potential objections to General Unsecured Claims and/or other responsibilities under the Plan of the Plan Administrator, to the Plan Administrator, on or as soon as reasonably practicable after the Effective Date.

8.17    Plan Administrator.

(a)      Appointment of the Plan Administrator.  The Plan Administrator shall be selected by the Debtors, with the consent of the Plan Sponsor, whose identity will be disclosed as part of the Plan Supplement in accordance with section 1129(a)(5) of the Bankruptcy Code. The Plan Administrator may be a Reorganized Debtor.

(b)      Resignation; Replacement.  The Plan Administrator shall serve from the Effective Date until the earlier of (a) full administration of the Distributable GUC Assets in accordance with the Plan or (b) further order of the Bankruptcy Court, and may resign upon thirty (30) days' written notice, provided such resignation shall not be effective until a successor has been appointed and accepted such appointment. In the event that the Person serving as the Plan Administrator is terminated or is unable to fulfill his, her or its duties under the Plan, the Plan Sponsor shall appoint a Person to fulfill the obligations of the Plan Administrator under the Plan. The Plan Administrator may be removed for cause by order of the Bankruptcy Court after notice and a hearing.

(c)      Powers of the Plan Administrator.  The Plan Administrator shall have the sole authority to administer, reconcile, and make Distributions on account of General Unsecured

-39-

Claims in accordance with the Plan.  In furtherance thereof, the Plan Administrator shall have the power and authority to:

(i)      administer Claims by receiving, reviewing, and reconciling Proofs of Claim relating to General Unsecured Claims and reconciling such claims, including to the GUC Schedule and the Debtors' books and records;

(ii)     identify and classify General Unsecured Claims as Allowed, Disputed, contingent, unliquidated, or otherwise subject to objection;

(iii)    object to or respond to asserted Claims by filing, litigating, settling, compromising, withdrawing, or otherwise resolving objections to General Unsecured Claims, including estimating any such Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of allowance and Distribution;

(iv)     establish and maintain accounts by opening, maintaining, investing (consistent with the Plan), and closing the Distributable GUC Assets Account;

(v)      calculate and make Distributions by determining Distribution amounts in accordance with the Plan and making interim and final Distributions to holders of Allowed General Unsecured Claims;

(vi)     establish and adjust reserves by implementing and modifying reserves for GUC Expenses and Disputed Claims;

(vii)    resolve matters relating to undeliverable Distributions, Unclaimed Property, forfeitures, and related administrative matters in accordance with the Plan and applicable law;

(viii)   seek orders of the Bankruptcy Court as necessary to implement the Plan with respect to General Unsecured Claims;

(ix)     retain and compensate professionals or agents as reasonably necessary to perform the foregoing duties without further order of the Bankruptcy Court; and

(x)      to take any and all other actions reasonably necessary or appropriate to implement, administer, and consummate the provisions of the Plan with respect to General Unsecured Claims and the Distributable GUC Assets.

(d)      <u>Fees and Expenses of the Plan Administrator</u>.  All expenses incurred by the Plan Administrator in administering General Unsecured Claims and effectuating distributions of the Distributable GUC Assets, including any costs and expenses associated with the reconciliation, resolution, and allowance of General Unsecured Claims, the maintenance and administration of the Distributable GUC Assets Account, and the calculation and implementation of distributions therefrom, shall be paid solely from the Distributable GUC Assets.  The Plan Administrator shall be allowed to reserve from Distributable GUC Assets on account of GUC Expenses.  Under no circumstances shall the Plan Administrator, the Reorganized Debtors, the Plan Sponsor or any

-40-

other Person be obligated to fund such expenses from any assets other than the Distributable GUC Assets.

8.18    Distribution Procedures for General Unsecured Claims.

(a)    General Unsecured Claims.  The Debtors have attached a GUC Schedule to the Plan, which sets forth the creditor and corresponding proposed Allowed amount for each General Unsecured Claim.  If General Unsecured Creditors disagree with the amount of their Claim or do not see their Claim listed on the GUC Schedule, such General Unsecured Creditors shall file a Proof of Claim in this Bankruptcy Case as provided in subsection (b) below.  The Plan Administrator has the right to request additional documentation or information from such General Unsecured Creditor.

(b)    GUC Bar Date.  To the extent, not already Filed with the Court prior to the Effective Date, within thirty (30) days following the Effective Date of the Plan (the "GUC Bar Date"), Holders of General Unsecured Claims must file and serve on counsel to the Plan Administrator a Proof of Claim on account of their respective General Unsecured Claims, subject to preceding Section 8.18(a).

(c)    Requirements of Proof of Claim.  Proofs of Claim shall:

(i)    Be in writing;

(ii)    Conform substantially to the applicable Official Bankruptcy Form;

(iii)    State the asserted amount of the Claim in U.S. Dollars;

(iv)    Include supporting documentation sufficient to substantiate the Claim; and

(v)    Be executed by the Creditor or an authorized representative.

(d)    Effect of Failure to Timely Submit Proof of Claim.  Any holder of a General Unsecured Claim that fails to file a Proof of Claim by the GUC Bar Date shall be forever barred, estopped, and enjoined from asserting such Claim against the Debtors, the Reorganized Debtors, the Plan Administrator, the Estates, or any Assets to be distributed under the Plan.  Such Claims shall be deemed waived and Disallowed for all purposes under the Plan.  Notwithstanding the foregoing, the Plan Administrator may, in its discretion, accept late-Filed claims in the Plan Administrator's sole discretion.

(e)    Claims Reconciliation.  The Plan Administrator shall have the exclusive authority to administer, reconcile, and resolve all General Unsecured Claims.  In furtherance thereof, the Plan Administrator may review Proofs of Claim, object to Claims, settle, compromise, or resolve Claims, estimate Claims, reclassify Claims consistent with the Plan, and establish reserves as necessary, in each case without any further approval of the Bankruptcy Court.

(f)    Disputed Claims.  General Unsecured Claims that are not Allowed shall be treated as Disputed Claims.  No Distribution shall be made on account of a Disputed Claim unless

-41-

US_ACTIVE\132544249

and until such Claim becomes an Allowed Claim pursuant to Section 7 of this Plan.  The Plan Administrator may establish reserves with respect to Disputed Claims pursuant to Section 7.9 of the Plan.

**SECTION 9**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES;**
**INDEMNIFICATION OBLIGATIONS**

9.1     Rejection / Assumption.

Unless otherwise provided in the Plan, as of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed rejected, unless any such Executory Contract or Unexpired Lease (i) was previously assumed, assumed and assigned, or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (ii) is identified on the Schedule of Assumed Executory Contracts; (iii) is the subject of a notice or motion to assume that is pending on the Effective Date; (iv) is subject to a notice or motion to assume pursuant to which the requested effective date of such assumption is after the Effective Date; (v) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; or (vi) is one of the following type of agreements, all of which shall be deemed assumed even if not identified by clauses (i)-(v) above: (a) confidentiality, non-compete and non-disclosure agreements and (b) intercompany agreements and arrangements, unless specifically identified as rejected under a notice or motion of rejected contracts.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumption of the Executory Contracts and Unexpired Leases set forth on the Schedule of Assumed Executory Contracts pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of such Executory Contracts or Unexpired Leases.  Except as otherwise provided herein or agreed to by the Debtors or Reorganized Debtors (as applicable) and the applicable non-Debtor counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements or other agreements related thereto and all rights related thereto.  Any modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases shall not be deemed to alter the prepetition nature of such agreements or the validity, priority or amount of any Claims that may arise in connection therewith.

Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts at any time through and including 30 days after the Effective Date.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

To the maximum extent permitted by law, to the extent any provision in an Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to

-42-

restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

The Debtors shall assume, as of the Effective Date, all contracts associated with the Debtors' employee benefits, including contracts regarding their payroll processing company, health benefits, 401(k) plan, paid time off, life insurance, accidental death and disability insurance and employee handbook; provided that the Debtors shall not assume any severance obligations unless expressly assumed.

On the Effective Date, any and all equity-based incentive plans or stock ownership plans of the Debtors, including all agreements related thereto, entered into before the Effective Date, or other plans, agreements, or documents giving rise to Interests, including the contingent cash components of any such plans, agreements, or documents, shall be immediately terminated without any action of the Debtors, the Reorganized Debtors, or the Plan Sponsor. To the extent such plans, agreements, or documents are considered to be Executory Contracts, such plans, agreements, or documents shall be deemed to be, and shall be treated as though they are, Executory Contracts that are rejected pursuant to Bankruptcy Code section 365 under the Plan.

From and after the Effective Date, all warrants, stock options, and other equity awards outstanding or issued before such time, whether included in a warrant, plan, contract, agreement, or otherwise, will have no value, shall be cancelled and extinguished and thus will not entitle any holder thereof to purchase or otherwise acquire any equity interests in the Reorganized Debtors.

9.2   <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.</u>

Any defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the Cure Amount; (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least twenty-one days prior to the Combined DS and Confirmation Hearing, the Debtors shall file and serve the Cure Notice. **Any objection by a counterparty to the proposed assumption of an Executory Contract or Unexpired Lease or the related Cure Amount must be Filed, served, and actually received by the Debtors no later than fourteen (14) days after the filing and service of the Cure Notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or the related Cure Amount will be deemed to have consented to such assumption and the related Cure Amount.**

-43-

To the extent that any dispute with respect to the related Cure Amount with respect to any Executory Contract and Unexpired Lease to be assumed pursuant to the Plan is resolved or determined, including by entry of an order by the Court, in a manner that is not acceptable to the Debtors or Reorganized Debtors, as applicable, and the Plan Sponsor, then the Schedule of Assumed Executory Contracts shall be deemed amended to delete such Executory Contract or Unexpired Lease after such resolution or determination and service upon the counterparty to such Executory Contract or Unexpired Lease of a notice of rejection (the "Notice of Rejection"). Upon service of such Notice of Rejection, such Executory Contract or Unexpired Lease shall be deemed to be rejected without the need for further action or an order from the Court, and such counterparty may thereafter file a proof of claim in the manner set forth in Section 8.18 of the Plan.

Upon payment of the related Cure Amount, assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults of any kind or nature, whether monetary or nonmonetary, including any Claims arising from indemnification obligations under any assumed Executory Contract or Unexpired Lease based on conduct, actions or inactions occurring or claims arising prior to the Effective Date, and including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, in each case arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **In recognition of the foregoing, any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

9.3     Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

9.4     Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

Except as provided for in the Plan, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be Filed with the Bankruptcy Court and served upon the Plan Administrator and Reorganized Debtors no later than (i) with respect to executory contracts and unexpired leases rejected pursuant to a Bankruptcy Court order other than the Confirmation Order, the date provided by an order approving the rejection, and, (ii) with respect to executory contracts and unexpired leases rejected pursuant to the Confirmation Order, the date that is sixty (60) days after the Effective Date (the "Rejection Bar Date"). All such Claims not Filed within such time will be forever barred from assertion against the Debtors and their Estates or the Reorganized Debtors and their Assets.

-44-

9.5     Treatment of Rejection Claims.

Any Allowed Claim arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan shall, pursuant to section 502(g) of the Bankruptcy Code, be an Allowed General Unsecured Claim.

9.6     Reinstatement and Continuation of Insurance Policies.

Unless otherwise assumed during the pendency of the Chapter 11 Cases, from and after the Effective Date, and notwithstanding Section 9.1 or any other provision of the Plan, each of the Debtors' insurance policies in existence on and as of the Effective Date, including, without limitation, any historical policies that are occurrence based, shall be Reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtors pursuant to section 365 of the Bankruptcy Code.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' insurance policies.

The Debtors' discharge and release from all Claims and Interests, as provided herein, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors (including, without limitation, their officers and directors), the Reorganized Debtors (including, without limitation, their officers and directors) or any other person or entity; *provided* that the Reorganized Debtors shall not have any obligation to satisfy any deductible or self-insured retention obligation associated with any Disallowed Claim or any claim that has been discharged, satisfied, released hereunder.

**SECTION 10**
**EFFECT OF CONFIRMATION**

10.1     Continued Corporate Existence.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate (or limited liability company, as applicable) entity, with all the powers of a corporation (or limited liability company, as applicable), pursuant to the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation or bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such Amended Certificate and Bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

10.2     Continued Operations with an Enhanced Business Model.

(a)     From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein.

-45-

(b)      Without limiting the foregoing, on and after the Effective Date, the Reorganized Debtors shall continue to operate and perform under the existing Secondment Agreement and related Technology Rights Agreement executed prior to the Petition Date (which agreements shall be assumed under the Plan), consistent with their terms.  In connection with performance of the Secondment Agreement, the Reorganized Debtors shall exercise their rights to enhance their existing business model and revenue prospects.  Under the entitlements of the Technology Rights Agreement, the Debtors shall be entitled to continue to pursue this model even in the event that the Secondment Agreement expires or is terminated.

10.3    Discharge of Claims Against and Interests in the Debtors.

**Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise provided herein or in the Confirmation Order, each Person that is a Holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest shall be deemed to have forever discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims and Interests and related rights, and liabilities that arose prior to the Effective Date, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed or Disallowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.  Except as otherwise provided herein, upon the Effective Date, all such Holders of Claims and Interests shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim and Interests and related rights and liabilities. Notwithstanding the foregoing, nothing in this Section 10.3 is intended or shall be deemed to (i) discharge the Debtors' obligations pursuant to the Plan to Holders of Allowed Claims, or (ii) preclude and enjoin such Holders from enforcing such obligations.**

10.4    Injunction.

**No Person or Entity holding a Claim or Interest may receive any payment from, or seek recourse against, directly or indirectly, any Assets of the Debtors and their Estates or the Reorganized Debtors other than Assets required to be distributed to that Person or Entity under the Plan.  Except as otherwise expressly provided for in the Plan or the Confirmation Order, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Interest, or on account of any claim, interest, obligation, right, suit, damages, Cause of Action, remedy or liability discharged, released, dismissed, exculpated, settled or waived under the Plan or the Confirmation Order, from, directly or indirectly (collectively, the "Enjoined Matters"):**

> **a.      asserting any Enjoined Matters against any Assets of the Debtors, their Estates, the Reorganized Debtors, the Released Parties, and their successors and assigns and any of their assets or properties, directly or indirectly;**

-46-

b.      commencing or continuing in any manner any suit, action, discovery, or other matter or proceeding of any kind against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, their successors and assigns and any of their assets and properties;

c.      enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, their successors and assigns and any of their assets and properties;

d.      creating, perfecting or enforcing any encumbrance of any kind against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, their successors and assigns and any of their assets and properties; or

e.      asserting any right of setoff or subrogation of any kind against any obligation due from the Debtors, their Estates, the Reorganized Debtors, the Released Parties, their successors and assigns and any of their assets and properties, directly or indirectly, except to the extent that a motion to effectuate such setoff or subrogation is timely Filed prior to the Confirmation Date.

Notwithstanding the foregoing, nothing in this Section 10.4 is intended or shall be deemed to enjoin Holders of Allowed Claims from enforcing the Debtors' obligations pursuant to the Plan.

10.5    Releases.

(a)     **Releases by the Debtors**. As of the Effective Date, for good and valuable consideration, pursuant to the Plan and the Confirmation Order, the Debtor Released Parties are forever released the ("**Debtor/Estate Release**") by the Debtors and the Estates, and anyone claiming by or through the Debtors and the Estates, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action (including, without limitation, any and all Avoidance Actions), remedies and liabilities whatsoever, including, without limitation, any derivative claims or claims asserted or assertable on behalf of the Debtors and the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or that a Holder of any Claim or Interest would have been legally entitled to assert derivatively on behalf of the Debtors or otherwise by or through the Debtors, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the Chapter 11 Cases, the Plan, the RSA, the Confirmation Order, the Disclosure Statement or related agreements, instruments or other documents in the Chapter 11 Cases, except for any such act, omission, transaction, event or other occurrence that is determined in a Final Order to have constituted actual fraud, gross negligence or willful misconduct.

-47-

(b)  **Releases by Holders of Claims**. **As of the Effective Date, for good and valuable consideration, the Third-Party Released Parties are forever released (the "Third Party Release") by the Releasing Parties, and anyone claiming by or through the Releasing Parties, from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, fixed or contingent, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, that the Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of and anyone claiming by or through the Releasing Parties, based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Estates, the Chapter 11 Cases, the Plan, the RSA, the Confirmation Order, the Disclosure Statement or related agreements, instruments or other documents in the Chapter 11 Cases, except for any such act, omission, transaction, event or other occurrence that is determined by a Final Order to have constituted actual fraud, gross negligence or willful misconduct; provided, however, that the foregoing is not intended and shall not be deemed to be a release of (i) the Debtors' obligations pursuant to the Plan to Holders of Allowed Claims, or (ii) the rights of such Holders to enforce such obligations.**

(c)  **Each Person and Entity deemed to grant a release under this Section 10.5 shall be deemed to have granted such release notwithstanding that such Person or Entity may hereafter discover facts in addition to, or different from, those which such Person or Entity now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person or Entity expressly waives any and all rights that such Person or Entity may have under any statute or common law principle, to the extent such section is applicable, which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of Confirmation.**

(d)  **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Section 10.5, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor/Estate Release and Third Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) in the best interests of the Debtors and all Holders of Claims and Interests; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action released pursuant to the Debtor/Estate Release.**

10.6  Exculpation and Limitation of Liability.

On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, the Exculpated Parties shall be exculpated from any liability to any Person or Entity, including, without limitation, to any Holder of a Claim or an Interest, for any act or omission occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the RSA, the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of

-48-

acceptances, implementation, confirmation or consummation of the Plan, the Disclosure Statement, any contract, instrument, release or other agreement or document created, executed or contemplated in connection with the Chapter 11 Cases, the Plan, the RSA, the Confirmation Order, the Disclosure Statement, related agreements, instruments or other documents in the Chapter 11 Cases, or the administration of the Plan or the Assets to be distributed under the Plan; provided, however, that the exculpation provisions of this Section 10.6 shall not apply to acts or omissions constituting actual fraud, willful misconduct or gross negligence by any Exculpated Party, as determined by a Final Order.  The Confirmation Order and the Plan shall serve as a permanent injunction against any Person or Entity commencing or continuing in any manner any suit, action, discovery, or other matter or proceeding of any kind against the Exculpated Parties that has been exculpated pursuant to this Section 10.6 of the Plan.

10.7    Subordination of Claim and Interests Under Section 510.

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and the Interests in each Class with due regard to any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise.

10.8    Post-Confirmation Liability of the Plan Administrator.

The Plan Administrator, together with its consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and the professionals engaged by the foregoing (collectively, the "Indemnified Parties") shall not be liable for any and all liabilities, losses, damages, claims, Causes of Action, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, to the Holders of Claims or Interests for any action or inaction taken in good faith in connection with the performance or discharge of their duties under the Plan, except the Indemnified Parties will be liable for actions or inactions that constitute willful misconduct, fraud, bad faith, or gross negligence (in each case only to the extent determined by final order of a court of competent jurisdiction).  However, any act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute willful misconduct, fraud, bad faith, or gross negligence.  In addition, the Estates shall, to the fullest extent permitted by the laws of the State of Delaware, indemnify and hold harmless the Indemnified Parties from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including but not limited to attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Administrator and the Estates or the implementation or administration of the Plan if the Indemnified Party acted in good faith and in a manner reasonably believed to be in or not opposed to the best interest of the Estates.  To the extent the Plan Administrator indemnifies and holds harmless the Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Plan Administrator in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be paid as GUC Expenses.  All rights of the Persons indemnified pursuant hereto shall survive confirmation of the Plan.  For the avoidance of doubt,

the Plan Administrator shall not be deemed an Exculpated Party under this Plan, nor shall this provision be read to grant the Plan Administrator an exculpation under this Plan.

