**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>IMPAC MORTGAGE HOLDINGS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 26-10593<br><br>(Joint Administration Requested) |

**DECLARATION OF GEORGE A. MANGIARACINA IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, George A. Mangiaracina, hereby declare under penalty of perjury that the following is true to the best of my knowledge and information:

1. I am the Chief Executive Officer ("CEO") and President of Impac Mortgage Holdings, Inc. ("Impac"), and the affiliated debtors herein (together with Impac, the "Debtors"). I also serve as the Treasurer for Impac, Copperfield Capital Corporation, a Delaware Corporation ("CCC"), Impac Mortgage Corp., a California corporation ("IMC"), and Integrated Real Estate Service Corp., a Maryland corporation ("IRES"). I also serve as the Chairman of the Board of Impac and am a Board member of each of the other Debtors other than Copperfield Financial, LLC, a Delaware limited liability company ("CFLLC"). I have been the CEO of Impac since

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Impac Mortgage Holdings, Inc. (5505); Impac Funding Corporation (4495); Impac Mortgage Corp. (3937); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Service Corp. (2263); Impac Warehouse Lending, Inc. (0541); Impac Warehouse Lending Group, Inc. (3488); and Synergy Capital Mortgage Corp. (9071). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

2018, and, prior to my role as CEO, I served as Impac's Executive Vice President and Managing Director from 2015 to 2018.

2.     As CEO, I have led Impac's operations, capital raise activities, asset-liability management, and strategic initiatives.  Before joining Impac, I was a Managing Director of UBS from 1992 to 2008 and Deutsche Bank from 2009 to 2013, with revenue and risk responsibility for proprietary trading, lending, and structured finance across an array of asset classes.  I began my career within the financial services industry group at Arthur Andersen & Co in 1986.  Overall, I have over 30 years of experience in securities and mortgage banking industries.

3.     On the date hereof (the "Petition Date"), the Debtors each commenced a chapter 11 case (together, the "Chapter 11 Cases") by filing a petition for relief under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court"), to implement a reorganization based on a highly negotiated Restructuring Support Agreement (as defined below) with all of the Debtors' funded debtholders, including the Debtors' senior secured creditors and the beneficial holders of all of the Debtors' subordinated notes.  I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these Chapter 11 Cases.

4.     I am over 18 and authorized to submit this declaration on behalf of the Debtors.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.  Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my ordinary course of business discussions with other members of the Debtors' senior management within their areas of responsibility, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial

US_ACTIVE\131960976

condition.  In making this Declaration, I also have relied on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.

5.      I submit this Declaration for the purpose of generally apprising the Court, the Debtors' creditors, and other parties in interest of the circumstances that led to the filing of these Chapter 11 Cases and as evidence and information in support of the Debtors' "first day" applications and motions (collectively, the "First Day Pleadings").

6.      The Declaration is organized as follows:

- Section I provides an overview of the Debtors' corporate history and business operations;

- Section II describes the Debtors' corporate and capital structure;

- Section III describes the events leading up to the filing of these Chapter 11 Cases;

- Section IV provides an overview of the Debtors' objectives, including the Restructuring Support Agreement and proposed debtor-in-possession financing;

- Section V provides an overview of Debtors' pre-packaged plan and case timeline; and

- Section VI provides an overview of the relief sought by the First Day Pleadings and factual bases for the relief requested therein.

## I.      Overview of the Debtors' Business Operations

7.      Impac was formed in 1995 as a real estate investment trust ("REIT") and became a publicly traded company that same year.  As a result of the subprime real estate crisis that began in 2007, Impac revoked its REIT status and began operating as a nationwide independent residential mortgage lender that originated, sold, and serviced residential mortgage loans. Specifically, the Debtors originated (i) non-qualified residential mortgages, (ii) conventional

US_ACTIVE\131960976

residential mortgage loans that were intended to be eligible for sale to U.S. government-sponsored enterprises ("GSEs"), including the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and (iii) government-insured residential mortgage loans eligible for securitization through the issuance of government securities by the Government National Mortgage Association ("Ginnie Mae").  In addition to these mortgage and real estate services, the Debtors operated as a master servicer on their historical mortgage-backed securitization portfolio and held residual interests in such long-term mortgage portfolios.

8.    As of the beginning of 2020, the three main channels of the Debtors' business were: (a) mortgage lending (including retail, wholesale, and correspondent); (b) long-term mortgage portfolio investments (including, specifically, residual interests in such portfolios); and (c) servicing and master servicing related to the Debtors' portfolios.  However, starting in early 2020, the onset of the COVID-19 pandemic resulted in dislocation of the financial markets and caused severe liquidity challenges across all of these channels.

9.    As a consequence of the foregoing events, the Debtors initially ceased loan originations temporarily in early 2020, while still fulfilling all of their obligations and commitments under all of their warehouse loan agreements.  The Debtors then slowly rebuilt the retail and wholesale lending channels in 2021 through early 2022.  However, as a result of quickly rising interest rates (the Federal Reserve Board increased short-term interest rates 11 times from February 2022 to October 2023, to their highest level in 22 years) and other circumstances described in Section III below, the Debtors ultimately decided to reposition themselves solely as a mortgage broker business and not a lender. Consistent with this strategy, during the latter half of 2022 and the first quarter of 2023, the Debtors undertook a number of significant business initiatives to reduce their operating expenses and funded debt related to mortgage originations and

US_ACTIVE\131960976

servicing, which included winding down the primary channels of the Debtors' business outside of the mortgage broker business line.

10. Currently, and as of the Petition Date, the Debtors continue to focus on their mortgage broker business. Most recently, the Debtors continued their historical entrepreneurship by entering into a secondment relationship with a technology firm to develop and enhance mortgage loan origination software that can be utilized by the Debtors to increase the efficiency of their own loan originations and/or be licensed to other loan origination companies (the "Business Plan").

11. As of the Petition Date, the Debtors employed a total of eighteen (18) employees, all of whom are full-time (the "Employees").  During the course of 2023 and 2024, the Debtors reduced their staff as part of their operational restructuring.  As of the Petition Date, approximately ten (10) Employees are employed by Debtor Impac and eight (8) Employees are employed by Debtor IMC. The Debtors are not a party to any collective bargaining agreements and have not sponsored any defined benefit pension or retiree medical benefit plans.

12. The Debtors' headquarters are in Irvine, California.

## II. The Debtors' Corporate and Capital Structure

### A. Corporate Structure

13. Debtor Impac owns 100% of the equity interests in the following Debtor subsidiaries: Impac Funding Corporation ("IFC"); CFLLC; IRES; IMH Assets Corp.; and Impac Warehouse Lending Group, Inc.

14. Debtor IFC owns 100% of the equity interests in the following Debtor subsidiaries: Impac Commercial Capital Corporation; and Impac Secured Assets Corp.

15. Debtor CFLLC owns a 100% equity interest in CCC.

US_ACTIVE\131960976

16.    Debtor IRES owns 100% of the equity interests in the following Debtor subsidiaries: IMC; Impac Warehouse Lending, Inc.; and Synergy Capital Mortgage Corp.

17.    Below is a visual diagram of the Debtors' organizational structure.



### B.    Capital Structure

18.    The Debtors have three tranches of secured debt that are described below, namely the Prepetition Bridge Note, the Prepetition Loan, and Life Insurance Loan Guaranty/Surety Bond Obligations.  In addition, the Debtors have unsecured Junior Subordinated Debt Obligations. With respect to Impac's equity, Impac has outstanding shares of Common Stock and Preferred D stock, as well as Warrants to purchase Common Stock (Common Stock, Preferred D and Warrants are defined below).

US_ACTIVE\131960976

i.  Prepetition Bridge Note

19.  Pursuant to that certain Secured Promissory Note, dated January 26, 2026 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Bridge Note"), executed by certain Debtors, as borrowers, and in favor of Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1, including any permitted assignees or successors ("Hildene"), as lender and successor-by-assignment to its subsidiary Trinity Park, LLC ("Trinity Park"), certain loans and other financial accommodations were extended to the Debtors. Pursuant to that certain Assignment and Assumption Agreement, dated as of April 20, 2026, Trinity Park assigned the Prepetition Bridge Note to Hildene as lender (in such capacity, the "Bridge Note Lender"). Hildene also serves as Plan Sponsor and the Prepetition Lender (as defined below). The Prepetition Bridge Note provided liquidity needed by the Debtors to finalize their negotiations of the RSA (defined below), prepare to file these Chapter 11 Cases, and operate their businesses during the run-up to the Petition Date.

20.  The Prepetition Bridge Note was issued upon demand by the Debtors, with the first draw occurring in late January 2026. As of the Petition Date, the outstanding principal balance under the Prepetition Bridge Note is $2,000,000, plus accrued and unpaid interest and fees (the "Prepetition Bridge Note Obligations").

21.  The Prepetition Bridge Note accrues interest at a rate of 12% per annum and all principal and interest are due on the earlier of (i) January 26, 2027, and (ii) the date upon which the Prepetition Bridge Note is satisfied in full in connection with the "roll up" of the obligations on a cashless basis into a senior secured debtor-in-possession financing facility pursuant to Section 364 of the Bankruptcy Code.

7

US_ACTIVE\131960976

22.     The Prepetition Bridge Note is secured by liens on substantially all assets of each Debtor party to the Prepetition Bridge Note including: (i) all Accounts; (ii) all Chattel Paper; (iii) all Commercial Tort Claims; (iv) all Deposit Accounts; (v) all Documents; (vi) all Equipment; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter-of-Credit Rights; (xii) all other Goods; (xiii) all Intellectual Property Collateral; and (xiv) all money, income, royalties, payments, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing (collectively the "Bridge Loan Collateral").[2]  With the consent of the Prepetition Lender, the Prepetition Bridge Note Obligations are secured by senior liens ranking *pari passu* with the senior liens securing the Prepetition Loan Obligations.

### ii.   Prepetition Loan Obligations

23.     In 2024, in connection with the Debtors' efforts to secure medium term financing to enhance opportunities for growth of their residential mortgage brokerage business, Impac successfully obtained access to a $20,000,000 facility (the "Prepetition Loan") made available by Hildene (in such capacity, the  "Prepetition Lender") pursuant to that certain Loan Agreement, dated as of May 6, 2024 (the "Prepetition Loan Agreement") among Impac as borrower and, excluding any borrower controlled entity that is a special purpose entity formed in connection with a mortgage loan securitization, all of Impac's direct and indirect subsidiaries as guarantors (the "Prepetition Loan Guarantors").[3]  The Prepetition Loan is a revolving line of credit that bears interest monthly at SOFR plus 7.5% and is compounded quarterly, unless Impac affirmatively

---

[2] The capitalized terms used in this sentence have the meanings ascribed to such terms in the Prepetition Bridge Note.

