**<u>Exhibit A</u>**

**Proposed Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| IMPAC MORTGAGE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 26-10593 (__) |
| | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, AND (V) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL AND (VI) <u>SCHEDULING A FINAL HEARING</u>**

Upon the motion (the "<u>Motion</u>") of the debtors and debtors in possession (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>"), pursuant to §§ 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "<u>Bankruptcy Code</u>"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the corresponding local rules of this District (the "<u>Local Rules</u>"), requesting entry of an interim order (this "<u>Interim Order</u>") and Final Order[2] authorizing the Debtors to, among other things:

(i)     Obtain senior secured postpetition financing in an aggregate principal amount not to exceed $5,000,000 (the "<u>DIP Credit Facility</u>," and the loans provided to the Debtors

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are:  Impac Mortgage Holdings, Inc. (5505); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Funding Corporation (4495); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Service Corp. (2263); Impac Mortgage Corp. (3937); Impac Warehouse Lending, Inc. (0541); Synergy Capital Mortgage Corp. (9071); and Impac Warehouse Lending Group, Inc. (3488). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them below, or as set forth in the Motion or the DIP Agreement, as applicable.

thereunder, the "DIP Loans"), consisting of (a) $2,000,000 of principal of the Bridge Note, plus interest, fees and other amounts due thereunder (the "DIP Roll-Up Loan") resulting from a dollar-for-dollar "roll-up" of the Prepetition Bridge Note Obligations outstanding under the Bridge Note, pursuant to the terms and conditions of the DIP Documents  and this Interim Order; and (b) new money term loans, in an aggregate principal amount such that, when combined with the DIP Roll-Up Loan, the total outstanding principal amount of the DIP Facility shall not exceed $5,000,000, which new money term loans shall be made available to the Debtors from time to time pursuant to the terms and subject to the conditions set forth in the DIP Agreement and the Orders (the "New Money Term Loan").

(ii)    Enter into (a) that certain Debtor-In-Possession Loan and Security Agreement (the "DIP Agreement"), substantially in the form attached as Exhibit A hereto, by and among the Debtors, certain subsidiaries of the Debtors identified as a guarantor on the signature page thereto, and Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1 (in such capacity, the "DIP Lender") as lender and (b) the documents related to the DIP Agreement (together with the DIP Agreement, the "DIP Documents");

(iii)    Borrow, on an interim basis, pursuant to the DIP Documents and this Interim Order, postpetition financing in an aggregate principal amount of up to (a) the DIP Roll-Up Loan, plus (b) the $1,500,000 Initial Term Loan (the "Interim DIP Credit Facility");

(iv)    Borrow, on a final basis, pursuant to the DIP Documents and the Final Order, postpetition financing in an aggregate principal amount of up to $5,000,000, upon entry of a Final Order;

(v)    Execute and deliver the DIP Agreement and the other DIP Documents to the DIP Lender pursuant thereto;

(vi)    Grant to the DIP Lender the DIP Liens on all of the DIP Collateral to secure the DIP Credit Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and the Interim Order and the Final Order, as applicable (collectively, and including all "Obligations" as defined in the DIP Agreement, the "DIP Obligations"), subject only to prior payment of the Carve-Out;

(vii)    Grant to the DIP Lender allowed superpriority administrative expense claims in the Chapter 11 Cases for all DIP Obligations;

(viii)    Use the proceeds of the DIP Credit Facility in accordance with the DIP Agreement, the DIP Documents and this Interim Order, in all cases in accordance with the Budget, a copy of which is attached hereto as Exhibit B, and as otherwise provided in the DIP Documents;

(ix)    Use any Prepetition Collateral, including the Cash Collateral, and provide adequate protection to those parties set forth herein that may have an interest in such Prepetition Collateral, including Cash Collateral, for any possible Diminution;

(x)    Vacate and modify the automatic stay imposed by § 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(xi)    Schedule a final hearing (the "Final Hearing") to consider entry of an order (the "Final Order") granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing; and

(xii)    Waive, to the extent applicable, any stay of the immediate effectiveness of this Interim Order imposed by the Bankruptcy Code or the Bankruptcy Rules, such that this Interim Order shall be immediately effective upon its entry on the Court's docket.

The Court having considered the Motion, the *Declaration of George A. Mangiaracina in Support of Debtors' Chapter 11 Petitions and First Day Pleadings, the Declaration of Eric J. Held in Support of Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To Obtain Postpetition Secured Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Authorizing Use of Cash Collateral; (VI)  Scheduling a Final Hearing; and (VII) Granting Related Relief*, the DIP Agreement, and the evidence submitted or adduced and the arguments of counsel made at the hearing on this Interim Order (the "Interim Hearing"); and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014; and the Interim Hearing having been held and concluded; and it appearing that granting the relief requested in the Motion on an interim basis is an appropriate exercise of the Debtors' business judgment, necessary to avoid immediate and irreparable harm to the Debtors pending the Final Hearing, and is otherwise fair and reasonable and in the best interests of the Debtors, their estates and their creditors, and is essential for the preservation of the value of the Debtors' property; and all objections, if any, to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**IT IS FOUND AND DETERMINED THAT**[3]:

A.      Petition Date.  On April 26, 2026 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code with this Court.

---

[3]   The findings and conclusions set forth herein constitute the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.  <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, and over the persons and property affected hereby.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.

C.  <u>Notice</u>.  Notice of the Interim Hearing and notice of the Motion has been given by the Debtors to (i) the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"); (ii) the Debtors' thirty (30) largest unsecured creditors (excluding insiders); (iii) counsel to the DIP Lender and to the Prepetition Secured Parties; (iv) all known holders of liens upon the Debtors' assets; (v) the attorneys general in the states in which the Debtors conduct their business; (vi) the Internal Revenue Service; (vii) the United States Securities and Exchange Commission (the "<u>SEC</u>"); and (viii) all parties that have filed notices of appearance pursuant to Bankruptcy Rule 2002; in each case by facsimile transmission, email, overnight courier and/or hand delivery. Under the circumstances, such notice of the Interim Hearing and Motion and the relief provided for in this Interim Order constitutes adequate and sufficient notice and complies with § 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001, and the Local Rules.

D.  <u>Debtors' Stipulations</u>.  In requesting the financing from the DIP Lender and in exchange for and as a material inducement to the DIP Lender to agree to provide the financing in accordance with the DIP Credit Facility, and to the Prepetition Secured Parties in exchange for any potential Diminution, the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the Challenge rights set forth in Paragraph 21 of this Interim Order

(solely with respect to the Prepetition Secured Parties) and without prejudice to the rights of interested parties other than the Debtors, as follows (the "Stipulations"):

(i)      As of the Petition Date, the Debtors have the following secured indebtedness:

a.      An aggregate outstanding amount of $23,950,000, inclusive of all accrued and unpaid interest, fees, costs, and expenses (collectively, the "Prepetition Loan Obligations"), owed pursuant to that certain Loan Agreement, dated as of May 6, 2024 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Loan Agreement"), by and among Impac Mortgage Holdings, Inc. ("Impac"), each subsidiary of Impac that is a guarantor thereunder, and Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1 (in such capacity, the "Prepetition Lender"), which obligations are secured by the Prepetition Loan Collateral. An aggregate outstanding principal amount of $2,000,000, together with all accrued and unpaid interest, fees, costs, and expenses (collectively, the "Prepetition Bridge Note Obligations," and together with the Prepetition Loan Obligations, the "Prepetition Obligations"), owed pursuant to that certain Bridge Note, dated as of January 26, 2026 (as amended, restated, supplemented, or otherwise modified from time to time, the "Bridge Note"), by and among Impac and Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1, as successor-by-assignment to Trinity Park Investments, LLC, (in such capacity, the "Bridge Note Lender," and together with the Prepetition Lender, the "Prepetition Secured Parties"), which obligations are secured by the Bridge Note Collateral, with the consent of the Prepetition Lender, rank *pari passu* with the liens securing the Prepetition Loan Obligations (the Bridge Note Collateral, and together with the Prepetition Loan Collateral, the "Prepetition Collateral").

(ii)     As of the Petition Date: (a) the Prepetition Obligations constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from § 362 of the Bankruptcy Code to the extent applicable); (b) no recoupments, offsets, defenses, or counterclaims exist to the Prepetition Obligations; and (c) no portion of the Prepetition Obligations or any payments or other transfers made to the Prepetition Secured Parties or applied to the Prepetition Obligations prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, recoupment, offset, counterclaim, crossclaim, defense, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iii)    The liens of the Prepetition Secured Parties (the "<u>Prepetition Liens</u>") constitute valid, binding, enforceable (other than with respect to the stay of an enforcement arising from § 362 of the Bankruptcy Code) and perfected liens with priority over any and all other liens in the Prepetition Collateral (except as otherwise provided in the Prepetition Loan Agreement, the Bridge Note, and / or any other documents relating thereto, respectively (collectively, the "<u>Prepetition Loan Documents</u>")), and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, crossclaim, or claim (as defined in § 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iv)    The Debtors have waived, discharged, and released any right they may have to challenge the Prepetition Obligations and the Prepetition Liens on the Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or causes of action against any Prepetition Secured Party with respect to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens, or the Prepetition Collateral;

(v)    Any payments made on account of the Prepetition Obligations before the Petition Date were payments made (a) out of the Prepetition Collateral, and/or (b) in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors;

(vi)    All of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral;

(vii)    Neither the DIP Lender nor any of the Prepetition Secured Parties is a control person or insider (as defined in § 101(31) of the Bankruptcy Code) of any Debtor;

(viii)   Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime, or seek to prime (or otherwise cause to be subordinated in any way), (a) the liens provided to the DIP Lender, or (b) the Prepetition Liens securing the Prepetition Collateral in favor of the Prepetition Secured Parties, in each case by offering a subsequent lender, or any party-in-interest, a superior or *pari passu* lien or claim with respect to the DIP Collateral or the Prepetition Collateral, as applicable, pursuant to § 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out;

(ix)   Until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under §§ 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to or *pari passu* with the DIP Superpriority Claim and the Adequate Protection Liens provided herein, except with respect to the Carve-Out;

(x)   The Prepetition Secured Parties are entitled, pursuant to §§ 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), that may be caused by or arising as a result of (a) the incurrence and payment of the DIP Obligations, (b) the use of Prepetition Collateral (including Cash Collateral), (c) the granting of the DIP Liens and the DIP Superpriority Claim, (d) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out, (e) the subordination of the Prepetition Obligations to the Carve-Out, and (f) imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code.

E. <u>Cash Collateral</u>. For the purposes of this Interim Order, the term "<u>Cash Collateral</u>" shall mean and include all "cash collateral," as defined in § 363 of the Bankruptcy Code, in or on which the DIP Lender or the Prepetition Secured Parties have a lien, security interest, or any other interest (including, without limitation, any Adequate Protection Liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise, and shall include, without limitation:

(i) All cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Lender or the Prepetition Secured Parties have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

(ii) All of the respective deposits, refund claims, and rights in retainers of the Debtors on which the DIP Lender or the Prepetition Secured Parties hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise;

(iii) All cash and cash equivalents held in any depository or other accounts maintained by the Debtors, whether such cash and cash equivalents existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

(iv) The proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral; and

(v) Any residual proceeds, after satisfaction of the Enterprise Loans (as defined in the Motion), that flow to the Debtors' estates from (a) the EB&T Pledged Accounts (as defined

in the Motion), including any cash collateral contained in restricted cash accounts securing the Enterprise Loans, and (b) the cash surrender value or death benefit proceeds of the Life Insurance Policies (as defined in the Motion) assigned as collateral for the Enterprise Loans.

For the avoidance of doubt, and subject to the Interim Order and Final Order, the Debtors' authorization to use Cash Collateral shall automatically terminate, without further order of the Court, upon the earliest of: (a) the Maturity Date; (b) entry of any order by the Bankruptcy Court denying or terminating the Debtors' use of Cash Collateral; or (c) upon the occurrence or continuation of an Event of Default.

       F.       <u>Findings Regarding the DIP Credit Facility</u>.

       (i)       <u>Need for the DIP Credit Facility and to Use Cash Collateral</u>.  An immediate need exists for the Debtors to obtain funds pursuant to borrowings under the Interim DIP Credit Facility and to use Cash Collateral in order to continue operations, fund payroll, and operating expenses, and administer and preserve the value of their estates pending the Final Hearing.  The ability of the Debtors to finance their operations through the Interim DIP Credit Facility and use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors' estates, to maximize the value of the Debtors' assets for the benefit of their creditors, and to avoid immediate and irreparable harm to the Debtors, their estates and their creditors.

       (ii)       <u>Priming of Any Prepetition Liens</u>.  Upon the entry of this Interim Order, the priming of any of the Primed Liens, is a condition to the Debtors' borrowings under the DIP Credit Facility, which borrowing is necessary for the Debtors to be able to continue to operate their business and administer the Chapter 11 Cases for the benefit of their estates and creditors.  The parties holding Primed Liens have consented to such treatment, and the terms of the adequate protection arrangements provided for herein are fair and reasonable and otherwise sufficient under

the circumstances to adequately protect the Prepetition Secured Parties against any Diminution with respect to the Prepetition Collateral as provided for herein.  For the avoidance of doubt, the Prior Permitted Liens are not being primed by the DIP Credit Facility.

(iii)    No Credit Available on More Favorable Terms.  The Debtors have been unable to obtain (a) unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, or (b) credit for money borrowed secured by a lien on property of the estates on more favorable terms and conditions than those provided in the DIP Agreement and this Interim Order.  The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections.

G.    Sections 506(c) and 552(b) Waivers. In light of (i) the DIP Lender's agreement to subordinate its liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lender to agree to provide the DIP Credit Facility and (ii) the Prepetition Secured Parties' agreement to subordinate their liens to the DIP Obligations, the Carve-Out, and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral for payments made in accordance with the Budget and the terms of this Interim Order), each of the DIP Lender and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the provisions of § 506(c), and, subject to entry of the Final Order, the Prepetition Secured Parties are entitled to a waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code, in each case as provided for herein.

H.    Use of Proceeds of the DIP Credit Facility.  Proceeds of the DIP Credit Facility (net of any amounts used to pay fees, costs, and expenses under the DIP Documents) shall be used in a manner consistent with the terms and conditions of the DIP Agreement and this Interim Order and in accordance with the Budget.

I.    Application of Proceeds of DIP Collateral.  All net proceeds of any sale or other disposition of the DIP Collateral, if any, shall, subject to the Carve-Out, be applied first to repay the DIP Obligations in full.

J.    Effect of Reversal; Good Faith.  The DIP Lender has indicated a willingness to provide financing to the Debtors solely in accordance with the DIP Agreement and this Interim Order, provided that the DIP Obligations, DIP Liens and other protections granted by this Interim Order and the DIP Documents will not be affected by any subsequent reversal or modification of this Interim Order as provided in § 364(e) of the Bankruptcy Code.  The DIP Lender has acted in good faith in agreeing to provide the DIP Credit Facility approved by this Interim Order.

K.    DIP Roll-Up Loan.  Upon entry of this Interim Order, but subject to the provisions of Paragraph 21 of this Interim Order, all outstanding Prepetition Bridge Note Obligations shall be rolled up, and converted into DIP Obligations (the "DIP Roll-Up Loan").  The Bridge Note Lender, who is also the DIP Lender, would not have consented to extend the Bridge Note Loan, DIP Loans, or other financial accommodations to the Debtors without the inclusion of the DIP Roll-Up Loan in the DIP Obligations.  Thus, the DIP Roll-Up Loan is consideration for, and solely on account of, the agreement of the DIP Lender to extend the DIP Loans and not on account of the Prepetition Bridge Note Obligations.