## SECTION 11
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Cases, the Plan and the Confirmation Order to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not a Disputed Claim), including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance or priority of any Claim and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim;

(b)      grant or deny any applications for allowance of compensation or reimbursement of expenses for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)      hear and determine motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed on or commenced after the Effective Date, including proceedings with respect to the rights of the Estates to recover Assets under sections 542 or 543 of the Bankruptcy Code;

(d)      determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)      ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(f)      following the Effective Date and consistent with section 1142 of the Bankruptcy Code, construe, take any action and issue such orders as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Estates following consummation in accordance with sections 524 and 1141 of the Bankruptcy Code;

(g)      determine and resolve any case, controversy, suit or dispute that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order, including the discharge, release, exculpation and injunction provisions

-50-

set forth in the Plan, or any Person's rights arising under or obligations incurred in connection therewith;

(h)     modify the Plan after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, or the Confirmation Order;

(i)     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k)     determine any other matters that may arise in connection with or relating to the Plan, the Plan Supplement, the Confirmation Order and the Bankruptcy Code;

(l)     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     continue to enforce the automatic stay through the Effective Date;

(n)     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, and issues presented or arising under the Plan, including, but not limited to, disputes among Holders or with the Reorganized Debtor and arising under agreements, documents or instruments executed in connection with or governed by the Plan;

(o)     hear and determine any other matter relating to the Plan, its interpretation or enforcement; and

(p)     enter a final decree and close the Chapter 11 Cases.

## SECTION 12
## CONFIRMATION AND EFFECTIVENESS OF THE PLAN

12.1   Conditions to Confirmation of the Plan.

The following conditions precedent to the occurrence of Confirmation must be satisfied unless any such condition shall have been waived by the Debtors and the Plan Sponsor:

(a)     the Disclosure Statement having been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code;

(b)     the RSA shall be in full force and effect, and no party thereto shall have exercised any termination rights under the RSA;

-51-

(c)    no breach or failure to comply with the terms of the DIP Order shall have occurred and be continuing, or has been waived in writing the party having the right to assert such breach or failure;

(d)    the final version of the Plan, Plan Supplement, and any other documents, or schedules thereto, shall have been Filed in form and substance acceptable to the Debtors and the Plan Sponsor, each in its reasonable discretion;

(e)    the Debtors have not caused or permitted to occur the sale, disposal or other transfer of the Debtors' material assets; and

(f)    entry of the Confirmation Order in form and substance acceptable to the Debtors and the Plan Sponsor, each in its reasonable discretion.

12.2    Conditions to the Effective Date.

The following conditions precedent to the occurrence of the Effective Date must be satisfied unless any such condition shall have been waived by the Debtors and the Plan Sponsor:

(a)    the Confirmation Order, in form and substance acceptable to the Debtors and the Plan Sponsor, each in its reasonable discretion, having become a Final Order;

(b)    the RSA shall be in full force and effect, and no party thereto shall have exercised any termination rights under the RSA;

(c)    the Plan and all related documents, including the Plan Supplement documents, in form and substance acceptable to the Debtors and the Plan Sponsor, each in its reasonable discretion, being approved by the Confirmation Order and executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith; *provided*, *however*, that, to the extent necessary or appropriate, the execution and delivery of any such documents may occur contemporaneously with the occurrence of the Effective Date;

(d)    the board of directors of the Reorganized Debtors, as applicable, shall have been selected and shall have agreed to serve;

(e)    the Debtor has not caused, or as to Insiders, permitted to occur, from and after the Petition Date an "ownership change" as such term is used in section 382 of the Code;

(f)    the receipt of any required regulatory approvals and material third party consents, or any other approvals, including approvals or consents required from any Governmental Unit, on terms reasonably satisfactory to the Plan Sponsor;

(g)    the issuance of an opinion by Plan Sponsor tax counsel, Proskauer Rose LLP that the transactions contemplated by the Plan, individually and in the aggregate, will not result in the application of Section 382(a) of the Code to Impac;

US_ACTIVE\132544249

(h)    to the extent requested by the Plan Sponsor, the approval by the Bankruptcy Court and adoption of the Tax Preservation Rights Plan;

(i)    all other actions and documents necessary to implement the Plan shall have been effected or executed and shall be reasonably acceptable to the Debtors and the Plan Sponsor;

(j)    payment by the Plan Sponsor of the Exit Loan Facility on the terms of the Exit Loan Agreement;

(k)    the procurement of insurance policies deemed necessary or appropriate by the Plan Sponsor for the Reorganized Debtors, including without limitation, general liability, D&O, E&O and key man insurance policies; provided that the Plan Sponsor shall work diligently to procure such policies of insurance prior to the Confirmation Date so as to avoid any delay in the occurrence of the Effective Date; and

(l)    establishment and funding of the Administrative and Priority Claims Reserve and Professional Fee Escrow Account as provided for in the Plan.

12.3    Notice of Occurrence of Effective Date.

The Reorganized Debtors shall file and serve the Effective Date Notice within three (3) Business Days after the Effective Date.

12.4    Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay.

The Debtors, with the consent of the Plan Sponsor, shall have the right to waive one or more of the conditions precedent set forth in Sections 12.1 and 12.2 above at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with confirmation of the Plan.

12.5    Consequences of Non-Occurrence of Effective Date.

If the Confirmation Order is vacated or the Effective Date otherwise does not occur, (a) the Plan shall be null and void in all respects; and (b) any settlement or release of claims provided for hereby shall be null and void without further order of the Bankruptcy Court.

**SECTION 13**
**MISCELLANEOUS PROVISIONS**

13.1    Binding Effect of Plan.

The provisions of the Plan shall be binding upon and inure to the benefit of the Debtors, the Plan Administrator, any Holder of any Claim or Interest treated herein and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.  The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, or Governmental Unit or parish in which any instrument related to under the Plan or related to any transaction contemplated

-53-

under the Plan is to be recorded with respect to any taxes of the kind specified in section 1146(a) of the Bankruptcy Code.

13.2    Severability.

Should the Bankruptcy Court determine prior to entry of the Confirmation Order, that any provision of the Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which the provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination shall in no way limit or affect the enforceability and operative effect of any other provisions of the Plan.  If any such ruling occurs, the Debtors shall not proceed with confirmation and/or consummation of the Plan absent the written consent of the Plan Sponsor.  The Debtors reserve the right not to proceed with Confirmation and/or consummation of the Plan if any such ruling occurs.

13.3    Governing Law.

Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, in particular the construction, implementation and enforcement of the Plan, and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the State of Delaware or the United States of America.

13.4    Notices.

All notices required or permitted to be made in accordance with the Plan shall be in writing and shall be delivered personally or by nationally recognized overnight or next-day courier service, first-class mail, electronic mail, or via facsimile with electronic confirmation of receipt as follows:

Counsel for Debtors:

Dentons US LLP
601 S. Figueroa Street, #2500
Los Angeles, CA 90017
Telephone: (213) 623-9300
Attn:   Tania M. Moyron, Esq.
        Van C. Durrer, II, Esq.
        tania.moyron@dentons.com
        van.durrer@dentons.com

1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Attn:   John D. Beck
        john.beck@dentons.com

-54-

US_ACTIVE\132544249

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Tel. 302-652-4100, Fax 302-652-4400
Attn:   Laura Davis Jones, Esq.
        Timothy Cairns
E-mail: ljones@pszjlaw.com
        tcairns@pszjlaw.com

If to the Plan Sponsor or the Reorganized Debtors:

Hildene re SPC, Ltd.
333 Ludlow Street
South Tower, 5th Floor
Stamford, Connecticut  06902
Attn:  Justin Gregory
E-mail:  corporateactions@hildenecap.com

with a copy to

Lowenstein Sandler LLP
1251 Avenue of the Americas, 17th Floor
New York, New York 10020
Attn:  Daniel B. Besikof
E-mail:  dbesikof@lowenstein.com

13.5    Filing of Additional Documents.

On or before substantial consummation of the Plan, or such later time as may be authorized by the Bankruptcy Court, the Debtors are authorized to issue, execute, deliver or File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence implementation of the terms and conditions of the Plan.

13.6    Time.

Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of next succeeding day that is a Business Day. Otherwise, the provisions of Bankruptcy Rule 9006 shall apply.

13.7    Exhibits/Schedules.

All exhibits and schedules to the Plan and any Plan Supplement are incorporated into and constitute a part of the Plan as if fully set forth herein.

-55-

13.8    Defenses with Respect to Impaired or Unimpaired Claims.

Except as otherwise specifically provided in the Plan, nothing shall affect the parties' rights and/or legal and equitable defenses with respect to any Impaired or Unimpaired Claim, including, but not limited to, all rights relating to legal and equitable defenses to setoffs or recoupments against any Unimpaired Claim.

13.9    No Injunctive Relief.

No Claim shall be entitled to specific performance or other injunctive, equitable or other prospective relief except as may be specified in the Plan.

13.10    No Admissions.

Notwithstanding anything herein to the contrary, prior to the Effective Date, nothing contained in the Plan shall be deemed an admission by any party with respect to any matter set forth herein, including, without limitation, liability on any Claim or the propriety of any classification of any Claim; provided, however, that the provisions of the Plan shall be treated as admissions under the Federal Rules of Evidence upon the Effective Date.

13.11    Extension of Time.

Any period of time or deadline under the Plan may be extended by agreement of the parties affected thereby, or by order of the Bankruptcy Court upon good cause shown.

13.12    Conflict.

To the extent that terms of Confirmation Order or the Plan are inconsistent with the Disclosure Statement or any agreement entered into between any of the Debtors and any other party, the terms of the Confirmation Order and Plan control the Disclosure Statement and any such agreement, and the provisions of the Confirmation Order control the terms of the Plan.

13.13    Reservation of Rights.

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs.  None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be, deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

13.14    Modifications and Amendments.

The Debtors, with the consent of the Plan Sponsor, may alter, amend, or modify the Plan or any Plan Document under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.

The Debtors shall provide parties-in-interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court.  A

-56-

Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtors or Reorganized Debtors, as applicable, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims or Interests in the Debtors under the Plan; provided, however, that, to the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court.  A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified or clarified, if the proposed alteration, amendment, modification or clarification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

13.15  Continuing Exclusivity and Solicitation Period.

Subject to further order of the Bankruptcy Court, until the Effective Date, the Debtors shall, pursuant to section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof, and any modifications or amendments thereto.

13.16  Revocation, Withdrawal, or Non-Consummation.

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or to be deemed to constitute a waiver or release of any Claims against, or any Interests in, the Debtors, or any Causes of Action by or against the Debtors or any Person or Entity, (ii) prejudice in any manner the rights of the Debtors or any Person or Entity in any further proceedings involving the Debtors, or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

13.17  Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Entity.

13.18   Tax Exemption.

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security under the Plan, or the execution, delivery, or recording of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, including, without limitation, any transfers to or by the Debtors, if on the Effective Date, and the Plan Administrator, if after the Effective Date, of the Debtors' Assets in implementation of or as contemplated by the Plan (including, without limitation, any subsequent transfer of Distributable GUC Assets by the Plan Administrator) shall not be taxed under any state or local law imposing a stamp tax, transfer tax, or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

13.19   Implementation.

Upon Confirmation, the Debtors shall be authorized to take all steps and execute all documents necessary to effectuate the provisions contained in the Plan.

13.20   Record Date.

To the extent a "Record Date" is required for implementation of the Plan, the record date shall be April 22, 2026.

13.21   Certain Actions.

By reason of entry of the Confirmation Order, prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of members, managers or other interest holders of the Debtors under the Plan, including, without limitation, (i) the distributions of Cash pursuant to the Plan, (ii) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (iii) the adoption, execution, and implementation of other matters provided for under the Plan involving the company or organizational structure of the Debtors, shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable corporation/limited liability company laws, without any requirement of further action by the members, managers or other interest holders of the Debtors, irrespective of whether the Confirmation Order specifically authorizes any such action.

Effective upon the Effective Date, the Debtors' formation documents shall each be deemed amended to prohibit the issuance by the Debtors of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

On or as soon as practicable following the Effective Date, the Plan Administrator shall be authorized to cancel, annul, and extinguish all Interests.

US_ACTIVE\132544249

13.22   Waiver of Fourteen-Day Stay.

The Debtors request as part of the Confirmation Order a waiver from the Bankruptcy Court of the 14-day stay of Bankruptcy Rule 3020(e) and, to the extent applicable, a waiver of the 14-day stay of Bankruptcy Rule 6004(g).

13.23   Entire Agreement.

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## SECTION 14
## SUBSTANTIAL CONSUMMATION

14.1   Substantial Consummation.

The Plan shall be deemed substantially consummated on the Effective Date under sections 1101 and 1127(b) of the Bankruptcy Code.

14.2   Final Decree.

On substantial consummation and performance of the Plan and Plan Documents, the Reorganized Debtors may request the Bankruptcy Court to enter a final decree closing the Chapter 11 Cases and such other orders that may be necessary and appropriate.

US_ACTIVE\132544249

Dated: April ___, 2026                    Respectfully submitted,

                                          Impac Mortgage Holdings, Inc.

                                          _/s/_
                                          George A. Mangiaracina
                                          Chief Executive Officer

US_ACTIVE\132544249

**Exhibit B**

**Contractual Incentive Payments**

**Exhibit B**

**Contractual Incentive Payments To Be Paid On the Effective Date[1]**

| Employees | | Contractual Incentive |
| Last Name | First Name | Payment Amount |
|---|---|---|
| Rassouli | Arash | $40,000 |
| Tarr | Troy A. | $10,000 |
| Mazur | Michael D. | $9,000 |
| Weniger | Aime J. | $8,000 |
| Bautista | Ulysses | $6,000 |
| Carciello | Robert G. | $6,000 |
| Minner | Timothy E. | $6,000 |
| Weixel | Jason P. | $3,000 |
| Livingston | Lisa | $2,000 |
| Shumate | Nick | $1,000 |
| **TOTAL** | | **$91,000** |

---

[1] In addition to the Contractual Incentive Payments of $91,000, an aggregate additional amount of $200,000 will be made as an incentive payment to employees who were employed both as of the Petition Date and the time of such payment, to the extent approved by the Board, on or about September 22, 2026.

**Exhibit C**

**Budget**

**IMPAC MORTGAGE HOLDINGS, INC.,** *et al.*
**Cash Forecast ($k)**

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Total |
|---|---|---|---|---|---|---|---|---|
| Week Ending | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 4/26 - 6/12 |
| Net Originations income | $   33 | $    9 | $   19 | $   28 | $   38 | $    9 | $   19 | $   154 |
| Other Revenue (Interest/servicing income) | 5 | - | - | - | - | 3 | - | 8 |
| **Total Receipts** | **38** | **9** | **19** | **28** | **38** | **12** | **19** | **162** |
| | | | | | | | | |
| Payroll & Benefits | 15 | 181 | 15 | 180 | 15 | 186 | 14 | 607 |
| FirstAgentic Contract | 25 | - | - | - | - | 50 | - | 75 |
| Data Expense | - | 30 | 8 | 2 | - | 29 | - | 69 |
| Business Promotion | 1 | 9 | 2 | 1 | 1 | 9 | 2 | 25 |
| Rent | 20 | - | - | - | - | 20 | - | 40 |
| Legal & Other | 10 | - | - | - | 10 | - | - | 20 |
| Other Professional Fees | - | 7 | - | 6 | - | 7 | - | 20 |
| G&A & Other Misc Expenses | 1 | 10 | 2 | 2 | 1 | 10 | 2 | 28 |
| **Total Operating Disbursements** | **72** | **237** | **27** | **191** | **27** | **311** | **18** | **884** |
| | | | | | | | | |
| **Operating Cash Flow** | **(35)** | **(228)** | **(8)** | **(163)** | **11** | **(298)** | **1** | **(721)** |
| **Restructuring Disbursements** [1] | | | | | | | | |
| Debtor's Counsel (Dentons) | 130 | 350 | - | - | - | 250 | - | 730 |
| Local Counsel (PSZJ) | 25 | 100 | - | - | - | 50 | - | 175 |
| Financial Advisor (DSI) | 60 | 100 | - | - | - | 100 | - | 260 |
| Claims / Noticing Agent (Verita) | 25 | 40 | - | - | - | 40 | - | 105 |
| Application of Remaining Retainers [2] | - | - | - | - | - | (233) | - | (233) |
| **Total Debtor Retained Professionals** | **240** | **590** | **-** | **-** | **-** | **208** | **-** | **1,038** |
| Lender Counsel (Lowenstein Sandler) | 400 | 100 | - | - | - | 100 | - | 600 |
| Lender Counsel (Morris Nichols) | 60 | 35 | - | - | - | 35 | - | 130 |
| Lender Tax Advisory (Proskauer Rose) | 50 | 25 | - | - | - | 25 | 20 | 120 |
| **Total Lender Professional Fees** | **510** | **160** | **-** | **-** | **-** | **160** | **20** | **850** |
| **Professional Fee Reserve** | **750** | **750** | **-** | **-** | **-** | **368** | **20** | **1,888** |
| | | | | | | | | |
| **Net Cash Flow** | **$  (785)** | **$  (978)** | **$   (8)** | **$  (163)** | **$   11** | **$  (666)** | **$  (19)** | **$  (2,609)** |
| | | | | | | | | |
| **Beginning Cash** | **$   275** | **$   874** | **$   395** | **$   387** | **$   224** | **$   234** | **$   493** | **$   275** |
| Net Cash Flow | (785) | (978) | (8) | (163) | 11 | (666) | (19) | (2,609) |
| DIP Loan Funding | 1,500 | 500 | - | - | - | 924 | - | 2,924 |
| Facility Fee [3] | (117) | - | - | - | - | - | - | (117) |
| **Ending Cash - Unrestricted** [4] | **$   874** | **$   395** | **$   387** | **$   224** | **$   234** | **$   493** | **$   473** | **$   473** |
| **DIP Loan Facility** | | | | | | | | |
| DIP Loan Balance [5] | 3,576 | 4,076 | 4,076 | 4,076 | 4,076 | 5,000 | 5,000 | |
| DIP Facility Availability | 1,424 | 924 | 924 | 924 | 924 | - | - | |

*Footnotes:*

[1]  Per the terms of the Plan and RSA, the Exit Loan Facility funds are used to pay US Trustee Fees, GUC Consideration, and Allowed Claims.

[2]  One-half of the Debtor Retained Professionals' retainers will be applied to pre-petition invoices, and the remaining balance is assumed to be applied to fees incurred during the Ch. 11 case.

[3]  The DIP facility fee is calculated as 4% of the amount of the facility will be deducted from the amount of proceeds of the facility.

[4]  Excludes a $35,000 reserve pending approval and issuance of a corporate credit card.

[5]  DIP Loan Balance reflects the outstanding principal balance under the DIP facility, including the roll-up of the Bridge Note including accrued interest.

**Exhibit D**

**DIP Loan Agreement**

## DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT, dated as of [_____], 2026 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into by and among Impac Mortgage Holdings, Inc., a Maryland corporation (the "**Borrower**"), certain Subsidiaries of the Borrower that may become party hereto from time to time (the "**Guarantors**", and collectively with the Borrower, the "**Loan Parties**"), and Hildene re SPC, Ltd. (the "**Lender**" and collectively with the Borrower and the Guarantors, the "**Parties**").