[3] Each of the Prepetition Loan Guarantors is a Debtor in these Chapter 11 Cases.  Two Debtors, IMH Assets Corp. and Impac Secured Assets Corp., are not Prepetition Loan Guarantors.

US_ACTIVE\131960976

elects to timely pay interest in cash. Subject only to *pari passu* status with the liens securing the Prepetition Bridge Note, the Prepetition Loan is secured by Impac's and the Prepetition Loan Guarantors' pledges of substantially all of their assets including: (i) all Accounts; (ii) all Chattel Paper; (iii) all Commercial Tort Claims; (iv) all Deposit Accounts; (v) all Documents; (vi) all Equipment; (vii) all General Intangibles; (viii) all Instruments; (ix) all Inventory; (x) all Investment Property; (xi) all Letter-of-Credit Rights; (xii) all other Goods; (xiii) all Intellectual Property Collateral; and (xiv) all money, income, royalties, payments, all products and Proceeds of any and all of the foregoing, and all Supporting Obligations of any and all of the foregoing (collectively with the Bridge Loan Collateral, the "Prepetition Collateral").[4] A Security Agreement, dated May 6, 2024, is supported by subsidiary share pledges from Impac and the Prepetition Loan Guarantors, a Trademark Security Agreement and UCC-1 filings in all relevant jurisdictions.

24.     The Debtors used a portion of the proceeds from the Prepetition Loan to repay outstanding Convertible Promissory Notes held by certain trusts affiliated with Richard Pickup and Todd Pickup—specifically, RHP Trust, a California trust dated May 31, 2011 ("RHP Trust"), and Vintage Trust II, a California trust dated July 19, 2007 ("Vintage Trust II" and, together with RHP Trust, the "Convertible Note Trusts"). Specifically, the Debtors used approximately $2.875 million of the proceeds thereof to partially repay the indebtedness owed to RHP Trust and approximately $2.125 million to partially repay the indebtedness owed to Vintage Trust II, in each case on account of the then-outstanding Convertible Promissory Notes. Thereafter, on December 30, 2024, the Debtors, with the consent of the Prepetition Lender, satisfied in full the outstanding Convertible Promissory Notes held by the Convertible Note Trusts.

---

[4] The capitalized terms used in this sentence have the meanings ascribed to such terms in the Prepetition Loan Agreement.

US_ACTIVE\131960976

25.     As of March 31, 2026, the outstanding balance under the Prepetition Loan was approximately $23,950,000.  From time to time, Impac has also requested and obtained from the Prepetition Lender certain waivers of identified covenant defaults.

iii.   Life Insurance Loan Guaranty/Surety Bond Obligations

26.     The third tranche of secured debt relates to obligations owed to Enterprise Bank & Trust ("Enterprise").

27.     Impac is the obligor solely as trustee on three amended and restated promissory notes in favor of Enterprise, each dated as of April 30, 2023 and maturing on April 30, 2026 (the "Enterprise Loans").    The outstanding amount on the Enterprise Loans is approximately $16,400,000.  To finance the acquisition and premium obligations of three life insurance policies issued by Allianz Life Insurance Company of North America (the "Life Insurance Policies"), the underlying trusts which hold the Life Insurance Policies obtained the Enterprise Loans.  Accrued interest on the Enterprise Loans is also rolled into the principal balance on a quarterly basis.  In addition, Impac executed a Continuing Limited Guaranty Agreement dated January 31, 2012 in favor of Enterprise guaranteeing the underlying trusts' obligations under the Enterprise Loans. The Enterprise Loans are secured by, among other things: (a) a collateral assignment of the Life Insurance Policies and (b) cash collateral contained in restricted cash accounts (the "EB&T Pledged Accounts").   The EB&T Pledged Accounts also secure obligations arising from an irrevocable standby letter of credit supporting surety bonds issued by Liberty Mutual Insurance Company.

28.     The three insured parties under the Life Insurance Policies are former executives of Impac, and the original beneficiaries of such policies were family members of the former executives or family trusts established by the former executives. Impac serves as both trustee and

US_ACTIVE\131960976

sole beneficiary of each of the three trusts that own the Life Insurance Policies. The Life Insurance Policies have accrued substantial cash surrender value estimated at approximately $15,000,000. Under the terms of the Enterprise Loans, Enterprise may periodically require the Debtors to increase the amount of security on deposit in the EB&T Pledged Accounts based on the difference between the outstanding loan balance and the cash surrender value of the Life Insurance Policies.

29.     The current cash amount in the EB&T Pledged Accounts is approximately $2,740,000, plus additional accrued interest. Including such cash collateral and the cash surrender value of the Life Insurance Policies, Enterprise is oversecured by approximately $1,400,000.

iv.   Junior Subordinated Notes

30.     In 2005, the Debtors issued four series of trust preferred securities.  In response to the 2007 housing market crash and resulting 2008 global financial crisis, in 2008 and 2009, the Debtors retired or exchanged all four series of trust preferred securities for cash and/or new securities.  Further, in a continuing effort to preserve capital, the Debtors exchanged $51.3 million of trust preferred securities for $62 million in interest only Junior Subordinated Indentures with Bank of New York, as indenture trustee, dated May 8, 2009 (the "Junior Subordinated Notes"), due March 30, 2034, with lower interest rates.  During 2017, the Debtors exchanged $8.4 million of the remaining outstanding trust preferred securities for 412,264 shares of Impac's Common Stock with a then existing fair market value of approximately $5.6 million.

31.     In January 2024, the Debtors defaulted under the Junior Subordinated Notes by failing to make the required interest payment.  The Debtors requested, negotiated and subsequently entered into a Forbearance Agreement, dated January 31, 2024 (the "Junior Subordinated Notes Forbearance Agreement"), with HCMC III, LLC, a Delaware limited liability company, in its capacity as collateral manager for the holders of the notes issued under the Junior Subordinated

11

Indentures (the "Junior Subordinated Notes Collateral Manager"). The beneficial holders of the Junior Subordinated Notes are Taberna Preferred Funding I, Ltd. and Taberna Preferred Funding II, Ltd., each of which is under common control with the Plan Sponsor and is a signatory to the RSA.

32.    The Junior Subordinated Notes Forbearance Agreement stayed the Junior Subordinated Notes Collateral Manager's rights to enforce the default provisions under the Junior Subordinated Note agreements. The Junior Subordinated Notes Forbearance Agreement had an initial termination date of February 29, 2024. However, such Junior Subordinated Notes Forbearance Agreement has been amended multiple times and as of the Petition Date, the current termination date is June 1, 2026. As of December 31, 2025, the Junior Subordinated Notes had a stated outstanding principal balance of $62 million, plus accrued interest, and a maturity date of March 30, 2034. As of the Petition Date, the Junior Subordinated Notes remain outstanding in the total amount of approximately $76,354,000, and accrue interest at an annual rate of SOFR + 375bps ("Floating Rate"), plus additional default interest equal to the Floating Rate.

v.    Unsecured Debt

33.    33.    Other than the Subordinated Notes, the Debtors have approximately $1.0 million in total unsecured debt, most of which is comprised of disputed, unliquidated, or contingent claims. These claims are made by vendors of goods and services, cost report payables, and certain disputed, unliquidated, or contingent claims, which may include repurchase and/or indemnification obligations.

34.    As to the repurchase obligations, the Debtors previously funded and sold mortgage loans in the secondary market in connection with their historical mortgage lending business. In connection with such activities, the Debtors made customary representations and warranties

12

regarding each loan, including compliance with underwriting standards, lien validity, property eligibility, borrower qualifications, and applicable law. Breaches of these representations and warranties may require the Debtors to repurchase the affected loans or indemnify investors or insurers for resulting losses. Repurchase obligations may also arise from borrower fraud or early payment defaults. Any resulting losses may be mitigated by proceeds from liquidation of the loan or, in the case of correspondent loans, by recourse against the originating correspondent lender that breached similar representations and warranties made to the Debtors in selling such loans.

35.     As to the indemnification obligations, in the case of early loan payoffs and early defaults on certain loans, both for sold and brokered loans, Impac may be required to repay all or a portion of the premium initially paid by the investor/lender.  Under generally accepted accounting principles ("GAAP"), the estimated obligation associated with early loan payoffs and early defaults is calculated based on historical loss experience by type of loan, notwithstanding that the Debtors have ceased to operate their historical mortgage lending business that gave rise to such contingent obligations.  As of December 31, 2025, the estimated repurchase and/or indemnification liability allowance reflected on the Debtors' books and records based on GAAP was $3,056,878.  Notwithstanding this estimated liability, none of the Debtors' ten (10) largest historical mortgage loan purchase and sale agreement counterparties had any outstanding repurchase demands.  As a consequence, the Debtors believe that their actual exposure for repurchase liability is nominal, if any.

vi.  Equity

36.     Impac's outstanding equity consists of common stock (the "Common Stock"), 8.25% Series D Cumulative Redeemable Preferred Stock (the "Preferred D"), and Warrants to

US_ACTIVE\131960976

purchase Common Stock (the "Warrants") and outstanding equity awards, including stock options, under Impac's equity incentive plans.

37.     The Common Stock currently trades over-the-counter on the OTC Marketplace (the "OTC") under the symbol IMPM.  Previously, the Common Stock was listed on the NYSE-American stock exchange and Impac was a registered, SEC-reporting company.  However, Impac was delisted from the NYSE-American and subsequently de-registered from the SEC reporting requirements in mid-2023.  The Preferred D and Warrants were issued in conjunction with an Offer to Exchange and Consent Solicitation (the "Exchange Offer") to convert previously issued 9.375% Series B Cumulative Redeemable Preferred Stock (the "Preferred B") and 9.125% Series C Cumulative Redeemable Preferred Stock (the "Preferred C"), into newly issued Common Stock and cash (or Preferred D if payment of cash was not permissible) and Warrants.  The Exchange Offer closed in October 2022.