L.    Business Judgment and Good Faith Pursuant to Section 364(e).

(i)    The terms and conditions of the DIP Credit Facility and the DIP Documents, and the fees paid and to be paid thereunder are fair, reasonable, and the best reasonably available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration;

(ii)     The DIP Documents and use of Cash Collateral were negotiated in good faith and at arms' length between the Debtors and the DIP Lender and the Prepetition Secured Parties; and

(iii)     The DIP Credit Facility loan proceeds to be funded to the Debtors pursuant to the DIP Documents will be advanced in good faith, and for valid business purposes and uses, as a consequence of which the DIP Lender is entitled to the protection and benefits of § 364(e) of the Bankruptcy Code.

M.     <u>Immediate Entry of Interim Order</u>. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b). The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors and their estates. This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary to administer the Chapter 11 Cases, to sustain the operation of the Debtors' existing business and to further enhance the Debtors' prospects for a successful reorganization.  Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**NOW, THEREFORE**, based upon the foregoing findings, and upon consideration of the Motion and the record made before this Court with respect to the Motion, including the record created during the Interim Hearing, all papers filed on the docket, and with the consent of the Debtors, the DIP Lender, and the Prepetition Secured Parties to the form and entry of this Interim

Order, and good and sufficient cause appearing therefor, and the Court being otherwise fully advised in the premises;

**IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.      Motion Granted.  The Motion is GRANTED in accordance with the terms and conditions set forth in this Interim Order and the DIP Documents.  Any objections to the Motion with respect to entry of this Interim Order to the extent not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.

2.      The DIP Documents.

(a)      Approval of Entry into the DIP Documents.  The Debtors are authorized to execute, deliver and perform in accordance with the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents.  Upon entry of this Interim Order, all outstanding Prepetition Bridge Note Obligations shall be deemed rolled up and converted into DIP Obligations, subject to the provisions of Paragraph 21 hereof.  The Debtors are authorized to take such acts as shall be necessary or desirable to effect the roll-up and conversion of the Prepetition Bridge Note Obligations to DIP Obligations.  The Debtors are hereby authorized to use Cash Collateral subject to the terms of this Interim Order.  The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the DIP Agreement and all other DIP Documents as such become due.

(b)    Authorization for DIP Financing.  To enable the Debtors to continue to preserve the value of their estates during the period prior to entry of the Final Order (the "Interim Period") and subject to the terms and conditions of this Interim Order, the Budget, and the DIP Documents, upon the execution of the DIP Agreement and the other DIP Documents, the Debtors are hereby authorized to borrow, pursuant to the Interim DIP Credit Facility, the aggregate principal amount of up to (a) the DIP Roll-Up Loan, plus (b) the Initial Term Loan.

(c)    Conditions Precedent.  The DIP Lender shall have no obligation to make any loans under the DIP Agreement during the Interim Period unless the conditions precedent to making such loans under the DIP Agreement, as set forth in Section 7 thereof, have been satisfied in full or waived by the Lender in its sole discretion.

(d)    Enforceable Obligations.  The DIP Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto, and their creditors or representatives thereof, in accordance with their terms.

(e)    Protection of the DIP Lender and Other Rights.  From and after the Petition Date, the Debtors shall use the proceeds of the DIP Credit Facility only for the purposes specifically set forth in the DIP Agreement, this Interim Order, and, notwithstanding any other order of this Court authorizing disbursements by the Debtors, in strict compliance with the Budget (subject only to any variances thereto that may be permitted by the DIP Agreement or the Budget).

3.    The DIP Lien Priority.

(a)    To secure the DIP Obligations, the DIP Lender is hereby granted pursuant to, and in accordance with, §§ 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "DIP Liens") in and on all of the DIP Collateral,

including, without limitation, all of each Debtor's now owned or hereafter acquired right, title, and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds, the EB&T Pledge Accounts (as defined in the Motion), and all cash and other property held therein, all intercompany claims, all claims, and causes of action of each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above, and subject to entry of the Final Order, all proceeds or property recovered in connection with any and all claims, causes of action, rights, or remedies of any Debtor or its estate arising under chapter 5 of the Bankruptcy Code (including, without limitation, §§ 544, 545, 547, 548, 549, 550, and 553 thereof), and any similar or related claims, causes of action, or rights arising under applicable state or other non-bankruptcy law ("Avoidance Actions"), (collectively, the "DIP Collateral"), subject only to prior payment of the Carve-Out and any Prior Permitted Liens;

(b)      The DIP Liens shall be effective immediately upon the entry of this Interim Order other than the DIP Lien on the proceeds of the Avoidance Actions which shall be effective upon entry of the Final Order, and the DIP Liens shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of

-16-

the Petition Date or created thereafter, including under §§ 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve-Out and the Prior Permitted Liens;

(c)     The DIP Liens shall be, and hereby are deemed, fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no action whatsoever need be taken by the DIP Lender, the Debtors, or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.

(d)     For the avoidance of doubt, until indefeasible payment in full in cash of the DIP Obligations, and subject in all cases to the Carve-Out and the terms of the Interim Order and Final Order, the DIP Lender shall have the following priority claims and liens:

(i)     pursuant to § 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims against each Debtor and its estate with priority over any and all administrative expenses and other claims of the kind specified in §§ 503(b) or 507(b) of the Bankruptcy Code and otherwise as set forth in the Orders;

(ii)     pursuant to § 364(c)(2) of the Bankruptcy Code, perfected first priority, senior liens on and security interests in all DIP Collateral that, as of the Petition Date, was not subject to any valid, perfected, and unavoidable lien, or was subject only to invalid, unperfected, or avoidable liens;

(iii)     pursuant to § 364(c)(3) of the Bankruptcy Code, perfected junior liens on, and security interests in, all DIP Collateral that, as of the Petition Date, was subject to a valid, perfected, and unavoidable lien in existence at the commencement of the Chapter 11 Cases, other than the Primed Liens (such third-party senior liens, "Prior Permitted Liens");

(iv)     pursuant to § 364(d)(1) of the Bankruptcy Code, and except with respect to any property subject to Prior Permitted Liens, perfected, first-priority senior priming liens on, and security interests, in all DIP Collateral that is subject to the existing liens in favor of the Prepetition Secured Parties securing the Prepetition Obligations (the "Primed Liens"), which Primed Liens shall be primed by and made subject and subordinate to the perfected first-priority senior priming

-17-

DIP Liens granted to the DIP Lender hereunder; such priming DIP Liens shall also prime any liens granted after the Petition Date as adequate protection of any Primed Liens, all as provided in the Interim Order and Final Order; *provided* that notwithstanding the foregoing, effective upon the making of the Roll-Up Loan, any prepetition liens and security interests, if any, securing the Bridge Note Obligations are hereby deemed replaced by the DIP Liens securing the DIP Obligations (including the DIP Roll-Up Loan), as provided in this Interim Order and the Final Order;

(v)     the DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (a "Successor Case"), or upon the dismissal of the any of the Chapter 11 Cases or Successor Case; and

(vi)     pursuant to the terms of this Interim Order, be subject to the Carve-Out.

4.      Superpriority Administrative Claim. The DIP Lender is hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim," together with the DIP Liens, the "DIP Protections") pursuant to § 364(c)(1) of the Bankruptcy Code in each of the Chapter 11 Cases and in any Successor Case(s) for all DIP Obligations, including the DIP Roll-Up Loan, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, including, without limitation, and after entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment

of the Carve-Out.  The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases.

5.     <u>Authorization to Use Proceeds of the DIP Credit Facility and Cash Collateral</u>. Pursuant to the terms and conditions of this Interim Order, the DIP Agreement and the other DIP Documents, and in accordance with the Budget and any variances thereto that may be permitted pursuant thereto or pursuant to the DIP Agreement, the Debtors are authorized to use the borrowings pursuant to the DIP Agreement and to use Cash Collateral during the Interim Period until the earliest to occur of the (a) the Maturity Date; (b) entry of any order by the Bankruptcy Court denying or terminating the Debtors' use of Cash Collateral; or (c) upon the occurrence or continuation of an Event of Default.  Subject to the terms of the DIP Agreement, the Debtors and the DIP Lender may agree in writing to modify the Budget in the DIP Lender's sole discretion at any time that the DIP Credit Facility remains outstanding; *provided, however*, that any such updated, modified or supplemented Budget provided to the DIP Lender shall be deemed approved at 5:00 p.m. (Eastern Time) five (5) days following the delivery of such Budget to the DIP Lender if the DIP Lender has neither approved nor rejected such Budget.

6.     <u>Relief from the Automatic Stay</u>.

(a)     Subject to Paragraph 16 of this Order, only upon five (5) Business Days' prior written notice to the Debtors (the "<u>Remedies Notice Period</u>"), counsel approved by this Court for any official committee of unsecured creditors in the Chapter 11 Cases (the "<u>Committee</u>"), if one is appointed, the Prepetition Secured Parties, and the U.S. Trustee, the DIP Lender is hereby granted relief from any stay of proceeding (including, without limitation, the automatic stay applicable under § 362 of the Bankruptcy Code to the holder or holders of any security interest) to permit the DIP Lender, upon the occurrence of and continuance of an Event of Default, to exercise

any rights and remedies provided to the DIP Lender under the DIP Documents or at law or equity, including all remedies provided under the Bankruptcy Code.  Furthermore, the DIP Lender is hereby granted immediate relief from the automatic stay to take steps to perfect the DIP Liens, as described below.  The automatic stay of § 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Committee, the Prepetition Secured Parties, and/or the U.S. Trustee have not obtained an order providing otherwise (a "Stay Enforcement Order") from this Court prior to the expiration of the Remedies Notice Period; *provided* that the hearing on whether the automatic stay shall be terminated may be sought on an expedited basis; and *provided further* that the sole basis on which the Debtors shall be permitted to seek a Stay Enforcement Order is that no Event of Default has occurred.

(b)    Upon an Event of Default and subject to the expiration of the Remedies Notice Period without entry of a Stay Enforcement Order, and notwithstanding § 362 of the Bankruptcy Code, the Prepetition Lender, solely in its capacity as party to any deposit account control agreement(s) or similar control agreements in effect as of the Petition Date with respect to any Debtor's deposit, securities, or other bank accounts (collectively, "DACAs"), shall be granted limited relief from the automatic stay to deliver any "notice of exclusive control," "activation notice," or similar instruction required under the DACAs to acknowledge and implement that the Prepetition Lender has exclusive control over the applicable account(s) for the benefit of itself and the DIP Lender pursuant to this Interim Order.  Any bank, financial institution, depository, or securities intermediary subject to a DACA (each, a "Depository Institution") is authorized to comply with any such notice or instruction without further order of the Court, and shall have the protections of § 364(e) of the Bankruptcy Code and any other applicable protections afforded by

this Interim Order for taking such actions in good faith. For the avoidance of doubt, any such exercise shall be limited to effectuating the Prepetition Lender's and the DIP Lender's exclusive control consistent with the DIP Documents and this Interim Order. Nothing in this paragraph requires the Prepetition Lender or any Depository Institution to sweep, transfer, or apply funds in any account before the expiration of the Remedies Notice Period. All parties' rights with respect to cash management relief and orders remain reserved, and this Paragraph 6 is intended to complement, and not conflict with, any cash management order entered in these Chapter 11 Cases.

7.      Postpetition Lien Perfection.

(a)      This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender may, at its sole discretion, file financing statements, without notice to the Debtors, with all appropriate jurisdictions to perfect or protect the DIP Lender's interest or rights hereunder, including a notice that any disposition of the DIP Collateral, by any of the Debtors or any other Person, shall be deemed to violate the rights of the DIP Lender under the Uniform Commercial Code. Such financing statements may indicate the DIP Collateral as "all assets of the Borrower" or words of similar effect, or as being of an equal or lesser scope, or with greater detail, all in the DIP Lender's discretion, and is hereby granted relief from the automatic stay of § 362 of the Bankruptcy Code in order to do so, and any and all of such financing

statements, mortgages, notices of lien and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Chapter 11 Cases.

(b) The Debtors shall from time to time execute and deliver to the DIP Lender, at the written request of the DIP Lender, all negotiable collateral, all financing statements and other documents that the DIP Lender may reasonably request, in form satisfactory to the DIP Lender, to perfect and continue the perfection of the DIP Lender's security interests in the DIP Collateral and in order to fully consummate all of the transactions contemplated under the DIP Documents.

8. <u>Authorization and Direction for Payment of DIP Lender and Prepetition Secured Parties' Fees and Expenses</u>. Subject to the provisions of this Paragraph 8 and Paragraph 2(a) of this Interim Order, all reasonable and documented fees paid or payable, and all reasonable and documented costs and expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Documents and the DIP Lender's reasonable and documented attorneys' fees and expenses), by the Debtors to the DIP Lender are hereby approved, but solely to the extent provided in the DIP Agreement. The Debtors are hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Agreement and this Interim Order, as well as all reasonable and documented fees and expenses payable to the Prepetition Secured Parties' pursuant to Paragraph 12(d), without any requirement that the Debtors, the DIP Lender, the Prepetition Secured Parties or their respective attorneys file any further application or other pleading, notice, or document with the Court for approval or payment of such fees, costs or expenses. The Debtors shall pay all reasonable and documented prepetition and postpetition out of pocket costs and expenses of DIP Lender and the Prepetition Secured Parties in connection with the Chapter 11 Cases and any Successor Case(s), including, without limitation, in connection with (a) the preparation, negotiation, execution and delivery of

the DIP Documents, this Interim Order, and any Final Order, and the funding of all DIP Loans under the DIP Credit Facility, (b) the administration of the DIP Credit Facility and any amendment or waiver of any provision of the DIP Documents, this Interim Order, and any Final Order, (c) the administration of the Chapter 11 Cases and any Successor Case(s), (d) the enforcement or protection of the DIP Lender's rights and remedies under the DIP Documents, this Interim Order, and any Final Order, and (e) as provided in Paragraph 12(d). Notwithstanding anything to the contrary herein, the payment of all such reasonable and documented fees, costs and expenses of DIP Lender and the Prepetition Secured Parties, whether incurred before or after the Petition Date, including, without limitation, all reasonable and documented fees referred to in the DIP Documents, all fees referred to in Paragraph 12(d) and all attorneys' fees and expenses, shall (i) be subject to Paragraph 21 of this Interim Order, be deemed non-refundable and irrevocable, and (ii) not be subject to the Budget.   None of DIP Lender's or the Prepetition Secured Parties' attorneys' fees or disbursements shall be subject to the approval (whether prior to payment or after) of this Court or the guidelines of the Office of the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  Any such fees, costs and expenses shall be paid by the Debtors within fourteen (14) days after delivery of a summary invoice to the Debtors and without the need for application to or order of the Court.  Such summary invoice may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any

other evidentiary privilege or protection recognized under applicable law. A copy of such summary invoice shall be provided by DIP Lender or the Prepetition Secured Parties, as applicable to the U.S. Trustee contemporaneously with the Debtors' receipt of such summary invoice. Notwithstanding the foregoing, if (x) the Debtors or the U.S. Trustee object to the reasonableness of a summary invoice submitted by the DIP Lender or the Prepetition Secured Parties and (y) the parties cannot resolve such objection, in each case within the fourteen (14) day period following receipt of such summary invoice, the Debtors or the U.S. Trustee, as the case may be, shall file with the Court and serve on the DIP Lender or Prepetition Secured Party submitting the fee request a fee objection (a "Fee Objection"), which Fee Objection shall be limited to the issue of the reasonableness of such fees and expenses. The Debtors shall promptly pay and/or the DIP Lender is hereby authorized to make an advance under the DIP Agreement to timely pay, any submitted invoice after the expiration of the fourteen (14) day period if no Fee Objection is filed with the Court and served on the DIP Lender or the Prepetition Secured Parties (as applicable) in such fourteen (14) day period. If a Fee Objection is timely filed and served, the Debtors shall promptly pay and/or the DIP Lender are hereby authorized to make an advance under the DIP Agreement to timely pay, the undisputed amount of the summary invoices, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the Fee Objection.