WHEREAS, the Borrower and the Guarantors existing as of the date hereof (together with any Guarantors later created who become debtors in bankruptcy, the "**Debtors**") intend to file petitions for voluntary relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware;

WHEREAS, the Borrower, the subsidiary guarantors party thereto and the Lender are parties to a Loan Agreement, dated as of May 6, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Loan Agreement**");

WHEREAS, Debtors acknowledge that the Debtors are indebted to the Lender under the Prepetition Loan Agreement in the aggregate principal amount of $20,000,000 as of the date hereof, plus accrued and unpaid interest and fees thereon (such debt, the "**Prepetition Facility**");

WHEREAS, Debtors acknowledge that pursuant to that certain Secured Promissory Note, dated as of January 26, 2026, by the Debtors in favor of Lender as successor-by-assignment to Trinity Park Investments, LLC (as further amended, restated, supplemented or otherwise modified from time to time, the "**Bridge Note**"), the Debtors are obligated to Lender in the aggregate principal amount of $2,000,000 as of the date hereof, plus accrued and unpaid interest and fees thereon (such debt, the "**Bridge Note Debt**");

WHEREAS, contemporaneously herewith, the Parties, together with certain other stakeholders, have entered into that certain Restructuring Agreement, which sets forth an agreed framework and conditions for the restructuring of the Debtors' obligations and the implementation of a consensual restructuring transaction intended to preserve value and facilitate an orderly resolution of the Debtors' financial affairs;

WHEREAS, the Borrower has asked the Lender to provide the Borrower, for the benefit of itself and the other Loan Parties, with a senior secured super-priority debtor-in-possession term loan credit facility (the "**DIP Facility**") in the principal amount of $5,000,000, consisting of (a) the principal amount of $2,000,000 of Bridge Note Debt, plus interest fees and other amounts due thereunder that will be deemed "rolled up" as a Roll-Up Loan (defined below) hereunder on a dollar-for-dollar basis pursuant to the terms and subject to the conditions set forth in this Agreement and the Orders and (b) new money term loans, in an aggregate principal amount such that, when combined with the Roll-Up Loan, the total outstanding principal amount of the DIP Facility shall not exceed $5,000,000, which new money term loans shall be made available to the

Debtors from time to time pursuant to the terms and subject to the conditions set forth in this Agreement and the Orders;

**WHEREAS**, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder, and the Loan Parties have agreed to secure their respective Obligations by granting to the Lender, subject to the Carve-Out as defined and provided in the Orders, a senior secured super-priority Lien on substantially all of their respective assets, subject to the terms and conditions set forth in this Agreement and the Orders; and

**WHEREAS**, the Lender is willing to make the DIP Facility available to the Borrower, for the benefit of itself and the other Loan Parties, subject to the terms and conditions set forth in this Agreement and the Orders.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

**1.**     *Definitions*.  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Section 26 hereof.

**2.**     *The Loan; Fees*.

(a)     Term Loans. Subject to the terms and conditions and relying upon the representations and warranties herein set forth, the Lender agrees, subject to the satisfaction of the conditions set forth in Section 7 hereof, to make term loans (each, a "**Term Loan**", and collectively, the "**Term Loans**") to the Borrower, for the benefit of itself and the other Loan Parties, from time to time, on any Business Day, during the Availability Period, in an aggregate principal amount at any time outstanding not to exceed the DIP Facility Amount. During the Availability Period, the Borrower may request to borrow up to the maximum amount of the DIP Facility Availability, subject to the terms of this Agreement and the Orders.  The initial borrowing of the Term Loans shall be made into the Specified Account in an amount not to exceed the Initial Term Loan Amount, and evidence of such deposit shall be made available to the Borrower no later than one (1) Business Day after the Interim Order Entry Date (such borrowing, the "**Initial Term Loan**").  All Term Loans made after the Initial Term Loan shall be based upon and subject to the terms of the Budget. Term Loans repaid or prepaid may not be reborrowed.

(b)     Roll-Up Loans. Subject to the terms and conditions set forth in this Agreement and the Orders, effective immediately upon the Interim Order Entry Date, without any further action by any party to this Agreement or the other Loan Documents, the Bankruptcy Court or any other Person, the Bridge Note Debt shall be automatically deemed (on a cashless basis) to constitute a Loan under this Agreement ("**Roll-Up Loan**"), which Roll-Up Loan shall be due and payable in accordance with the terms and conditions set forth in this Agreement. Upon the incurrence of the foregoing Roll-Up Loan, the outstanding Bridge Note Debt shall be automatically and irrevocably deemed satisfied in full and the amount of the Roll-Up Loan advanced under this Agreement. The Roll-Up Loan, if repaid or prepaid, may not be reborrowed.

(c)     Funding. Subject to the fulfillment of all applicable conditions set forth herein, the Lender shall deposit the proceeds of each Term Loan in immediately available funds in the Specified Account not later than 12:00 p.m. on the agreed upon borrowing date or, if

2

requested by the Borrower in the request for borrowing, shall wire-transfer such funds as requested on or before such time.

(d)     Facility Fee. As consideration for the extension of the DIP Facility to the Borrower, the Loan Parties agree to pay, jointly and severally, to the Lender, a facility fee equal to four percent (4%) of the "new money" portion of the DIP Facility Amount (for the avoidance of doubt, excluding the Roll-Up Loan) (the "**Facility Fee**"), which shall be fully earned and non-refundable on the Interim Order Entry Date, and shall be paid in full directly to the Lender from the proceeds of the Initial Term Loan.  For federal income tax purposes, the Parties agree to treat the Facility Fee as causing each Loan to have been issued at a discount and not as a separate fee.

**3.     *Interest.***

(a)     Interest on the outstanding principal balance of the Loans shall accrue, daily, at a rate equal to twelve percent (12.00%) per annum (the "**Non-Default Rate**") from the date of funding of the Initial Term Loan until the Maturity Date. Accrued interest shall be paid (i) on the Maturity Date and (ii) on the date of any payment or prepayment made pursuant to, and in accordance with, Sections 4 and 5(a) hereof (each such date, a "**Payment Date**").  The payment due on each Payment Date shall be paid, in U.S. Dollars and in immediately available funds.

(b)     In computing interest with respect to any Loan made hereunder, the date on which such Loan is made (or any portion thereof is advanced) shall be included and the date on which any principal amount of such Loan is repaid or prepaid shall be excluded (with interest accruing through but excluding such date), in each case, based on the receipt of such repayment or prepayment in immediately available funds.  Interest shall be calculated on the basis of a year of 360 days and actual days elapsed.  Any amounts not paid or satisfied when due hereunder shall bear interest, in addition to the Non-Default Rate, at a fixed rate equal to the lesser of (i) three percent (3.00%) per annum or (ii) the maximum rate permitted by applicable law (such rate, the "**Default Rate**") and shall be payable promptly upon demand in U.S. Dollars and in immediately available funds.

**4.     *Repayment.***

(a)     Except as otherwise provided by a Plan and confirmed in the Cases, the Borrower shall repay all Loans, together with all accrued and unpaid interest thereon and other amounts due hereunder, no later than the Maturity Date. The obligation of the Borrower to repay the outstanding principal amount of the Loans, and any and all interest which accrues thereon, shall be recorded by the Lender and attached on Annex A hereto.  The Lender is hereby authorized to endorse Annex A with an appropriate notation evidencing each Loan of principal made by the Lender pursuant to this Agreement; *provided, however*, that the failure to make any such notation will not limit, expand or otherwise affect the rights of the Lender under this Agreement or the Obligations of the Borrower and the other Loan Parties under this Agreement.

(b)     All payments of the Loans and the other Obligations shall be made by wire transfer in accordance with the Lender's written instructions.  Notwithstanding any other provision of this Agreement, if any day upon which a payment of the Loans or any other Obligation is due is not a Business Day, such payment shall be made on the next succeeding Business Day.

3

(c)     Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any taxes. If law requires the deduction or withholding of any tax from any such payment by a Loan Party, then such Loan Party shall be entitled to make such deduction or withholding, provided that, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions the applicable recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(d)     All payments under this Agreement shall be made in U.S. Dollars and in immediately available funds and accompanied by the payment of (i) accrued and unpaid interest attributable to the principal amount of the Loans being repaid (including the Default Rate, if any) through but excluding the date of such payment, and (ii) all other amounts then due and payable under this Agreement.

**5.     *Prepayments*.**

(a)     <u>Prepayments</u>. The Borrower shall not have the right to prepay the Loans without the prior written consent of the Lender.

(b)     <u>Application of Prepayments</u>. Any prepayment made with the prior written consent of the Lender pursuant to Section 5(a) shall be applied first to the payment of the Lender's unpaid fees and expenses reimbursable pursuant to this Agreement, second to accrued and unpaid interest, which shall include the Default Rate, if applicable, to, but excluding, the date of such prepayment, and third to the outstanding principal amount of the Loans.

**6.     *Grant of Security Interest.***

(a)     To secure the full and punctual payment by each Loan Party of the Obligations (other than Remaining Obligations) and all other amounts outstanding under this Agreement, when due, each Loan Party hereby grants to the Lender a continuing security interest in and continuing lien on all of such Loan Party's right, title and interest, whether now owned or hereafter acquired, in, to and under the Collateral. The security interest granted pursuant to this <u>Section 6(a)</u> shall continually exist until the Obligations and all other amounts outstanding under this Agreement (other than Remaining Obligations) have been paid in full in cash. Notwithstanding anything to the contrary in this Agreement, upon payment in full in cash of all Obligations (except for any Remaining Obligations) and the termination of all commitments under this Agreement, the security interest and all Liens granted hereunder shall automatically terminate and be released notwithstanding any Remaining Obligation that survives termination pursuant to Sections 13 and 19. For the avoidance of doubt, following the termination of the security interest and all Liens granted hereunder as set forth in this Section 6(a), the Remaining Obligations shall be unsecured obligations of the Loan Parties.

(b)     Each Loan Party hereby authorizes the Lender to file financing statements and any other instruments to perfect (and continue to perfect from time to time) the security interest. Each Loan Party will take such actions as reasonably requested by the Lender from time to time to perfect or continue the security interest granted hereunder. Each Loan Party appoints the Lender as its true attorney in fact to perform any of the following actions, which are coupled

4

with an interest, are irrevocable until the termination of this Agreement and may be exercised from time to time by the Lender in accordance with the terms of this Agreement: (a) to give notice of the Lender's right in respect of the Collateral to enforce the same; (b) to prepare, execute, file, record or deliver notes, assignments, schedules, financing statements, Control Agreements, continuation statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release the Lender's interest in the Collateral (which in the case of any UCC-filings, may include, "all-assets" filings); (c) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or fictitious name; (d) solely during the existence of an Event of Default, to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (e) solely during the existence of an Event of Default, to exercise all rights, powers and remedies which such Loan Party would have, but for this Agreement, under all Collateral; and (h) to do all acts and things and execute all documents in the name of such Loan Party, deemed by the Lender as necessary, proper and advisable in connection with the preservation, perfection or enforcement of its rights hereunder.

(c)     Upon satisfaction of the Obligations (except the Remaining Obligations) and the termination of all commitments under this Agreement pursuant to Section 19, the security interest granted by such Loan Party in favor of the Lender under this Agreement shall be terminated and released without any further action by any person and the Lender shall, at the Loan Parties' request and sole cost and expense, release its Liens and execute and deliver to the Borrower, such documents as reasonably requested by such Loan Party to evidence such release.

(d)     Except for Prior Permitted Liens or as otherwise expressly provided in the Orders, each Loan Party represents, warrants, and covenants that the security interests granted hereunder are, and shall at all times remain, valid, perfected, and first-priority security interests in the Collateral, senior to all other Liens and security interests therein except for Prior Permitted Liens, including, without limitation, the Liens and security interests in favor of the Lender securing the Prepetition Facility. The Borrower further agrees that the Obligations are entitled to be allowed superpriority administrative expense claims in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114, in each case subject to and limited by the terms of the Orders.

**7.     *Conditions Precedent.***

(a)     <u>Conditions to the Initial Term Loan</u>. The obligation of the Lender to fund the Initial Term Loan hereunder is subject to the satisfaction of the following conditions precedent:

(i)     the Lender shall have received, in form and substance satisfactory to Lender, the following: (1) executed copies of this Agreement and the other Loan Documents; and (2) such other customary documents and other matters as the Lender may reasonably deem necessary or appropriate;

(ii)     the Loan Parties shall have delivered to Lender the initial Budget, which Budget shall be in form and substance satisfactory to Lender;

5

(iii)     the Interim Order Entry Date shall have occurred not later than two (2) Business Days following the Petition Date, and the Interim Financing Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay;

(iv)     the Petition Date shall have occurred and each Loan Party shall be a debtor and debtor-in-possession in the Cases; and

(v)     the "first day orders" sought by the Debtors shall be satisfactory in form and substance to the Lender and shall have been entered not later than two (2) Business Days following the Petition Date and shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

(b)     <u>Conditions to each Term Loan</u>. The obligation of the Lender to make each Term Loan, including the Initial Term Loan, is subject to the following conditions precedent:

(i)     the Lender shall have received a request for such Term Loan, upon at least five (5) Business Days' prior written notice, before 12:00 p.m., New York City time executed by the Borrower;

(ii)     on the date on which each Term Loan is made and after giving effect to the making of such Loan: (1) the Term Loan amount shall not exceed the DIP Facility Availability, (2) all payments then due and payable by all Loan Parties under this Agreement shall have been paid, (3) the representations and warranties set forth in <u>Section 8</u> hereof, shall be true and correct with the same effect as though made on and as of such date, (4) the Borrower and each other Loan Party shall be in material compliance with all the terms and provisions contained in this Agreement to be observed or performed, (5) no Default or Event of Default shall have occurred and be continuing; and (6) the Debtors shall be in compliance with, and no default shall have occurred and be in existence as of the date of such Term Loan under, the Restructuring Agreement;

(iii)     the Cases of any of the Debtors shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(iv)     no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases;

(v)     in the case of Term Loans other than the Initial Term Loan, the Debtor is in compliance with the Budget as provided for herein (and giving effect to the Permitted Budget Variance) and the requested amount of such Loan is provided for in the Budget; and

(vi)     for each Loan requested after the Final Order has been entered by the Bankruptcy Court, the Final Order shall be in full force and effect, shall not have been

6

vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

**8.** *Representations and Warranties.* Each Loan Party represents and warrants to the Lender (and where applicable, agrees) that, in each case, as of the date hereof and after giving effect to the making of the Loans hereunder as follows:

(a) Organization and Standing. Each Loan Party and each Subsidiary is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate power to execute and deliver this Agreement and to perform its obligations hereunder.

(b) Authorization. Each Loan Party has duly authorized this Agreement by all necessary corporate or other organizational actions and has duly executed and delivered this Agreement.

(c) Enforceability. Subject to entry of the Orders, this Agreement constitutes a legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by general principles of equity.

(d) No Violation of Other Agreements or Laws. The execution and delivery of this Agreement by each Loan Party do not, and the performance of its obligations hereunder will not, (i) result in a violation by such Loan Party of any provision of any Loan Party's Operating Documents, (ii) result in a violation of any law applicable to such Loan Party, (iii) require any consent or approval of, registration or filing with, or any other action by, any governmental authority except to the extent already obtained, made, or taken and remaining in full force and effect, (iv) except for the Prepetition Loan Agreement, violate any agreement to which any Loan Party is subject, or by which it or any of its assets are bound, or (v) result in the creation or imposition of any lien on any assets of any Loan Party other than the liens in favor of the Lender.

(e) Use of Proceeds. The proceeds of all Loans made by the Lender under this Agreement shall be used by the Debtors for working capital and general corporate purposes of the Debtors and as otherwise provided in the Budget.

(f) Default. No event has occurred and is continuing which constitutes a Default or an Event of Default.

(g) Budget. On and as of the Petition Date, the Budget, copies of which have heretofore been furnished to the Lender and following the Petition Date, any updated Budget delivered pursuant to Section 9(w), in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

(h) Cases. The Cases were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Interim Financing Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

7

(i)      Orders. The Interim Financing Order and, after it has been entered, the Final Order are in full force and effect, and have not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Debtors are in material compliance with each Order.

(j)      Ratification of Prepetition Facility. The Debtors hereby ratify and reaffirm all of their payment and performance obligations (including known indemnification obligations) with respect to the Prepetition Facility, and acknowledge that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by Debtors; *provided, however*, that nothing herein shall prejudice, impair or limit any such challenge rights of any other party in interest to the extent expressly preserved under the Orders.

9.      *Covenants.* Each Loan Party shall, and shall cause each of its Subsidiaries, to:

(a)      Financial Statements and Other Reports and Notices.  Deliver to the Lender:

(i)   promptly upon obtaining knowledge of any Default or an Event of Default, a reasonably detailed notice specifying the nature and period of existence of such event and what action such Loan Party has taken, is taking and/or proposes to take with respect thereto;

(ii)  commencing on the Friday after the Petition Date and each successive Friday thereafter, a cash flow forecast for the Debtors in form and detail as prepared by the Debtors in the ordinary course of business, covering all of the weeks through the Maturity Date;

(iii) all reports filed, including monthly operating reports, with the Office of the United States Trustee, and shall promptly file all such monthly operating reports as and when due under the Bankruptcy Code;

(iv) commencing on the Friday occurring at least five (5) Business Days after the Petition Date and each successive Friday thereafter, a Budget Variance Report certified by the Debtors' financial advisors, and any updates to the Budget that are approved by Lender in Lender's sole discretion;

(v)  commencing on the Friday occurring at least five (5) Business Days after the Petition Date and on each Friday thereafter, an updated statement of accounts payable and accounts receivable; and

(vi) upon the Lender's reasonable request and solely to the extent otherwise internally prepared, promptly, all financial statements and information relating to any calendar month of such Loan Party and any bank accounts statement and similar information of such Loan Party, and any other certificates or other bank account statements, readily available reports and other information (financial or otherwise) regarding the business, operations and financial condition of the Borrower and the other Loan Parties.

(b)      Inspection Rights.  Permit any representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, to visit and inspect its properties, liabilities,

8

books and records, including examining and making extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

(c)    Insurance.  Maintain with financially sound and reputable carriers, having a financial strength rating of at least investment grade by A.M. Best Company, insurance in such amounts and against such risks (including loss or damage to property; general liability; errors and omissions and directors and officers; and key man, if any) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  The Debtors will furnish to the Lender, upon request, information in reasonable detail as to the insurance so maintained.

(d)    Key Persons.  Request Lender's written consent prior to the appointment of any Key Person and/or replacement of any Key Person on or after the date of this Agreement.  The Lender hereby grants its consent to the position, or appointment, of all Key Persons as of the date of this Agreement.

(e)    Bank Accounts; Control Agreements.

(i)    (A) Maintain all cash and cash equivalents in deposit, securities or other bank accounts (collectively, "**Collateral Accounts**") at Enterprise Bank & Trust or other financial institutions reasonably acceptable to Lender, including Wells Fargo, N.A. and (B) not maintain or establish any deposit, securities or other bank accounts other than the Collateral Accounts without prior written notice to the Lender.

(ii)    At the request of the Lender, enter into one or more Control Agreements over any of its Collateral Accounts within ten (10) days (or such later date as the Lender may agree in its sole discretion) following the date of this Agreement or the opening of such Collateral Account, as applicable, unless waived by the Lender in its sole discretion.