### C.     Recent Financial Results

38.     The Debtors possess certain Tax Attributes (as defined below), including estimated federal net operating loss carryforwards ("NOLs") of at least $850 million and California NOLs of at least $600 million, as of December 31, 2025, based on the Debtors' audited financial statements, which estimates remain substantially similar as of the Petition Date.

### III.     Events Leading to Filing of Chapter 11 Cases

39.     The Debtors had unique historical challenges that were exacerbated by the COVID-19 pandemic and related market turmoil in 2020, followed by inflationary pressures and rising interest rates in 2021 and 2022—these headwinds led to the ultimate wind-down of some of their business channels and revenue shortages that led to the financial distress that precipitated these Chapter 11 Cases.

US_ACTIVE\131960976

A.      **Historical Challenges.**

1.      *Protracted Litigation & Capital Raise Related Difficulties.*

40.      By way of background and more specifically, prior to my tenure, Impac conducted an initial exchange offer in an attempt to amend the terms of its Preferred B and Preferred C Articles of Incorporation (the "2009 Exchange Offer").  In late 2011, certain preferred shareholders commenced litigation challenging the 2009 Exchange Offer, which was finally adjudicated in early 2023 in favor of the preferred shareholders.  Prior to the resolution of this litigation in 2023, the Debtors were severely impaired in their ability to issue additional equity or other forms of capital raises. Further, certain potential merger and/or acquisition activities were impacted by the inability of the Debtors to successfully negotiate a settlement with the plaintiffs in the litigation, resulting in lost transactions.  Additionally, the interest payments due on Impac's floating rate Junior Subordinated Notes increased significantly in 2021 through 2023 as interest rates rose and Impac was unable, due to its weakened financial position and counterparty credit risk profile, to engage in swap or other hedging activities that would have reduced the impact of such rise in interest rates.

2.      *CashCall Mortgage Transaction and GSE Relationship.*

41.      In 2015, IMC acquired the assets of residential consumer lender CashCall Mortgage from CashCall Inc. under a 3-year earn-out payment structure that largely permitted the founder of CashCall Mortgage to operate the lending platform at his sole discretion.  In 2016, CashCall Mortgage's business experienced a significant increase in loan refinance activity associated with the BREXIT bond market rally, with prepayment accelerating to levels deemed unacceptable by Fannie Mae and by extension resulted in the disrepair of the Company's relationship with Fannie Mae.  The CEO of Impac at that time voluntarily suspended loan delivery to Fannie Mae, leaving the company with only Freddie Mac as a direct GSE loan takeout.  In July 2020 (at the beginning

15

of the COVID-19 refinance cycle), Freddie Mac suspended Impac's ability to sell loans directly to Freddie Mac, citing concerns over potentially increasing prepayment speeds in spite of Impac's good faith and substantial changes to its business model from 2016 to 2020 that resulted in a convergence of Impac's prepay speeds to be more consistent with its industry cohort. The inability of Impac to sell loans directly to the GSEs forced Impac to redirect loan sales to aggregators, who in turn sold to the GSEs.  The additional layer of execution resulted in highly compressed margins for Impac, resulting in lower income per loan and causing a major impact on Impac's financial performance.  Additionally, selling to aggregators materially slowed the turn, or velocity, of Impac's loan origination cycle placing significant stress on its capital and liquidity needs, primarily due to increased dwell times and notional outstanding amounts on Impac's warehouse lending facilities.

**B.      COVID-19 & Prepetition Strategic Initiatives.**

42.      **COVID-19 Global Pandemic**. In the first quarter of 2020, the COVID-19 pandemic greatly impacted the Debtors' businesses.  In response to the onset of challenges, the Debtors temporarily ceased all lending operations and furloughed the majority of their workforce. Ultimately, the Debtors also implemented other actions to deleverage their consolidated balance sheet and reduce their risk profile, including selling $4.2 billion in unpaid principal balance of Freddie Mac mortgage servicing rights and reducing warehouse lending capacity from $1.7 billion from the beginning of 2020 to $600 million by year end, thereby materially reducing exposure to warehouse borrowings and the Debtors' capital market activities with respect to loans held for sale.  Notwithstanding the market turmoil, all obligations and amounts due under Impac's warehouse facilities and forward sale arrangements were satisfied in full.  Specifically, these actions included:

US_ACTIVE\131960976

- ***Repositioning As a Mortgage Broker:*** At the end of 2022 and into 2023, the Debtors repositioned their CashCall Mortgage division to be a mortgage broker rather than a direct lender.

- ***Wind-Down of Wholesale Lending:*** During the first quarter of 2023, the Debtors decided to wind-down operations in the wholesale channel due to significantly diminished volume as a result of volatility in the market around rates and credit risk.

- ***Sale of Mortgage Servicing Rights:*** While the Debtors had historically retained select mortgage servicing rights for their originated mortgages, in December 2022, the Debtors sold their remaining Ginnie Mae residential mortgage loan servicing rights portfolio of approximately $68 million in total unpaid principal balance for approximately $725,000.

- ***Sale of Residual Interest - Long-Term Mortgage Portfolio Business:*** Consistent with the Debtors' initiatives described above, the Debtors sold their residual interests [5] in March 2022 for $37.5 million.  The transaction materially deleveraged Impac's statement of financial condition by reducing assets and liabilities by approximately $1.6 billion each.

- ***Wind-Down of Real Estate Services Business:*** The Debtors wound down their real estate services segment, which was originally established in 2008 and performed master servicing and provided loss mitigation services for primarily the Debtors' securitized long-term mortgage portfolio, including default surveillance, loan modification services, short sale services (where a lender agrees to take less than the balance owed from the borrower), Real Estate Owned property surveillance and disposition services and monitoring, reconciling and reporting services for residential and multifamily mortgage portfolios.

43.     In January 2023, consistent with the Debtors' initiatives to downsize, the Debtors reduced their legacy commercial office footprint of 120,000 square feet to a new 19,000 square foot office space by entering into an early termination agreement with the landlord.  Such agreement called for Impac to pay the landlord $3 million in lieu of the remaining commitment under the lease of approximately $8.8 million.  The reduction of space was possible because a majority of the Debtors' workforce were transitions to be hybrid or remote, minimizing in-office space needs.  The new lease term ran through July 31, 2025, with an average rent of $1.35 per square foot over the term of the lease, which, including CAM charges, totals approximately

---

[5] Historically, the Debtors' long-term mortgage portfolio consisted of residual interests in securitization trusts that held non-conforming mortgage loans originated between 2002 and 2007.

17

$800,000 over the term of the lease, resulting in significant savings. Following the expiration of that lease, the Debtors once again downsized and relocated, executing a new lease effective July 28, 2025, which runs to September 30, 2028, for approximately 6,000 square feet of space and an average rent of $217,000 per year ($18,000 per month) over the 38-month term of the lease.

44. **Post-Pandemic Strategic Initiatives**. Despite the aforementioned efforts to decrease the Debtors' operating expenses and redevelop the Debtors' business model, revenues and margins did not offset reduced expenses. The Debtors continued to make required payments under their debt agreements, which not only included the aforementioned $62 million of Junior Subordinated Notes, but also then-outstanding Convertible Promissory Notes, which were originally issued in April 2013 in the total principal amount of $25 million. By the end of 2023, following amendments, extensions and principal installment payments, the outstanding principal balance of the Convertible Promissory Notes was approximately $10 million.

45. During 2023, the Debtors were left with minimal liquidity to operate their business. Accordingly, unable to satisfy their future operating costs and liabilities, including repayment of their debt, the Debtors explored their options regarding capital raise, merger and acquisition activity and chapter 11. Ultimately, the Debtors were successful and executed the Prepetition Loan described above, which provided the Debtors with working capital to continue their mortgage broker business and funds to reduce the outstanding Convertible Promissory Notes.

46. During the remainder of 2024 and 2025, the mortgage business remained constrained with interest rates staying at consistently elevated historical levels. In November 2024, the Debtors received additional working capital funds related to an Employee Retention Tax Credit (the "ERTC") that they applied for in 2023. A portion of the ERTC funds was used to pay off the Convertible Promissory Notes in full in December 2024. Such pay off was earlier than the required

US_ACTIVE\131960976

pay off date of May 2025, and the Debtors negotiated a waiver of the early payment penalty. The remaining ERTC funds were used for working capital purposes.

47. Although the Debtors entered into a series of consents and waivers due to financial covenants breached under the Prepetition Loan, the Prepetition Loan was fully drawn as of July 2025, which left the Debtors with minimal liquidity to operate their business.  Accordingly, unable to satisfy their future operating costs and liabilities, including repayment of their remaining debt obligations, the Debtors again explored their options regarding filing for chapter 11.  In conjunction therewith, the Debtors commenced negotiations regarding a potential chapter 11 reorganization with key stakeholders.  In the course of those negotiations, in January 2026, as described earlier, the Debtors were able to secure an additional, limited working capital line of credit through the Prepetition Bridge Note, and, ultimately, entered into the Restructuring Support Agreement.

**IV.     The Debtors' Objectives in the Chapter 11 Cases**

48. Prior to filing these Chapter 11 Cases, on April 22, 2026, the Debtors entered into that certain Restructuring Support Agreement (as may be amended from time to time, the "RSA") with the Prepetition Lender. The RSA contemplates a recapitalization of the Debtors through a prepackaged chapter 11 plan of reorganization (as may be amended from time to time, the "Plan") supported by the Prepetition Lender and holders of 100% of the Junior Subordinated Notes.

49. The transactions contemplated by the RSA (the "Restructuring") are intended to, among other things, restructure the Prepetition Loan, address other funded debt, provide a recovery to holders of Allowed General Unsecured Claims, stabilize the Debtors' businesses and preserve valuable tax attributes.  Through chapter 11, the Debtors seek to emerge as better capitalized and more focused operating entities while preserving going concern value, regulatory licenses, and net

US_ACTIVE\131960976

operating loss carryforwards.  Absent the RSA transactions, the likely alternative is liquidation with minimal (or no) recoveries.

50.    Under the RSA, the Prepetition Lender will serve as Plan Sponsor and exchange its debt for 100% of the equity in Reorganized Impac.  The Plan Sponsor will also provide a debtor-in-possession term loan facility (the "DIP Facility").  Upon entry of the interim order, all outstanding Prepetition Bridge Note will be rolled up into DIP Facility, as required under the RSA. The DIP Facility will fund operations and administration of the Chapter 11 Cases.