        9.      Carve-Out; Professional Fee Escrow.

        (a)      "Carve-Out" means (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) (without regard to the notice set forth in (c) below) (the "U.S. Trustee Fees"); (b) to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court, solely to the extent provided

-24-

for in the Budget, all unpaid fees (including, without limitation, transaction fees paid upon the closing of the respective transaction but excluding success fees) and expenses (collectively, the "Professional Fees") accrued or incurred by persons or firms retained by the Debtors pursuant to §§ 327, 328, or 363 of the Bankruptcy Code (the "Professionals") and any Committee professionals (the "Committee Professionals" and, together with the Professionals, the "Professional Persons") employed by the Committee (if such Committee is appointed in these Chapter 11 Cases pursuant to §§ 328 or 1103 of the Bankruptcy Code) at any time on or prior to delivery by or on behalf of the DIP Lender of a Carve-Out Trigger Notice, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (c) the Professional Fees in an aggregate amount not to exceed $125,000 for amounts incurred after the date of delivery of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise by the Court (the amounts set forth in this clause (c) being the "Post-Carve-Out Trigger Notice Cap").  "Carve-Out Trigger Notice" means a written notice delivered by email (or other electronic means) to the Debtors and their counsel, the U.S. Trustee, and counsel to the Committee, if any, and the Prepetition Secured Parties, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Documents, stating (x) that the Post-Carve-Out Trigger Notice Cap has been invoked, (y) the DIP Loans have been accelerated, and (z) the DIP Lender does not intend to fund further advances under the DIP Loans or consent to further use of Cash Collateral.  Except as otherwise provided herein, no portion of the Carve-Out or proceeds of the DIP Credit Facility may be used for the payment of the fees and expenses of any person incurred in challenging, or in relation to the Challenge of, (a) the liens and/or claims of the DIP Lender or the Prepetition Secured Parties, or the initiation or prosecution of any claim or action against the DIP Lender or the Prepetition Secured Parties, including, without

limitation, any Avoidance Actions, and any other federal, state or foreign law, in respect of the DIP Documents or (b) any claims or causes of actions against the DIP Lender or the Prepetition Secured Parties, their advisors, professionals, agents and sub-agents, including formal discovery proceedings in anticipation thereof.

(b)      The Debtors shall wire transfer funds, on a weekly basis, to an escrow agent as the Debtors and the DIP Lender may agree in writing, in an amount equal to, but not to exceed, the amounts set forth in the professional fee line items under the "Restructuring Disbursements" subheading in the Budget for each such week (the "Professional Fee Escrow").  The Debtors shall use funds held in the Professional Fee Escrow exclusively to pay Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, in accordance with any interim or final orders of the Court; *provided*, however, that the Debtors' obligations to pay such allowed Professional Fees shall not be limited or be deemed limited to funds held in the Professional Fee Escrow.  Upon delivery of a Carve-Out Trigger Notice, the Debtors may also fund the Professional Fee Escrow with the amount of the Post-Carve-Out Trigger Notice Cap.  Except as provided in this Interim Order, no funds of the Debtors shall be transferred or otherwise deposited into the Professional Fee Escrow.  The Professional Fee Escrow shall not be subject to the control of the DIP Lender, and the funds transferred to the Professional Fee Escrow shall not be subject to the DIP Liens, the Adequate Protection Liens or any other liens, nor constitute DIP Collateral, Prepetition Collateral or collateral for any other obligation; *provided*, *however*, that the DIP Liens shall automatically attach to any residual interest in the Professional Fee Escrow (which liens shall be deemed automatically perfected liens as of entry of this Interim Order), and upon satisfaction of all amounts payable from the Professional Fee Escrow, any excess proceeds shall revert to the DIP Lender until the DIP

Obligations have been satisfied in full and thereafter to the Debtors' (including as reorganized pursuant to a chapter 11 plan).

10.     For the avoidance of doubt, notwithstanding any (i) occurrence of any Event of Default, (ii) delivery of a Carve-Out Trigger Notice, or (iii) termination of the DIP Documents, the Debtors shall be permitted to fund and make payments from the Professional Fee Escrow in accordance with the Budget and this Interim Order; *provided, that*, for the further avoidance of doubt, nothing in this subparagraph is intended or shall be deemed to obligate the DIP Lender to make any further DIP Loans or advance any further funds under the DIP Facility upon the occurrence of any of the events identified at (i), (ii), and (iii) in this subparagraph.

11.     Payment of Compensation.  Nothing herein shall (i) limit or cap the amount of any professional fees of the Debtors or any Committee that may ultimately be allowed or paid from sources other than the DIP Collateral or Prepetition Collateral, or (ii) be construed as consent to the allowance of any professional fees or expenses of the Debtors or any Committee or affect the right of any party in interest to object to the allowance and payment of such fees and expenses.

12.     Adequate Protection for Prepetition Secured Parties. As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to § 362 of the Bankruptcy Code, the Prepetition Secured Parties are hereby granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection:

(a)     Adequate Protection Liens. The Prepetition Secured Parties are hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens, (ii) prior payment of the Carve-Out and (iii) any liens senior by operation of law or otherwise permitted under the Prepetition Loan Documents (solely to the extent that any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, or valid, non-avoidable senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code).

(b)     Superpriority Claims.  Administrative superpriority expense claims in the Chapter 11 Cases (the "Adequate Protection Superpriority Claims"), junior and subordinate only to the DIP Obligations and the Carve-Out, pursuant to section 507(b) having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under §§ 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed Adequate Protection Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof including, without limitation, and after

entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.

(c)        506(c) and 552(b) Waivers. Upon the entry of the Final Order, the Prepetition Secured Parties' consent to use of Cash Collateral and Prepetition Collateral under this Interim Order and the Final Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any § 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Chapter 11 Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in §§ 552(b)(1) and (2) of the Bankruptcy Code.

(d)        Prepetition Secured Parties Fees and Expenses.  The Debtors shall pay all outstanding prepetition and all postpetition reasonable and documented fees and expenses incurred by Prepetition Secured Parties, including, without limitation, the reasonable and documented fees and expenses of counsel to the Prepetition Secured Parties in accordance with the procedures identified in Paragraph 8.

13.      Credit Bid Rights.  In connection with any sale or disposition of all or any portion of the DIP Collateral, including in each case pursuant to §§ 9-610 or 9-620 of the Uniform Commercial Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including § 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under § 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the DIP Lender, by a chapter 7 trustee under § 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, § 363(k) of the Bankruptcy Code, the DIP Lender shall have the power and right to "credit bid" the full amount of all DIP Obligations

(inclusive of the DIP Roll-Up Loan) in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral and (b) subject to the terms of Paragraph 21 herein, the Prepetition Lender shall have the right to credit bid the Prepetition Loan Obligations, in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Prepetition Loan Collateral.  The Debtors, on behalf of themselves and the estates, further hereby agree not to challenge the rights granted to the DIP Lender and the Prepetition Lender in this paragraph.

14.     Maturity Date.  The maturity date (the "Maturity Date") of the DIP Agreement is the earlier of (a) the date which is ninety (90) days following the Petition Date, (b) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases; (c) the date of filing or support by the Debtors of a plan of reorganization other than the plan contemplated by the Restructuring Agreement; (d) entry of an order by the Bankruptcy Court converting the Chapter 11 Cases to a proceeding or proceedings under chapter 7 of the Bankruptcy Code or appointing a chapter 11 trustee; (e) entry of a final order by the Bankruptcy Court dismissing the Chapter 11 Cases; or (f) the date of termination of the DIP Credit Facility and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of the DIP Agreement.

15.     Events of Default.  The occurrence of an "Event of Default" by the Debtors pursuant to Section 10 of the DIP Agreement shall constitute an event of default under this Interim Order, unless expressly waived by the DIP Lender in its sole discretion in writing in accordance with the DIP Documents (each, an "Event of Default").

16.     Rights and Remedies Upon Event of Default. Upon the occurrence and during the continuance of an Event of Default, the DIP Lender shall have the rights to which it is entitled

under the DIP Agreement and this Interim Order, subject to the rights and defenses of the Debtors under this Interim Order.

17.    Proofs of Claim.  Neither the DIP Lender nor the Prepetition Secured Parties shall be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein.  The Stipulations set forth in Paragraph D of this Interim Order shall be deemed to constitute a timely filed proof of claim for the Prepetition Secured Parties upon approval of this Interim Order.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the Prepetition Secured Parties are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement as it sees fit) a proof of claim and/or proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

18.    Other Rights and Obligations.

(a)    Good Faith Under Section 364(e) of the Bankruptcy Code.  The DIP Lender and the Prepetition Secured Parties have acted in good faith in connection with (i) negotiating the DIP Documents and the loans to be made pursuant thereto, (ii) consenting to the Debtors' use of Cash Collateral, and (iii) their reliance on this Interim Order.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with § 364(e) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), in the event any or all of the provisions of this Interim Order are hereafter reversed or modified by a subsequent order of this or any other Court, the DIP Lender and the Prepetition Secured Parties are entitled to all of the benefits and protections provided in § 364(e) of the Bankruptcy Code.

(b)    Binding Effect.  The DIP Liens, DIP Superpriority Claim, and the Adequate Protection Liens and other rights and remedies granted under this Interim Order to the DIP Lender

and the Prepetition Secured Parties, as applicable, shall continue in these Chapter 11 Cases and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and upon the dismissal of any or all of the Debtors' Chapter 11 Cases, or in any Successor Case(s), and such liens and security interests shall maintain their first priority as provided in this Interim Order until all the DIP Obligations or the Prepetition Obligations, as applicable, have been indefeasibly paid in full in accordance with the DIP Documents, the Prepetition Documents or this Interim Order, as applicable.

(c)    DIP Lender Expenses.  If any Debtor fails to pay any amounts or furnish any required proof of payment due to third persons or entities to safeguard or preserve the DIP Collateral, including to obtain any insurance policies DIP Lender reasonably determines to be appropriate, or otherwise as required under the terms of the DIP Agreement, then the DIP Lender may do any or all of the following after reasonable notice to the Debtors:  (i) make payment of the same or any part thereof; (ii) set up such reserves as the DIP Lender deems necessary to protect the DIP Lender from the exposure created by such failure; or (iii) obtain and maintain insurance policies, including of the type discussed in Section 9(c) of the DIP Agreement, and take any action with respect to such policies as the DIP Lender deems prudent.  Any reasonable and documented costs and expenses incurred by the DIP Lender in connection with actions permitted by the DIP Documents to protect or preserve the DIP Collateral or to enforce rights thereunder shall constitute DIP Obligations under the DIP Agreement, shall be secured by the DIP Liens on the DIP Collateral, and shall be payable on demand; any such amounts not paid when due shall accrue interest at the Default Rate as provided in Section 3(b) of the DIP Agreement.  Any payments made by the DIP Lender shall not constitute an agreement by the DIP Lender to make similar

payments in the future or a waiver by the DIP Lender of any Event of Default under the DIP Agreement.

(d)     The DIP Lender's Liability for DIP Collateral.  So long as the DIP Lender complies with reasonable commercial lending practices, the DIP Lender shall not in any way or manner be liable or responsible for:  (i) the safekeeping of the DIP Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever.  All risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtors.

(e)     Remedies Cumulative.  The DIP Lender's rights and remedies under the DIP Agreement, the DIP Documents, and all other agreements shall be cumulative.  The DIP Lender shall have all other rights and remedies not inconsistent herewith as provided under the New York Uniform Commercial Code, by law, or in equity, subject to the requirements of the Bankruptcy Code.  No exercise by the DIP Lender of one right or remedy shall be deemed an election, and no waiver by the Lender of any Event of Default shall be deemed a continuing waiver. No delay by the DIP Lender shall constitute a waiver, election, or acquiescence by it.  No waiver by the DIP Lender shall be effective unless made in a written document signed on behalf of the DIP Lender and then shall be effective only in the instance and for the purpose for which it was given.

(f)     Demand; Protest.  The Debtors waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts,

documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Debtors may in any way be liable.

(g)    <u>Borrower Liability</u>.  Any of the Debtors may, acting singly, request a Loan under the DIP Agreement.  Each of the Debtors hereby appoint each other as agent for the other for all purposes under the DIP Agreement, including with respect to requesting Loans.  Each of the Debtors shall be jointly and severally obligated to repay all Loans made under the DIP Agreement, regardless of which of the Debtors actually receives said Loans, as if each of the Debtors directly received all Loans.  Each of the Debtors waive any right to require the DIP Lender to:  (i) proceed against the Debtors or any other person; (ii) proceed against or exhaust any security; (iii) seek to impose the equitable doctrine of marshalling (subject to entry of the Final Order); or (iv) pursue any other remedy.  Subject to the terms of this Interim Order, the Final Order, and the DIP Agreement, the DIP Lender may exercise or not exercise any right or remedy it has against any Debtor or any security they hold (including the right to foreclose by judicial or non-judicial sale) without affecting any of the Debtors' liability.  Notwithstanding any other provision of the DIP Agreement or other related document, each Debtor irrevocably waives all rights that it may have at law or in equity (including, without limitation, any law subrogating the Debtors to the rights of the DIP Lender under the DIP Agreement) to seek contribution, indemnification or any other form of reimbursement from any other Debtor, or any other Person now or hereafter primarily or secondarily liable for any of the DIP Obligations, for any payment made by the Debtors with respect to the DIP Obligations in connection with the DIP Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the DIP Obligations as a result of any payment made by the Debtors with respect to the Obligations in connection with the DIP Agreement or otherwise.

(h)     Amendments in Writing, Integration.  Except as expressly set forth in the DIP Agreement, all amendments to or terminations of the DIP Agreement or the DIP Documents must be in writing signed by each of the parties thereto.  All prior agreements, understandings, representations, warranties, and negotiations between any of the parties thereto with respect to the subject matter of the DIP Agreement and the DIP Documents, if any, are merged into the DIP Agreement and the DIP Documents.

19.     Releases.  The release, discharge, waivers, settlements, compromises, and agreements set forth in this Paragraph 19 and the Stipulations set forth in Paragraph D of this Interim Order shall be deemed effective upon entry of this Interim Order, subject only to the rights set forth in Paragraph 21 below.

(a)     The Debtors forever and irrevocably release, discharge, and acquit (i) the DIP Lender, solely in its capacity as DIP Lender, under the DIP Documents; (ii) the DIP Lender's affiliates and predecessors in interest; and (iii) the DIP Lender's former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' actual fraud, gross negligence, bad faith, self-dealing or

-35-

willful misconduct.  For the avoidance of doubt, nothing contained herein shall relieve the DIP Lender from fulfilling any of its commitments under this Interim Order or the DIP Documents.

(b)        Subject to (i) entry of the Final Order and (ii) the Challenge rights set forth in Paragraph 21 of this Interim Order and without prejudice to the rights of interested parties under Paragraph 21 of this Interim Order, the Debtors forever and irrevocably release, discharge, and acquit the Prepetition Secured Parties, solely in their capacity as prepetition lenders, respectively, under the Prepetition Loan Documents, and their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants, and attorneys, solely in their capacity as such (collectively, the "Prepetition Secured Party Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type at any time arising prior to the Petition Date, including without limitation, all Avoidance Actions, provided that no such parties will be released, discharged, and acquitted for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' actual fraud, gross negligence, bad faith, self-dealing or willful misconduct.  For the avoidance of doubt, the foregoing release applies only to conduct, acts and omissions that occurred on or prior to the entry of the Final Order, and the release does not apply to future conduct, acts or omissions or ongoing obligations of the Prepetition Secured Parties to the Debtors under the Prepetition Loan Documents.