(iii)    Except as required under the Bankruptcy Code or otherwise provided in the order of the Bankruptcy Court approving the Debtors' cash management motion, rules or policies of the U.S. Trustee, and/or any other Bankruptcy Court order, not maintain or establish any new bank accounts other than the Collateral Accounts (which Collateral Accounts constitute all of the deposit accounts, securities accounts or other accounts maintained by the Loan Parties as of the date of this Agreement) without prior written notice to the Lender and unless Lender, and the applicable Loan Party and the bank at which the account is to be opened enter into a Control Agreement over such bank account within ten (10) days following the establishment of any such new Collateral Accounts, unless waived by the Lender in its sole discretion.

(iv)    (A) Not materially violate or breach any Control Agreement, (B) not terminate any Control Agreement and (C) otherwise maintain and comply with the terms of any Control Agreement.

(f)    Additional Subsidiaries.  (A) Cause any subsequently acquired or organized Subsidiary of Borrower or any Debtor to become a Guarantor (and thus a Loan Party) by promptly (and in any event within three (3) Business Days), (i) executing and delivering to the Lender a joinder to this Agreement reasonably satisfactory in form and substance to the Lender in its sole

9

discretion (the "**Joinder Agreement**"), pursuant to which the joining party thereunder shall become a "Loan Party" under this Agreement and be bound by all obligations and covenants applicable to each Loan Party hereunder, and provide a Guaranty under Section 12 hereof and grant a security interest under Section 6 hereof, together with other documents as reasonably requested by and, in each case, in form and substance satisfactory to, the Lender, (ii) enter into one or more Control Agreements, as applicable, as required by Section 9(e)(iii) and (iii) taking all other actions as may be reasonably requested by the Lender to protect and perfect the security granted under Section 6 hereof and (B) take such actions as the Lender may reasonably request, from time to time, to ensure that the Obligations are guaranteed by the Guarantors as provided under Section 12 hereof and are secured, on a first priority perfected security interest, by the Collateral as provided under Section 6 hereof.

(g)      Indebtedness. Except with respect to Permitted Indebtedness, not create, incur, assume, refinance or otherwise become or remain liable with respect to any indebtedness for borrowed money, in each case, without the Lender's prior written consent.

(h)      Dispositions. Not sell, transfer, convey, lease or otherwise dispose of (each, a "**Disposition**") any property of any Loan Party, whether now owned or hereafter acquired by such Loan Party (or enter into any arrangement with any person to make such a Disposition), in each case, without the Lender's prior written consent, other than Dispositions of property made in the ordinary course of business and having an aggregate fair market value not to exceed $25,000 in the aggregate any fiscal year, so long as no Event of Default has occurred and is continuing; provided that in no event shall any Loan Party make any Disposition of any property to any Subsidiary that is not a Loan Party.

(i)      Investments. Not make or enter into any acquisition of or investment into any person that is not a Loan Party, whether by means of (x) a purchase or other acquisition of any equity interests, ownership interests or any assets of another person or (y) a loan, advance or capital contribution to another person or assumption or purchase of debt, in each case, without the Lender's prior written consent.

(j)      Prepayments of Other Indebtedness. Except as otherwise provided in an order of the Bankruptcy Court, not repay or prepay, in cash, any indebtedness owed to any Person (other than to the Lender), without the Lender's prior written consent.

(k)      Restricted Payments. Not make or pay any cash dividend or other cash distribution to any holder of the equity interests of any Loan Party with respect to such equity interests, except for intercompany dividends, distributions or transfers from one Loan Party to another Loan Party (including any Loan Party paying an expense of another Loan Party in the ordinary course of business), in each case as permitted under, and made in a manner consistent with, the cash management motion (and any final order entered thereon) in the Cases or any other order of the Bankruptcy Court.

(l)      Subsidiaries. Except in compliance with Section 9(f) above, not form any Subsidiaries, or otherwise acquire any entities who will become Subsidiaries of any Loan Party that themselves would not be Loan Parties, after the date of this Agreement, without the prior written consent of the Lender.

US_ACTIVE\131979672

(m)     Liens. Except any Liens in connection with this Agreement and any Prior Permitted Liens, not create, incur, assume or permit to exist any Lien on any of its property, now owned or hereafter acquired.

(n)     [Reserved].

(o)     Notice of Motions. Not less than five (5) Business Days prior to filing any motion requesting approval for debtor-in-possession financing, use of cash collateral, approval of a disclosure statement and plan of reorganization, or any other material relief, the Debtors shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender; provided, however, that to the extent the Debtors seek relief on an emergency or expedited basis, the Debtors shall provide the Lenders with as much advance notice as is reasonably practicable under the circumstances.

(p)     Conduct of Business. Not engage in any material business other than (i) the businesses engaged by such Loan Party on the date of this Agreement and similar, incidental or related businesses and (ii) such other lines of business as may be consented to by the Lender.

(q)     Operating Documents; Material Agreements. Not, without the prior written consent of the Lender (email being sufficient), (i) amend or otherwise modify, or waive any provision of (1) any Loan Party's Operating Documents or (2) any Material Agreement (except as permitted under the Plan) or (ii) enter into any Material Agreement or any extension, amendment or renewal thereof after the date hereof.

(r)     Accountant. Not replace its independent public accountant without the prior written consent of the Lender, which consent shall not be unreasonably withheld, delayed or conditioned.

(s)     Restructuring Agreement. Materially comply with all covenants and agreements set forth in the Restructuring Agreement.

(t)     Use of Proceeds. Use the proceeds of the Loans in accordance with the Budget and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Financing Order), and as further set forth below:

(i)     to pay the reasonable and documented fees and expenses, indemnities and other amounts owed to the Lender under this Agreement and under the Prepetition Loan Agreement, whether or not set forth in the Budget;

(ii)     to the extent not included in Section 9(t)(i), to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and

(iii)     to fund working capital and other expenditures of the Debtors in accordance with the Budget.

11

Proceeds of the DIP Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a committee of unsecured creditors (except to the extent provided below), or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine (i) the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, (ii) the validity, perfection, enforceability of the Prepetition Facility, or (iii) the validity, perfection, enforceability of the Bridge Note Debt, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives, including, without limitation, any lender liability claims or subordination claims, (c) to commence, prosecute or defend any claim or proceeding or cause of action of any kind or nature to disallow or challenge the Prepetition Facility or Bridge Note Debt, any loan documents relating thereto, or any other Loan Document, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the Lender, in each case except as otherwise permitted in the Orders; *provided, however*, that any statutorily appointed committee of unsecured creditors may use up to $25,000 of funds solely to investigate the validity, perfection, and priority of the Lender's Liens and claims in connection with the Prepetition Loan Agreement.

(u)  Milestones.  Achieve each of the following milestones (as the same may be extended from time to time with the consent of the Lender, the "**Milestones**"), each in a manner and in form and substance satisfactory to the Lender:

(i)  Each of the Debtors shall commence the Cases no later than April 26, 2026.

(ii)  File with the Bankruptcy Court no later than the Petition Date (a) an application to retain a claims agent; (b) a motion for orders approving this Agreement on an interim (an "**Interim Financing Order**") and final (a "**Final Financing Order**") basis; (c) a motion to continue cash management; (d) a motion to establish notice and hearing procedures that must be followed for (i) certain transfers of equity in Impac and Subordinated Notes Claims, and of any beneficial interest therein, and (ii) certain claims of worthlessness for federal or state tax purposes with respect to equity in Impac (the "**NOL Motion**"); (e) such other first day papers as may be approved or requested by the Debtors or the Lender ("**First Day Motions**"); (f) a combined Plan and disclosure statement; (g) a motion seeking entry of an order (the "**Prepack Scheduling Order**") scheduling a combined hearing on approval of the Plan and disclosure statement, setting an objection deadline with respect thereto, establishing related confirmation procedures and approving the disclosure statement on an interim basis; (h) a motion seeking the Bankruptcy Court's approval of assumption of the Restructuring Agreement; and (i) a motion for approval of bar dates.

(iii)  The Bankruptcy Court shall enter no later than two (2) Business Days following the Petition Date: (i) the Interim Financing Order, the Prepack Scheduling Order; the interim order approving the NOL Motion; and interim or final orders, as applicable, approving the other First Day Motions.

12

(iv)    File with the Bankruptcy Court a motion to retain professionals and an interim compensation motion no later than ten (10) days following the Petition Date.

(v)    The Bankruptcy Court shall enter no later than  thirty (30) days following the Petition Date:  the Final Financing Order, an order authorizing the Debtors to assume the Restructuring Agreement and the final order approving the NOL Motion.

(vi)    The Bankruptcy Court shall enter an order approving the disclosure statement and the Plan no later than forty-five (45) days following the Petition Date.

(vii)    The effective date of the Plan shall occur no later than sixty (60) days following the Petition Date.

(v)    First Day Orders.  Cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

(w)    Budget.  Use the proceeds of the Loans solely to make disbursements for expenditures provided for in accordance with Section 9(t) and this Section 9(w).  The Loan Parties and their Subsidiaries shall not pay any expenses (other than *de minimis* amounts) or other disbursements (other than *de minimis* disbursements) other than the type and amount of expenses and disbursements set forth in the Budget.  If the Budget is updated, modified or supplemented by the Debtors, each such updated, modified or supplemented Budget shall be approved in writing by, and shall be in form and substance satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget; *provided, however*, that any such updated, modified or supplemented Budget provided to the Lender shall be deemed approved at 5:00 p.m. (Eastern Time) five (5) days following the delivery of such Budget to the Lender if the Lender has neither approved nor rejected such Budget.  Each Budget delivered to Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender.  Each Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable.  The Loan Parties shall not cause cash disbursements to vary from the applicable Budget by more than fifteen percent (15%) in excess of the aggregate budgeted amount for cash disbursements on a trailing one-week basis (the "**Permitted Budget Variance**"); *provided* that to the extent the actual cash receipts in any such weekly period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the Permitted Budget Variance for such disbursements for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive weekly periods to the extent such additional budgeted capacity is unused by the Loan Parties).  In the event that actual amounts for operations line items and/or professional fees are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variance, it being understood and agreed that the Lender may, but shall have no obligation to, fund any amounts in excess of the Budget and Permitted Budget Variance (but in no event shall have any obligation to fund in excess of the DIP Facility Amount).

(x)    Filing of Motions and Applications.  Without the prior written consent of the Lender, not apply to the Bankruptcy Court for, or join in or support any motion or application

13

seeking, authority to (i) take any action that is prohibited by the terms of any of the Restructuring Agreement, the Loan Documents or the Orders (including, but not limited to, a motion to sell any of the Debtors' assets), (ii) refrain from taking any action that is required to be taken by the terms of the Restructuring Agreement, any of the Loan Documents or the Orders, or (iii) permit any debt or claim to be *pari passu* with or senior to any of the Loans, except as expressly stated in the Orders.

(y)     Superpriority Claim.  Not incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lender against any Loan Party, except for the Carve Out, and as otherwise expressly stated in the Orders.

(z)     Further Assurances.  At any time and from time to time the Loan Parties shall execute and deliver such further instruments and take such further action as may reasonably be requested by the Lender to effect the purposes of this Agreement.

**10.     *Events of Default.***  The occurrence of any of the following shall constitute an "**Event of Default**" under this Agreement:

(a)     Failure to Pay.  The Borrower or any other Loan Party shall fail to pay (i) the principal amount of the Loans or interest payment on the applicable due date hereunder or (ii) any other payment required under the terms of this Agreement on the date due hereunder, and solely in the case of clause (ii) of this section (a), which failure continues for five (5) calendar days.

(b)     Covenant Default.  The Borrower or any other Loan Party shall breach any other covenant contained in this Agreement and such breach continues for five (5) days after the earlier of: (i) such Loan Party receiving a written notice from the Lender and (ii) any officer of such Loan Party becoming aware of such breach, or through the exercise of reasonable diligence should have become aware, of such breach.

(c)     Representation or Warranty.  Any representation or warranty made by the Borrower or any other Loan Party in this Agreement shall be materially incorrect or misleading as of the date such representation or warranty was made.

(d)     Control Agreements.  The Borrower or any other Loan Party shall breach any material covenant or representation contained in any Control Agreement or otherwise violate or terminate any Control Agreement.

(e)     Default under Restructuring Agreement.  The Borrower or any other Loan Party shall breach, violate or default under, in any material respect the Restructuring Agreement and such breach, violation or default has not been remedied or waived within five (5) calendar days after the earlier of (i) such Loan Party receiving a written notice from the Lender and (ii) any officer of such Loan Party becoming aware of such failure, breach, violation or default.

(f)     Attachment.  If any material portion of any Loan Party's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged, rescinded or otherwise resolved to the commercially reasonable satisfaction of the Lender within ten (10) calendar days, or if any Loan

14

US_ACTIVE\131979672

Party is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a Lien or encumbrance upon any material portion of any Loan Party's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of any Loan Party's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid or otherwise resolved to the commercially reasonable satisfaction of the Lender within ten (10) calendar days after any Loan Party receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by the applicable Loan Party (provided that no Credit Extensions will be required to be made during such cure period).

(g) <u>Priority</u>. If the Obligations or the Prepetition Facility shall not have the priority contemplated by this Agreement or the Orders, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations or the Prepetition Facility.

(h) <u>Key Persons</u>. Any Key Person shall (i) resign or be removed by the board of directors or other governing body of a Loan Party from its applicable position at such Loan Party and a replacement reasonably acceptable to the Lender is not appointed with thirty (30) days, or (ii) be terminated by the Loan Parties or have their duties or authority materially reduced from those the Key Person performs as of the date of this Agreement, except for cause.

(i) <u>Cases</u>. Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender, or an order shall be entered denying confirmation of the Plan.

(j) <u>IRC Section 382</u>. The Lender determines in its reasonable discretion that an "ownership change" within the meaning of Section 382(g) of the Internal Revenue Code, as amended, has occurred or is about to occur.

(k) <u>Trustee</u>. A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers (beyond those powers set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases.

(l) <u>Cash Collateral</u>. An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties.

(m) <u>Relief from Stay</u>. The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of any of the Debtors which have a value in excess of $75,000 in the aggregate or (ii) permit other actions that would be reasonably expected to have a material adverse effect on the Debtors or their estates (taken as a whole).

15

US_ACTIVE\131979672

(n)    Orders.  The Interim Financing Order (prior to Final Order Entry Date) or Final Financing Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender.

(o)    Compliance with Orders.  Any of the Loan Parties shall fail to comply with the Interim Financing Order (prior to Final Order Entry Date) or Final Financing Order (on and after the Final Order Entry Date) in any material respect, and such failure has not been remedied or waived within five (5) days after the earlier of: (i) such Loan Party receiving a written notice from the Lender and (ii) any officer of such Loan Party becoming aware of such failure.

(p)    Other Financing. (a) Except as permitted in the Orders, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lender hereunder, or (b) any Loan Party shall make any payment of principal or interest or otherwise on account of any debt or payables other than the Obligations, or other than in accordance with the Budget approved by the Lender.

(q)    Avoidance. Any Loan Party commences any suit or action against the Lender that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender.

**11.    *Rights of the Lender upon an Event of Default*.**  Upon the occurrence and during the continuation of any Event of Default, and subject in all respects to the Orders, the Lender shall have the rights and remedies set forth herein and in the other Loan Documents and the Lender may exercise any other right, power or remedy permitted to them by law, either by suit in equity or by action at law, or both; *provided, however*, that with respect to the enforcement of Liens or the exercise of remedies against the Collateral of the Loan Parties, the Lender shall provide the Borrower, the committee of unsecured creditors (if any) and the Office of the United States Trustee with not less than five (5) Business Days' prior written notice of the action contemplated thereby. Notwithstanding anything to the contrary herein or in Section 362 of the Bankruptcy Code, and except as otherwise expressly provided in this paragraph, upon the occurrence and during the continuation of any Event of Default, at the option of the Lender and without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, the Lender may: (i) terminate the DIP Facility with respect to further Loans; (ii) reduce the Facility Amount from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan, to be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Loan Parties; or (iv) subject to this paragraph 11, exercise any other rights and remedies available to the Lender under the Loan Documents or at law or in equity, including remedies under the Bankruptcy Code. Pursuant to the Orders, the automatic stay under Section 362 of the Bankruptcy Code shall be modified and vacated to permit the Lender to exercise such remedies in accordance with this Agreement and the Loan Documents. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and except as otherwise expressly provided herein, the Lender may also, without application, motion, notice, hearing or order of the Bankruptcy Court, increase the rate of interest applicable to the Loan to the Default Rate upon the occurrence and during the continuation of an Event of Default. Subject to the Orders,

16

in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Borrower and each other Loan Party hereby gives the Lender the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations allocated to the Lender in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

**12.** *Guaranty*.

(a)     Provision of Guaranty.  Each Guarantor hereby, jointly and severally with each other Guarantor or any other guarantor of the Obligations, unconditionally and irrevocably guaranties the punctual payment and performance, as and when due and payable, by stated maturity, acceleration or otherwise, of all Obligations, including, without limitation, all principal, interest, fees, commissions, expense reimbursements, costs, expenses, indemnifications and all other amounts due or to become due under this Agreement and any and all expenses (including reasonable counsel fees and disbursements) incurred by the Lender in enforcing any rights or remedies under this Agreement. Upon execution of the Joinder Agreement, and failing the payment of the Loan or the other Obligations in full when due for whatever reason, each Guarantor shall be, jointly and severally, obligated to immediately pay the amount not so paid.  Each Guarantor agrees that the guarantee contemplated hereby is a guarantee of payment and not a guarantee of collection.

(b)     Limitation on Guarantor Liability.  Each Guarantor and the Lender hereby confirm that it is the intention of all such parties that the Guaranty of such Guarantor not constitute a fraudulent transfer or fraudulent conveyance, voidable transaction or similar limitation, for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transfers Act or any similar federal or state law to the extent applicable to any Guaranty.  To effectuate the foregoing intention, upon execution of the Joinder Agreement, each Guarantor and the Lender irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as shall, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from the rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Agreement, result in the obligations of such Guarantor under its Guaranty not constituting a fraudulent transfer, fraudulent conveyance, voidable transfer, or similar limitation, under applicable law.  Notwithstanding anything to the contrary contained in this Agreement, upon execution of the Joinder Agreement, each Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including without limitation any law subrogating the Guarantors to the rights of the Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from the Borrower or any other Loan Party liable for payment of any or all of the Obligations for any payment made by the Guarantors under or in connection with its Guaranty or otherwise until such time as all Obligations are paid in full

17

US_ACTIVE\131979672

under this Agreement and this Agreement has been terminated in accordance with Section 19 hereof. The obligations of each Guarantor under this Guaranty are independent of the underlying Obligations, and a separate action or actions may be brought and prosecuted against any Guarantor to enforce such obligations, irrespective of whether any action is brought against Borrower, any other Debtor, any other Guarantor or any other guarantor thereof or whether Borrower, any other Debtor, any other Guarantor or any other guarantor thereof is joined in any such action or actions.

(c)    Subrogation, Etc.; Termination. Each Guarantor may not exercise any rights that it may now or hereafter acquire against Borrower, any other Loan Party, any other Debtor or any other guarantor thereof that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Lender against Borrower, any other Loan Party, any other Debtor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party, any other Debtor or any other guarantor thereof, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, in each case, unless and until all of the Obligations (other than contingent indemnification obligations for which no claim has been asserted) shall have been paid in full in cash and all commitments under this Agreement after the date hereof, if any, have terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Obligations (other than contingent indemnification obligations for which no claim has been asserted) and termination of the commitments under this Agreement after the date hereof, if any, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender as so directed to be credited and applied to the Obligations, whether matured or unmatured, in accordance with the terms of the this Agreement, or to be held as Collateral for any Obligations thereafter arising.