51.    On the Plan's effective date, the DIP Facility will be refinanced through an exit facility, also provided by the Plan Sponsor, which will also supply post-emergence working capital and payment of Allowed Administrative Claims, Priority Claims, and Other Secured Claims.  In exchange for the Junior Subordinated Notes, holders will receive unsecured contingent payment certificates tied to Reorganized Impac's performance, with a minimum payment due of $250,000 and a maximum payment of $5,000,000.  The Plan also provides for a fund of up to $300,000 for Allowed General Unsecured Claims and a market-based management incentive plan.

52.    The RSA requires the Debtors to seek assumption of the RSA under section 365, reimburse the Plan Sponsor's expenses, and pay a breakup fee if the Debtors pursue a superior alternative transaction pursuant to their fiduciary out.  The Plan Sponsor retains matching rights, and the breakup fee is payable upon the closing of any such alternative transaction.  The Debtors have exercised their business judgment to assume the RSA, consistent with its terms.

53.    The RSA is the product of arm's-length negotiations and includes customary milestones, including deadlines for filing, obtaining interim and final relief, confirmation within forty-five (45) days, and effectiveness within sixty (60) days of the Petition Date.  In light of

20

stakeholder support and prepetition solicitation, the Debtors believe these milestones are achievable.

54.     Given the support of the various parties to the RSA and the fact that the Debtors commenced solicitation of the Plan prepetition, the Debtors believe that the timeline required by the Milestones is reasonable and achievable.

55.     In order to avert continued losses and prevent further deterioration of their business, the Debtors commenced these Chapter 11 Cases to: (i) stabilize operations; (ii) implement the RSA and the Plan, including their new business plan; and (iii) obtain postpetition financing through the DIP Facility to fund operations and the administration of these cases.  The Debtors believe these efforts will maximize value for all stakeholders, including customers, employees, and creditors, and enable a timely emergence from chapter 11 with a significantly deleveraged capital structure.

## V.     Debtors' Pre-Packaged Plan and Case Timeline

56.     As set forth above, the Debtors intend to implement the RSA through the confirmation and consummation of the Plan pursuant to the Milestones listed above.  The Plan addresses all levels of the Debtors' capital structure obligations and provides the opportunity for a significant recovery on Allowed General Unsecured Claims, including, potentially, payment in full.

57.     The DIP Facility will be refinanced by an exit facility, as discussed in further detail in relevant documents.

US_ACTIVE\131960976

58.     All other Holders of Claims and Interests will not receive or retain any distribution under the Plan on account of their Claims or Interests.

## VI.     First Day Pleadings

### A.     *Administrative Motions*

#### i.     Joint Administration Motion

59.     The Debtors request entry of an order directing joint administration of their Chapter 11 Cases, for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure providing for the Court to maintain one file and one docket for all of the Debtors' Chapter 11 Cases under the lead case, *In re Impac Mortgage Holdings Inc., et al*.

60.     The Debtor entities are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code, as Impac is the 100% direct or indirect owner and ultimate parent of each of the Debtors.  Accordingly, joint administration of these Chapter 11 Cases will allow for the efficient administration of the Debtors' interrelated Chapter 11 Cases, yield significant cost savings, and not prejudice the substantive rights of any party in interest.

61.     Entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

#### ii.     Creditor Matrix Motion

62.     In the Creditor Matrix Motion, the Debtors seek an order (a) authorizing the Debtors to (i) file a consolidated list of Debtors' thirty (30) largest unsecured creditors in lieu of

US_ACTIVE\131960976

filling lists for each Debtor and (ii) redact certain personally identifiable information of natural persons; and (b) granting related relief.

63.    Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in some cases involving more than one debtor, the Debtors may file a consolidated creditor matrix "in the interest of justice." Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.

64.    Similarly, I understand that it is appropriate for the Debtors to file a single list of their thirty (30) largest general unsecured creditors on a consolidated basis. Because the list of creditors that hold the thirty (30) largest unsecured claims against each Debtor (the "Top 30 List") of the Debtors could overlap, and certain Debtors may have fewer than thirty (30) significant unsecured creditors, the Debtors submit that filing separate Top 30 Lists for each Debtor would be of limited utility. Further, a single, consolidated list of the Debtors' thirty (30) largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

65.    Additionally, it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of individual creditors—including the Debtors' current and former employees—because such information could be used, among other things, to perpetrate identity theft or to locate survivors of domestic violence, harassment, or stalking.

66.    The Debtors propose to provide an unredacted version of the Creditor Matrix (and any other applicable filings) to the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases, any party in interest upon reasonable and legitimate request, and the Court.

US_ACTIVE\131960976

67.     Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Creditor Matrix Motion.

      iii.     <u>Debtors' Application for Order Appointing Kurtzman Carson Consultants, LLC dba Verita Global as Claims and Noticing Agent, Effective as of the Petition Date (the "156(c) Application")</u>

68.     In the 156(c) Application, the Debtors seek entry of an order appointing Kurtzman Carson Consultants, LLC dba Verita Global ("<u>Verita</u>") as their Claims and Noticing Agent in the Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.  It is my understanding that the Debtors' selection of Verita to act as the Claims and Noticing Agent has satisfied this Court's protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors, with the assistance of their advisors, have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I submit, based on input from the Debtors' advisors regarding all engagement proposals obtained and reviewed, that Verita's rates are competitive and reasonable given Verita's quality of services and expertise. It is anticipated that there could be thousands of entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of a claims and noticing agent is in the best interests of both the Debtors' estates and their creditors.

**B.     *Operational Motions Requesting Immediate Relief***

      i.     <u>Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Management Procedures, Bank Accounts, and Certain Payment Methods; (II) Prohibiting Setoffs and Freezing of Bank Accounts; (III) Modifying Requirements of Section 345(b) of the Bankruptcy Code; (IV) Granting Administrative Expense Status to Postpetition Intercompany Claims; And (V) Granting Related Relief (the "Cash Management Motion")</u>

US_ACTIVE\131960976

69.    By the Cash Management Motion, the Debtors request interim and final orders (i) authorizing the Debtors to continue to use (as such capitalized terms are defined in the Cash Management Motion and below) their existing Cash Management System, Bank Accounts, and certain Credit and Electronic Payment Methods; (ii) authorizing the Debtors to open or close Bank Accounts or establish new or different Credit and Electronic Payment Methods, all in the ordinary course of business; (iii)  prohibiting applicable banks from offsetting against or freezing any of the Debtors' deposit accounts; (iv) modifying the requirements of section 345(b) of the Bankruptcy Code; (v) granting administrative expense status to postpetition intercompany claims; (vi) scheduling a final hearing; and (vii) granting related relief.

70.    Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of their businesses, the Debtors maintained centralized cash management and monitoring procedures (the "Cash Management System") to efficiently collect, monitor, transfer, and disburse funds generated by the Debtors' business operations.

71.    The Cash Management System allows the Debtors to operate their businesses and manage cash efficiently.

72.    The Cash Management System is comprised of twenty (20) bank accounts (the "Bank Accounts") maintained at three (3) different financial institutions (the "Banks" and each individually a "Bank"). The Banks include Wells Fargo ("Wells Fargo"), Enterprise, and Merchants Bank of Indiana.

73.    The Bank Accounts are identified and described on a schedule (the "Bank Accounts Chart") attached as Exhibit D to the Cash Management Motion (the "Bank Accounts" or each individually a "Bank Account").  The Bank Accounts Chart contains key pieces of information about each of the Debtors' Bank accounts, including: (a) the manner in which they are titled based

US_ACTIVE\131960976

on recent bank statements, which reflects the status of any specific Bank Account if used to hold funds for other parties; (b) last four digits for each account number; (c) the account type (e.g., warehouse, checking, etc.); (d) the applicable Bank; (e) whether the accounts are subject to draft agreements (such as to fund customer property taxes) and the name of the drafting party; (f) recent balances; and (g) a short description of the purpose and use for each account. The Debtors may open additional accounts immediately after the Petition Date to the extent needed.

74.     The Debtors are in the process of transitioning their banking relationship away from Wells Fargo and over to Enterprise.  It is anticipated that most, if not all, of the Wells Fargo accounts will be closed within the sixty (60) days following the Petition Date.

75.     The Bank Accounts can be grouped into several categories as indicated in the Bank Account Chart.  These include operating accounts; payroll accounts; money market accounts and business CD accounts, for restricted cash; and checking accounts used as clearing accounts.

76.     Certain of the Bank Accounts on the Bank Accounts Chart occasionally have in excess of $250,000.00 in the account depending on the timing of receipts and disbursements.  The Bank Accounts Chart indicates recent balances shortly before the Petition Date.

77.     Each of the Bank Accounts are insured by the Federal Deposit Insurance Corporation and are held at well-capitalized and highly-rated banks.  Moreover, Wells Fargo and Merchants Bank of Indiana are both designated as an authorized depository by the U.S. Trustee and conform to the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "UST Guidelines").  Although the Bank Accounts at Enterprise are not held at an authorized depository, I believe that any funds that are deposited in the Enterprise Bank Accounts are secure.

US_ACTIVE\131960976

78.    Attached to the Cash Management Motion as Exhibit C is a diagram (the "Cash Flow Diagram") reflecting the manner in which the Debtors have received funds and made disbursements.

79.    As reflected in the Cash Flow Diagram, which is intended to be representative of the manner in which funds have flowed into and out of the Debtors, the Debtors have borrowed funds from certain lines of credit from Hildene and receive funds from brokerage fee revenue, interest income, and recovery of outstanding advances.  The Debtors then use those funds to pay the Debtors' business operations, including making distributions to vendors, payroll, insurance premiums, rent, and taxes and fees.

80.    The Debtors use funds from the Bank Accounts to pay, among other things, the following items: (i) wages and employee benefits; (ii) amounts owed to contract counterparties and vendors; (iii) insurance premiums; (iv) rent; (v) taxes and fees; (vi) employee expense reimbursements; and (vii) general operating costs.

81.    As part of the Cash Management System, all disbursements are approved through the Debtors' standard procedures under which ultimate approval authority for disbursements is currently vested in me, the Debtors' CEO, who also has check-signing authority.   All disbursements, excluding scheduled payroll, over $10,000 require direct, rather than delegated, approval of the CEO.  Using internal reports, including aged accounts payable summaries, the Treasury Manager, VP Accounting/Finance, or CEO directs the Debtors' financial accountants regarding which invoices to pay, in what amounts, and when to make such payments. The financial accountants then have the ability to select approved invoices for specific vendors that a Debtor intends to pay, and then batches of checks and/or automatic clearing house ("ACH")/wire transfers are run on a specific date based on the directives.