20.        Indemnity.  The DIP Lender has acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or

-36-

related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Loans, including in respect of the granting of the DIP Liens, any challenges or objections to the DIP Credit Facility, and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the DIP Lender shall be and hereby is indemnified and held harmless by the Debtors in respect of any claim or liability incurred in respect thereof or in any way related thereto, *provided* that no such party will be indemnified for any cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such party's actual fraud, gross negligence, bad faith, or willful misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set forth, as the case may be, in this Paragraph 20 or in the DIP Documents, to the Debtors' obligation to indemnify and/or hold harmless the DIP Lender.

21.     Reservation of Certain Third-Party Rights and Bar of Challenges and Claims. The releases set forth in Paragraph 19 above and the Stipulations set forth in Paragraph D of this Interim Order shall be binding upon the Debtors and any of their respective successors and assigns in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date.  In addition, such releases and Stipulations shall be binding upon the Debtors' estates and all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates (including any chapter 7 trustee or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to § 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), unless and to the extent that a party interest with proper standing granted by order of this Court (to the extent required) has filed an adversary proceeding or initiated a contested matter

-37-

under the Bankruptcy Rules (i) by no later than the earlier of seventy-five (75) calendar days after entry of this Interim Order or confirmation of a chapter 11 plan, subject to further extension by (a) written agreement of the Debtors and the Prepetition Secured Parties; or (b) an order of this Court obtained on notice and after a hearing (in each case, a "Challenge Period" and the date of expiration of each Challenge Period, a "Challenge Period Termination Date"); (ii) seeking to avoid, object to, or otherwise challenge the findings in this Interim Order and the Debtors' Stipulations (any such claim, a "Challenge"); and (iii) in which this Court enters a final order in favor of the plaintiff or the movant sustaining any such Challenge in any such filed adversary proceeding or initiated contested matter.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled), (i) any and all such Challenges by any party (including any Committee, any chapter 11 trustee and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; and (ii) the Stipulations set forth in Paragraph D of this Interim Order shall be binding on all parties in interest, including any Committee.  For the avoidance of doubt, if any party in interest timely commences a Challenge, the releases and Stipulations set forth in Paragraph 19 and Paragraph D of this Interim Order shall remain binding in all respects on all other parties in interest other than the challenging party, and such releases and Stipulations shall continue in full force and effect as to all such non-challenging parties.  The releases and Stipulations set forth in Paragraph 19 and Paragraph D of this Interim Order shall also remain binding on the challenging party except solely to the extent of the specific claims and defenses expressly asserted in the timely and properly filed Challenge, and only if and to the extent such Challenge is subsequently sustained by a Final Order.  Nothing in this Interim

Order vests or confers on any person or entity, including, without limitation, any Committee, standing or authority to pursue any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any Challenges.

22.     Restrictions on Use of Funds. Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, without the express written consent of the DIP Lender, no proceeds of the DIP Credit Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, any Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Case(s), or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to § 364 of the Bankruptcy Code or otherwise, other than from the DIP Lender, unless the proceeds of such loans or accommodations are or will be sufficient, and will be first used, to indefeasibly pay in full in cash all DIP Obligations; (b) investigate (except as set forth in this paragraph below), assert, join, commence, support or prosecute any Challenge or other action or claim, counter-claim, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Lender or any other DIP Lender Releasee or the Prepetition Secured Parties or any other Prepetition Secured Party Releasees with respect to any transaction, occurrence, omission, or action including, without limitation, (i) any Avoidance Actions, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the DIP Lender Releasees or the Prepetition Secured Party Releasees, on the one hand, and any of the Debtors, on the other, (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition Obligations, or the validity, extent, and priority of the DIP Liens, the

Prepetition Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens, or the Adequate Protection Liens, or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) DIP Lender in respect of the enforcement of the DIP Liens; (c) subject to authority provided to the Debtors pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtors have received a written objection to such payment from the DIP Lender; and/or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Documents, without the express written consent of the DIP Lender.  Notwithstanding the foregoing, up to $25,000 (the "Challenge Budget") in the aggregate of the DIP Credit Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by any Committee during the Challenge Period to investigate Challenges against the Prepetition Secured Party Releasees and the legality, validity, priority, perfection, enforceability and extent of the Prepetition Liens.

23.     Limitation on Surcharge. Without limiting the terms of the Carve-Out (and subject to the entry of the Final Order solely with respect to the Prepetition Secured Parties), no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Lender, the Prepetition Secured Parties, the Carve-Out (other than the Professional Persons that are the beneficiaries of the Carve-Out as provided for in the Budget), the DIP Collateral or the Prepetition Collateral, pursuant to §§ 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender and the Prepetition Secured Parties (and the Professional Persons that are the beneficiaries of the

Carve-Out as provided for in the Budget in the case of an asserted surcharge against the Carve-Out); *provided* that nothing herein shall alter the Challenge Budget. No action, inaction or acquiescence by the DIP Lender or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against either DIP Lender, the DIP Collateral, the Prepetition Secured Parties or the Prepetition Collateral.

24.     No Marshaling.  Subject to entry of the Final Order, the Prepetition Secured Parties and the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral. Without limiting the generality of the immediately preceding sentence, and subject to entry of the Final Order, no party (other than the Prepetition Secured Parties and the DIP Lender) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

25.     Survival of Interim Order and Other Matters.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any Plan in the Chapter 11 Cases, (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or a Successor Case, (c) to the extent authorized by applicable law, dismissing the Chapter 11 Cases, (d) withdrawing the reference of the Chapter 11 Cases from this Court, or (e) providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Cases in this Court and this Interim Order.  The terms and provisions of this Interim Order shall be binding upon the Debtors, the DIP Lender, the Prepetition Secured Parties and each of their respective successors and assigns, and shall inure to the benefit of the Debtors and the DIP Lender, the Prepetition Secured Parties and each of their respective successors and assigns

-41-

including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed or elected in a case for any Debtor under any chapter of the Bankruptcy Code, including any Successor Case.  Subject to Paragraph 21, the terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders, and all other parties in interest, including, but not limited to a trustee appointed or elected under chapter 7 or chapter 11 of the Bankruptcy Code.

(a)     Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(b)     Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable effective as of to the Petition Date immediately upon entry of this Interim Order. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.  The rights of all parties in interest to object to the terms of the Final Order, including the DIP Documents at the Final Hearing are expressly reserved.

26.     Governmental Consents.  Except as otherwise provided herein, the execution, delivery and performance by the Debtors of the DIP Documents and the consummation of the transactions contemplated by the DIP Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any governmental authority.

27.     Final Hearing; Objection Deadlines.

(a)     The Final Hearing to consider entry of the proposed Final Order and final approval of the DIP Credit Facility is scheduled for [_____], [__]:00 [_].m. prevailing Eastern Time at the United States Bankruptcy Court for the District of Delaware.  Any objections or responses to entry of the proposed Final Order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on  [_____] and served on the following parties: (i) counsel to the Debtors, Dentons, 601 S. Figueroa Street, Suite 2500, Los Angeles, California  90017-5704, Attn: Tania M. Moyron (tania.moyron@dentons.com) and Pachulski, Stang, Ziehl & Jones, 919 North Market Street, 17th Floor Wilmington, DE 19801, Attn: Laura Davis Jones (ljones@pszjlaw.com), (ii) counsel to any statutorily appointed committee, (iii) counsel to the DIP Lender and the Prepetition Secured Parties, Lowenstein Sandler, LLP, 1251 Avenue of the Americas, New York, NY 10020 Attn: Daniel Besikof, Esq. (dbesikof@lowenstein.com) and Morris, Nichols, Arsht & Tunnell LLP, 1201 Market Street, 16th Floor, Wilmington, Delaware 19801, Attn:  Curtis S. Miller (cmiller@morrisnichols.com), and (iv) the Office of the U.S. Trustee for the District of Delaware, 844 N. King Street, Room 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: [_____] [(_____)].  If no objections to the entry of the proposed Final Order are filed and served in accordance with this Interim Order, no Final Hearing may be held, and the proposed Final Order may be presented by the Debtors under certification of counsel and entered by this Court.

(b)     Within two (2) business days following entry of this Interim Order, the Debtors shall serve notice of the entry of this Interim Order and of the Final Hearing, together with copies of this Interim Order and the Motion, on: (i) the parties having been given notice of the Interim Hearing; and (ii) any party which has filed prior to such date a request for notices with this Court.

       (c)    <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order.

Dated:   This _____ day of _____, 2026
         Wilmington, Delaware

**Exhibit A**

**DIP Agreement**

**DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

THIS DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT, dated as of April 26, 2026 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**"), is entered into by and among Impac Mortgage Holdings, Inc., a Maryland corporation (the "**Borrower**"), certain Subsidiaries of the Borrower that may become party hereto from time to time (the "**Guarantors**", and collectively with the Borrower, the "**Loan Parties**"), and Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1 (the "**Lender**" and collectively with the Borrower and the Guarantors, the "**Parties**").

**WHEREAS,** the Borrower and the Guarantors existing as of the date hereof (together with any Guarantors later created who become debtors in bankruptcy, the "**Debtors**") intend to file petitions for voluntary relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware;

**WHEREAS**, the Borrower, the subsidiary guarantors party thereto and the Lender are parties to a Loan Agreement, dated as of May 6, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "**Prepetition Loan Agreement**");

**WHEREAS**, Debtors acknowledge that the Debtors are indebted to the Lender under the Prepetition Loan Agreement in the aggregate principal amount of $20,000,000 as of the date hereof, plus accrued and unpaid interest and fees thereon (such debt, the "**Prepetition Facility**");

**WHEREAS**, Debtors acknowledge that pursuant to that certain Secured Promissory Note, dated as of January 26, 2026, by the Debtors in favor of Lender as successor-by-assignment to Trinity Park Investments, LLC (as further amended, restated, supplemented or otherwise modified from time to time, the "**Bridge Note**"), the Debtors are obligated to Lender in the aggregate principal amount of $2,000,000 as of the date hereof, plus accrued and unpaid interest and fees thereon (such debt, the "**Bridge Note Debt**");

**WHEREAS**, contemporaneously herewith, the Parties, together with certain other stakeholders, have entered into that certain Restructuring Agreement, which sets forth an agreed framework and conditions for the restructuring of the Debtors' obligations and the implementation of a consensual restructuring transaction intended to preserve value and facilitate an orderly resolution of the Debtors' financial affairs;

**WHEREAS**, the Borrower has asked the Lender to provide the Borrower, for the benefit of itself and the other Loan Parties, with a senior secured super-priority debtor-in-possession term loan credit facility (the "**DIP Facility**") in the principal amount of $5,000,000, consisting of (a) the principal amount of $2,000,000 of Bridge Note Debt, plus interest fees and other amounts due thereunder that will be deemed "rolled up" as a Roll-Up Loan (defined below) hereunder on a dollar-for-dollar basis pursuant to the terms and subject to the conditions set forth in this Agreement and the Orders and (b) new money term loans, in an aggregate principal amount such that, when combined with the Roll-Up Loan, the total outstanding principal amount of the DIP Facility shall not exceed $5,000,000, which new money term loans shall be made available to the

US_ACTIVE\131979672

Debtors from time to time pursuant to the terms and subject to the conditions set forth in this Agreement and the Orders;

WHEREAS, the Guarantors have agreed to guarantee the obligations of the Borrower hereunder, and the Loan Parties have agreed to secure their respective Obligations by granting to the Lender, subject to the Carve-Out as defined and provided in the Orders, a senior secured super-priority Lien on substantially all of their respective assets, subject to the terms and conditions set forth in this Agreement and the Orders; and

WHEREAS, the Lender is willing to make the DIP Facility available to the Borrower, for the benefit of itself and the other Loan Parties, subject to the terms and conditions set forth in this Agreement and the Orders.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

1.    *Definitions*.  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Section 26 hereof.

2.    *The Loan; Fees*.

(a)    Term Loans. Subject to the terms and conditions and relying upon the representations and warranties herein set forth, the Lender agrees, subject to the satisfaction of the conditions set forth in Section 7 hereof, to make term loans (each, a "**Term Loan**", and collectively, the "**Term Loans**") to the Borrower, for the benefit of itself and the other Loan Parties, from time to time, on any Business Day, during the Availability Period, in an aggregate principal amount at any time outstanding not to exceed the DIP Facility Amount. During the Availability Period, the Borrower may request to borrow up to the maximum amount of the DIP Facility Availability, subject to the terms of this Agreement and the Orders.  The initial borrowing of the Term Loans shall be made into the Specified Account in an amount not to exceed the Initial Term Loan Amount, and evidence of such deposit shall be made available to the Borrower no later than one (1) Business Day after the Interim Order Entry Date (such borrowing, the "**Initial Term Loan**").  All Term Loans made after the Initial Term Loan shall be based upon and subject to the terms of the Budget. Term Loans repaid or prepaid may not be reborrowed.

(b)    Roll-Up Loans. Subject to the terms and conditions set forth in this Agreement and the Orders, effective immediately upon the Interim Order Entry Date, without any further action by any party to this Agreement or the other Loan Documents, the Bankruptcy Court or any other Person, the Bridge Note Debt shall be automatically deemed (on a cashless basis) to constitute a Loan under this Agreement ("**Roll-Up Loan**"), which Roll-Up Loan shall be due and payable in accordance with the terms and conditions set forth in this Agreement. Upon the incurrence of the foregoing Roll-Up Loan, the outstanding Bridge Note Debt shall be automatically and irrevocably deemed satisfied in full and the amount of the Roll-Up Loan advanced under this Agreement. The Roll-Up Loan, if repaid or prepaid, may not be reborrowed.

(c)    Funding. Subject to the fulfillment of all applicable conditions set forth herein, the Lender shall deposit the proceeds of each Term Loan in immediately available funds in the Specified Account not later than 12:00 p.m. on the agreed upon borrowing date or, if

2

requested by the Borrower in the request for borrowing, shall wire-transfer such funds as requested on or before such time.

(d)    Facility Fee. As consideration for the extension of the DIP Facility to the Borrower, the Loan Parties agree to pay, jointly and severally, to the Lender, a facility fee equal to four percent (4%) of the "new money" portion of the DIP Facility Amount (for the avoidance of doubt, excluding the Roll-Up Loan) (the "**Facility Fee**"), which shall be fully earned and non-refundable on the Interim Order Entry Date, and shall be paid in full directly to the Lender from the proceeds of the Initial Term Loan.  For federal income tax purposes, the Parties agree to treat the Facility Fee as causing each Loan to have been issued at a discount and not as a separate fee.

**3.    *Interest.***

(a)    Interest on the outstanding principal balance of the Loans shall accrue, daily, at a rate equal to twelve percent (12.00%) per annum (the "**Non-Default Rate**") from the date of funding of the Initial Term Loan until the Maturity Date. Accrued interest shall be paid (i) on the Maturity Date and (ii) on the date of any payment or prepayment made pursuant to, and in accordance with, Sections 4 and 5(a) hereof (each such date, a "**Payment Date**").  The payment due on each Payment Date shall be paid, in U.S. Dollars and in immediately available funds.

(b)    In computing interest with respect to any Loan made hereunder, the date on which such Loan is made (or any portion thereof is advanced) shall be included and the date on which any principal amount of such Loan is repaid or prepaid shall be excluded (with interest accruing through but excluding such date), in each case, based on the receipt of such repayment or prepayment in immediately available funds.  Interest shall be calculated on the basis of a year of 360 days and actual days elapsed.  Any amounts not paid or satisfied when due hereunder shall bear interest, in addition to the Non-Default Rate, at a fixed rate equal to the lesser of (i) three percent (3.00%) per annum or (ii) the maximum rate permitted by applicable law (such rate, the "**Default Rate**") and shall be payable promptly upon demand in U.S. Dollars and in immediately available funds.