(d)    Rights and Remedies. This is an absolute, unconditional and continuing guaranty of payment and performance of the Obligations and not of collection and shall continue to be in force and be binding upon each Guarantor, until (a) all of the Obligations have been paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted) and the termination of all commitments under this Agreement and (b) be binding upon each Guarantor and its or his respective successors and assigns. Upon the occurrence and during the continuance of an Event of Default, the Lender may, at its option, declare the Obligations due and payable without demand or notice, and the Lender shall have the remedies of a secured party under the applicable Uniform Commercial Code as well as all other remedies available under applicable law. Whether or not any existing relationship between any Guarantor and Borrower has been changed or ended, the Lender may enter into transactions resulting in the creation or continuance of the Obligations and may otherwise agree, consent to or suffer the creation or continuance of any of the Obligations, without any consent or approval by any Guarantor and without any prior or subsequent notice to any Guarantor, in each case except as expressly provided for in this Agreement.

18

(e)      <u>Release of Guaranty</u>.  Upon the termination of this Agreement pursuant to <u>Section 19</u> hereof, all of the Guaranties shall be released and discharged without any further action by any person.

(f)      <u>Excluded Subsidiaries</u>. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Excluded Subsidiary shall be required to guarantee the Obligations or to become a Guarantor hereunder or under any other Loan Document, and no Excluded Subsidiary shall be required to execute or deliver a Guaranty or Joinder Agreement.

**13.      *Expenses; Indemnity; Damage Waiver.***

(a)      The Loan Parties shall reimburse the Lender upon written demand for all reasonable and documented out-of-pocket audit fees, costs and expenses (including reasonable attorneys' fees and expenses incurred by the Lender) for preparing, amending, negotiating and administering the Loan Documents as well as those fees, cost and reasonable expenses for defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or insolvency proceedings) or otherwise incurred with respect to the Loan Parties. Notwithstanding the foregoing, the Loan Parties shall not reimburse the Lender for any amounts arising from the Lender's actual fraud, gross negligence, bad faith or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)      The Loan Parties shall indemnify the Lender and each affiliate, director, officer, employee, agent and advisor of the Lender, each solely in their capacities as such (each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented fees and disbursements of outside (but not inside) counsel for any Indemnitee (the "**Losses**"), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of, any actual or prospective claim, litigation, investigation or proceeding relating to (i) the execution or delivery of this Agreement, the performance of the parties hereto of their respective obligations thereunder, (ii) the Loans or the use of the proceeds therefrom, (iii) the enforcement of any of the Lender's rights or remedies under this Agreement, in each case, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, or (iv) in any way related to any act or omission taken by the Indemnitee during the Cases; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such Losses are determined by a final judgment of a court of competent jurisdiction to have been incurred by reason of actual fraud, gross negligence, bad faith or willful misconduct of such Indemnitee.

(c)      To the extent permitted by applicable law, none of the Parties shall assert, and each of the Parties hereby waives, any claim against any other Party or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated thereby, each Loan or the use of the proceeds thereof.

(d)      All amounts due under this <u>Section 13</u> shall be payable promptly after written demand therefor.  The Obligations of the Loan Parties under this <u>Section 13</u> shall survive payment in full of the Loans.

19

**14.**  *Successors and Assigns.*  This Agreement binds and is for the benefit of the successors and permitted assigns of each party hereto.  The Loan Parties may not assign this Agreement or any rights or obligations under it without the Lender's prior written consent (which may be granted or withheld in the Lender's discretion).

**15.**  *Amendment and Integration.*  Any provision of this Agreement may be amended, waived or modified only upon the prior written consent of the Loan Parties and the Lender.  This Agreement represents the entire agreement about this subject matter and supersedes prior negotiations or agreements relating thereto.  All prior agreements, understandings, representations, warranties, and negotiations about the subject matter of this Agreement merge into this Agreement.

**16.**  *Notices.*  Except as otherwise provided in the Orders, all notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and delivered to each other party at the address set forth below, or at such other address as such party shall have furnished to the other party in writing.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally or (iii) one (1) Business Day after being deposited with an overnight courier service of recognized standing:

<u>Borrower or any other Loan Party:</u>

Impac Mortgage Holdings, Inc.
19800 MacArthur Blvd., Suite 500, Irvine, CA 92612
Attention:  George A. Mangiaracina, Chief Executive Officer


with a copy to (service on which shall not constitute notice hereunder):

Impac Mortgage Holdings, Inc.
19800 MacArthur Blvd., Suite 500, Irvine, CA 92612
Attention:  Legal Department
Email :  GeneralCounselDG@impacmail.com

<u>and</u>

Dentons US LLP
601 S. Figueroa Street Suite 2500
Los Angeles, California  90017-5704
Attention:  Tania M. Moyron
Email:  tania.moyron@dentons.com

<u>Lender:</u>

Hildene re SPC, Ltd.
333 Ludlow Street
South Tower, 5th Floor
Stamford, Connecticut  06902

20

Attention:  Justin Gregory
Email:  corporateactions@hildenecap.com

with a copy to (service on which shall not constitute notice hereunder):

Lowenstein Sandler LLP
1251 Avenue of the Americas, Fl 17
New York, New York  10020
Attention:  Daniel B. Besikof
Email:  dbesikof@lowenstein.com

**17.**   *Waivers.*  Except as otherwise expressly provided herein, the Loan Parties hereby waive notice of an Event of Default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

**18.**   *Severability of Provisions.*  Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**19.**   *Termination of this Agreement.*  This Agreement may not be terminated prior to the Maturity Date, unless mutually agreed to in writing by the Lender and the Loan Parties; *provided*, *further*, that the provisions of Section 13 hereof shall survive and remain in full force and effect regardless of the repayment of the Loan or the termination of this Agreement or any provision hereof.

**20.**   *Usury.*  In the event any interest is paid on this Agreement that is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Agreement.

**21.**   *Counterparts and Execution.*  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.  The words "execution," "signed," "signature," and words of like import shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**22.**   *Governing Law.*  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law provisions of the State of New York, or of any other state.  The parties hereby submit and consent irrevocably to the exclusive jurisdiction of the Bankruptcy Court for the interpretation and enforcement of the provisions of this Agreement.  The parties also agree that the jurisdiction over the person of such parties and the subject matter of such dispute shall be effected by the mailing of process or other papers in connection with any such

21

action in the manner provided for herein or in such other manner as may be lawful, and that service in such manner shall constitute valid and sufficient service of process.

**23.** **_Waiver of Jury Trial._**   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.

**24.** **_Reserved_**.

**25.** **_Reserved_**.

**26.** **_Defined Terms_**.   As used in this Agreement, the following terms have the following meanings:

"**_Availability Period_**" means the period commencing on the Petition Date and ending on the Maturity Date.

"**_Avoidance Actions_**" means any and all claims, causes of action, rights, or remedies of any Debtor or its estate arising under chapter 5 of the Bankruptcy Code (including, without limitation, sections 544, 545, 547, 548, 549, 550, and 553 thereof), and any similar or related claims, causes of action, or rights arising under applicable state or other non-bankruptcy law, including claims for fraudulent transfer, preferential transfer, or recovery of property, together with any proceeds thereof, in each case to the extent constituting property of the Debtors' estates.

"**_Bankruptcy Code_**" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**_Bankruptcy Court_**" means the United States Bankruptcy Court for the District of Delaware or any court having jurisdiction over the Cases from time to time.

"**_Budget_**" means a 13-week cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender, which begins on or around the Petition Date; provided that, with the prior written consent of the Lender, the budget may be updated, modified or supplemented in accordance with Section 9(x).

"**_Budget Variance Report_**" means a report provided by the Borrower to the Lender showing by line item and in the aggregate the actual cash disbursements of the Debtors for the period set forth in Section 9(y), comparing the actual cash receipts and disbursements (on a line item by line item basis) with the cumulative budgeted amounts for each such line item set forth in the Budget for such period, noting therein all variances on a line-item and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct in all material respects by the Debtors' Chief Restructuring Officer.

22

"**Business Day**" means with respect to any borrowing or payment, a day other than Saturday or Sunday on which banks are open for business in New York, NY.

"**Carve Out**" shall have the meaning assigned to such term in the Interim or Final Financing Order, as applicable.

"**Cases**" means the cases initiated by the Debtors' filing of voluntary petitions for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

"**Collateral**" has the meaning set forth in in Annex B attached hereto.

"**Committee**" means any official committee of unsecured creditors appointed in the Case by the U.S. Trustee.

"**Control Agreement**" means a tri-party control agreement, executed and delivered by the applicable Loan Party, the Lender, and a depository intermediary, in form and substance satisfactory to the Lender, which agreement is sufficient for Lender to establish "control", within the meaning of the UCC, over each of such Loan Party's deposit accounts, securities accounts or other bank accounts, as applicable, maintained by the depository intermediary and in any event providing for (i) "springing" dominion following the delivery of a "notice of exclusive control" (or similar notice) during the occurrence and continuance of an Event of Default and (ii)(x) if requested, delivery to the Lender of duplicate account statements when delivered to the applicable Loan Party and (y) to the extent available, full on-line access to the Lender of account information regarding the accounts including, but not limited to, account activity and current balances.

"**Excluded Subsidiaries**" means IMH Assets Corp. and Impac Secured Assets Corp., solely to the extent that each such Subsidiary (a) does not own any assets and (b) is prohibited by law or its Operating Documents from guaranteeing the Obligations or pledging its assets to secure the Obligations (*provided* that such prohibition is not the result of a restriction under the Operating Documents that arose solely in contemplation of such Subsidiary satisfying this definition).

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**DIP Facility Amount**" means $5,000,000.

"*DIP Facility Availability*" means, at any time, an amount equal to (a) the DIP Facility Amount minus (b) the aggregate principal amount of all Term Loans previously funded to the Borrower under this Agreement. For the avoidance of doubt, the Term Loans are non-revolving, and any principal amount repaid or prepaid may not be reborrowed.

"**Final Financing Order**" means a final order of the Bankruptcy Court in substantially the form of the Interim Financing Order (or such other form acceptable to the Lender) authorizing the Loans.

US_ACTIVE\131979672

"*Final Order Entry Date*" means the date on which the Final Order is entered by the Bankruptcy Court.

"*Guaranty*" means (a) the guarantee of the Obligations by each of the Guarantors provided pursuant to Section 12 hereof and (b) any other guarantee of the Obligations by any other Subsidiary, provided pursuant to a Joinder Agreement or other documentation in form and substance reasonably acceptable to the Lender.

"*Initial Term Loan*" has the meaning set forth in Section 2(a) of this Agreement.

"*Initial Term Loan Amount*" means an aggregate principal amount equal to $1,500,000.

"*Interim Financing Order*" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as Exhibit A hereto, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the Initial Term Loan in such amounts as are contemplated by Section 2(a).

"*Interim Order Entry Date*" means the date on which the Interim Financing Order is entered by the Bankruptcy Court.

"*Key Person*" means each of George A. Mangiaracina in his capacity as Chief Executive Officer and Joseph Joffrion in his capacity as Secretary and General Counsel.

"*Lien*" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, but not including the interest of a lessor under a lease which is not a capital lease.

"*Loan Documents*" means this Agreement (including any renewals, extensions, re-issuances and refundings thereof), the Bridge Note, and such other related agreements, and any amendments or supplements thereto or modifications thereof, executed or delivered pursuant to the terms of this Agreement or any other Loan Document. For the avoidance of doubt, the Prepetition Loan Agreement and any other documents in connection with the Prepetition Loan shall not constitute Loan Documents hereunder.

"*Loan Party*" has the meaning ascribed to such term in the preamble of this Agreement.

"*Loans*" means all loans made to the Borrower in connection with this Agreement, including, without limitation, the Term Loans and Roll-Up Loan.

"*Material Agreement*" means (a) any employment or consulting agreement which provides for compensation in excess of $40,000 per year; (b) any contract for the purchase or lease of real property; or (c) any contract for the purchase of services, materials, supplies, goods, equipment or other assets or property that provides for either (i) annual payments of $40,000 or more, or (ii) aggregate payments of $40,000 or more.

24

"*Maturity Date*" means the earliest of (i) the date which is ninety (90) days following the Petition Date; (ii) the effective date of a Plan in the Cases; (iii) the date of filing or support by any Debtor of a plan of reorganization other than the Plan; (iv) entry of an order by the Bankruptcy Court converting the Cases to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code or appointing a chapter 11 trustee; (v) entry of a final order by the Bankruptcy Court dismissing the Cases; or (vi) the date of termination of the DIP Facility and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of this Agreement.

"*Non-Default Rate*" has the meaning set forth in <u>Section 3(a)</u> of this Agreement.

"*Obligations*" means all unpaid principal of, and accrued and unpaid interest due on, the Loans and all other obligations, interest (including at the Default Rate, if any), fees, charges, indemnities and expenses of any Loan Party to the Lender arising under or in connection with this Agreement or the other Loan Documents.

"*Operating Documents*" are, for any Person, such Person's formation documents and (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership or limited partnership, its partnership agreement or limited partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"*Orders*" means collectively the Interim Financing Order and Final Financing Order.

"*Permitted Budget Variance*" has the meaning set forth in Section 9(x) of this Agreement.

"*Permitted Indebtedness*" means:

    (i)    the Obligations under this Agreement;

    (ii)    the Prepetition Facility;

    (iii)    the Subordinated Notes;

    (iv)    indebtedness existing as of the date hereof and set forth on Schedule I;

    (v)    indebtedness incurred in the ordinary course of business in respect of trade payables and accrued expenses, in each case incurred consistent with past practice and not overdue by more than 60 days (except to the extent disputed in good faith);

    (vi)    indebtedness consisting of taxes, assessments and other governmental charges to the extent not yet due and payable or being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP (if applicable);

25

(vii) indebtedness arising from intercompany loans, advances, contributions and other intercompany obligations among Loan Parties, and (to the extent permitted under the Orders and the cash management order) between Loan Parties, in each case to the extent permitted under this Agreement;

(viii) indebtedness under bank products, cash management, credit cards, merchant services, and similar arrangements incurred in the ordinary course of business consistent with past practice, in each case to the extent permitted by (and subject to) the cash management order and the Orders;

(ix) indebtedness consisting of deferred compensation, employee benefit and payroll obligations incurred in the ordinary course of business consistent with past practice in each case to the extent permitted by (and subject to) the cash management order and the Orders;

(x) indebtedness arising from judgments, orders or awards to the extent not constituting an Event of Default under this Agreement (including because enforcement is stayed, bonded, or being appealed in good faith); and

(xi) any other Indebtedness approved by the Bankruptcy Court and consented to in writing by the Lender (or expressly permitted under the Orders, the Budget and this Agreement).

"*Person*" means an individual, sole proprietorship, joint venture, association, trust, estate, business trust, corporation, limited liability company, exempted company, limited liability partnership, limited partnership, exempted limited partnership, nonprofit corporation, partnership, sovereign government or agency, instrumentality, or political subdivision thereof, or any similar entity or organization.

"*Petition Date*" means the first date that any of the Loan Parties files a voluntary petition with the Bankruptcy Court initiating the Cases.

"*Plan*" means any chapter 11 plan of reorganization or liquidation filed in the Cases that is (a) consistent in all material respects with the Restructuring Agreement or (b) otherwise approved in writing by the Lender.

"*Prepetition Loan Agreement*" has the meaning assigned to such term in the recitals hereto.

"*Prior Permitted Liens*" means Liens that are valid, perfected, and unavoidable as of the Petition Date (or that are perfected in accordance with section 546(b) of the Bankruptcy Code) and that were granted by any Debtor prior to the Petition Date.

"*Remaining Obligations*" means, as of any date of determination, the Obligations that as of such date of determination are Obligations under the Loan Documents that survive termination of the Loan Documents, but as of such date of determination are not due and payable and for which no claims have been made.

26

"***Restructuring Agreement***" means the certain Restructuring Support Agreement, dated as of April 22, 2026, by and among (a) the Debtors, (b) the Lender, (c) Taberna Preferred Funding 1 LTD and (d) Taberna Preferred Funding 2 LTD.

"***Roll-Up Loan***" has the meaning set forth in Section 2(b).

"***Specified Account***" means an account of the Borrower used in connection with the Term Loans, which account is not subject to a security interest by any other person. For the avoidance of doubt, the Specified Account may be the Borrower's existing operating account at Enterprise Bank & Trust.

"***Subordinated Notes***" means those certain Junior Subordinated Notes due March 30, 2034 issued by Impac Mortgage Holdings, Inc., as in effect on the Petition Date.

"***Subordinated Notes Claims***" means claims arising under the Subordinated Notes.

"***Subsidiary***" means any direct or indirect subsidiary of each Loan Party, as applicable.

"***Superpriority Claim***" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, in all cases subject to the terms of the Orders.

"***Term Loan***" has the meaning set forth in Section 2(a).

"***UCC***" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided*, however, that, in the event that, by reason of mandatory provisions of any applicable law, any of the attachment, perfection or priority of the Lender's security interest in any Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "***UCC***" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or otherwise used in such provisions.

*[Signature page follows]*

27

IN WITNESS WHEREOF, each of the undersigned have caused this Agreement to be executed as of the date first written above.

**BORROWER:**

IMPAC MORTGAGE HOLDINGS, INC.

By:_____
Name:
Title:

*[Signature Page to DIP Loan and Security Agreement]*

**GUARANTORS:**

COPPERFIELD FINANCIAL, LLC


By: _____
Name:
Title:


COPPERFIELD CAPITAL CORPORATION

By: _____
Name:
Title:


IMPAC FUNDING CORPORATION

By: _____
Name:
Title:


IMPAC COMMERCIAL CAPITAL
CORPORATION

By: _____
Name:
Title


INTEGRATED REAL ESTATE SERVICES
CORP.

By: _____
Name:
Title


IMPAC MORTGAGE CORP.

By: _____
Name:
Title


*[Signature Page to DIP Loan and Security Agreement]*

IMPAC WAREHOUSE LENDING, INC.

By:_____
Name:
Title

SYNERGY CAPITAL MORTGAGE CORP.

By:_____
Name:
Title

IMPAC WAREHOUSE LENDING GROUP, INC.

By:_____
Name:
Title

*[Signature Page to DIP Loan and Security Agreement]*

**LENDER:**

HILDENE RE SPC, LTD.

By:_____
Name:
Title:

US_ACTIVE\131979672

**ANNEX A**

## REGISTER

| Date of Loan | Amount of Term Loan | Amount of Roll-Up Loan | Total Principal Amount Outstanding |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

US_ACTIVE\131979672

**ANNEX B**

## DESCRIPTION OF COLLATERAL

<u>Definitions</u>:

When used herein the terms Account, As-Extracted Collateral, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixture, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Rights, Money, Account, Supporting Obligations and Tangible Chattel Paper have the respective meanings provided in Article 8 or Article 9, as applicable, of the UCC. Letter of Credit has the meaning provided in Section 5-102(a)(10) of the UCC. To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the UCC, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

*"**Collateral**"*, shall mean:

(a)    All Accounts (together with all guaranties thereof and security therefor, all rights of stoppage in transit, replevin and reclamation and all rights as an unpaid vendor);

(b)    All Chattel Paper;

(c)    All Commercial Tort Claims;

(d)    All Deposit Accounts;

(e)    All Documents;

(f)    All Fixtures;

(g)    All General Intangibles (including all Intellectual Property Collateral);

(h)    All Goods (including all Inventory and all Equipment), together with all accessions, additions, attachments, improvements, substitutions, and replacements thereto and therefor;

(i)    All Instruments, all tax refunds, all tax refund claims and all other rights and claims to payment (together with all guaranties thereof and security therefor);

(j)    All Investment Property (including all equity and stock interests);

(k)    All Letter-of-Credit Rights and all Letters of Credit;

(l)    All Money (of every jurisdiction whatsoever);

(m)    All oil, gas or other minerals before extraction and all As-Extracted Collateral;

(n)    All insurance policies (including casualty and hazard insurance and right as loss payee or endorsee thereof);

US_ACTIVE\131979672

(o)    All restricted cash accounts pledged as cash collateral to Enterprise Bank & Trust, and any cash and other assets maintained therein, subject and subordinate to the rights therein of Enterprise Bank & Trust;

(p)    All Supporting Obligations and all security interests and all other liens securing rights to payment or performance, all leases and all rights of setoff;

(q)    All books, correspondence, records, writings, databases, information and other property relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the Collateral;

(r)    All Proceeds and all products of, and all rights associated with, the foregoing and, to the extent not otherwise included, (A) all payments under insurance (whether or not the Borrower or any Loan Party is the loss payee thereof), (B) rights acquired by reason of condemnation or exercise of the power of eminent domain, and (C) all tort claims; and

(s)    all other personal property and rights of every kind and description and interests therein;

in each case, whether such property is acquired prior to the Petition Date or after the Petition Date; ***provided that***, only upon the Final Order Entry Date, "Collateral" shall include the net cash proceeds actually recovered from Avoidance Actions, if any, subject to the Final Order, including the Carve-Out.