US_ACTIVE\131960976

82.     The Debtors' non-payroll disbursements are primarily, but not exclusively, made through a weekly ACH. Subordinate employees requesting disbursements are required to get the appropriate level of approval prior to review and approval by the CEO of all disbursements. Checks are typically printed twice a month on check stock that the Debtors have and can edit as necessary.

83.     The Bank Accounts are monitored daily for cash balances and placed in appropriate categories to show the Debtors' daily cash position.  The Bank Accounts are reconciled monthly by a financial accountant and reviewed by the Debtors' treasury manager. A financial accountant maintains a spreadsheet to reconcile the general ledger to the Bank Accounts each month. Discrepancies are investigated by a financial accountant.

84.     While the majority of disbursements are made by ACH, the Debtors' employees occasionally use their personal credit or debit cards in the ordinary course of business for certain expenses.  Employees that used their personal credit card for business expenses are reimbursed for such payments. The Debtors currently do not maintain a corporate credit card program.  However, the Debtors are evaluating the implementation of a corporate card program with Enterprise.  While terms and credit limits have not yet been finalized, based on current spending levels, a $25,000 aggregate card limit is expected to be sufficient.

85.     The Debtors also use electronic funds transfers and ACH transactions (collectively, "Electronic Payment Methods") in the ordinary course of their businesses.

86.     In addition, in the ordinary course of their business, the Debtors engage in intercompany transactions with each other (collectively, the "Intercompany Transactions") to fund operations.  The Intercompany Transactions may result in intercompany receivables and payables

28

among the Debtors (the "Intercompany Claims"), which are, and will continue to be, accounted for and recorded in the Debtors' accounting systems.

87.     The Debtors' business operations and cash management capabilities would be negatively affected if they are required to modify their Cash Management System, close their Bank Accounts, and cease using Electronic Payment Methods. Opening new bank accounts and making disbursements solely by check would lead to delayed cash receipts and delayed disbursements—and the Debtors do not have sufficient cash reserves to maintain operations without a reliable and ready stream of cash receipts.  Lastly, their business would further be negatively affected—and residential borrowers and mortgage lenders would be harmed—if the Debtors are not able to maintain their ordinary and customary practices.

88.     The relief sought in the Cash Management Motion is critical to ensure that the Debtors continue to have reliable and ready access to cash receipts so they can pay for the ordinary and necessary expenses of their businesses and to avoid harm to parties who have entrusted funds to the Debtors. Without this relief, the Debtors would suffer immediate and irreparable harm because they would not be able to access cash receipts in order to fund business operations, thereby harming their businesses and depleting value from their estates to the detriment of creditors. Granting the Cash Management Motion is necessary to ensure that the Debtors can pay their ordinary course operating expenses, and, ultimately, provide the Debtors with an opportunity to administer their business as a going concern.

89.     The relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest.  Accordingly, for the reasons set forth herein and in the Cash

US_ACTIVE\131960976

Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

ii.    Motion of Debtors for Approval to (A) Pay Employee Obligations, (B) Continue Employee Benefit Programs, and (C) Related Relief (the "Wages and Benefits Motion")

90.    By the Wages and Benefits Motion, the Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto (together, the "Employee Compensation & Benefits"), (ii) scheduling a final hearing, and (iii) granting related relief.

### a) The Debtors' Employees

91.    As of the Petition Date, the Debtors have a total of eighteen (18) Employees.  Of this, ten (10) Employees are employed by Debtor Impac and eight (8) Employees are employed by Debtor IMC.

92.    These Employees remain because they are skilled and are central to the Debtors' efforts to rapidly emerge from chapter 11 in accordance with their proposed Plan and exit strategy.

93.    The Employees fill the following roles: corporate and administrative, accounting/finance, legal, information technology, loan processors and loan agents, and include upper-level management (comprised of two persons as described below).  The Debtors are not parties to any collective bargaining agreements.

US_ACTIVE\131960976

**b) Obligations on Account of Employee Wages and Other Compensation, Business Expenses, Deductions and Payroll Taxes**

**1. Payroll Schedules**

94. Traditionally, and with limited exception noted below, Employees receive wages and salaries, including base pay, and for certain employees, commissions (the "Wages") according to the following schedule: (i) Wages for work from the 1st day of each month through the 15th day of each month, including commissions on loans funded during this period, are paid on the on the 22nd day of each month (or, if the 22nd falls on a weekend or holiday, the preceding Friday) and (ii) Wages for work from the 16th day of each month through the end of each month, including commission on loans funded during this period, are paid on the 7th day of each subsequent month (or, if the 7th falls on a weekend, the preceding Friday).

95. The Debtors fund their payroll approximately one to two days before the applicable payday.

96. The Debtors' last payroll was April 22, 2026, and the Debtors fully paid amounts that were due and owing through April 22, 2026. In addition, Debtors paid Wages (to the extent reasonably calculatable), through the April 22, 2026 as opposed to through April 15, 2026.  In the next regular payroll, employees will be paid from April 23, 2026 through April 30, 2026.  The primary reason for this special payroll was due to the change of Impac's primary bank following the April 22, 2026 payroll.

**2. Outstanding Amounts to Employees and the Upcoming Payrolls**

97. The Debtors estimate that they owe their Employees an aggregate of approximately $31,000 on account of accrued Wages, including unpaid wages, salaries, Commissions, paid leave, and other regular compensation earned before the Petition Date (collectively, the "Unpaid

31

Employee Wages"), however, this amount may fluctuate depending on the contingencies of loan closings and submitted expenses.

98.     Post-petition, the Debtors estimate their average gross payroll for their Employees will be approximately $310,000 per month.

99.     The next scheduled payrolls for the Debtors are May 7, 2026 and May 22, 2026, under which Employees may be owed both pre and post-petition Wages.

100.     In these payrolls, Debtors would ordinarily pay Employees amounts that had been reconciled or adjusted as owed from any previous underpayment, including recently submitted expenses, uncalculated overtime, etc. (with these amounts as the "Adjustments" and which are included in the definition of Wages and Unpaid Employee Wages as applicable).

101.     The Debtors, with the DIP Loans, will have sufficient cash to pay Wages for these payrolls for Employees requested in the Wages and Benefits Motion.

102.     By the Wages and Benefits Motion, the Debtors seek authority, but not direction, to (i) pay their the Unpaid Employee Wages (which arose pre-petition) in the ordinary course of business consistent with past practice, provided that no Employee shall be paid pre-petition Wages exceeding $17,150, absent specific order from this Court and (ii) to pay post-petition Wages in the ordinary course.

### 3.  Payroll Costs

103.     The Debtors subscribe to software from Paylocity ("Paylocity") to support, payroll processing, payroll tax calculations and filings, and other payroll-related services (all such associated costs, collectively, the "Payroll Costs").   The Debtors pay Paylocity monthly a subscription fee of approximately $690, and the next payment will be due on or about May 20, 2026 for services to be provided in June 2026.  The Debtors are current on payments to Paylocity.

US_ACTIVE\131960976

The Debtors seek authority to honor prepetition amounts of Payroll Costs, including amounts owed to Paylocity to ensure continued payroll services during the Chapter 11 Cases.

### 4.    The Ordinary Course Payments

104.    Historically, the Debtors have paid their non-insider Employees bonuses in the ordinary course of their business.

### 5.    The Executive Agreements and Post-Effective Date Payments

105.    In addition to rank-and-file employees, the Debtors employ two upper-level management employees, George A. Mangiaracina, the Debtors' Chief Executive Officer, and Joe Joffrion, the Debtors' Secretary and General Counsel (collectively, the "Executives," and each, an "Executive").  The Debtors employ the Executives under respective employment agreements, which were originally entered into on December 20, 2024 (and effective for the period of January 1, 2025 through December 31, 2026), and which were subsequently amended and restated on October 7, 2025, and further amended on April 21, 2026 (which amendment only becomes effective on July 1, 2026) and still remain effective through September 30, 2026 with respect to Mr. Mangiaracina, and December 31, 2026 with respect to Mr. Joffrion (the "Executive Agreement(s)").  The Executives earn a salary and benefits under their Executive Agreement and are eligible for (i) a "Discretionary Annual Bonus" and (ii) a "Restructuring Success Bonus"; provided, however that the first amendment (once effective) eliminates any Discretionary Annual Bonus.

106.    The Executives were each eligible for a Discretionary Annual Bonus for 2025, payable in January 2026, with a target amount equal to 100% of their respective Base Salary; however, each Executive voluntarily waived their right to receive any such Discretionary Annual Bonus for 2025.

US_ACTIVE\131960976

107.   The Executives each earn their Restructuring Success Bonus, equal to 100% of their respective base pay, if: (i) the Debtors implement a restructuring transaction in the Chapter 11 Cases while the Executive Agreement is effective, (ii) the Debtors confirms a bankruptcy plan (the "Plan") that becomes effective during the term of the Executive Agreement, and (iii) the Executive remains actively employed by Debtors through the effective date of the Plan (the "Effective Date"). This amount will be paid on the first pay period following the Effective Date.

108.   The Debtors disclose this to be transparent concerning employee matters, and the Debtors do not currently seek to pay the Executives any retention or performance bonus during these Chapter 11 Cases.   However, as agreed with the Plan Sponsor and set forth in the Restructuring Support Agreement, as part of the Plan the Debtors propose to assume the Executive Agreements, including bonus arrangements, to be paid after the Debtors' emergence from chapter 11.   Such arrangement is sought to provide the parties with a universally beneficial outcome, without the expenditure of limited estate resources to obtain approval of a separate key employee incentive program or otherwise implicate § 503(c).

### 6.  Supplemental Workforce

109.   The Debtors utilize independent contractors for services including information-technology. These independent contractors are paid by the Debtors as needed, and not based on any set payment schedule (these workers are the "Supplemental Workforce"). The Debtors estimate that they will pay the Supplemental Workforce approximately $15,000 per month post-petition. As of the Petition Date, the Debtors estimate that approximately $5,000 is owed to the Supplemental Workforce. If the Debtors do not pay these amounts, the Supplemental Workforce may stop working for the Debtors. Accordingly, the Debtors request authority to pay the remaining Supplemental Workforce, as part of their ordinary course of business, whether the amounts are for

US_ACTIVE\131960976

services that arose pre or post-petition. The Debtors do not believe that any amounts to an individual member of their Supplemental Workforce exceeds the $17,150 priority cap under § 507(a)(4).