**4.    *Repayment.***

(a)    Except as otherwise provided by a Plan and confirmed in the Cases, the Borrower shall repay all Loans, together with all accrued and unpaid interest thereon and other amounts due hereunder, no later than the Maturity Date. The obligation of the Borrower to repay the outstanding principal amount of the Loans, and any and all interest which accrues thereon, shall be recorded by the Lender and attached on Annex A hereto.  The Lender is hereby authorized to endorse Annex A with an appropriate notation evidencing each Loan of principal made by the Lender pursuant to this Agreement; *provided, however*, that the failure to make any such notation will not limit, expand or otherwise affect the rights of the Lender under this Agreement or the Obligations of the Borrower and the other Loan Parties under this Agreement.

(b)    All payments of the Loans and the other Obligations shall be made by wire transfer in accordance with the Lender's written instructions.  Notwithstanding any other provision of this Agreement, if any day upon which a payment of the Loans or any other Obligation is due is not a Business Day, such payment shall be made on the next succeeding Business Day.

US_ACTIVE\131979672

(c)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction for any taxes.  If law requires the deduction or withholding of any tax from any such payment by a Loan Party, then such Loan Party shall be entitled to make such deduction or withholding, provided that, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions the applicable recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(d)    All payments under this Agreement shall be made in U.S. Dollars and in immediately available funds and accompanied by the payment of (i) accrued and unpaid interest attributable to the principal amount of the Loans being repaid (including the Default Rate, if any) through but excluding the date of such payment, and (ii) all other amounts then due and payable under this Agreement.

5.    *Prepayments*.

(a)    <u>Prepayments</u>.  The Borrower shall not have the right to prepay the Loans without the prior written consent of the Lender.

(b)    <u>Application of Prepayments</u>.  Any prepayment made with the prior written consent of the Lender pursuant to Section 5(a) shall be applied first to the payment of the Lender's unpaid fees and expenses reimbursable pursuant to this Agreement, second to accrued and unpaid interest, which shall include the Default Rate, if  applicable, to, but excluding, the date of such prepayment, and third to the outstanding principal amount of the Loans.

6.    ***Grant of Security Interest.***

(a)    To secure the full and punctual payment by each Loan Party of the Obligations (other than Remaining Obligations) and all other amounts outstanding under this Agreement, when due, each Loan Party hereby grants to the Lender a continuing security interest in and continuing lien on all of such Loan Party's right, title and interest, whether now owned or hereafter acquired, in, to and under the Collateral.  The security interest granted pursuant to this <u>Section 6(a)</u> shall continually exist until the Obligations and all other amounts outstanding under this Agreement (other than Remaining Obligations) have been paid in full in cash. Notwithstanding anything to the contrary in this Agreement, upon payment in full in cash of all Obligations (except for any Remaining Obligations) and the termination of all commitments under this Agreement, the security interest and all Liens granted hereunder shall automatically terminate and be released notwithstanding any Remaining Obligation that survives termination pursuant to Sections 13 and 19. For the avoidance of doubt, following the termination of the security interest and all Liens granted hereunder as set forth in this Section 6(a), the Remaining Obligations shall be unsecured obligations of the Loan Parties.

(b)    Each Loan Party hereby authorizes the Lender to file financing statements and any other instruments to perfect (and continue to perfect from time to time) the security interest.  Each Loan Party will take such actions as reasonably requested by the Lender from time to time to perfect or continue the security interest granted hereunder.  Each Loan Party appoints the Lender as its true attorney in fact to perform any of the following actions, which are coupled

US_ACTIVE\131979672

with an interest, are irrevocable until the termination of this Agreement and may be exercised from time to time by the Lender in accordance with the terms of this Agreement: (a) to give notice of the Lender's right in respect of the Collateral to enforce the same; (b) to prepare, execute, file, record or deliver notes, assignments, schedules, financing statements, Control Agreements, continuation statements, termination statements, statements of assignment, applications for registration or like papers to perfect, preserve or release the Lender's interest in the Collateral (which in the case of any UCC-filings, may include, "all-assets" filings); (c) to verify facts concerning the Collateral by inquiry of obligors thereon, or otherwise, in its own name or fictitious name; (d) solely during the existence of an Event of Default, to endorse, collect, deliver and receive payment under instruments for the payment of money constituting or relating to the Collateral; (e) solely during the existence of an Event of Default, to exercise all rights, powers and remedies which such Loan Party would have, but for this Agreement, under all Collateral; and (h) to do all acts and things and execute all documents in the name of such Loan Party, deemed by the Lender as necessary, proper and advisable in connection with the preservation, perfection or enforcement of its rights hereunder.

(c)     Upon satisfaction of the Obligations (except the Remaining Obligations) and the termination of all commitments under this Agreement pursuant to Section 19, the security interest granted by such Loan Party in favor of the Lender under this Agreement shall be terminated and released without any further action by any person and the Lender shall, at the Loan Parties' request and sole cost and expense, release its Liens and execute and deliver to the Borrower, such documents as reasonably requested by such Loan Party to evidence such release.

(d)     Except for Prior Permitted Liens or as otherwise expressly provided in the Orders, each Loan Party represents, warrants, and covenants that the security interests granted hereunder are, and shall at all times remain, valid, perfected, and first-priority security interests in the Collateral, senior to all other Liens and security interests therein except for Prior Permitted Liens, including, without limitation, the Liens and security interests in favor of the Lender securing the Prepetition Facility. The Borrower further agrees that the Obligations are entitled to be allowed superpriority administrative expense claims in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over any and all administrative expense claims of the kind specified or ordered pursuant to or in accordance with any provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114, in each case subject to and limited by the terms of the Orders.

**7.     *Conditions Precedent.***

(a)     <u>Conditions to the Initial Term Loan</u>. The obligation of the Lender to fund the Initial Term Loan hereunder is subject to the satisfaction of the following conditions precedent:

(i)     the Lender shall have received, in form and substance satisfactory to Lender, the following: (1) executed copies of this Agreement and the other Loan Documents; and (2) such other customary documents and other matters as the Lender may reasonably deem necessary or appropriate;

(ii)     the Loan Parties shall have delivered to Lender the initial Budget, which Budget shall be in form and substance satisfactory to Lender;

5

(iii)    the Interim Order Entry Date shall have occurred not later than two (2) Business Days following the Petition Date, and the Interim Financing Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay;

(iv)    the Petition Date shall have occurred and each Loan Party shall be a debtor and debtor-in-possession in the Cases; and

(v)    the "first day orders" sought by the Debtors shall be satisfactory in form and substance to the Lender and shall have been entered not later than two (2) Business Days following the Petition Date and shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

(b)    Conditions to each Term Loan. The obligation of the Lender to make each Term Loan, including the Initial Term Loan, is subject to the following conditions precedent:

(i)    the Lender shall have received a request for such Term Loan, upon at least five (5) Business Days' prior written notice, before 12:00 p.m., New York City time executed by the Borrower;

(ii)    on the date on which each Term Loan is made and after giving effect to the making of such Loan: (1) the Term Loan amount shall not exceed the DIP Facility Availability, (2) all payments then due and payable by all Loan Parties under this Agreement shall have been paid, (3) the representations and warranties set forth in Section 8 hereof, shall be true and correct with the same effect as though made on and as of such date, (4) the Borrower and each other Loan Party shall be in material compliance with all the terms and provisions contained in this Agreement to be observed or performed, (5) no Default or Event of Default shall have occurred and be continuing; and (6) the Debtors shall be in compliance with, and no default shall have occurred and be in existence as of the date of such Term Loan under, the Restructuring Agreement;

(iii)    the Cases of any of the Debtors shall have not been dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(iv)    no trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases;

(v)    in the case of Term Loans other than the Initial Term Loan, the Debtor is in compliance with the Budget as provided for herein (and giving effect to the Permitted Budget Variance) and the requested amount of such Loan is provided for in the Budget; and

(vi)    for each Loan requested after the Final Order has been entered by the Bankruptcy Court, the Final Order shall be in full force and effect, shall not have been

6

vacated or reversed, shall not have been modified or amended other than as acceptable to the Lender and shall not be subject to a stay.

**8.**     ***Representations and Warranties.***  Each Loan Party represents and warrants to the Lender (and where applicable, agrees) that, in each case, as of the date hereof and after giving effect to the making of the Loans hereunder as follows:

(a)     Organization and Standing.  Each Loan Party and each Subsidiary is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate power to execute and deliver this Agreement and to perform its obligations hereunder.

(b)     Authorization. Each Loan Party has duly authorized this Agreement by all necessary corporate or other organizational actions and has duly executed and delivered this Agreement.

(c)     Enforceability. Subject to entry of the Orders, this Agreement constitutes a legal, valid and binding obligation of each Loan Party, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by general principles of equity.

(d)     No Violation of Other Agreements or Laws.  The execution and delivery of this Agreement by each Loan Party do not, and the performance of its obligations hereunder will not, (i) result in a violation by such Loan Party of any provision of any Loan Party's Operating Documents, (ii) result in a violation of any law applicable to such Loan Party, (iii) require any consent or approval of, registration or filing with, or any other action by, any governmental authority except to the extent already obtained, made, or taken and remaining in full force and effect, (iv) except for the Prepetition Loan Agreement, violate any agreement to which any Loan Party is subject, or by which it or any of its assets are bound, or (v) result in the creation or imposition of any lien on any assets of any Loan Party other than the liens in favor of the Lender.

(e)     Use of Proceeds. The proceeds of all Loans made by the Lender under this Agreement shall be used by the Debtors for working capital and general corporate purposes of the Debtors and as otherwise provided in the Budget.

(f)     Default. No event has occurred and is continuing which constitutes a Default or an Event of Default.

(g)     Budget. On and as of the Petition Date, the Budget, copies of which have heretofore been furnished to the Lender and following the Petition Date, any updated Budget delivered pursuant to Section 9(w), in each case, are based on good faith estimates and assumptions made at such time by the persons who prepared it.

(h)     Cases. The Cases were commenced on the Petition Date in accordance with applicable law, and notice of the hearing for the approval of the Interim Financing Order has been given as identified in the certificate of service filed with the Bankruptcy Court.

7

(i)  Orders. The Interim Financing Order and, after it has been entered, the Final Order are in full force and effect, and have not, in whole or in material part, been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any pending or threatened challenge or proceeding in any jurisdiction, and the Debtors are in material compliance with each Order.

(j)  Ratification of Prepetition Facility. The Debtors hereby ratify and reaffirm all of their payment and performance obligations (including known indemnification obligations) with respect to the Prepetition Facility, and acknowledge that all amounts owing thereunder are due and owing without counterclaim, defense, setoff or reduction of any kind by Debtors; *provided, however*, that nothing herein shall prejudice, impair or limit any such challenge rights of any other party in interest to the extent expressly preserved under the Orders.

9.  *Covenants.* Each Loan Party shall, and shall cause each of its Subsidiaries, to:

(a)  Financial Statements and Other Reports and Notices.  Deliver to the Lender:

(i)  promptly upon obtaining knowledge of any Default or an Event of Default, a reasonably detailed notice specifying the nature and period of existence of such event and what action such Loan Party has taken, is taking and/or proposes to take with respect thereto;

(ii)  commencing on the Friday after the Petition Date and each successive Friday thereafter, a cash flow forecast for the Debtors in form and detail as prepared by the Debtors in the ordinary course of business, covering all of the weeks through the Maturity Date;

(iii)  all reports filed, including monthly operating reports, with the Office of the United States Trustee, and shall promptly file all such monthly operating reports as and when due under the Bankruptcy Code;

(iv)  commencing on the Friday occurring at least five (5) Business Days after the Petition Date and each successive Friday thereafter, a Budget Variance Report certified by the Debtors' financial advisors, and any updates to the Budget that are approved by Lender in Lender's sole discretion;

(v)  commencing on the Friday occurring at least five (5) Business Days after the Petition Date and on each Friday thereafter, an updated statement of accounts payable and accounts receivable; and

(vi)  upon the Lender's reasonable request and solely to the extent otherwise internally prepared, promptly, all financial statements and information relating to any calendar month of such Loan Party and any bank accounts statement and similar information of such Loan Party, and any other certificates or other bank account statements, readily available reports and other information (financial or otherwise) regarding the business, operations and financial condition of the Borrower and the other Loan Parties.

(b)  Inspection Rights.  Permit any representatives designated by the Lender (including employees of the Lender or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice, to visit and inspect its properties, liabilities,

8

books and records, including examining and making extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

(c)    Insurance.  Maintain with financially sound and reputable carriers, having a financial strength rating of at least investment grade by A.M. Best Company, insurance in such amounts and against such risks (including loss or damage to property; general liability; errors and omissions and directors and officers; and key man, if any) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations.  The Debtors will furnish to the Lender, upon request, information in reasonable detail as to the insurance so maintained.

(d)    Key Persons.  Request Lender's written consent prior to the appointment of any Key Person and/or replacement of any Key Person on or after the date of this Agreement.  The Lender hereby grants its consent to the position, or appointment, of all Key Persons as of the date of this Agreement.

(e)    Bank Accounts; Control Agreements.

(i)    (A) Maintain all cash and cash equivalents in deposit, securities or other bank accounts (collectively, "**Collateral Accounts**") at Enterprise Bank & Trust or other financial institutions reasonably acceptable to Lender, including Wells Fargo, N.A. and (B) not maintain or establish any deposit, securities or other bank accounts other than the Collateral Accounts without prior written notice to the Lender.

(ii)    At the request of the Lender, enter into one or more Control Agreements over any of its Collateral Accounts within ten (10) days (or such later date as the Lender may agree in its sole discretion) following the date of this Agreement or the opening of such Collateral Account, as applicable, unless waived by the Lender in its sole discretion.

(iii)    Except as required under the Bankruptcy Code or otherwise provided in the order of the Bankruptcy Court approving the Debtors' cash management motion, rules or policies of the U.S. Trustee, and/or any other Bankruptcy Court order, not maintain or establish any new bank accounts other than the Collateral Accounts (which Collateral Accounts constitute all of the deposit accounts, securities accounts or other accounts maintained by the Loan Parties as of the date of this Agreement) without prior written notice to the Lender and unless Lender, and the applicable Loan Party and the bank at which the account is to be opened enter into a Control Agreement over such bank account within ten (10) days following the establishment of any such new Collateral Accounts, unless waived by the Lender in its sole discretion.

(iv)    (A) Not materially violate or breach any Control Agreement, (B) not terminate any Control Agreement and (C) otherwise maintain and comply with the terms of any Control Agreement.

(f)    Additional Subsidiaries.  (A) Cause any subsequently acquired or organized Subsidiary of Borrower or any Debtor to become a Guarantor (and thus a Loan Party) by promptly (and in any event within three (3) Business Days), (i) executing and delivering to the Lender a joinder to this Agreement reasonably satisfactory in form and substance to the Lender in its sole

9

discretion (the "**Joinder Agreement**"), pursuant to which the joining party thereunder shall become a "Loan Party" under this Agreement and be bound by all obligations and covenants applicable to each Loan Party hereunder, and provide a Guaranty under Section 12 hereof and grant a security interest under Section 6 hereof, together with other documents as reasonably requested by and, in each case, in form and substance satisfactory to, the Lender, (ii) enter into one or more Control Agreements, as applicable, as required by Section 9(e)(iii) and (iii) taking all other actions as may be reasonably requested by the Lender to protect and perfect the security granted under Section 6 hereof and (B) take such actions as the Lender may reasonably request, from time to time, to ensure that the Obligations are guaranteed by the Guarantors as provided under Section 12 hereof and are secured, on a first priority perfected security interest, by the Collateral as provided under Section 6 hereof.

(g) Indebtedness. Except with respect to Permitted Indebtedness, not create, incur, assume, refinance or otherwise become or remain liable with respect to any indebtedness for borrowed money, in each case, without the Lender's prior written consent.