# EXHIBIT A

Form of Interim Financing Order

[to be attached]

**Exhibit E**

**GUC Schedule**

**Fill in this information to identify the case:**

☐ Check if this is an amended filing

Debtor name    Impac Mortgage Holdings, Inc.

United States Bankruptcy Court for the: _____ District of    Delaware
(State)

Case number (If known):    26 - _____

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders                                              12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim — If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. | The Bank of New York Mellon Trust Company, NA as indenture trustee for: Taberna Preferred Funding I, Ltd. Taberna Preferred Funding II, Ltd. 500 Ross Street, 12th Floor Pittsburg, PA  15262 | Contact:  Nancy R. Johnson Phone: (412) 236-3139 Email: Nancy.R.Johnson@BNYMellon.com | Subordinated Notes Indenture Trustee | | | | $77,000,000.00 |
| 2. | Dark Matter Technologies LLC[1] 6651 Gate Parkway 4th Floor Jacksonville, FL 32256 | Contact:  Cassandra Marciniak VP, Associate General Counsel Phone: (414) 719- 4829 Email: cassandra.steele@dmatter.com | Trade Debt | Disputed | | | $567,000.00 |
| 3. | Nationstar Mortgage dba Mr. Cooper 8950 Cypress Waters Blvd Dallas, TX 75019 | Contact: Phone: Email: | Trade Debt | Disputed | | | $280,000.00 |
| 4. | Lakeview Loan Servicing 4425 Ponce De Leon, MS 5-251 Coral Gables, FL 33146 | Contact: Phone: Email: | Trade Debt | | | | $190,000.00 |

---

[1] The unsecured amount will be reduced if a settlement is reached.

Debtor: __Impac Mortgage Holding, Inc.__  Case number (*if known*) __26 -__
Name

| | | | | | | |
|---|---|---|---|---|---|---|
| 5. | Peerless Network, Inc.<br>433 W Van Buren St<br>#410s<br>Chicago, IL 60607 | Contact: Michael Amponsah<br>        Marilyn Szamlewski Manager,<br>Account Management and Partner<br>Support<br>Phone: (800) 440-9440<br>Email: michael.amponsah@infobip.com<br>        Marilyn.Szamlewski@infobip.com | Trade Debt | Disputed | | $35,978.00 |
| 6. | Black Knight Technology Solutions, LLC<br>PO Box 7374<br>Fredericksburg, VA 22404-7374 | Contact:<br>Phone: (540) 371-7234<br>Email: | Trade Debt - Software | Disputed | | $33,250.00 |
| 7. | Wilmington Savings Fund Society, FSB<br>500 Delaware Avenue<br>Wilmington, DE 19801 | Contact:<br>Phone: (888) 973-7226<br>Email: | Trade Debt | Disputed | | $31,250.00 |
| 8. | Newport Gateway<br>Office LLC<br>19900 MacArthur Blvd<br>Irvine, CA 92612 | Contact:<br>Phone: (949) 720-2550<br>Email: | Lease Agreement | | | $17,414.00 |
| 9. | Katten Muchin<br>Rosenman LLP<br>50 Rockefeller Plaza<br>New York, NY 10020 | Contact:<br>Phone: (212) 940-8800<br>Email: | Professional Services | | | $15,101.00 |
| 10. | Wilmington Trust Company<br>1100 N. Market Street<br>Wilmington, DE 19890 | Contact:<br>Phone: (800) 982-4620<br>Email: | Trade Debt | Disputed | | $15,000.00 |
| 11. | Computershare<br>600 South 4th Street<br>7th Floor<br>Minneapolis, MN 55415 | Contact:<br>Phone:<br>Email: | Trade Debt | Disputed | | $15,000.00 |
| 12. | The Bank of New York<br>240 Greenwich St<br>New York, NY 10286 | Contact:<br>Phone: (212) 495-1784<br>Email: | Trade Debt | Disputed | | $12,990.00 |
| 13. | Venable LLP<br>151 W 42nd St<br>New York, NY 10036 | Contact:<br>Phone: (212) 307-5500<br>Email: | Trade Debt | | | $10,127.00 |
| 14. | Morgan, Lewis &<br>Bockius LLP<br>101 Park Ave<br>New York, NY 10178 | Contact:<br>Phone: (212) 309-6000<br>Email: | Subordinated Notes Indenture Trustee | Disputed | | $8,297.00 |
| 15. | | | | | | |
| 16. | | | | | | |
| 17. | | | | | | |

Debtor: <u>Impac Mortgage Holding, Inc.</u>          Case number (*if known*)  26 - _____
Name

| | | | | | | |
|---|---|---|---|---|---|---|
| 18. | | | | | | |
| 19. | | | | | | |
| 20. | | | | | | |

**Exhibit F**

**Interim Financing Order**

*Form of Interim DIP Order*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| IMPAC MORTGAGE HOLDINGS, INC., *et al.*,[1] | ) Case No. 26-_____ (__) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL AND (VI) <u>SCHEDULING A FINAL HEARING</u>**

Upon the motion (the "<u>Motion</u>") of the debtors and debtors in possession (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>"), pursuant to §§ 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the corresponding local rules of this District (the "<u>Local Rules</u>"), requesting entry of an interim order (this "<u>Interim Order</u>") and Final Order (as defined herein) authorizing the Debtors to, among other things:

(i)     Obtain senior secured postpetition financing in an aggregate principal amount not to exceed $5,000,000 (the "<u>DIP Credit Facility</u>," and the loans provided to the Debtors thereunder, the "<u>DIP Loans</u>"), consisting of (a) $2,000,000 of principal of the Bridge Note (as

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Impac Mortgage Holdings, Inc. (5505); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Funding Corporation (4495); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Services Corp. (2263); Impac Mortgage Corp. (3937); Impac Warehouse Lending, Inc. (0541); Synergy Capital Mortgage Corp. (9071); and Impac Warehouse Lending Group, Inc. (3488). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

defined herein), plus interest, fees and other amounts due thereunder (the "DIP Roll-Up Loan") resulting from a dollar-for-dollar "roll-up" of the Prepetition Bridge Note Obligations outstanding under the Bridge Note, pursuant to the terms and conditions of the DIP Documents (as defined herein), this Interim Order, and the Final Order; and (b) new money term loans, in an aggregate principal amount such that, when combined with the DIP Roll-Up Loan, the total outstanding principal amount of the DIP Facility shall not exceed $5,000,000, which new money term loans shall be made available to the Debtors from time to time pursuant to the terms and subject to the conditions set forth in this Agreement and the Orders (the "New Money Term Loan").

(ii)    Enter into (a) that certain Debtor-In-Possession Loan and Security Agreement (the "DIP Agreement"),[2] substantially in the form attached as Exhibit A hereto, by and among the Debtors, certain subsidiaries of the Debtors identified as a guarantor on the signature page thereto, and Hildene re SPC, Ltd., acting for and on behalf of the account of SP 1 (in such capacity, the "Lender") as lender and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

(iii)    Borrow, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to $3,500,000 (the "Interim DIP Credit Facility");

(iv)    Borrow, on a final basis, pursuant to the DIP Documents and the Final Order, postpetition financing in an aggregate principal amount of up to $5,000,000, upon entry of a Final Order;

---

[2]    All capitalized terms not otherwise defined in this Interim Order shall have the meaning ascribed to same in the DIP Agreement.

-2-

US_ACTIVE\132026028

(v)     Execute and deliver the DIP Agreement and the other DIP Documents to the Lender pursuant thereto;

(vi)    Grant to the Lender the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Credit Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below);

(vi)    Grant to the Lender allowed superpriority administrative expense claims in the Chapter 11 Cases for all DIP Obligations;

(vii)   Use the proceeds of the DIP Credit Facility in accordance with the DIP Agreement, the DIP Documents and this Interim Order, in all cases in accordance with the Budget, a copy of which is attached hereto as Exhibit B, and as otherwise provided in the DIP Documents;

(viii)  Use any Prepetition Collateral (as defined below), including the Cash Collateral, and provide adequate protection to those parties set forth herein that may have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution (as defined below);

(ix)    Vacate and modify the automatic stay imposed by § 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(x)     Schedule a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

-3-

US_ACTIVE\132026028

(xi)     Waive, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

The Court having considered the Motion, the *Declaration of George A. Mangiaracina in Support of Debtors' Chapter 11 Petitions and First Day Pleadings, the Declaration of Bradley D. Sharp in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To Obtain Postpetition Secured Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Authorizing Use of Cash Collateral; (VI)  Scheduling a Final Hearing; and (VII) Granting Related Relief*, the DIP Agreement, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (the "Interim Hearing"); and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the Motion on an interim basis is an appropriate exercise of the Debtors' business judgment, necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' property; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**IT IS FOUND AND DETERMINED THAT**[3]:

---

[3]     The findings and conclusions set forth herein constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

-4-

US_ACTIVE\132026028

A.    Petition Date.  On April 26, 2026 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with this Court.

B.    Jurisdiction and Venue.  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, and over the persons and property affected hereby.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.

C.    Notice.  Notice of the Interim Hearing and notice of the Motion has been given by the Debtors to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (ii) the Debtors' twenty (20) largest unsecured creditors (excluding insiders); (ii) counsel to the Lender and to the Prepetition Secured Parties; (iii) all known holders of liens upon the Debtors' assets; (iv) the attorneys general in the states in which the Debtors conduct their business; (v) the Internal Revenue Service; (vi) the United States Securities and Exchange Commission (the "SEC"); and (vii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; in each case by facsimile transmission, email, overnight courier and/or hand delivery. Under the circumstances, such notice of the Interim Hearing and Motion and the relief provided for in this Interim Order constitutes adequate and sufficient notice and complies with § 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules.

D.    Debtors' Stipulations.  In requesting the financing from the Lender and in exchange for and as a material inducement to the Lender to agree to provide the financing in accordance with the DIP Credit Facility, and to the Prepetition Secured Parties (as defined below) in exchange

-5-

for any potential Diminution, the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the Challenge (as defined below) rights set forth in Paragraph 21 of this Interim Order (solely with respect to the Prepetition Secured Parties) and without prejudice to the rights of interested parties other than the Debtors, as follows (the "Stipulations"):

(i)     As of the Petition Date, the Debtors have the following secured indebtedness:

      a.     An aggregate outstanding principal amount of $20,000,000, together with all accrued and unpaid interest, fees, costs, and expenses (collectively, the "Prepetition Loan Obligations"), owed pursuant to that certain Loan Agreement, dated as of May 6, 2024 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Agreement"), by and among Impac Mortgage Holdings, Inc. ("Impac"), each subsidiary of Impac that is a guarantor thereunder, and Hildene re SPC, Ltd., acting for and on behalf of the account of SP 1 (in such capacity, the "Prepetition Loan Lender"), which obligations are secured by liens on, and security interests in, all or substantially all of the Debtors' property (the "Prepetition Loan Collateral").

      b.     An aggregate outstanding principal amount of $2,000,000, together with all accrued and unpaid interest, fees, costs, and expenses (collectively, the "Prepetition Bridge Note Obligations," and together with the Prepetition Loan Obligations, the "Prepetition Obligations"), owed pursuant to that certain Bridge Note, dated as of January 26, 2026 (as amended, restated, supplemented, or otherwise modified from time to time, the "Bridge Note"), by and among Impac and Hilden re SPC, Ltd., acting for and on behalf of the account of SP 1, as successor-by-assignment to Trinity Park Investments, LLC (in such capacity, the "Bridge Note Lender," and together with the Prepetition Loan Lender, the "Prepetition Secured Parties"), which obligations are secured by liens on, and security interests in, all or substantially all of the Debtors' property that are junior in all respects to the liens securing the Prepetition Loan Obligations (the "Bridge Note Collateral," and together with the Prepetition Loan Collateral, the "Prepetition Collateral").

(ii)     As of the Petition Date: (a) the Prepetition Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from § 362 of the Bankruptcy Code to the extent applicable); (b) no recoupments, offsets, defenses, or counterclaims exist to the Prepetition

-6-

Obligations; and (c) no portion of the Prepetition Obligations or any payments or other transfers made to the Prepetition Secured Parties or applied to the Prepetition Obligations prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, recoupment, offset, counterclaim, crossclaim, defense, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iii)    The liens of the Prepetition Secured Parties (the "Prepetition Liens") constitute valid, binding, enforceable (other than with respect to the stay of an enforcement arising from § 362 of the Bankruptcy Code) and perfected liens with priority over any and all other liens in the Prepetition Collateral (except as otherwise provided in the Prepetition Loan Agreement, the Bridge Note, and / or any other documents relating thereto, respectively (collectively, the "Prepetition Loan Documents")) and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, crossclaim, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iv)    The Debtors have waived, discharged, and released any right they may have to challenge the Prepetition Obligations and the Prepetition Liens on the Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or causes of action against any Prepetition Secured Party with respect to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, or the Prepetition Collateral;

(v)    Any payments made on account of the Prepetition Obligations before the Petition Date were payments made (a) out of the Prepetition Collateral, and/or (b) in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors;

-7-

(vi)     All of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below);

(vii)     Neither the Lender nor any of the Prepetition Secured Parties is a control person or insider (as defined in § 101(31) of the Bankruptcy Code) of any Debtor;

(viii)     Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime, or seek to prime (or otherwise cause to be subordinated in any way), the liens provided to the Lender by offering a subsequent lender, or any party-in-interest, a superior or *pari passu* lien or claim with respect to the DIP Collateral pursuant to § 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out (as defined below) and the existing Prepetition Liens in favor of the Prepetition Secured Parties, which are being primed hereunder;

(ix)     Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under §§ 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out;

(x)     The Prepetition Secured Parties are entitled, pursuant to §§ 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), that

-8-

may be caused by or arising as a result of (a) the incurrence and payment of the DIP Obligations, (b) the use of Prepetition Collateral (including Cash Collateral), (c) the granting of the DIP Liens and the DIP Superpriority Claim, (d) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out, (e) the subordination of the Prepetition Obligations to the Carve-Out, and (f) imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code.

E.      Cash Collateral. For the purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in § 363 of the Bankruptcy Code, in or on which the Lender or the Prepetition Secured Parties have a lien, security interest or any other interest (including, without limitation, any adequate protection liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise, and shall include, without limitation:

(i)      All cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the Lender or the Prepetition Secured Parties have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

(ii)     All of the respective deposits, refund claims, and rights in retainers of the Debtors on which the Lender or the Prepetition Secured Parties hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise;

(iii)    The proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral.

US_ACTIVE\132026028

For the avoidance of doubt, and subject to the Interim Order and Final Order, the Debtors' authorization to use Cash Collateral shall automatically terminate, without further order of the Court, upon the earliest of: (a) the Maturity Date; or (b) entry of any order by the Bankruptcy Court denying or terminating the Debtors' use of Cash Collateral.

F.    Findings Regarding the DIP Credit Facility.

(i)    Need for the DIP Credit Facility and to Use Cash Collateral. An immediate need exists for the Debtors to obtain funds pursuant to borrowings under the Interim DIP Credit Facility and to use Cash Collateral in order to continue operations, fund payroll, and operating expenses, and administer and preserve the value of their estates pending the Final Hearing. The ability of the Debtors to finance their operations through the Interim DIP Credit Facility and use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors' estates, to maximize the value of the Debtors' assets for the benefit of their creditors, and to avoid immediate and irreparable harm to the Debtors, their estates and their creditors.

(ii)    Priming of Any Prepetition Liens. Upon the entry of this Interim Order, the priming of any of the Primed Liens (as defined below), is a condition to the Debtors' borrowings under the DIP Credit Facility, which borrowing is necessary for the Debtors to be able to continue to operate their business and administer the Chapter 11 Cases for the benefit of their estates and creditors. The parties holding Primed Liens  have consented to such treatment, and the terms of the adequate protection arrangements provided for herein are fair and reasonable and otherwise sufficient under the circumstances to adequately protect the Prepetition Secured Parties against any Diminution with respect to the Prepetition Collateral as provided for herein. For the avoidance of doubt, the Prior Permitted Liens are not being primed by the DIP Credit Facility.

-10-

(iii)   No Credit Available on More Favorable Terms.  The Debtors have been unable to obtain (a) unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, or (b) credit for money borrowed secured by a lien on property of the estates on more favorable terms and conditions than those provided in the DIP Agreement and this Interim Order.  The Debtors are unable to obtain credit for borrowed money without granting to the Lender the DIP Protections (as defined below).

G.   Sections 506(c) and 552(b) Waivers. In light of (i) the Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the Lender to agree to provide the DIP Credit Facility and (ii) the Prepetition Secured Parties' agreement to subordinate their liens to the DIP Obligations, the Carve-Out, and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral for payments made in accordance with the Budget (as defined below) and the terms of this Interim Order), each of the Lender and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the provisions of § 506(c), and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code, in each case as provided for herein.

H.   Use of Proceeds of the DIP Credit Facility.  Proceeds of the DIP Credit Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Documents) shall be used in a manner consistent with the terms and conditions of the DIP Agreement and this Interim Order and in accordance with the Budget.

I.   Application of Proceeds of DIP Collateral.  All net proceeds of any sale or other disposition of the DIP Collateral, if any, shall, subject to the Carve-Out, be applied first to repay the DIP Obligations in full.

-11-

J.       Effect of Reversal; Good Faith.  The Lender has indicated a willingness to provide financing to the Debtors solely in accordance with the DIP Agreement and this Interim Order, provided that the DIP Obligations, DIP Liens and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order as provided in § 364(e) of the Bankruptcy Code.  The Lender has acted in good faith in agreeing to provide the DIP Credit Facility approved by this Interim Order.

K.       DIP Roll-Up Loan.  Upon entry of this Interim Order, but subject to the provisions of Paragraph 21 of this Interim Order, all outstanding Prepetition Bridge Loan Obligations shall be rolled up, and converted into DIP Obligations (the "DIP Roll-Up Loan").  The Bridge Note Lender, who is also the Lender would not have consented to extend the DIP Financing or other financial accommodations to the Debtors without the inclusion of the DIP Roll-Up Loan in the DIP Obligations.  Thus, the roll-up is consideration for, and solely on account of, the agreement of the Lender to extend the DIP Loans and not on account of the Prepetition Bridge Loan Obligations.