### 7.   The Regal Contract

110.   The Debtors are parties to a contract with Regal Resources, Inc. (respectively, "Regal" and the "Regal Contract"), whereby the Debtors are outsourcing certain payroll and human resources functions to Regal (separate from the software provided by Paylocity). The Debtors entered into the Regal Contract on November 13, 2023.  The Debtors pay a flat-fee of $6,500 (reduced to $5,500 effective May 1, 2026) on or about the first of every month for services to be incurred that month.  The Debtors are current on payments to Regal.  If the Debtors do not pay amounts going forward, then the Debtors transition and business could be negatively impacted. Accordingly, the Debtors request authority to pay amounts connected to the Regal Contract, whether the amounts are for services that arose pre or post-petition.

### 8.   Business Expense Reimbursements

111.   The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, business-related travel expenses (including mileage), general corporate purchases, online payments and other items (the "Reimbursement Obligations"). Expense reports detailing the Reimbursement Obligations are submitted for reimbursement by the Employees and generally must be supported by copies of receipts.  Expenses are reimbursed with payroll.

112.   There is commonly delay between when an Employee incurs an expense and submits the corresponding expense report for processing.  Therefore, it is difficult for the Debtors

US_ACTIVE\131960976

to determine the exact amount of Reimbursement Obligations that are currently due and owing. However, with that caveat, the Debtors estimate that, as of the Petition Date, the Debtors owe at least $205 of Reimbursement Obligations, and also believe that few, if any, Employees may be owed expenses earned within 180 days of the Petition Date that would, with other amounts owed, require payment above the § 507(a)(4) cap.  However, notwithstanding that caveat, the Debtors seek authority to pay Employees in the ordinary course all Reimbursement Obligations amounts, no matter when earned, and to continue to pay these amounts in the ordinary course of the Debtors' business.

### 9.  Deductions and Withholding

113.    Certain of these Employee Benefit Programs are funded by the Employees themselves through payroll deductions or a combination of payroll deductions and contributions from the Debtors (the "Deductions").  For instance, the Debtors are required by law to withhold from the Employees' wages amounts related to, among other things, national, regional, and local income tax (the "Employee Payroll Taxes") for remittance to the appropriate taxing authorities. The Employee Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority when the Employees' payroll checks are disbursed.

114.    The average amount of Deductions per pay period varies.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued, but unpaid, Deductions are approximately $30,000.  The Debtors seek authority to continue deducting and remitting amounts to the appropriate third parties in a manner consistent with historical practice for any unpaid Deductions that relate to the period prior to the Petition Date and, post-petition, to continue the Deductions in the ordinary course of the Debtors' business.

US_ACTIVE\131960976

### c) The Debtors' Employee Benefit Programs

115.    In addition to their wages and/or commissions, the Debtors' Employees also generally are entitled to receive other forms of compensation, including health benefits, paid time off, and reimbursement of certain business expenses (collectively, the "Employee Benefit Programs"). The Employee Benefit Programs include, but are not limited to: (i) paid time off; (ii) 401(k) retirement savings plan; (iv) a healthcare program, including dental and vision coverage; (v) life and disability coverage; and (vi) health savings accounts or flexible spending accounts.

### 1.  PTO

116.    The Debtors provide eligible Employees with paid time off ("PTO"). The ability to receive payments for unused PTO depends on whether the Employee is exempt or non-exempt. The Debtors cap PTO at 1.5 times the annual amount allotted, which is based upon years of service.

117.    As required by applicable law, non-exempt Employees accrue PTO each pay-cycle and are entitled to receive a payout of accrued, but unused, PTO for their final pay-check if they are terminated.   The Debtors cap PTO for non-exempt Employees as follows: (i) for one to four years of completed service, PTO is capped at 15 days; for five to nine years of completed service, PTO is capped at 22.5 days; and for ten or more years of completed service, PTO is capped at 30 days.

118.    Exempt Employees do not accrue PTO hours and therefor do not receive payment for unused PTO following a termination of their employment.  Exempt Employees have no set limit for using PTO, however taking PTO is subject to manager approval.

119.    As of the Petition Date, the Debtors have approximately $20,500 on their books as an accrued liability, for approximately 720 hours, for accrued PTO.

US_ACTIVE\131960976

120.     The Debtors believe that the continuation of PTO policy in accordance with prior practice for their Employees is essential to maintaining Employee wellness and morale during the Chapter 11 Cases.  Further, the policies are broad-based programs upon which all Employees have come to depend, and the continuation of those programs will not create any material cash flow obligations beyond the Debtors' normal payroll obligations.  Moreover, disruptions or changes to these policies could have a direct impact on Employee commitment, morale, and retention, to the detriment of the Debtors.

121.     The Debtors therefore seek authority to honor their existing PTO policies to the extent it would permit continuing Employees to use their prepetition accrued leave in the ordinary course of business, and going forward.   Further, the Debtors are often required under applicable law to fully pay-out PTO upon termination of an Employee.  The Debtors seek authority to fully pay out PTO in these circumstances, regardless of whether the amount exceeds the statutory cap(s) of § 507(a).

**2.  Health Plans**

122.     The Debtors offer all Employees who are full-time and their eligible dependents (collectively, the "Dependents") the option of medical, dental and vision insurance.  For medical insurance, including prescription drug coverage, the Debtors offer coverage (the "Medical Plan") through Kaiser and Anthem (together, with VSP (defined below), the "Health Providers" and each a "Health Provider").   The Debtors bear 70% of the costs of the Medical Plan for eligible Employees, and the Employees bear the remainder of the costs, based on dependent elections.  If an Employee elects insurance coverage for dependents, the monthly cost for the premiums is deducted from payroll.

US_ACTIVE\131960976

123.    For dental insurance, the Debtors also offer coverage through the Health Provider of Anthem Blue Cross (the "Dental Plan"). The Debtors bear 70% of the costs of the Dental Plan for eligible Employees, and the Employees bear the remainder of the costs, based on dependent elections.  If an Employee elects insurance coverage for dependents, the monthly cost for the premiums is deducted from payroll.

124.    For vision insurance, Debtors offer coverage through VSP (the "Vision Plan," and, together with the Medical Plan and Dental Plan, and below-defined HSA & FSA Benefits, defined as the "Health Plans").  The Debtors bear 100% of the costs of the Vision Plan for eligible Employees if an Employee elects insurance coverage.

125.    The Debtors' monthly cost for the premiums of the Health Plans is approximately $35,000 per month.

126.    The Debtors also offer their Employees the benefit of maintaining a respective health-savings account through HSA Bank and a flexible savings account through WEX Health, Inc. (the "HSA & FSA Benefits").

127.    As discussed above, the Debtors' Health Plans are fully insured, and there is no estate liability outside of payment of premiums.

128.    In the ordinary course of their business, the Debtors pre-pay the Health Providers premiums for the following month, and, as of the Petition Date, the Debtors are current in payments to the Health Providers.

129.    Therefore, as of the Petition Date, the Debtors believe they do not owe anything to Health Providers on account of the portion of premiums that accrued and remain unpaid as of the Petition Date under the Health Plans.  However, to the extent any amount is identified as payable, the Debtors seek authority to pay these amount(s).  The Debtors also seek authority to continue to

39

pay, in their discretion and in the ordinary course of their business, the premiums for the Health Plans incurred postpetition and to maintain their Health Plans (including the HSA & FSA Benefits). The Debtors further seek authority to make payments due or that will be due to Alliant relating to the Health Plans.

130.   Furthermore, and for similar reasons, the Debtors seek to continue to perform any obligations under § 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") (see 26 U.S.C. § 4980B) in respect to eligible former Employees.   The Debtors believe that any prepetition costs related to COBRA coverage benefits are de minimis. The Debtors also employ Regal to assist with Family and Medical Leave and ADA administration and expenses are included within the Regal Contract fee.  In order to maintain employee morale and ensure the orderly administration of the estate, the Debtors requests authority to pay in their discretion such prepetition costs and amounts discussed in this section and continue to pay post-petition in the ordinary course.

### 3.  Employee Life and AD&D Insurance

131.   The Debtors offer eligible Employees premium based group life insurance ("Life Insurance"), accidental death and dismemberment insurance, disability and other similar insurance ("AD&D Insurance") through New York Life Group.  The amount of monthly premiums for Life Insurance and AD&D Insurance total approximately $3,600 per month less voluntary employee deductions.

132.   The Debtors' Employees and their families depend on insurance provided by the Debtors as a fundamental aspect of compensation.  Any disruption or perceived-disruption regarding insurance benefits or coverage would damage morale and may cause Employees to seek employment elsewhere.  The Debtors believe that they are current on all the above-described

US_ACTIVE\131960976

insurance policies and claims obligations.  To the extent they are not, however, the Debtors seek authority, in their discretion, to pay any accrued and unpaid prepetition premiums and related charges and to continue the above benefits post-petition and to deliver the Employees' portion of any accrued and unpaid prepetition premiums for the AD&D Insurance and Life Insurance to the corresponding administrators in connection with the payment of the Wages and withholding obligations.

### 4.  Retirement Plan

133.    The Debtors offer eligible Employees the opportunity to participate in a defined 401(k) contribution plan through Voya, which allows for voluntary employee pre-tax or post-tax deferrals (the "Retirement Plan").  Employees participating in this program may contribute up to the federal statutory caps per year, and the Debtors deduct the employee deferrals from Employee paychecks for each pay-cycle.  The Debtors' Retirement Plan includes a match by the Debtors of up to 100% of 1% of the Employees' salary and 50% of the next 5% contributed by the Employee, for a total match of up to 3.5% of salary.  Failure to timely forward the Employees' Retirement Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), resulting in potential liabilities for the Debtors and personal liability for the Debtors' officers for such deducted amounts.  Maintaining the Retirement Plan as a part of the Employee Benefit Programs is critical to maintaining employee morale.