(h) Dispositions. Not sell, transfer, convey, lease or otherwise dispose of (each, a "**Disposition**") any property of any Loan Party, whether now owned or hereafter acquired by such Loan Party (or enter into any arrangement with any person to make such a Disposition), in each case, without the Lender's prior written consent, other than Dispositions of property made in the ordinary course of business and having an aggregate fair market value not to exceed $25,000 in the aggregate any fiscal year, so long as no Event of Default has occurred and is continuing; provided that in no event shall any Loan Party make any Disposition of any property to any Subsidiary that is not a Loan Party.

(i) Investments. Not make or enter into any acquisition of or investment into any person that is not a Loan Party, whether by means of (x) a purchase or other acquisition of any equity interests, ownership interests or any assets of another person or (y) a loan, advance or capital contribution to another person or assumption or purchase of debt, in each case, without the Lender's prior written consent.

(j) Prepayments of Other Indebtedness. Except as otherwise provided in an order of the Bankruptcy Court, not repay or prepay, in cash, any indebtedness owed to any Person (other than to the Lender), without the Lender's prior written consent.

(k) Restricted Payments. Not make or pay any cash dividend or other cash distribution to any holder of the equity interests of any Loan Party with respect to such equity interests, except for intercompany dividends, distributions or transfers from one Loan Party to another Loan Party (including any Loan Party paying an expense of another Loan Party in the ordinary course of business), in each case as permitted under, and made in a manner consistent with, the cash management motion (and any final order entered thereon) in the Cases or any other order of the Bankruptcy Court.

(l) Subsidiaries. Except in compliance with Section 9(f) above, not form any Subsidiaries, or otherwise acquire any entities who will become Subsidiaries of any Loan Party that themselves would not be Loan Parties, after the date of this Agreement, without the prior written consent of the Lender.

10

(m)    Liens. Except any Liens in connection with this Agreement and any Prior Permitted Liens, not create, incur, assume or permit to exist any Lien on any of its property, now owned or hereafter acquired.

(n)    [Reserved].

(o)    Notice of Motions. Not less than five (5) Business Days prior to filing any motion requesting approval for debtor-in-possession financing, use of cash collateral, approval of a disclosure statement and plan of reorganization, or any other material relief, the Debtors shall send copies of such motions to Lender, and all such motions shall be satisfactory to Lender; provided, however, that to the extent the Debtors seek relief on an emergency or expedited basis, the Debtors shall provide the Lenders with as much advance notice as is reasonably practicable under the circumstances.

(p)    Conduct of Business. Not engage in any material business other than (i) the businesses engaged by such Loan Party on the date of this Agreement and similar, incidental or related businesses and (ii) such other lines of business as may be consented to by the Lender.

(q)    Operating Documents; Material Agreements. Not, without the prior written consent of the Lender (email being sufficient), (i) amend or otherwise modify, or waive any provision of (1) any Loan Party's Operating Documents or (2) any Material Agreement (except as permitted under the Plan) or (ii) enter into any Material Agreement or any extension, amendment or renewal thereof after the date hereof.

(r)    Accountant. Not replace its independent public accountant without the prior written consent of the Lender, which consent shall not be unreasonably withheld, delayed or conditioned.

(s)    Restructuring Agreement. Materially comply with all covenants and agreements set forth in the Restructuring Agreement.

(t)    Use of Proceeds. Use the proceeds of the Loans in accordance with the Budget and the Orders entered in connection with the Cases exclusively for one or more of the following purposes (subject to any additional restrictions on the use of such proceeds and any such cash collateral set forth in the Interim Financing Order), and as further set forth below:

(i)    to pay the reasonable and documented fees and expenses, indemnities and other amounts owed to the Lender under this Agreement and under the Prepetition Loan Agreement, whether or not set forth in the Budget;

(ii)    to the extent not included in Section 9(t)(i), to pay certain costs, premiums, fees and expenses related to the Cases (including, without limitation, with respect to the Carve Out) in accordance with the Budget; and

(iii)    to fund working capital and other expenditures of the Debtors in accordance with the Budget.

11

Proceeds of the DIP Facility or cash collateral shall not be used (a) by the Debtors, or any other party-in-interest, including a committee of unsecured creditors (except to the extent provided below), or any of their representatives, to challenge or otherwise contest or institute any proceeding of any kind or nature to determine (i) the validity, perfection, enforceability or priority of claims or security interests in favor of Lender, (ii) the validity, perfection, enforceability of the Prepetition Facility, or (iii) the validity, perfection, enforceability of the Bridge Note Debt, (b) to commence, prosecute or defend any claim, motion, proceeding or cause of action of any kind or nature against Lender and its agents, attorneys, advisors or representatives, including, without limitation, any lender liability claims or subordination claims, (c) to commence, prosecute or defend any claim or proceeding or cause of action of any kind or nature to disallow or challenge the Prepetition Facility or Bridge Note Debt, any loan documents relating thereto, or any other Loan Document, or (d) to fund acquisitions, capital expenditures, capital leases, or any other similar expenditure other than capital expenditures specifically set forth in the Budget and approved by the Lender, in each case except as otherwise permitted in the Orders; *provided, however*, that any statutorily appointed committee of unsecured creditors may use up to $25,000 of funds solely to investigate the validity, perfection, and priority of the Lender's Liens and claims in connection with the Prepetition Loan Agreement.

(u)    Milestones. Achieve each of the following milestones (as the same may be extended from time to time with the consent of the Lender, the "**Milestones**"), each in a manner and in form and substance satisfactory to the Lender:

(i)    Each of the Debtors shall commence the Cases no later than April 26, 2026.

(ii)    File with the Bankruptcy Court no later than the Petition Date (a) an application to retain a claims agent; (b) a motion for orders approving this Agreement on an interim (an "**Interim Financing Order**") and final (a "**Final Financing Order**") basis; (c) a motion to continue cash management; (d) a motion to establish notice and hearing procedures that must be followed for (i) certain transfers of equity in Impac and Subordinated Notes Claims, and of any beneficial interest therein, and (ii) certain claims of worthlessness for federal or state tax purposes with respect to equity in Impac (the "**NOL Motion**"); (e) such other first day papers as may be approved or requested by the Debtors or the Lender ("**First Day Motions**"); (f) a combined Plan and disclosure statement; (g) a motion seeking entry of an order (the "**Prepack Scheduling Order**") scheduling a combined hearing on approval of the Plan and disclosure statement, setting an objection deadline with respect thereto, establishing related confirmation procedures and approving the disclosure statement on an interim basis; (h) a motion seeking the Bankruptcy Court's approval of assumption of the Restructuring Agreement; and (i) a motion for approval of bar dates.

(iii)    The Bankruptcy Court shall enter no later than two (2) Business Days following the Petition Date: (i) the Interim Financing Order, the Prepack Scheduling Order; the interim order approving the NOL Motion; and interim or final orders, as applicable, approving the other First Day Motions.

12

US_ACTIVE\131979672

(iv)      File with the Bankruptcy Court a motion to retain professionals and an interim compensation motion no later than ten (10) days following the Petition Date.

(v)      The Bankruptcy Court shall enter no later than  thirty (30) days following the Petition Date:  the Final Financing Order, an order authorizing the Debtors to assume the Restructuring Agreement and the final order approving the NOL Motion.

(vi)      The Bankruptcy Court shall enter an order approving the disclosure statement and the Plan no later than forty-five (45) days following the Petition Date.

(vii)      The effective date of the Plan shall occur no later than sixty (60) days following the Petition Date.

(v)      First Day Orders.  Cause all proposed "first day orders" submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement in all respects.

(w)      Budget.  Use the proceeds of the Loans solely to make disbursements for expenditures provided for in accordance with Section 9(t) and this Section 9(w).  The Loan Parties and their Subsidiaries shall not pay any expenses (other than *de minimis* amounts) or other disbursements (other than *de minimis* disbursements) other than the type and amount of expenses and disbursements set forth in the Budget.  If the Budget is updated, modified or supplemented by the Debtors, each such updated, modified or supplemented Budget shall be approved in writing by, and shall be in form and substance satisfactory to, the Lender and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed to be a Budget; *provided, however*, that any such updated, modified or supplemented Budget provided to the Lender shall be deemed approved at 5:00 p.m. (Eastern Time) five (5) days following the delivery of such Budget to the Lender if the Lender has neither approved nor rejected such Budget.  Each Budget delivered to Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender.  Each Budget shall be prepared in good faith based upon assumptions which the Loan Parties believe to be reasonable.  The Loan Parties shall not cause cash disbursements to vary from the applicable Budget by more than fifteen percent (15%) in excess of the aggregate budgeted amount for cash disbursements on a trailing one-week basis (the "**Permitted Budget Variance**"); *provided* that to the extent the actual cash receipts in any such weekly period exceed the amounts for such period in the applicable Budget, or if the cash disbursements in any such period are less than the amounts for such period in the applicable Budget, then the Permitted Budget Variance for such disbursements for the next succeeding period shall be increased by an amount equal to such difference (and shall continue to roll over into successive weekly periods to the extent such additional budgeted capacity is unused by the Loan Parties).  In the event that actual amounts for operations line items and/or professional fees are in excess of the Budget, the parties hereto agree to negotiate in good faith to discuss any modification to the Budget and Permitted Budget Variance, it being understood and agreed that the Lender may, but shall have no obligation to, fund any amounts in excess of the Budget and Permitted Budget Variance (but in no event shall have any obligation to fund in excess of the DIP Facility Amount).

(x)      Filing of Motions and Applications.  Without the prior written consent of the Lender, not apply to the Bankruptcy Court for, or join in or support any motion or application

13

seeking, authority to (i) take any action that is prohibited by the terms of any of the Restructuring Agreement, the Loan Documents or the Orders (including, but not limited to, a motion to sell any of the Debtors' assets), (ii) refrain from taking any action that is required to be taken by the terms of the Restructuring Agreement, any of the Loan Documents or the Orders, or (iii) permit any debt or claim to be *pari passu* with or senior to any of the Loans, except as expressly stated in the Orders.

(y)    Superpriority Claim.  Not incur, create, assume, suffer to exist or permit any other Superpriority Claim that is *pari passu* with or senior to the claims of the Lender against any Loan Party, except for the Carve Out, and as otherwise expressly stated in the Orders.

(z)    Further Assurances.  At any time and from time to time the Loan Parties shall execute and deliver such further instruments and take such further action as may reasonably be requested by the Lender to effect the purposes of this Agreement.

**10.**    *Events of Default.*  The occurrence of any of the following shall constitute an "**Event of Default**" under this Agreement:

(a)    Failure to Pay.  The Borrower or any other Loan Party shall fail to pay (i) the principal amount of the Loans or interest payment on the applicable due date hereunder or (ii) any other payment required under the terms of this Agreement on the date due hereunder, and solely in the case of clause (ii) of this section (a), which failure continues for five (5) calendar days.

(b)    Covenant Default.  The Borrower or any other Loan Party shall breach any other covenant contained in this Agreement and such breach continues for five (5) days after the earlier of: (i) such Loan Party receiving a written notice from the Lender and (ii) any officer of such Loan Party becoming aware of such breach, or through the exercise of reasonable diligence should have become aware, of such breach.

(c)    Representation or Warranty.  Any representation or warranty made by the Borrower or any other Loan Party in this Agreement shall be materially incorrect or misleading as of the date such representation or warranty was made.

(d)    Control Agreements.  The Borrower or any other Loan Party shall breach any material covenant or representation contained in any Control Agreement or otherwise violate or terminate any Control Agreement.

(e)    Default under Restructuring Agreement.  The Borrower or any other Loan Party shall breach, violate or default under, in any material respect the Restructuring Agreement and such breach, violation or default has not been remedied or waived within five (5) calendar days after the earlier of (i) such Loan Party receiving a written notice from the Lender and (ii) any officer of such Loan Party becoming aware of such failure, breach, violation or default.

(f)    Attachment.  If any material portion of any Loan Party's assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged, rescinded or otherwise resolved to the commercially reasonable satisfaction of the Lender within ten (10) calendar days, or if any Loan

14

Party is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a Lien or encumbrance upon any material portion of any Loan Party's assets, or if a notice of lien, levy, or assessment is filed of record with respect to any material portion of any Loan Party's assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid or otherwise resolved to the commercially reasonable satisfaction of the Lender within ten (10) calendar days after any Loan Party receives notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by the applicable Loan Party (provided that no Credit Extensions will be required to be made during such cure period).

(g)     Priority.  If the Obligations or the Prepetition Facility shall not have the priority contemplated by this Agreement or the Orders, or the entry of any order in the Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations or the Prepetition Facility.

(h)     Key Persons.  Any Key Person shall (i) resign or be removed by the board of directors or other governing body of a Loan Party from its applicable position at such Loan Party and a replacement reasonably acceptable to the Lender is not appointed with thirty (30) days, or (ii) be terminated by the Loan Parties or have their duties or authority materially reduced from those the Key Person performs as of the date of this Agreement, except for cause.

(i)     Cases.  Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code without the consent of the Lender, or an order shall be entered denying confirmation of the Plan.

(j)     IRC Section 382. The Lender determines in its reasonable discretion that an "ownership change" within the meaning of Section 382(g) of the Internal Revenue Code, as amended, has occurred or is about to occur.

(k)     Trustee.  A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers (beyond those powers set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases.

(l)     Cash Collateral.  An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Loan Parties.

(m)     Relief from Stay.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of any of the Debtors which have a value in excess of $75,000 in the aggregate or (ii) permit other actions that would be reasonably expected to have a material adverse effect on the Debtors or their estates (taken as a whole).

US_ACTIVE\131979672

(n)    Orders.  The Interim Financing Order (prior to Final Order Entry Date) or Final Financing Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been in any material respect reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, without prior written consent of Lender.

(o)    Compliance with Orders.  Any of the Loan Parties shall fail to comply with the Interim Financing Order (prior to Final Order Entry Date) or Final Financing Order (on and after the Final Order Entry Date) in any material respect, and such failure has not been remedied or waived within five (5) days after the earlier of: (i) such Loan Party receiving a written notice from the Lender and (ii) any officer of such Loan Party becoming aware of such failure.

(p)    Other Financing. (a) Except as permitted in the Orders, the entry of any order of the Bankruptcy Court granting to any third party a Superpriority Claim or Lien *pari passu* with or senior to that granted to and/or for the benefit of the Lender hereunder, or (b) any Loan Party shall make any payment of principal or interest or otherwise on account of any debt or payables other than the Obligations, or other than in accordance with the Budget approved by the Lender.

(q)    Avoidance. Any Loan Party commences any suit or action against the Lender that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender.