L.       Business Judgment and Good Faith Pursuant to Section 364(e).

(i)       The terms and conditions of the DIP Credit Facility and the DIP Documents, and the fees paid and to be paid thereunder are fair, reasonable, and the best reasonably available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration;

(ii)       The DIP Documents and use of Cash Collateral were negotiated in good faith and at arms' length between the Debtors and the Lender and the Prepetition Secured Parties; and

-12-

US_ACTIVE\132026028

(iii)    The DIP Credit Facility loan proceeds to be funded to the Debtors pursuant to the DIP Documents will be advanced in good faith, and for valid business purposes and uses, as a consequence of which the Lender is entitled to the protection and benefits of § 364(e) of the Bankruptcy Code.

M.    <u>Immediate Entry of Interim Order</u>. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b). The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors and their estates. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary to administer the Chapter 11 Cases, to sustain the operation of the Debtors' existing business and to further enhance the Debtors' prospects for a successful reorganization. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**NOW, THEREFORE**, based upon the foregoing findings, and upon consideration of the Motion and the record made before this Court with respect to the Motion, including the record created during the Interim Hearing, all papers filed on the docket, and with the consent of the Debtors, the Lender, and the Prepetition Secured Parties to the form and entry of this Interim Order, and good and sufficient cause appearing therefor, and the Court being otherwise fully advised in the premises;

-13-

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.      <u>Motion Granted</u>.  The Motion is GRANTED in accordance with the terms and conditions set forth in this Interim Order and the DIP Documents.  Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.      <u>The DIP Documents</u>.

(a)      <u>Approval of Entry into the DIP Documents</u>.  The Debtors are authorized to execute, deliver and perform in accordance with the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents.  Upon entry of this Interim Order, all outstanding Prepetition Bridge Loan Obligations shall be deemed rolled up and converted into DIP Obligations, subject to the provisions of Paragraph 21 hereof.  The Debtors are authorized to take such acts as shall be necessary or desirable to effect the roll-up and conversion of the Prepetition Bridge Loan Obligations to DIP Obligations.  The Debtors are hereby authorized to use Cash Collateral.  The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Agreement and all other DIP Documents as such become due.

(b)      <u>Authorization for DIP Financing</u>.  To enable the Debtors to continue to preserve the value of their estates during the period prior to entry of the Final Order (the "<u>Interim Period</u>") and subject to the terms and conditions of this Interim Order, the Budget, and the DIP

-14-

Documents, upon the execution of the DIP Agreement and the other DIP Documents, the Debtors are hereby authorized to borrow, pursuant to the Interim DIP Credit Facility, a principal amount not to exceed $3,500,000.

(c)     Conditions Precedent.  The Lender shall have no obligation to make any loans under the DIP Agreement during the Interim Period unless the conditions precedent to making such loans under the DIP Agreement, as set forth in Section 7 thereof, have been satisfied in full or waived by the Lender in its sole discretion.

(d)     Enforceable Obligations.  The DIP Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto, and their creditors or representatives thereof, in accordance with their terms.

(e)     Protection of the Lender and Other Rights.  From and after the Petition Date, the Debtors shall use the proceeds of the DIP Credit Facility only for the purposes specifically set forth in the DIP Agreement and this Interim Order and in strict compliance with the Budget (subject only to any variances thereto that may be permitted by the DIP Agreement or the Budget).

3.     The DIP Lien Priority.

(a)     To secure the DIP Obligations, the Lender is hereby granted pursuant to, and in accordance with, §§ 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "DIP Liens") in and on all of the DIP Collateral, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds, and the EB&T Pledge Accounts

-15-

and all cash and other property held therein, and subject to entry of the Final Order, all proceeds or property recovered in connection with any and all claims, causes of action, rights, or remedies of any Debtor or its estate arising under chapter 5 of the Bankruptcy Code (including, without limitation, §§ 544, 545, 547, 548, 549, 550, and 553 thereof), and any similar or related claims, causes of action, or rights arising under applicable state or other non-bankruptcy law ("Avoidance Actions"), all intercompany claims, all claims, and causes of action of each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "DIP Collateral"), subject only to prior payment of the Carve-Out and any Prior Permitted Liens;

(b)    The DIP Liens shall be effective immediately upon the entry of this Interim Order other than the DIP Lien on the proceeds of the Avoidance Actions which shall be effective upon entry of the Final Order, and the DIP Liens shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date or created thereafter, including under §§ 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve-Out and the Prior Permitted Liens;

(c)    The DIP Liens shall be, and hereby are deemed, fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity

-16-

of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no action whatsoever need be taken by the Lender, the Debtors, or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.

(d)    For the avoidance of doubt, until indefeasible payment in full in cash of the DIP Obligations, and subject in all cases to the Carve-Out and the terms of the Interim Order and Final Order, the Lender shall have the following priority claims and liens:

(i)    pursuant to § 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate with priority over any and all administrative expenses and other claims of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code and otherwise as set forth in the Orders;

(ii)    pursuant to § 364(c)(2) of the Bankruptcy Code, perfected first priority, senior liens on and security interests in all DIP Collateral that, as of the Petition Date, was not subject to any valid, perfected, and unavoidable lien, or was subject only to invalid, unperfected, or avoidable liens;

(iii)    pursuant to § 364(c)(3) of the Bankruptcy Code, perfected junior liens on, and security interests in, all DIP Collateral that, as of the Petition Date, was subject to a valid, perfected, and unavoidable lien in existence at the commencement of the Chapter 11 Cases, other than the Primed Liens (such third-party senior liens, "Prior Permitted Liens");

(iv)    pursuant to § 364(d)(1) of the Bankruptcy Code, and except with respect to any property subject to Prior Permitted Liens, perfected, first-priority senior priming liens on, and security interests, in all DIP Collateral that is subject to the existing liens in favor of the Prepetition Secured Parties securing the Prepetition Obligations (the "Primed Liens"), which Primed Liens shall be primed by and made subject and subordinate to the perfected first-priority senior priming DIP Liens granted to the Lender hereunder; such priming DIP Liens shall also prime any liens granted after the Petition Date as adequate protection of any Primed Liens, all as provided in the Interim Order and Final Order; *provided* that notwithstanding the foregoing, effective upon the making of the Roll-Up Loan, any prepetition liens and security interests, if any, securing the Bridge Note Obligations are hereby deemed replaced by the DIP Liens securing the DIP Obligations (including the DIP Roll-Up Loan), as provided in this Interim Order and the Final Order;

-17-

(v) the DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (a "Successor Case"), or upon the dismissal of the any of the Chapter 11 Cases or Successor Case; and

(vi) pursuant to the terms of this Interim Order, be subject to the Carve-Out.

4. Superpriority Administrative Claim. The Lender is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim," together with the DIP Liens, the "DIP Protections") pursuant to § 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and in any Successor Case(s) for all DIP Obligations, including the DIP Roll-Up Loan, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof including, without limitation, and after entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases.

5. Authorization to Use Proceeds of the DIP Credit Facility and Cash Collateral. Pursuant to the terms and conditions of this Interim Order, the DIP Agreement and the other DIP Documents, and in accordance with the Budget and any variances thereto that may be permitted pursuant thereto or pursuant to the DIP Agreement, the Debtors are authorized to use the

-18-

borrowings pursuant to the DIP Agreement and to use Cash Collateral during the Interim Period until the earliest to occur of the (a) the Maturity Date; or (b) entry of any order by the Bankruptcy Court denying or terminating the Debtors' use of Cash Collateral.  Subject to the terms of the DIP Agreement, the Debtors and the Lender may agree in writing to modify the Budget in the Lender's sole discretion at any time that the DIP Credit Facility remains outstanding; *provided, however*, that any such updated, modified or supplemented Budget provided to the Lender shall be deemed approved at 5:00 p.m. (Eastern Time) five (5) days following the delivery of such Budget to the Lender if the Lender has neither approved nor rejected such Budget.

6. Relief from the Automatic Stay.  Subject to Paragraph 16 of this Order, only upon five (5) Business Days' prior written notice to the Debtors (the "Remedies Notice Period"), counsel approved by this Court for any official committee of unsecured creditors in the Chapter 11 Cases (the "Committee"), if one is appointed, the Prepetition Secured Parties, and the U.S. Trustee, the Lender is hereby granted relief from any stay of proceeding (including, without limitation, the automatic stay applicable under § 362 of the Bankruptcy Code to the holder or holders of any security interest) to permit the Lender, upon the occurrence of and continuance of an Event of Default (as defined below), to exercise any rights and remedies provided to the Lender under the DIP Documents or at law or equity, including all remedies provided under the Bankruptcy Code. Furthermore, the Lender is hereby granted immediate relief from the automatic stay to take steps to perfect the DIP Liens, as described below.  The automatic stay of § 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Committee, the Prepetition Secured Parties, and/or the U.S. Trustee have not obtained an order providing otherwise (a "Stay Enforcement

-19-

Order") from this Court prior to the expiration of the Remedies Notice Period; *provided* that the hearing on whether the automatic stay shall be terminated may be sought on an expedited basis.

(a)     Upon an Event of Default and subject to the expiration of the Remedies Notice Period without entry of a Stay Enforcement Order, and notwithstanding § 362 of the Bankruptcy Code, the Prepetition Loan Lender, solely in its capacity as party to any deposit account control agreement(s) or similar control agreements in effect as of the Petition Date with respect to any Debtor's deposit, securities, or other bank accounts (collectively, "DACAs"), shall be granted limited relief from the automatic stay to deliver any "notice of exclusive control," "activation notice," or similar instruction required under the DACAs to acknowledge and implement that the Prepetition Loan Lender has exclusive control over the applicable account(s) for the benefit of the Lender pursuant to this Interim Order.  Any bank, financial institution, depository, or securities intermediary subject to a DACA (each, a "Depository Institution") is authorized and directed to comply with any such notice or instruction without further order of the Court, and shall have the protections of § 364(e) of the Bankruptcy Code and any other applicable protections afforded by this Interim Order for taking such actions in good faith.  For the avoidance of doubt, any such exercise shall be limited to effectuating the Lender's exclusive control consistent with the DIP Documents and this Interim Order.  Nothing in this paragraph requires the Prepetition Loan Lender or any Depository Institution to sweep, transfer, or apply funds in any account before the expiration of the Remedies Notice Period.  All parties' rights with respect to cash management relief and orders remain reserved, and this Paragraph 6 is intended to complement, and not conflict with, any cash management order entered in these Chapter 11 Cases.

7.     Postpetition Lien Perfection.

-20-

US_ACTIVE\132026028

(a)      This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein.  Notwithstanding the foregoing, the Lender may, at its sole discretion, file financing statements, without notice to the Debtors, with all appropriate jurisdictions to perfect or protect the Lender's interest or rights hereunder, including a notice that any disposition of the DIP Collateral, by any of the Debtors or any other Person, shall be deemed to violate the rights of the Lender under the Uniform Commercial Code.  Such financing statements may indicate the DIP Collateral as "all assets of the Borrower" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the Lender's discretion, and is hereby granted relief from the automatic stay of § 362 of the Bankruptcy Code in order to do so, and any and all of such financing statements, mortgages, notices of lien and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

(b)      The Debtors shall from time to time execute and deliver to the Lender, at the written request of the Lender, all negotiable collateral, all financing statements and other documents that the Lender may reasonably request, in form satisfactory to the Lender, to perfect and continue the perfection of the Lender's security interests in the DIP Collateral and in order to fully consummate all of the transactions contemplated under the DIP Documents.

8.      Authorization and Direction for Payment of Lender and Prepetition Secured Parties' Fees and Expenses. Subject to the provisions of this Paragraph 8 and Paragraph 2(a) of

US_ACTIVE\132026028

this Interim Order, all reasonable and documented fees paid or payable, and all reasonable and documented costs and expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Documents and the Lender's reasonable and documented attorneys' fees and expenses), by the Debtors to the Lender are hereby approved, but solely to the extent provided in the DIP Agreement.  The Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Agreement and this Interim Order, as well as all reasonable and documented fees and expenses payable to the Prepetition Secured Parties' pursuant to Paragraph 12(d), without any requirement that the Debtors, the Lender, the Prepetition Secured Parties or their respective attorneys file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs or expenses. The Debtors shall pay all reasonable and documented prepetition and postpetition out of pocket costs and expenses of Lender and the Prepetition Secured Parties in connection with the Chapter 11 Cases and any Successor Case(s), including, without limitation, in connection with (a) the preparation, negotiation, execution and delivery of the DIP Documents, this Interim Order, and any Final Order, and the funding of all DIP Loans under the DIP Credit Facility, (b) the administration of the DIP Credit Facility and any amendment or waiver of any provision of the DIP Documents, this Interim Order, and any Final Order, (c) the administration of the Chapter 11 Cases and any Successor Case(s), (d) the enforcement or protection of the Lender's rights and remedies under the DIP Documents, this Interim Order, and any Final Order, and (e) as provided in Paragraph 12(d). Notwithstanding anything to the contrary herein, the payment of all such reasonable and documented fees, costs and expenses of Lender and the Prepetition Secured Parties, whether incurred before or after the Petition Date, including, without limitation, all reasonable and documented fees referred to in the DIP Documents, all fees referred to in Paragraph 12(d) and all

-22-

attorneys' fees and expenses, shall (i) be subject to Paragraph 21 of this Interim Order, be deemed non-refundable and irrevocable, and (ii) not be subject to the Budget. None of Lender's or the Prepetition Secured Parties' attorneys' fees or disbursements shall be subject to the approval (whether prior to payment or after) of this Court or the guidelines of the Office of the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. Any such fees, costs and expenses shall be paid by the Debtors within fourteen (14) days after delivery of a summary invoice to the Debtors and without the need for application to or order of the Court. Such summary invoice may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law. A copy of such summary invoice shall be provided by Lender or the Prepetition Secured Parties, as applicable to the U.S. Trustee contemporaneously with the Debtors' receipt of such summary invoice. Notwithstanding the foregoing, if (x) the Debtors or the U.S. Trustee object to the reasonableness of a summary invoice submitted by the Lender or the Prepetition Secured Parties and (y) the parties cannot resolve such objection, in each case within the fourteen (14) day period following receipt of such summary invoice, the Debtors or the U.S. Trustee, as the case may be, shall file with the Court and serve on the Lender or Prepetition Secured Party submitting the fee request a fee objection (a "Fee Objection"), which Fee Objection shall be limited to the issue of the reasonableness of such fees and expenses. The Debtors shall promptly pay

-23-

and/or the Lender is hereby authorized to make an advance under the DIP Agreement to timely pay, any submitted invoice after the expiration of the fourteen (14) day period if no Fee Objection is filed with the Court and served on the Lender or the Prepetition Secured Parties (as applicable) in such fourteen (14) day period. If a Fee Objection is timely filed and served, the Debtors shall promptly pay and/or the Lender are hereby authorized to make an advance under the DIP Agreement to timely pay, the undisputed amount of the summary invoices, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the Fee Objection.

9.      Carve-Out; Professional Fee Escrow.

(a)      "Carve-Out" means (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) (without regard to the notice set forth in (c) below) (the "U.S. Trustee Fees"); (b) to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court, solely to the extent provided for in the Budget, all unpaid fees (including, without limitation, transaction fees paid upon the closing of the respective transaction but excluding success fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to §§ 327, 328, or 363 of the Bankruptcy Code (the "Professionals") and any Committee professionals (the "Committee Professionals" and, together with the Professionals, the "Professional Persons") employed by the Committee (if the Committee professional is appointed in these Chapter 11 Cases pursuant to §§ 328 or 1103 of the Bankruptcy Code) at any time on or prior to delivery by or on behalf of the Lender of a Carve-Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (c) the Professional Fees in an aggregate amount not to exceed $125,000 for amounts incurred after the

-24-

date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth in this clause (d) being the "Post-Carve-Out Trigger Notice Cap"). "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) to the Debtors and their counsel, the U.S. Trustee, and counsel to the Committee, if any, and the Prepetition Secured Parties, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Documents, stating (x) that the Post-Carve-Out Trigger Notice Cap has been invoked, (y) the DIP Loans have been accelerated, and (z) the Lender does not intend to fund further advances under the DIP Loans or consent to further use of Cash Collateral. Except as otherwise provided herein, no portion of the Carve-Out or proceeds of the DIP Credit Facility may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the Challenge of, (a) the liens and/or claims of the Lender or the Prepetition Secured Parties, or the initiation or prosecution of any claim or action against the Lender or the Prepetition Secured Parties, including, without limitation, any Avoidance Actions, and any other federal, state or foreign law, in respect of the DIP Documents or (b) any claims or causes of actions against the Lender or the Prepetition Secured Parties, their advisors, professionals, agents and sub-agents, including formal discovery proceedings in anticipation thereof.

(b)     The Debtors shall wire transfer funds, on a weekly basis, to an escrow agent as the Debtors and the Lender may agree in writing, in an amount equal to, but not to exceed, the amounts set forth in the professional fee line items under the "Restructuring Disbursements" subheading in the Budget for each such week (the "Professional Fee Escrow"). The Debtors shall use funds held in the Professional Fee Escrow exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local

US_ACTIVE\132026028

Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided*, however, that the Debtors' obligations to pay such allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fee Escrow. Upon delivery of a Carve-Out Trigger Notice, the Debtors may also fund the Professional Fee Escrow with the amount of the Post-Carve-Out Trigger Notice Cap. Except as provided in this Interim Order, no funds of the Debtors shall be transferred or otherwise deposited into the Professional Fee Escrow. The Professional Fee Escrow shall not be subject to the control of the Lender, and the funds transferred to the Professional Fee Escrow shall not be subject to the DIP Liens, the Adequate Protection Liens or any other liens, nor constitute DIP Collateral, Prepetition Collateral or collateral for any other obligation; *provided*, *however*, that the DIP Liens shall automatically attach to any residual interest in the Professional Fee Escrow (which liens shall be deemed automatically perfected liens as of entry of this Interim Order), and upon satisfaction of all amounts payable from the Professional Fee Escrow, any excess proceeds shall revert to the Lender until the DIP Obligations have been satisfied in full and thereafter to the Debtors' (including as reorganized pursuant to a chapter 11 plan).

10. For the avoidance of doubt, notwithstanding any (i) occurrence of any Event of Default, (ii) delivery of a Carve-Out Trigger Notice, or (iii) termination of the DIP Documents, the Debtors shall be permitted to fund and make payments from the Professional Fee Escrow in accordance with the Budget and this Interim Order; *provided, that*, for the further avoidance of doubt, nothing in this subparagraph is intended or shall be deemed to obligate the Lender to make any further DIP Loans or advance any further funds under the DIP Facility upon the occurrence of any of the events identified at (i), (ii), and (iii) in this subparagraph.

US_ACTIVE\132026028

11.    <u>Payment of Compensation</u>.  Nothing herein shall (i) limit or cap the amount of any professional fees of the Debtors or any Committee that may ultimately be allowed or paid from sources other than the DIP Collateral or Prepetition Collateral, or (ii) be construed as consent to the allowance of any professional fees or expenses of the Debtors or any Committee or affect the right of any party in interest to object to the allowance and payment of such fees and expenses.

12.    <u>Adequate Protection for Prepetition Secured Parties</u>. As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code, the Prepetition Secured Parties are hereby granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection:

(a)    <u>Adequate Protection Liens</u>. The Prepetition Secured Parties are hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "<u>Adequate Protection Liens</u>") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens, (ii) prior payment of the Carve-Out and (iii) any liens senior by operation of law or otherwise permitted under the Prepetition Loan Documents (solely to the extent that any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, or valid, non-avoidable senior priority liens in existence

US_ACTIVE\132026028

as of the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code).