134.    The Debtors seek authority to deliver the Employee contributions in connection with the payment of Wages and withholding obligations described above.  Administration fees for the Retirement Plan are paid by the Employee participants.  The Debtors do not believe these additional payments will cause the total payments made for prepetition Employee obligations to exceed the statutory limit for priority claims of $17,150; however, if that is not the case, the

41

Debtors believe that any prepetition costs related to these retirement benefits are de minimis, and the Debtors request authority to pay in their discretion any such prepetition costs to maintain employee morale and ensure the orderly administration of the estates.

135.    The majority of the Debtors' employees rely exclusively on the Employee Compensation & Benefits to satisfy their daily living expenses and to provide security and assurance for themselves and their families regarding reacting to and planning for major life events. Consequently, employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation & Benefits.

136.    Additionally, continuing ordinary course benefits will help maintain employee morale, and avoid employee flight that could jeopardize the Debtors' ongoing business efforts and endanger creditor recoveries. Moreover, current employees provide the Debtors with services necessary to conduct the Debtors' business through the current Chapter 11 Cases, and absent the payment of the Employee Compensation & Benefits, the Debtors may experience turnover and instability at this critical time in their chapter 11 efforts.

137.    Accordingly, for the reasons set forth herein and expanded on in the Wage and Benefits Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Wage and Benefits Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

iii.    <u>Motion of the Debtors For Entry of Order (I) Authorizing the Debtors to Continue (A) Insurance Program and (B) Prepetition Surety Bonds, And Pay Obligations Arising Thereunder, and (II) Related Relief (the "Insurance and Surety Bonds Motion")</u>

138.    The Debtors request the entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) continue to administer, and as applicable, renew, their Insurance

US_ACTIVE\131960976

Program and Surety Bond Program (each, as defined below) in the ordinary course of business in accordance with practices and procedures in effect prior to the Petition Date, and (b) pay and perform prepetition and postpetition Insurance Obligations and Surety Bond Obligations; and (ii) granting related relief.

139.    The Debtors maintain various insurance policies providing coverage for, among other things, the Debtors' property, general liability, automobile liability, umbrella coverage, workers' compensation, cyber liability, employment practices liability, directors and officers coverage, fiduciary liability, and professional liability/mortgage bankers' bond (collectively, the "Insurance Policies"), which the Debtors have obtained through various third-party insurance carriers (the "Insurance Carriers"). A list of the Insurance Policies and their corresponding premium amounts calculated on an annualized basis is attached as Exhibit C to the Insurance and Surety Bonds Motion.

140.    In particular, given the proliferation of cyber crime in recent years, the Debtors have maintained insurance products to address the risks of cyber attacks and data breaches. Among the various Insurance Policies that the Debtors propose to maintain in the Insurance and Surety Bonds Motion, the Debtors seek authority to maintain an Insurance Policy designed to mitigate risks from such cyber attacks and breaches.

141.    The premium amounts for the Insurance Policies (the "Insurance Premiums") are determined annually and are due in their entirety at policy inception or renewal. The Debtors' aggregate annual Insurance Premiums under the Insurance Policies total approximately $1.03 million.

142.    The Insurance Premiums are paid up-front. As of the Petition Date, the Debtors believe they have made all required prepetition payments for Insurance Premiums and have

43

otherwise satisfied all of their obligations concerning the Insurance Policies, but, out of an abundance of caution, seek authority to satisfy any outstanding financial obligations relating to the Insurance Policies.

143.    The Debtors make such payments indirectly to the insurance carriers through the Debtors' insurance brokers, HUB International Insurance Services Inc., Arthur J. Gallagher Risk Management Services LLC, and Willis Towers Watson plc (collectively, the "Brokers").  The Debtors employ the Brokers to assist them with the procurement and management of the Insurance Policies.  The Brokers receive compensation from the Debtors in the form of a commission fee in addition to the Insurance Premiums paid by the Debtors (the "Broker's Fees").  The retention of the Brokers allows the Debtors to obtain and manage the Insurance Policies in an efficient manner and to realize considerable savings in the procurement of such policies.  As of the Petition Date, the Debtors do not believe that there are any prepetition Broker's Fees owed, but, out of an abundance of caution, to the extent that any Broker's Fees may be attributed to the prepetition period, the Debtors seek authority to pay any outstanding amounts.

144.    Under the terms of the Insurance Policies, the Debtors may be required to pay various deductibles, retention amounts, and administrative fees (together with the Insurance Premiums and Broker's Fees, the "Insurance Obligations"), depending upon the type of policy and claims involved.  As of the Petition Date, the Debtors do not believe that there are any prepetition Insurance Obligations owed, but, out of an abundance of caution, seek authority to satisfy any such outstanding obligations.

145.    The foregoing Insurance Policies, Insurance Premiums, Insurance Obligations and all other related obligations, contracts and benefits are referred to collectively are the Debtors' "Insurance Program."

US_ACTIVE\131960976

146.    In the ordinary course of business, the Debtors are required to provide various types of surety bonds (each a "Surety Bond," and collectively the "Surety Bonds") from surety providers (each, a "Surety Issuer," and collectively, the "Surety Issuers"). These Surety Bonds secure the Debtors' payment or performance of certain obligations owed to various third parties, including certain governmental units or other public agencies. Certain Surety Bonds are required by state agencies in order for the Debtors to maintain their state mortgage lender, broker, and originator licenses.

147.    To that end, to continue their business operations during these Chapter 11 Cases, the Debtors are required to provide financial assurance to state governments, government sponsored enterprises, regulatory agencies, and other third parties.  These obligations require the Debtors to maintain the existing Surety Bond Program, including satisfying applicable obligations thereunder, renewing and executing agreements, and related matters.  Failing to provide, maintain, or timely replace Surety Bonds could prevent the Debtors from performing essential operations.

148.    Enterprise issued a letter of credit in the face amount of $1.15 million as collateral for the Surety Bonds issued by Liberty Mutual Insurance Company, which in turn is secured by cash held in a restricted account at Enterprise.  The Debtors have significantly reduced the number of the outstanding Surety Bonds over the last 12 months and, as such, anticipate a corresponding reduction in the required letter of credit amount and a release of any over-collateralized cash held in connection with the letter of credit in late 2026.

149.    As of the date of the Insurance and Surety Bonds Motion, the Debtors have two (2) outstanding Surety Bonds, totaling $190,000. Premiums are generally determined annually and are paid by the Debtors when a bond is issued or renewed (the "Surety Bond Premiums"). The Debtors' annual Surety Bond Premiums for the two (2) Surety Bonds is approximately $1,500.

US_ACTIVE\131960976

The Debtors pay Surety Bond Premiums indirectly to the Surety Issuer through Gallagher Mortgage Banking, as broker (the "Surety Broker"). In connection with the Surety Bond Program, the Debtors compensate the Surety Broker by paying negotiated annual fees as a percentage of the face amount of the bonds procured (the "Surety Broker Fees"). The Surety Broker Fees are remitted to the Surety Broker as a portion of the Surety Bond Premiums. Because the Surety Broker takes its fee from the Surety Bond Premiums described above, the Debtors do not believe that there are any additional prepetition obligations due and owing on account of the Surety Broker Fees.

150.    A schedule of the outstanding Surety Bonds is attached as Exhibit D to the Insurance and Surety Bonds Motion. As of the Petition Date, the Debtors believe that no prepetition invoices are outstanding on account of the Surety Bond Program. Nevertheless, out of an abundance of caution, the Debtors seek authority to satisfy any outstanding prepetition amounts related to the Surety Bond Program, following the Petition Date (collectively, the "Surety Bond Obligations").

151.    The foregoing Surety Bonds, Surety Bond Premiums, the Surety Bond Obligations, and all other related obligations, contracts, and benefits are referred to collectively as the Debtors' "Surety Bond Program."

152.    Maintenance of their Insurance Policies and insurance financing programs, and Surety Bond Program, including payment of the prepetition and postpetition Insurance Obligations, renewing the Insurance Policies and Surety Bonds, and entering into new insurance arrangements are within the ordinary course of the Debtors' business.

153.    The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Program and Surety Bond Program on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees

46

US_ACTIVE\131960976

under the Insurance Program and Surety Bond Program could result in one or more of the Insurance Carriers terminating the Debtors' existing policies, declining to renew the Debtors' policies, or refusing to enter into new insurance agreements with the Debtors in the future. If the Insurance Program and/or Surety Bond Program are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages to persons and property of the Debtors and others, which could negatively impact the value of the Debtors' estates.  It could also impact their state and other licensures.  Furthermore, the Debtors would then be required to obtain replacement policies on an expedited basis at what would likely be a significantly higher cost.

154.    Accordingly, for the reasons set forth herein and expanded on in the Insurance and Surety Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance and Surety Bond Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

iv.    Motion of the Debtors Pursuant to 11 U.S.C. §§ 105(a) and 366 and Fed. R. Bankr. P. 6003 and 6004 for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief (the "Utilities Motion")

155.    By the Utilities Motion, the Debtors seek entry of interim and final orders: (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined below); (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance provided by the Debtors; (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these Chapter 11 Cases

and/or any outstanding prepetition debts; and (iv) granting related relief, all as more fully set forth in the Utilities Motion.

156.   In the ordinary course of business, the Debtors obtain various essential utility services (collectively, the "Utility Services") directly from certain utility companies (collectively, the "Utility Companies").  A nonexclusive list of the Utility Companies is attached to the Utilities Motion as Exhibit C (the "Utility Services List").

157.   The Debtors pay the Utility Companies directly in the ordinary course of business for the Utility Services.  The Debtors also pay for certain other utility services indirectly through their lease of real property and through other vendor agreements.  The Debtors rely on the Utility Companies to provide necessary support to their employees, vendors, and customers.  Preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtors' business.

158.   The Debtors have a consistent historical payment record with the Utility Companies.  To the best of my knowledge, there are no defaults or arrearages of any significance for the Debtors' undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases.  Prior to the Petition Date, the Debtors spent an average of approximately $17,200.00 each month for Utility Services.  Based on historical averages for Utility Services, I estimate that their cost of Utility Services for the next thirty days will be approximately $17,200.00.

159.   To maintain ongoing business operations, it is imperative the Debtors are able to rely on a consistent supply of these services.  Approving the relief requested in the Utilities Motion will ensure that the Debtors maintain essential utility services to their facilities at this critical

US_ACTIVE\131960976

juncture in their Chapter 11 Cases, prevent irreparable harm to the Debtors' estates, and, ultimately, provide the Debtors with an opportunity to reorganize or sell their business as a going concern.