**11.**    *Rights of the Lender upon an Event of Default*.  Upon the occurrence and during the continuation of any Event of Default, and subject in all respects to the Orders, the Lender shall have the rights and remedies set forth herein and in the other Loan Documents and the Lender may exercise any other right, power or remedy permitted to them by law, either by suit in equity or by action at law, or both; *provided, however*, that with respect to the enforcement of Liens or the exercise of remedies against the Collateral of the Loan Parties, the Lender shall provide the Borrower, the committee of unsecured creditors (if any) and the Office of the United States Trustee with not less than five (5) Business Days' prior written notice of the action contemplated thereby. Notwithstanding anything to the contrary herein or in Section 362 of the Bankruptcy Code, and except as otherwise expressly provided in this paragraph, upon the occurrence and during the continuation of any Event of Default, at the option of the Lender and without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court, the Lender may: (i) terminate the DIP Facility with respect to further Loans; (ii) reduce the Facility Amount from time to time; (iii) declare all or any portion of the Obligations, including all or any portion of the Loan, to be immediately due and payable, without presentment, demand, protest or further notice of any kind, all of which are expressly waived by the Loan Parties; or (iv) subject to this paragraph 11, exercise any other rights and remedies available to the Lender under the Loan Documents or at law or in equity, including remedies under the Bankruptcy Code. Pursuant to the Orders, the automatic stay under Section 362 of the Bankruptcy Code shall be modified and vacated to permit the Lender to exercise such remedies in accordance with this Agreement and the Loan Documents. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and except as otherwise expressly provided herein, the Lender may also, without application, motion, notice, hearing or order of the Bankruptcy Court, increase the rate of interest applicable to the Loan to the Default Rate upon the occurrence and during the continuation of an Event of Default. Subject to the Orders,

US_ACTIVE\131979672

in connection with any sale or disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129 of the Bankruptcy Code, or at any sale or foreclosure conducted by the Lender, by a chapter 7 trustee under Section 725 of the Bankruptcy Code, or otherwise, in each case in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Borrower and each other Loan Party hereby gives the Lender the power and right, without assent by such Loan Party, to "credit bid" the full amount of all Obligations allocated to the Lender in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

**12.** *Guaranty*.

(a)    <u>Provision of Guaranty</u>.  Each Guarantor hereby, jointly and severally with each other Guarantor or any other guarantor of the Obligations, unconditionally and irrevocably guaranties the punctual payment and performance, as and when due and payable, by stated maturity, acceleration or otherwise, of all Obligations, including, without limitation, all principal, interest, fees, commissions, expense reimbursements, costs, expenses, indemnifications and all other amounts due or to become due under this Agreement and any and all expenses (including reasonable counsel fees and disbursements) incurred by the Lender in enforcing any rights or remedies under this Agreement. Upon execution of the Joinder Agreement, and failing the payment of the Loan or the other Obligations in full when due for whatever reason, each Guarantor shall be, jointly and severally, obligated to immediately pay the amount not so paid.  Each Guarantor agrees that the guarantee contemplated hereby is a guarantee of payment and not a guarantee of collection.

(b)    <u>Limitation on Guarantor Liability</u>.  Each Guarantor and the Lender hereby confirm that it is the intention of all such parties that the Guaranty of such Guarantor not constitute a fraudulent transfer or fraudulent conveyance, voidable transaction or similar limitation, for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, the Uniform Voidable Transfers Act or any similar federal or state law to the extent applicable to any Guaranty.  To effectuate the foregoing intention, upon execution of the Joinder Agreement, each Guarantor and the Lender irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as shall, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from the rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Agreement, result in the obligations of such Guarantor under its Guaranty not constituting a fraudulent transfer, fraudulent conveyance, voidable transfer, or similar limitation, under applicable law.  Notwithstanding anything to the contrary contained in this Agreement, upon execution of the Joinder Agreement, each Guarantor hereby unconditionally and irrevocably waives, releases and abrogates any and all rights it may now or hereafter have under any agreement, at law or in equity (including without limitation any law subrogating the Guarantors to the rights of the Lender), to assert any claim against or seek contribution, indemnification or any other form of reimbursement from the Borrower or any other Loan Party liable for payment of any or all of the Obligations for any payment made by the Guarantors under or in connection with its Guaranty or otherwise until such time as all Obligations are paid in full

17

under this Agreement and this Agreement has been terminated in accordance with Section 19 hereof. The obligations of each Guarantor under this Guaranty are independent of the underlying Obligations, and a separate action or actions may be brought and prosecuted against any Guarantor to enforce such obligations, irrespective of whether any action is brought against Borrower, any other Debtor, any other Guarantor or any other guarantor thereof or whether Borrower, any other Debtor, any other Guarantor or any other guarantor thereof is joined in any such action or actions.

(c)    Subrogation, Etc.; Termination. Each Guarantor may not exercise any rights that it may now or hereafter acquire against Borrower, any other Loan Party, any other Debtor or any other guarantor thereof that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Agreement, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Lender against Borrower, any other Loan Party, any other Debtor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from the Borrower, any other Loan Party, any other Debtor or any other guarantor thereof, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, in each case, unless and until all of the Obligations (other than contingent indemnification obligations for which no claim has been asserted) shall have been paid in full in cash and all commitments under this Agreement after the date hereof, if any, have terminated. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Obligations (other than contingent indemnification obligations for which no claim has been asserted) and termination of the commitments under this Agreement after the date hereof, if any, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender as so directed to be credited and applied to the Obligations, whether matured or unmatured, in accordance with the terms of the this Agreement, or to be held as Collateral for any Obligations thereafter arising.

(d)    Rights and Remedies. This is an absolute, unconditional and continuing guaranty of payment and performance of the Obligations and not of collection and shall continue to be in force and be binding upon each Guarantor, until (a) all of the Obligations have been paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted) and the termination of all commitments under this Agreement and (b) be binding upon each Guarantor and its or his respective successors and assigns. Upon the occurrence and during the continuance of an Event of Default, the Lender may, at its option, declare the Obligations due and payable without demand or notice, and the Lender shall have the remedies of a secured party under the applicable Uniform Commercial Code as well as all other remedies available under applicable law. Whether or not any existing relationship between any Guarantor and Borrower has been changed or ended, the Lender may enter into transactions resulting in the creation or continuance of the Obligations and may otherwise agree, consent to or suffer the creation or continuance of any of the Obligations, without any consent or approval by any Guarantor and without any prior or subsequent notice to any Guarantor, in each case except as expressly provided for in this Agreement.

18

(e)      <u>Release of Guaranty</u>.  Upon the termination of this Agreement pursuant to <u>Section 19</u> hereof, all of the Guaranties shall be released and discharged without any further action by any person.

(f)      <u>Excluded Subsidiaries</u>. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no Excluded Subsidiary shall be required to guarantee the Obligations or to become a Guarantor hereunder or under any other Loan Document, and no Excluded Subsidiary shall be required to execute or deliver a Guaranty or Joinder Agreement.

**13.      *Expenses; Indemnity; Damage Waiver.***

(a)      The Loan Parties shall reimburse the Lender upon written demand for all reasonable and documented out-of-pocket audit fees, costs and expenses (including reasonable attorneys' fees and expenses incurred by the Lender) for preparing, amending, negotiating and administering the Loan Documents as well as those fees, cost and reasonable expenses for defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or insolvency proceedings) or otherwise incurred with respect to the Loan Parties. Notwithstanding the foregoing, the Loan Parties shall not reimburse the Lender for any amounts arising from the Lender's actual fraud, gross negligence, bad faith or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)      The Loan Parties shall indemnify the Lender and each affiliate, director, officer, employee, agent and advisor of the Lender, each solely in their capacities as such (each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable and documented fees and disbursements of outside (but not inside) counsel for any Indemnitee (the "**Losses**"), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of, any actual or prospective claim, litigation, investigation or proceeding relating to (i) the execution or delivery of this Agreement, the performance of the parties hereto of their respective obligations thereunder, (ii) the Loans or the use of the proceeds therefrom, (iii) the enforcement of any of the Lender's rights or remedies under this Agreement, in each case, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, or (iv) in any way related to any act or omission taken by the Indemnitee during the Cases; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such Losses are determined by a final judgment of a court of competent jurisdiction to have been incurred by reason of actual fraud, gross negligence, bad faith or willful misconduct of such Indemnitee.

(c)      To the extent permitted by applicable law, none of the Parties shall assert, and each of the Parties hereby waives, any claim against any other Party or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated thereby, each Loan or the use of the proceeds thereof.

(d)      All amounts due under this <u>Section 13</u> shall be payable promptly after written demand therefor.  The Obligations of the Loan Parties under this <u>Section 13</u> shall survive payment in full of the Loans.

19

**14.**     ***Successors and Assigns.***   This Agreement binds and is for the benefit of the successors and permitted assigns of each party hereto.  The Loan Parties may not assign this Agreement or any rights or obligations under it without the Lender's prior written consent (which may be granted or withheld in the Lender's discretion).

**15.**     ***Amendment and Integration.***   Any provision of this Agreement may be amended, waived or modified only upon the prior written consent of the Loan Parties and the Lender.  This Agreement represents the entire agreement about this subject matter and supersedes prior negotiations or agreements relating thereto.  All prior agreements, understandings, representations, warranties, and negotiations about the subject matter of this Agreement merge into this Agreement.

**16.**     ***Notices.***  Except as otherwise provided in the Orders, all notices, requests, demands, consents, instructions or other communications required or permitted hereunder shall be in writing and delivered to each other party at the address set forth below, or at such other address as such party shall have furnished to the other party in writing.  All such notices and communications will be deemed effectively given the earlier of (i) when received, (ii) when delivered personally or (iii) one (1) Business Day after being deposited with an overnight courier service of recognized standing:

<u>Borrower or any other Loan Party:</u>

Impac Mortgage Holdings, Inc.
19800 MacArthur Blvd., Suite 500, Irvine, CA 92612
Attention:  George A. Mangiaracina, Chief Executive Officer

with a copy to (service on which shall not constitute notice hereunder):

Impac Mortgage Holdings, Inc.
19800 MacArthur Blvd., Suite 500, Irvine, CA 92612
Attention:  Legal Department
Email :  GeneralCounselDG@impacmail.com

<u>and</u>

Dentons US LLP
601 S. Figueroa Street Suite 2500
Los Angeles, California  90017-5704
Attention:  Tania M. Moyron
Email:  tania.moyron@dentons.com

<u>Lender:</u>

Hildene Re SPC, Ltd., acting for and on behalf of the account of SP 1
333 Ludlow Street
South Tower, 5th Floor
Stamford, Connecticut  06902

20

US_ACTIVE\131979672

Attention:  Justin Gregory
Email:  corporateactions@hildenecap.com

with a copy to (service on which shall not constitute notice hereunder):

Lowenstein Sandler LLP
1251 Avenue of the Americas, Fl 17
New York, New York  10020
Attention:  Daniel B. Besikof
Email:  dbesikof@lowenstein.com

**17.     *Waivers.*** Except as otherwise expressly provided herein, the Loan Parties hereby waive notice of an Event of Default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

**18.     *Severability of Provisions.*** Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**19.     *Termination of this Agreement.*** This Agreement may not be terminated prior to the Maturity Date, unless mutually agreed to in writing by the Lender and the Loan Parties; *provided*, *further*, that the provisions of Section 13 hereof shall survive and remain in full force and effect regardless of the repayment of the Loan or the termination of this Agreement or any provision hereof.

**20.     *Usury.*** In the event any interest is paid on this Agreement that is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Agreement.

**21.     *Counterparts and Execution.*** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.  The words "execution," "signed," "signature," and words of like import shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**22.     *Governing Law.*** This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law provisions of the State of New York, or of any other state.  The parties hereby submit and consent irrevocably to the exclusive jurisdiction of the Bankruptcy Court for the interpretation and enforcement of the provisions of this Agreement.  The parties also agree that the jurisdiction over the person of such parties and the subject matter of such dispute shall be effected by the mailing of process or other papers in connection with any such

US_ACTIVE\131979672

action in the manner provided for herein or in such other manner as may be lawful, and that service in such manner shall constitute valid and sufficient service of process.

**23.**    *Waiver of Jury Trial.*    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING (WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATED TO THIS AGREEMENT.

**24.**    *Reserved*.

**25.**    *Reserved*.

**26.**    *Defined Terms*.  As used in this Agreement, the following terms have the following meanings:

"*Availability Period*" means the period commencing on the Petition Date and ending on the Maturity Date.

"*Avoidance Actions*" means any and all claims, causes of action, rights, or remedies of any Debtor or its estate arising under chapter 5 of the Bankruptcy Code (including, without limitation, sections 544, 545, 547, 548, 549, 550, and 553 thereof), and any similar or related claims, causes of action, or rights arising under applicable state or other non-bankruptcy law, including claims for fraudulent transfer, preferential transfer, or recovery of property, together with any proceeds thereof, in each case to the extent constituting property of the Debtors' estates.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware or any court having jurisdiction over the Cases from time to time.

"*Budget*" means a 13-week cash flow projection and debtor-in-possession budget in form and substance acceptable to the Lender, which begins on or around the Petition Date; provided that, with the prior written consent of the Lender, the budget may be updated, modified or supplemented in accordance with Section 9(x).

"*Budget Variance Report*" means a report provided by the Borrower to the Lender showing by line item and in the aggregate the actual cash disbursements of the Debtors for the period set forth in Section 9(y), comparing the actual cash receipts and disbursements (on a line item by line item basis) with the cumulative budgeted amounts for each such line item set forth in the Budget for such period, noting therein all variances on a line-item and cumulative basis from the amounts set forth for such period in the Budget, together with explanations for all material variances, and certified as being true and correct in all material respects by the Debtors' Chief Restructuring Officer.

22

"*Business Day*" means with respect to any borrowing or payment, a day other than Saturday or Sunday on which banks are open for business in New York, NY.

"*Carve Out*" shall have the meaning assigned to such term in the Interim or Final Financing Order, as applicable.

"*Cases*" means the cases initiated by the Debtors' filing of voluntary petitions for relief with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

"*Collateral*" has the meaning set forth in in Annex B attached hereto.

"*Committee*" means any official committee of unsecured creditors appointed in the Case by the U.S. Trustee.

"*Control Agreement*" means a tri-party control agreement, executed and delivered by the applicable Loan Party, the Lender, and a depository intermediary, in form and substance satisfactory to the Lender, which agreement is sufficient for Lender to establish "control", within the meaning of the UCC, over each of such Loan Party's deposit accounts, securities accounts or other bank accounts, as applicable, maintained by the depository intermediary and in any event providing for (i) "springing" dominion following the delivery of a "notice of exclusive control" (or similar notice) during the occurrence and continuance of an Event of Default and (ii)(x) if requested, delivery to the Lender of duplicate account statements when delivered to the applicable Loan Party and (y) to the extent available, full on-line access to the Lender of account information regarding the accounts including, but not limited to, account activity and current balances.

"*Excluded Subsidiaries*" means IMH Assets Corp. and Impac Secured Assets Corp., solely to the extent that each such Subsidiary (a) does not own any assets and (b) is prohibited by law or its Operating Documents from guaranteeing the Obligations or pledging its assets to secure the Obligations (*provided* that such prohibition is not the result of a restriction under the Operating Documents that arose solely in contemplation of such Subsidiary satisfying this definition).

"*Default*" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"*DIP Facility Amount*" means $5,000,000.

"*DIP Facility Availability*" means, at any time, an amount equal to (a) the DIP Facility Amount minus (b) the aggregate principal amount of all Term Loans previously funded to the Borrower under this Agreement. For the avoidance of doubt, the Term Loans are non-revolving, and any principal amount repaid or prepaid may not be reborrowed.

"*Final Financing Order*" means a final order of the Bankruptcy Court in substantially the form of the Interim Financing Order (or such other form acceptable to the Lender) authorizing the Loans.

US_ACTIVE\131979672

"*Final Order Entry Date*" means the date on which the Final Order is entered by the Bankruptcy Court.

"*Guaranty*" means (a) the guarantee of the Obligations by each of the Guarantors provided pursuant to Section 12 hereof and (b) any other guarantee of the Obligations by any other Subsidiary, provided pursuant to a Joinder Agreement or other documentation in form and substance reasonably acceptable to the Lender.

"*Initial Term Loan*" has the meaning set forth in Section 2(a) of this Agreement.

"*Initial Term Loan Amount*" means an aggregate principal amount equal to $1,500,000.

"*Interim Financing Order*" means an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof) in the form set forth as Exhibit A hereto, with changes to such form as are satisfactory to the Lender, approving the Loan Documents and authorizing the Initial Term Loan in such amounts as are contemplated by Section 2(a).

"*Interim Order Entry Date*" means the date on which the Interim Financing Order is entered by the Bankruptcy Court.