(b)    Superpriority Claims.  Administrative superpriority expense claims in the Chapter 11 Cases (the "Adequate Protection Superpriority Claims"), junior and subordinate only to the DIP Obligations and the Carve-Out, pursuant to section 507(b) having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed Adequate Protection Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof including, without limitation, and after entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the DIP Obligations and the Carve-Out.

(c)    506(c) and 552(b) Waivers. Upon the entry of the Final Order, the Prepetition Secured Parties' consent to use of Cash Collateral and Prepetition Collateral under this Interim Order and the Final Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any § 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Chapter 11 Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code.

-28-

(d)     Prepetition Secured Parties Fees and Expenses.  The Debtors shall pay all outstanding prepetition and all postpetition reasonable and documented fees and expenses incurred by Prepetition Secured Parties, including, without limitation, the reasonable and documented fees and expenses of counsel to the Prepetition Secured Parties in accordance with the procedures identified in Paragraph 8.

13.     Credit Bid Rights.  In connection with any sale or disposition of all or any portion of the DIP Collateral, including in each case pursuant to §§ 9-610 or 9-620 of the Uniform Commercial Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including § 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under § 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the Lender, by a chapter 7 trustee under § 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, § 363(k) of the Bankruptcy Code, the Lender shall have the power and right to "credit bid" the full amount of all DIP Obligations (inclusive of the DIP Roll-Up Loan) in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral and (b) subject to the terms of Paragraph 21 herein, the Prepetition Loan Lender shall have the right to credit bid the Prepetition Loan Obligations, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Prepetition Loan Collateral.  The Debtors, on behalf of themselves and the estates, further hereby agree not to challenge the rights granted to the Lender and the Prepetition Loan Lender in this paragraph.

14.     Maturity Date.  The maturity date (the "Maturity Date") of the DIP Agreement is the earlier of (a) the date which is ninety (90) days following the Petition Date, (b) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases; (c) the date of filing or

-29-

US_ACTIVE\132026028

support by the Debtors of a plan of reorganization other than the plan contemplated by the Restructuring Agreement; (d) entry of an order by the Bankruptcy Court converting the Chapter 11 Cases to a proceeding or proceedings under chapter 7 of the Bankruptcy Code or appointing a chapter 11 trustee; (e) entry of a final order by the Bankruptcy Court dismissing the Chapter 11 Cases; or (f) the date of termination of the DIP Loan Facility and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of the DIP Agreement.

15.     <u>Events of Default</u>.  The occurrence of an "Event of Default" by the Debtors pursuant to Section 10 of the DIP Agreement shall constitute an event of default under this Interim Order, unless expressly waived by the Lender in its sole discretion in writing in accordance with the DIP Documents (each, an "<u>Event of Default</u>").

16.     <u>Rights and Remedies Upon Event of Default</u>. Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the rights to which it is entitled under the DIP Agreement, subject to Paragraph 6 of this Interim Order.

17.     <u>Proofs of Claim</u>.  Neither the Lender nor the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  The Stipulations set forth in Paragraph D of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties upon approval of this Interim Order.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the Prepetition Secured Parties are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement as it sees fit) a proof of claim and/or proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

-30-

18.    Other Rights and Obligations.

(a)    Good Faith Under Section 364(e) of the Bankruptcy Code.  The Lender has acted in good faith in connection with negotiating the DIP Documents, and the loans to be made pursuant thereto, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with § 364(e) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), in the event any or all of the provisions of this Interim Order are hereafter reversed or modified by a subsequent order of this or any other Court, the Lender is entitled to all of the benefits and protections provided in § 364(e) of the Bankruptcy Code.

(b)    Binding Effect.  The DIP Liens, DIP Superpriority Claim, and the Adequate Protection Liens and other rights and remedies granted under this Interim Order to the Lender and the Prepetition Secured Parties, as applicable, shall continue in these Chapter 11 Cases and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and upon the dismissal of any or all of the Debtors' Chapter 11 Cases, or in any Successor Case(s), and such liens and security interests shall maintain their first priority as provided in this Interim Order until all the DIP Obligations or the Prepetition Obligations, as applicable, have been indefeasibly paid in full in accordance with the DIP Documents, the Prepetition Documents or this Interim Order, as applicable.

(c)    Lender Expenses.  If any Debtor fails to pay any amounts or furnish any required proof of payment due to third persons or entities to safeguard or preserve the DIP Collateral, including to obtain any insurance policies Lender reasonably determines to be appropriate, or otherwise as required under the terms of the DIP Agreement, then the Lender may do any or all of the following after reasonable notice to the Debtors:  (i) make payment of the same

-31-

or any part thereof; (ii) set up such reserves as the Lender deems necessary to protect the Lender from the exposure created by such failure; or (iii) obtain and maintain insurance policies, including of the type discussed in Section 9(c) of the DIP Agreement, and take any action with respect to such policies as the Lender deems prudent. Any reasonable and documented costs and expenses incurred by the Lender in connection with actions permitted by the DIP Documents to protect or preserve the DIP Collateral or to enforce rights thereunder shall constitute DIP Obligations under the DIP Agreement, shall be secured by the DIP Liens on the DIP Collateral, and shall be payable on demand; any such amounts not paid when due shall accrue interest at the Default Rate as provided in Section 3(b) of the DIP Agreement. Any payments made by the Lender shall not constitute an agreement by the Lender to make similar payments in the future or a waiver by the Lender of any Event of Default under the DIP Agreement.

(d)     The Lender's Liability for DIP Collateral. So long as the Lender complies with reasonable commercial lending practices, the Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the DIP Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever. All risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

(e)     Remedies Cumulative. The Lender's rights and remedies under the DIP Agreement, the DIP Documents, and all other agreements shall be cumulative. The Lender shall have all other rights and remedies not inconsistent herewith as provided under the New York Uniform Commercial Code, by law, or in equity, subject to the requirements of the Bankruptcy Code. No exercise by the Lender of one right or remedy shall be deemed an election, and no

-32-

waiver by the Lender of any Event of Default shall be deemed a continuing waiver. No delay by the Lender shall constitute a waiver, election, or acquiescence by it. No waiver by the Lender shall be effective unless made in a written document signed on behalf of the Lender and then shall be effective only in the instance and for the purpose for which it was given.

(f) <u>Demand; Protest</u>. The Debtors waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by the Lender on which the Debtors may in any way be liable.

(g) <u>Borrower Liability</u>. Any of the Debtors may, acting singly, request a Loan under the DIP Agreement. Each of the Debtors hereby appoint each other as agent for the other for all purposes under the DIP Agreement, including with respect to requesting Loans. Each of the Debtors shall be jointly and severally obligated to repay all Loans made under the DIP Agreement, regardless of which of the Debtors actually receives said Loans, as if each of the Debtors directly received all Loans. Each of the Debtors waive any right to require the Lender to: (i) proceed against the Debtors or any other person; (ii) proceed against or exhaust any security; (iii) seek to impose the equitable doctrine of marshalling (subject to entry of the Final Order); or (iv) pursue any other remedy. Subject to the terms of this Interim Order, the Final Order, and the DIP Agreement, the Lender may exercise or not exercise any right or remedy it has against any Debtor or any security they hold (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability. Notwithstanding any other provision of the DIP Agreement or other related document, each Debtor irrevocably waives all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of

-33-

US_ACTIVE\132026028

the Lender under the DIP Agreement) to seek contribution, indemnification or any other form of reimbursement from any other Debtor, or any other Person now or hereafter primarily or secondarily liable for any of the DIP Obligations, for any payment made by the Debtors with respect to the DIP Obligations in connection with the DIP Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the DIP Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise.

(h)     *Amendments in Writing, Integration*.  Except as expressly set forth in the DIP Agreement, all amendments to or terminations of the DIP Agreement or the DIP Documents must be in writing signed by each of the parties thereto.  All prior agreements, understandings, representations, warranties, and negotiations between any of the parties thereto with respect to the subject matter of the DIP Agreement and the DIP Documents, if any, are merged into the DIP Agreement and the DIP Documents.

19.     *Releases*.  The release, discharge, waivers, settlements, compromises, and agreements set forth in this Paragraph 19 and the Stipulations set forth in Paragraph D of this Interim Order shall be deemed effective upon entry of this Interim Order, subject only to the rights set forth in Paragraph 21 below.

(a)     The Debtors forever and irrevocably release, discharge, and acquit (i) the Lender, solely in its capacity as Lender, under the DIP Documents; (ii) the Lender's affiliates and predecessors in interest; and (iii) the Lender's former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities,

-34-

responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' actual fraud, gross negligence, bad faith, self-dealing or willful misconduct.  For the avoidance of doubt, nothing contained herein shall relieve the Lender from fulfilling any of its commitments under this Interim Order or the DIP Documents.

(b)        Subject to (i) entry of the Final Order and (ii) the Challenge rights set forth in Paragraph 21 of this Interim Order and without prejudice to the rights of interested parties under Paragraph 21 of this Interim Order, the Debtors forever and irrevocably release, discharge, and acquit the Prepetition Secured Parties, solely in their capacity as prepetition lenders, respectively, under the Prepetition Loan Documents, and their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "Prepetition Secured Party Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' actual fraud, gross negligence, bad faith, self-dealing or willful misconduct.  For the avoidance of doubt,

-35-

the foregoing release applies only to conduct, acts and omissions that occurred on or prior to the entry of the Final Order, and the release does not apply to future conduct, acts or omissions or ongoing obligations of the Prepetition Secured Parties to the Debtors under the Prepetition Loan Documents.

20.     Indemnity.  The Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Loans, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Credit Facility, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Lender shall be and hereby is indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, *provided* that no such party will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such party's actual fraud, gross negligence, bad faith, or willful misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this Paragraph 20 or in the DIP Documents, to the Debtors' obligation to indemnify and/or hold harmless each Lender.

21.     Reservation of Certain Third-Party Rights and Bar of Challenges and Claims. The releases set forth in Paragraph 19 above and the Stipulations set forth in Paragraph D of this Interim Order shall be binding upon the Debtors and any of their respective successors and assigns in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date.  In addition, such releases and Stipulations shall be binding upon the Debtors' estates and all other parties in interest, including any Committee and

-36-

any other person acting on behalf of the Debtors' estates (including any chapter 7 trustee or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to § 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), unless and to the extent that a party interest with proper standing granted by order of this Court (to the extent required) has filed an adversary proceeding or initiated a contested matter under the Bankruptcy Rules (i) by no later than the earlier of seventy-five (75) calendar days after entry of this Interim Order or confirmation of a chapter 11 plan, subject to further extension by (a) written agreement of the Debtors and the Prepetition Secured Parties; or (b) an order of this Court obtained on notice and after a hearing (in each case, a "Challenge Period" and the date of expiration of each Challenge Period, a "Challenge Period Termination Date"); (ii) seeking to avoid, object to, or otherwise challenge the findings in this Interim Order and the Debtors' Stipulations (any such claim, a "Challenge"); and (iii) in which this Court enters a final order in favor of the plaintiff or the movant sustaining any such Challenge in any such filed adversary proceeding or initiated contested matter.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled), (i) any and all such Challenges by any party (including any Committee, any chapter 11 trustee and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; and (ii) the Stipulations set forth in Paragraph D of this Interim Order shall be binding on all parties in interest, including any Committee.  For the avoidance of doubt, if any party in interest timely commences a Challenge, the releases and Stipulations set forth in Paragraph 19 and Paragraph D of this Interim Order shall

-37-

remain binding in all respects on all other parties in interest other than the challenging party, and such releases and Stipulations shall continue in full force and effect as to all such non-challenging parties. The releases and Stipulations set forth in Paragraph 19 and Paragraph D of this Interim Order shall also remain binding on the challenging party except solely to the extent of the specific claims and defenses expressly asserted in the timely and properly filed Challenge, and only if and to the extent such Challenge is subsequently sustained by a Final Order. Nothing in this Interim Order vests or confers on any person or entity, including, without limitation, any Committee, standing or authority to pursue any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any Challenges.

22. <u>Restrictions on Use of Funds</u>. Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, without the express written consent of the Lender, no proceeds of the DIP Credit Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, any Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Case(s), or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to § 364 of the Bankruptcy Code or otherwise, other than from the Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be first used, to indefeasibly pay in full in cash all DIP Obligations; (b) investigate (except as set forth in this paragraph below), assert, join, commence, support or prosecute any Challenge or other action or claim, counter-claim, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the Lender or any other DIP Lender Releasee or the

-38-

Prepetition Secured Parties or any other Prepetition Secured Party Releasees with respect to any transaction, occurrence, omission, or action including, without limitation, (i) any Avoidance Actions, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Lender Releasees or the Prepetition Secured Party Releasees, on the one hand, and any of the Debtors, on the other, (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens, or the Adequate Protection Liens, or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) Lender in respect of the enforcement of the DIP Liens; (c) subject to authority provided to the Debtors pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtors have received a written objection to such payment from the Lender; and/or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Documents, without the express written consent of the Lender.  Notwithstanding the foregoing, up to $25,000 (the "Challenge Budget") in the aggregate of the DIP Credit Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by any Committee during the Challenge Period to investigate Challenges against the Prepetition Secured Party Releasees and the legality, validity, priority, perfection, enforceability and extent of the Prepetition Liens.

23.    Limitation on Surcharge. Without limiting the terms of the Carve-Out (and subject to the entry of the Final Order solely with respect to the Prepetition Secured Parties), no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any

-39-

Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the Lender, the Prepetition Secured Parties, the Carve-Out (other than the Professional Persons that are the beneficiaries of the Carve-Out as provided for in the Budget), the DIP Collateral or the Prepetition Collateral, pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Lender and the Prepetition Secured Parties (and the Professional Persons that are the beneficiaries of the Carve-Out as provided for in the Budget in the case of an asserted surcharge against the Carve-Out); *provided* that nothing herein shall alter the Challenge Budget. No action, inaction or acquiescence by the Lender or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against either Lender, the DIP Collateral, the Prepetition Secured Parties or the Prepetition Collateral.

24.     No Marshaling.  Subject to entry of the Final Order, the Prepetition Secured Parties and the Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, and subject to entry of the Final Order, no party (other than the Prepetition Secured Parties and the Lender) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

25.     Survival of Interim Order and Other Matters.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any Plan in the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or a Successor Case, (c) to the extent authorized by

-40-

applicable law, dismissing the Chapter 11 Cases, (d) withdrawing the reference of the Chapter 11 Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court and this Interim Order.  The terms and provisions of this Interim Order shall be binding upon the Debtors, the Lender, the Prepetition Secured Parties and each of their respective successors and assigns, and shall inure to the benefit of the Debtors and the Lender, the Prepetition Secured Parties and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed or elected in a case for any Debtor under any chapter of the Bankruptcy Code, including any Successor Case.  Subject to Paragraph 21, the terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest, including, but not limited to a trustee appointed or elected under chapter 7 or chapter 11 of the Bankruptcy Code.

(a)     Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(b)     Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of to the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.  The rights of all parties in interest to object to the terms of the Final Order, including the DIP Documents at the Final Hearing are expressly reserved.

-41-

US_ACTIVE\132026028

26.     <u>Governmental Consents</u>.   Except as otherwise provided herein, the execution, delivery and performance by the Debtors of the DIP Documents and the consummation of the transactions contemplated by the DIP Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any governmental authority.

27.     <u>Final Hearing; Objection Deadlines</u>.

(a)     The Final Hearing to consider entry of the proposed Final Order and final approval of the DIP Credit Facility is scheduled for [_____], [__]:00 [_].m. prevailing Eastern Time at the United States Bankruptcy Court for the District of Delaware.  Any objections or responses to entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on  [_____] and served on the following parties: (i) counsel to the Debtors, Dentons, 601 S. Figueroa Street, Suite 2500, Los Angeles, California  90017-5704, Attn: Tania M. Moyron (tania.moyron@dentons.com) and Pachulski, Stang, Ziehl & Jones, 919 North Market Street, 17th Floor Wilmington, DE 19801, Attn: Laura Davis Jones (ljones@pszjlaw.com), (ii) counsel to any statutorily appointed committee, (iii) counsel to the Lender and the Prepetition Secured Parties, Lowenstein Sandler, LLP, 1251 Avenue of the Americas, New York, NY 10020 Attn: Daniel Besikof, Esq. (dbesikof@lowenstein.com) and Morris, Nichols, Arsht & Tunnell LLP, 1201 Market Street, 16th Floor, Wilmington, Delaware 19801, Attn:  Curtis S. Miller (cmiller@morrisnichols.com), and (iv) the Office of the U.S. Trustee for the District of Delaware, 844 N. King Street, Room 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: [_____] [(_____)].  If no objections to the entry of the proposed Final Order are filed and served in accordance with this Interim Order, no Final Hearing may be held, and the proposed Final Order may be presented by the Debtors under certification of counsel and entered by this Court.

-42-

-43-

(b)     Within two (2) business days following entry of this Interim Order, the Debtors shall serve notice of the entry of this Interim Order and of the Final Hearing, together with copies of this Interim Order and the Motion, on: (i) the parties having been given notice of the Interim Hearing; and (ii) any party which has filed prior to such date a request for notices with this Court.

(c)     Retention of Jurisdiction.  This Court has and will retain jurisdiction to enforce this Interim Order.

Dated:   This _____ day of _____, 2026
         Wilmington, Delaware

US_ACTIVE\132026028

**Exhibit G**

**Restructuring Support Agreement Milestones**

The obligations of the Plan Sponsor under this Agreement, including the obligation of Plan Sponsor to advance the DIP Facility and Exit Loan Amount, shall be subject to the Debtors satisfying, or causing the satisfaction of, the milestones listed below (collectively, the "*Milestones*") by the specified deadline (after taking into account any applicable cure period, the "*Specified Deadlines*"). The non-satisfaction of any Milestone by the applicable Specified Deadline (and the non-waiver of such non-satisfaction by the Plan Sponsor, Consenting Subordinated Noteholders, and the Companies in their sole and absolute discretion) shall be an Event of Default under the Financing Orders.

| | **Chapter 11 Cases Milestone** | **Specified Deadline** |
|---|---|---|
| 1. | Commencement of the Chapter 11 Cases. | No later than April 26, 2026 (the "**Petition Date**") |
| 2. | The Debtor shall file: <br>• An application to retain a claims agent<br>• The Financing Motion<br>• A cash management motion<br>• The NOL Motion<br>• Such other first day papers as may be approved or requested by the Debtors or Plan Sponsor<br>• Chapter 11 plan of reorganization<br>• Disclosure statement<br>• A tabulation with respect to votes solicited on the Plan before the Petition Date<br>• A motion seeking scheduling and approval for a combined hearing on the Plan and Disclosure Statement, setting an objection deadline with respect thereto and establishing related confirmation procedures<br>• A motion seeking the Bankruptcy Court's approval of assumption of this Agreement | The Petition Date |

| 3. | The Bankruptcy Court shall enter:<br>• the Prepack Scheduling Order<br>• the Interim Financing Order<br>• the interim order approving the NOL Motion<br>• Orders approving First-Day Motions | No later than 1 day following the Petition Date |
|---|---|---|
| 4. | The Debtors shall file retention applications and an interim compensation motion (if required) | No later than 10 days following the Petition Date. |
| 5. | The Bankruptcy Court shall enter:<br>• the Final Financing Order<br>• an order authorizing the Debtors to assume this Agreement<br>• the final order approving the NOL Motion | No later than 30 days following the Petition Date, |
| 7. | The Bankruptcy Court shall enter an order approving the Disclosure Statement and the Plan | No later than 45 days following the Petition Date. |
| 9. | The Plan Effective Date of the Plan shall occur | No later than 60 days following the Petition Date. |