160. The Debtors have proposed to provide Utility Companies with Proposed Adequate Assurance of payment for Utility Services and customary procedures for resolving any disputes. I understand such procedures are routinely approved in this district and would request the Court approve the Utilities Motion to ensure the Debtors maintain uninterrupted Utility Services.

> v. <u>Emergency Motion of the Debtors for Entry of Emergency, Interim, and Final Orders (I) Establishing Notification Procedures and Approving Restrictions on Certain Transfers of and Declarations of Worthlessness With Respect to Interests in the Debtors as of the Petition Date; (II) Directing That Any Violations of the Procedures Are Void *Ab Initio*; (III) Scheduling a Final Hearing to Consider Approval of the Motion on a Final Basis; (IV) Granting Related Relief (the "Motion to Restrict Trading")</u>

161. By the Motion to Restrict Trading, the Debtors seek entry of emergency, interim, and final orders (i) establishing certain notification and hearing procedures (the "<u>Procedures</u>") to protect the potential value of the Debtors' consolidated NOLs and certain other tax attributes for federal and state tax purposes (collectively, the "<u>Tax Attributes</u>") and approving restrictions on certain transfers of and/or declarations of worthlessness with respect to interests in the Debtors, including direct and indirect ownership of the Debtors' Common Stock and any Options (each as defined in the Motion to Restrict Trading) to acquire such stock, as of the Petition Date; (ii) directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to Common Stock in violation of the Procedures shall be null and void ab initio; (iii) scheduling an emergency hearing (to the extent necessary), an interim hearing, and a final hearing within thirty (30) days of the commencement of these Chapter 11 Cases to consider approval of the Motion to Restrict Trading on a final basis; and (iv) granting related relief.

US_ACTIVE\131960976

162.    The Debtors possess certain Tax Attributes, including estimated federal NOLs of at least $850 million and California NOLs of at least $600 million, as of December 31, 2025, based on the Debtors' audited financial statements, which estimates remain substantially similar as of the Petition Date.  The Tax Attributes are available to reduce the Debtors' or any successor purchaser's federal and state income tax liability through the taxable year that includes the effective date of the Plan and potentially thereafter, generating future tax savings that enhance the value of the Debtors' estates for the benefit of all parties in interest.  The Debtors' go-forward business plan depends in part on the preservation of, and ability to utilize, the Tax Attributes.  Given the Debtors' modest market capitalization of approximately $2.9 million relative to the size of the Tax Attributes, the risk of loss or impairment of these Tax Attributes is significant, and emergency temporary bridge relief pending the scheduling of a first day hearing is therefore warranted.

163.    I understand that the Debtors' Tax Attributes may become subject to significant limitation if an "ownership change" occurs.  The Debtors have not undergone an "ownership change" as of the Petition Date and, accordingly,  continue to have significant Tax Attributes that would be adversely affected by the occurrence of an "ownership change" during the pendency of these Chapter 11 Cases.  The Plan is designed to preserve the Debtors' ability to use those Tax Attributes.  In particular, the Plan contemplates, among other things, the distribution of newly issued stock representing 100% ownership of the Reorganized Debtors to the Debtors' prepetition secured lender and the Plan Sponsor in respect of its Claims.  Even though such issuance would otherwise result in an Ownership Change, the Plan is intended to qualify for the special relief afforded by § 382(l)(5) of the Tax Code.

US_ACTIVE\131960976

164. That relief, however, may become effectively unavailable if the Debtors undergo an Ownership Change before the effective date of the Plan. For that reason, it is a condition precedent to the Plan Sponsor's obligations under the RSA that the Debtors preserve the Tax Attributes as required by Section 7.01(b) of the RSA. The RSA Parties have already agreed not to take any actions that would impair the value of the NOLs. *See* RSA §§ 5.01 and 7.01. The Debtors file the Motion to Restrict Trading so that other stakeholders who are not parties to the RSA likewise do not take actions that would jeopardize this significant asset.

165. The Procedures are necessary to preserve the Debtors' ability to utilize their Tax Attributes, while providing certain latitude for acquisition, disposition, trading, and declarations of worthlessness. The Debtors' ability to preserve their Tax Attributes may be jeopardized unless the Procedures are established immediately and made effective as of the Petition Date to ensure that any acquisition, disposition, trading, or declaration of worthlessness with respect to the Beneficial Ownership of Common Stock, including Options to acquire Beneficial Ownership of Common Stock, is either precluded or closely monitored and made subject to Court approval. Further, these Procedures must be implemented as soon as possible to prevent an irrevocable diminution of the value of the Debtors' estates. It is an important condition to consummation of the RSA, and therefore the Plan, that the Debtors' Tax Attributes be preserved to the greatest extent practicable.

166. Accordingly, for the reasons set forth herein and as further described in the Motion to Restrict Trading, it is in the best interests of the Debtors and their stakeholders to implement these Procedures and to restrict transfers of Beneficial Ownership of Common Stock that could result in an "ownership change" on or before the effective date of the Plan.

US_ACTIVE\131960976

**C.** ***Motion to Approve Confirmation Procedures***

    i.    <u>Debtors' Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Establishing Plan and Disclosure Statement Objection and Reply Deadlines and Related Procedures, (III) Approving the Prepetition Solicitation Procedures, (IV) Approving the Notice of Commencement & Confirmation Hearing Notice, and Finding Notice Sufficient, (V) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and Unexpired Leases, (VI) Waiving the Requirement of Filing Schedules, Statements of Financial Affairs, Rule 2015.3 Reports and Section 341 Meeting of Creditors, and (VII) Granting Related Relief (the "Motion to Approve Confirmation Procedures")</u>

167.    By the Motion to Approve Confirmation Procedures, the Debtors seek entry of an order granting the following relief:[6]

    a.  scheduling a Confirmation Hearing to consider (a) the adequacy of the Disclosure Statement and (b) confirmation of the Plan not less than 28 days after filing the Plan and Disclosure Statement;[7]

    b.  establishing a Objection Deadline and approving procedures and a Reply Deadline;

    c.  establishing a Plan Supplement Filing Deadline;

    d.  approving the Solicitation and Voting Procedures, including the forms of Ballots and the Opt-In Release;

    e.  approving the Tabulation Procedures;

    f.  approving the form of Ballots and the form of the Opt-In Release Form;

    g.  approving the form and manner of the Notice of Commencement & Confirmation Hearing Notice and the form and manner of the Publication Notice, and not requiring service of the Notice of Commencement & Confirmation Hearing Notice on the individuals that received notice of the Data Breach;

    h.  approving the form of Assumption Notice, and the Executory Contract Procedures;

---

[6] Capitalized terms used but not otherwise defined in this paragraph shall have the meanings afforded in the Motion to Approve Confirmation Procedures.

[7] Capitalized terms used but not otherwise defined herein shall have the meanings as ascribed to them in the Plan.

52

i.   conditionally directing the U.S. Trustee not to convene a meeting of creditors pursuant to § 341 of the Bankruptcy Code within seventy-five days of the Petition Date;

j.   conditionally waiving the requirements that the Debtors file Schedules, SOFAs, and the 2015.3 Reports; and

k.   granting related relief.

168.    By the Motion to Approve Confirmation Procedures, The Debtors also request that the Court approve the Proposed Confirmation Schedule (as defined and set forth in the Motion to Approve Confirmation Procedures).

169.    The relief requested in the Motion to Approve Confirmation Procedures will assist the Debtors in moving toward expeditious confirmation of the Plan and implementation of the transactions contemplated thereby, with the least possible disruption or harm to their businesses, for the benefit of all stakeholders.

170.    The Motion to Approve Confirmation Procedures and the Debtors' Disclosure Statement explains that a Data Breach (as defined in the Motion to Approve Confirmation Procedures) occurred in 2024. The Debtors provided impacted individuals with direct personal notice of the Data Breach, as well as an opportunity to participate in a free credit monitoring. The Debtors will honor the Cyberscout creditor monitoring and include information about these Chapter 11 Cases on the website that Cyberscout maintains with respect to the Data Breach. The Debtors will also include information about Cyberscout's services for the Debtors on the website that the Debtors' Claims Agent will maintain regarding the Chapter 11 Cases.

US_ACTIVE\131960976

**D.**     *Motion to Assume the RSA*

      i.    <u>Motion of Debtors for Entry of an Order (I) Approving the Debtors' Assumption of the Restructuring Support Agreement, (II) Authorizing the Debtors to Perform Their Obligations Thereunder, and (III) Granting Related Relief (the "Motion to Assume the RSA")</u>

171.     By the Motion to Assume the RSA, the Debtors seek approval of the Debtors' assumption of the RSA, which, as set forth above, reflects the culmination of extensive, good faith, arm's length negotiations among the Debtors, Hildene in its capacities as the Plan Sponsor and the DIP Lender, and the Consenting Subordinated Noteholders (each as defined in the RSA). The RSA provides a framework for the Debtors' restructuring and establishes a path toward a prompt emergence from chapter 11. Among other things, the RSA contemplates the funding of these Chapter 11 Cases through the DIP Facility, the preservation and monetization of the Debtors' NOLs, the implementation of the Exit Loan Facility, and a material distribution to unsecured creditors. In the absence of the RSA and the transactions contemplated thereby, the Debtors would likely face a liquidation scenario with diminished recoveries for stakeholders.

172.     The RSA not only secures critical funding and creditor support for the Debtors' restructuring, but also preserves flexibility through a reasonable and customary fiduciary out provision, allowing the Debtors to consider and pursue superior alternatives if required to satisfy their fiduciary duties. At the same time, the RSA includes the following protections for the Plan Sponsor in connection with a qualifying alternative transaction: (i) reasonable and documented fees and expenses incurred by the Plan Sponsor in connection with the transactions, (ii) a termination/break-up fee in an amount equal to 3% of the value of the alternative transaction, and (iii) all amounts outstanding under the DIP Loans and the Senior Indebtedness (each as defined in the RSA). I believe these protections are an essential inducement to the Plan Sponsor to participate in the restructuring transactions, which themselves are for the benefit of the Debtors' estates.

US_ACTIVE\131960976

173.    I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

[*Signature page to follow*]

US_ACTIVE\131960976

Dated: April 26, 2026

Respectfully submitted,

Impac Mortgage Holdings, Inc.

George A. Mangiaracina
Chief Executive Officer