"*Key Person*" means each of George A. Mangiaracina in his capacity as Chief Executive Officer and Joseph Joffrion in his capacity as Secretary and General Counsel.

"*Lien*" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing, but not including the interest of a lessor under a lease which is not a capital lease.

"*Loan Documents*" means this Agreement (including any renewals, extensions, re-issuances and refundings thereof), the Bridge Note, and such other related agreements, and any amendments or supplements thereto or modifications thereof, executed or delivered pursuant to the terms of this Agreement or any other Loan Document. For the avoidance of doubt, the Prepetition Loan Agreement and any other documents in connection with the Prepetition Loan shall not constitute Loan Documents hereunder.

"*Loan Party*" has the meaning ascribed to such term in the preamble of this Agreement.

"*Loans*" means all loans made to the Borrower in connection with this Agreement, including, without limitation, the Term Loans and Roll-Up Loan.

"*Material Agreement*" means (a) any employment or consulting agreement which provides for compensation in excess of $40,000 per year; (b) any contract for the purchase or lease of real property; or (c) any contract for the purchase of services, materials, supplies, goods, equipment or other assets or property that provides for either (i) annual payments of $40,000 or more, or (ii) aggregate payments of $40,000 or more.

24

"***Maturity Date***" means the earliest of (i) the date which is ninety (90) days following the Petition Date; (ii) the effective date of a Plan in the Cases; (iii) the date of filing or support by any Debtor of a plan of reorganization other than the Plan; (iv) entry of an order by the Bankruptcy Court converting the Cases to a proceeding or proceedings under Chapter 7 of the Bankruptcy Code or appointing a chapter 11 trustee; (v) entry of a final order by the Bankruptcy Court dismissing the Cases; or (vi) the date of termination of the DIP Facility and the acceleration of any outstanding extensions of credit under the Loans in accordance with the terms of this Agreement.

"***Non-Default Rate***" has the meaning set forth in Section 3(a) of this Agreement.

"***Obligations***" means all unpaid principal of, and accrued and unpaid interest due on, the Loans and all other obligations, interest (including at the Default Rate, if any), fees, charges, indemnities and expenses of any Loan Party to the Lender arising under or in connection with this Agreement or the other Loan Documents.

"***Operating Documents***" are, for any Person, such Person's formation documents and (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership or limited partnership, its partnership agreement or limited partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"***Orders***" means collectively the Interim Financing Order and Final Financing Order.

"***Permitted Budget Variance***" has the meaning set forth in Section 9(x) of this Agreement.

"***Permitted Indebtedness***" means:

  (i)    the Obligations under this Agreement;

  (ii)   the Prepetition Facility;

  (iii)  the Subordinated Notes;

  (iv)   indebtedness existing as of the date hereof and set forth on Schedule I;

  (v)    indebtedness incurred in the ordinary course of business in respect of trade payables and accrued expenses, in each case incurred consistent with past practice and not overdue by more than 60 days (except to the extent disputed in good faith);

  (vi)   indebtedness consisting of taxes, assessments and other governmental charges to the extent not yet due and payable or being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP (if applicable);

25

(vii)   indebtedness arising from intercompany loans, advances, contributions and other intercompany obligations among Loan Parties, and (to the extent permitted under the Orders and the cash management order) between Loan Parties, in each case to the extent permitted under this Agreement;

(viii)  indebtedness under bank products, cash management, credit cards, merchant services, and similar arrangements incurred in the ordinary course of business consistent with past practice, in each case to the extent permitted by (and subject to) the cash management order and the Orders;

(ix)    indebtedness consisting of deferred compensation, employee benefit and payroll obligations incurred in the ordinary course of business consistent with past practice in each case to the extent permitted by (and subject to) the cash management order and the Orders;

(x)     indebtedness arising from judgments, orders or awards to the extent not constituting an Event of Default under this Agreement (including because enforcement is stayed, bonded, or being appealed in good faith); and

(xi)    any other Indebtedness approved by the Bankruptcy Court and consented to in writing by the Lender (or expressly permitted under the Orders, the Budget and this Agreement).

"*Person*" means an individual, sole proprietorship, joint venture, association, trust, estate, business trust, corporation, limited liability company, exempted company, limited liability partnership, limited partnership, exempted limited partnership, nonprofit corporation, partnership, sovereign government or agency, instrumentality, or political subdivision thereof, or any similar entity or organization.

"*Petition Date*" means the first date that any of the Loan Parties files a voluntary petition with the Bankruptcy Court initiating the Cases.

"*Plan*" means any chapter 11 plan of reorganization or liquidation filed in the Cases that is (a) consistent in all material respects with the Restructuring Agreement or (b) otherwise approved in writing by the Lender.

"*Prepetition Loan Agreement*" has the meaning assigned to such term in the recitals hereto.

"*Prior Permitted Liens*" means Liens that are valid, perfected, and unavoidable as of the Petition Date (or that are perfected in accordance with section 546(b) of the Bankruptcy Code) and that were granted by any Debtor prior to the Petition Date.

"*Remaining Obligations*" means, as of any date of determination, the Obligations that as of such date of determination are Obligations under the Loan Documents that survive termination of the Loan Documents, but as of such date of determination are not due and payable and for which no claims have been made.

26

"***Restructuring Agreement***" means the certain Restructuring Support Agreement, dated as of April 22, 2026, by and among (a) the Debtors, (b) the Lender, (c) Taberna Preferred Funding 1 LTD and (d) Taberna Preferred Funding 2 LTD.

"***Roll-Up Loan***" has the meaning set forth in Section 2(b).

"***Specified Account***" means an account of the Borrower used in connection with the Term Loans, which account is not subject to a security interest by any other person. For the avoidance of doubt, the Specified Account may be the Borrower's existing operating account at Enterprise Bank & Trust.

"***Subordinated Notes***" means those certain Junior Subordinated Notes due March 30, 2034 issued by Impac Mortgage Holdings, Inc., as in effect on the Petition Date.

"***Subordinated Notes Claims***" means claims arising under the Subordinated Notes.

"***Subsidiary***" means any direct or indirect subsidiary of each Loan Party, as applicable.

"***Superpriority Claim***" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, in all cases subject to the terms of the Orders.

"***Term Loan***" has the meaning set forth in Section 2(a).

"***UCC***" means the Uniform Commercial Code as from time to time in effect in the State of New York; *provided*, however, that, in the event that, by reason of mandatory provisions of any applicable law, any of the attachment, perfection or priority of the Lender's security interest in any Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "***UCC***" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or otherwise used in such provisions.

*[Signature page follows]*

27

IN WITNESS WHEREOF, each of the undersigned have caused this Agreement to be executed as of the date first written above.

**BORROWER:**

IMPAC MORTGAGE HOLDINGS, INC.

By:_____

Name:

Title:

*[Signature Page to DIP Loan and Security Agreement]*

US_ACTIVE\131979672

**GUARANTORS:**

COPPERFIELD FINANCIAL, LLC

By:_____
Name:
Title:

COPPERFIELD CAPITAL CORPORATION

By:_____
Name:
Title:

IMPAC FUNDING CORPORATION

By:_____
Name:
Title:

IMPAC COMMERCIAL CAPITAL
CORPORATION

By:_____
Name:
Title

INTEGRATED REAL ESTATE SERVICE CORP.

By:_____
Name:
Title

IMPAC MORTGAGE CORP.

By:_____
Name:
Title

*[Signature Page to DIP Loan and Security Agreement]*

US_ACTIVE\131979672

IMPAC WAREHOUSE LENDING, INC.

By:_____
Name:
Title

SYNERGY CAPITAL MORTGAGE CORP.

By:_____
Name:
Title

IMPAC WAREHOUSE LENDING GROUP, INC.

By:_____
Name:
Title

*[Signature Page to DIP Loan and Security Agreement]*

**LENDER:**

HILDENE RE SPC, LTD., acting for and on behalf of the account of SP 1

By: HILDENE CAPITAL MANAGEMENT, LLC, as its investment manager

By: _____
Name:
Title:

*[Signature Page to DIP Loan and Security Agreement]*

**ANNEX A**

**REGISTER**

| Date of Loan | Amount of Term Loan | Amount of Roll-Up Loan | Total Principal Amount Outstanding |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**ANNEX B**

## DESCRIPTION OF COLLATERAL

<u>Definitions</u>:

When used herein the terms Account, As-Extracted Collateral, Chattel Paper, Commercial Tort Claim, Deposit Account, Document, Electronic Chattel Paper, Equipment, Fixture, Goods, Instrument, Inventory, Investment Property, Letter-of-Credit Rights, Money, Account, Supporting Obligations and Tangible Chattel Paper have the respective meanings provided in Article 8 or Article 9, as applicable, of the UCC. Letter of Credit has the meaning provided in Section 5-102(a)(10) of the UCC. To the extent the definition of any category or type of collateral is expanded by any amendment, modification or revision to the UCC, such expanded definition will apply automatically as of the date of such amendment, modification or revision.

*"**Collateral**"*, shall mean:

(a)    All Accounts (together with all guaranties thereof and security therefor, all rights of stoppage in transit, replevin and reclamation and all rights as an unpaid vendor);

(b)    All Chattel Paper;

(c)    All Commercial Tort Claims;

(d)    All Deposit Accounts;

(e)    All Documents;

(f)    All Fixtures;

(g)    All General Intangibles (including all Intellectual Property Collateral);

(h)    All Goods (including all Inventory and all Equipment), together with all accessions, additions, attachments, improvements, substitutions, and replacements thereto and therefor;

(i)    All Instruments, all tax refunds, all tax refund claims and all other rights and claims to payment (together with all guaranties thereof and security therefor);

(j)    All Investment Property (including all equity and stock interests);

(k)    All Letter-of-Credit Rights and all Letters of Credit;

(l)    All Money (of every jurisdiction whatsoever);

(m)    All oil, gas or other minerals before extraction and all As-Extracted Collateral;

(n)    All insurance policies (including casualty and hazard insurance and right as loss payee or endorsee thereof);

(o)     All restricted cash accounts pledged as cash collateral to Enterprise Bank & Trust, and any cash and other assets maintained therein, subject and subordinate to the rights therein of Enterprise Bank & Trust;

(p)     All Supporting Obligations and all security interests and all other liens securing rights to payment or performance, all leases and all rights of setoff;

(q)     All books, correspondence, records, writings, databases, information and other property relating to, used or useful in connection with, evidencing, embodying, incorporating or referring to, any of the Collateral;

(r)     All Proceeds and all products of, and all rights associated with, the foregoing and, to the extent not otherwise included, (A) all payments under insurance (whether or not the Borrower or any Loan Party is the loss payee thereof), (B) rights acquired by reason of condemnation or exercise of the power of eminent domain, and (C) all tort claims; and

(s)     all other personal property and rights of every kind and description and interests therein;

in each case, whether such property is acquired prior to the Petition Date or after the Petition Date; *provided that*, only upon the Final Order Entry Date, "Collateral" shall include the net cash proceeds actually recovered from Avoidance Actions, if any, subject to the Final Order, including the Carve-Out.

**EXHIBIT A**

Form of Interim Financing Order

[to be attached]

**<u>Exhibit B</u>**

**Budget**

**IMPAC MORTGAGE HOLDINGS, INC.,** *et al.*
**Cash Forecast ($k)**

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | Total |
|---|---|---|---|---|---|---|---|---|
| Week Ending | 5/1 | 5/8 | 5/15 | 5/22 | 5/29 | 6/5 | 6/12 | 4/26 - 6/12 |
| Net Originations income | $ 33 | $ 9 | $ 19 | $ 28 | $ 38 | $ 9 | $ 19 | $ 154 |
| Other Revenue (Interest/servicing income) | 5 | - | - | - | - | 3 | - | 8 |
| **Total Receipts** | **38** | **9** | **19** | **28** | **38** | **12** | **19** | **162** |
| Payroll & Benefits | 15 | 181 | 15 | 180 | 15 | 186 | 14 | 607 |
| FirstAgentic Contract | 25 | - | - | - | - | 50 | - | 75 |
| Data Expense | - | 30 | 8 | 2 | - | 29 | - | 69 |
| Business Promotion | 1 | 9 | 2 | 1 | 1 | 9 | 2 | 25 |
| Rent | 20 | - | - | - | - | 20 | - | 40 |
| Legal & Other | 10 | - | - | - | 10 | - | - | 20 |
| Other Professional Fees | - | 7 | - | 6 | - | 7 | - | 20 |
| G&A & Other Misc Expenses | 1 | 10 | 2 | 2 | 1 | 10 | 2 | 28 |
| **Total Operating Disbursements** | **72** | **237** | **27** | **191** | **27** | **311** | **18** | **884** |
| **Operating Cash Flow** | **(35)** | **(228)** | **(8)** | **(163)** | **11** | **(298)** | **1** | **(721)** |
| **Restructuring Disbursements [1]** | | | | | | | | |
| Debtor's Counsel (Dentons) | 130 | 350 | - | - | - | 250 | - | 730 |
| Local Counsel (PSZJ) | 25 | 100 | - | - | - | 50 | - | 175 |
| Financial Advisor (DSI) | 60 | 100 | - | - | - | 100 | - | 260 |
| Claims / Noticing Agent (Verita) | 25 | 40 | - | - | - | 40 | - | 105 |
| Application of Remaining Retainers [2] | - | - | - | - | - | (233) | - | (233) |
| **Total Debtor Retained Professionals** | **240** | **590** | **-** | **-** | **-** | **208** | **-** | **1,038** |
| Lender Counsel (Lowenstein Sandler) | 400 | 100 | - | - | - | 100 | - | 600 |
| Lender Counsel (Morris Nichols) | 60 | 35 | - | - | - | 35 | - | 130 |
| Lender Tax Advisory (Proskauer Rose) | 50 | 25 | - | - | - | 25 | 20 | 120 |
| **Total Lender Professional Fees** | **510** | **160** | **-** | **-** | **-** | **160** | **20** | **850** |
| **Professional Fee Reserve** | **750** | **750** | **-** | **-** | **-** | **368** | **20** | **1,888** |
| **Net Cash Flow** | **$ (785)** | **$ (978)** | **$ (8)** | **$ (163)** | **$ 11** | **$ (666)** | **$ (19)** | **$ (2,609)** |
| **Beginning Cash** | **$ 130** | **$ 729** | **$ 250** | **$ 242** | **$ 79** | **$ 89** | **$ 348** | **$ 130** |
| Net Cash Flow | (785) | (978) | (8) | (163) | 11 | (666) | (19) | (2,609) |
| DIP Loan Funding | 1,500 | 500 | - | - | - | 924 | - | 2,924 |
| Facility Fee [3] | (117) | - | - | - | - | - | - | (117) |
| **Ending Cash - Unrestricted [4]** | **$ 729** | **$ 250** | **$ 242** | **$ 79** | **$ 89** | **$ 348** | **$ 328** | **$ 328** |
| **DIP Loan Facility** | | | | | | | | |
| DIP Loan Balance [5] | 3,576 | 4,076 | 4,076 | 4,076 | 4,076 | 5,000 | 5,000 | |
| DIP Facility Availability | 1,424 | 924 | 924 | 924 | 924 | - | - | |

*Footnotes:*

[1] *Per the terms of the Plan and RSA, the Exit Loan Facility funds are used to pay US Trustee Fees, GUC Consideration, and Allowed Claims.*

[2] *One-half of the Debtor Retained Professionals' retainers will be applied to pre-petition invoices, and the remaining balance is assumed to be applied to fees incurred during the Ch. 11 case.*

[3] *The DIP facility fee is calculated as 4% of the amount of the facility will be deducted from the amount of proceeds of the facility.*

[4] *Excludes a $35,000 reserve pending approval and issuance of a corporate credit card.*

[5] *DIP Loan Balance reflects the outstanding principal balance under the DIP facility, including the roll-up of the Bridge Note including accrued interest.*