# EXHIBIT "D"

# Management Incentive Plan

**IMPAC MORTGAGE HOLDINGS, INC.**

**STOCK APPRECIATION RIGHTS PLAN**

**(Effective as of May 15, 2026)**

#318149255.3

**IMPAC MORTGAGE HOLDINGS, INC.**

**STOCK APPRECIATION RIGHTS PLAN**

1.  **Establishment; Purpose.**

    a)  Impac Mortgage Holdings, Inc. (the "*Company*") hereby establishes the Impac Mortgage Holdings, Inc. Stock Appreciation Rights Plan (the "*Plan*"), effective as of May 15, 2026 (the "*Effective Date*").

    b)  The purpose of the Plan is to retain and motivate certain selected officers, employees, non- employee directors, consultants and advisors of the Company and its Affiliates through the grant of SARs (as defined below) on the terms set forth herein. Capitalized words and phrases not otherwise defined in the body of the Plan are defined in Section 2 below.

2.  **Definitions.**

    a)  "*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, "control" (including with correlative meanings, the terms "controlling", "controlled by" or "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

    b)  "*Award Agreement*" means a SAR award agreement in the form authorized by the Board and attached hereto as **Exhibit A**, which form may be amended, modified or supplemented from time to time as determined by the Board in its sole discretion.

    c)  "*Beneficiary*" means an individual who succeeds, upon the death of a Participant, to the rights of the Participant with respect to one or more SARs through the Participant's will or by reason of the laws of decent and distribution.

    d)  "*Board*" means the Board of Directors of the Company.

    e)  "*Cause*" means (i) being formally charged by law enforcement with a felony; (ii) commission of an act of fraud, embezzlement or misappropriation of funds; (iii) unlawful use (including being under the influence) or possession of illegal drugs in the workplace or that otherwise impairs the Participant's ability to perform his or her duties; (iv) willful or prolonged and unexcused absence from work (other than by reason of Disability or Board-approved leave of absence); (v) willful and repeated failure or refusal to perform the lawful and material employment duties related to a Participant's position or duties as from time to time assigned to such Participant that are consistent with such Participant's position (other than by reason of Disability or Board-approved leave of absence); (vi) breach of fiduciary duty or commission of any willful, intentional or grossly negligent act in each case having the effect of materially injuring the finances, business or reputation of the Company; (vii) violation in any material respect with the

Company's published rules or policies, as in effect or amended from time to time; or (viii) material breach of any written agreement with the Company.

f) "*Closing Date Net Proceeds Per Share*" means the Net Proceeds received by the Company or its Shareholders, as applicable, upon the closing of an Exit Event, as determined by the Board in its sole discretion, divided by the aggregate number of Shares and Vested SARs outstanding as of the Exit Event (determined on a fully diluted basis).

g) "*Code*" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

h) "*Contingent Proceeds*" means an amount of additional Net Proceeds received by the Company or its Shareholders following the closing of an Exit Event pursuant to the Exit Event's transaction documents, as determined by the Board in its sole discretion, including, but not limited to, payments attributable to the release of escrow or holdback amounts, or payment of earn-out or similar amounts.

i) "*Contingent Net Proceeds Per Share*" means the Contingent Proceeds received by the Company or its Shareholders, as applicable, following the closing of an Exit Event, divided by the aggregate number of Shares and Vested SARs outstanding as of the Exit Event (determined on a fully diluted basis); provided that Vested SARs of a Participant who, following the Exit Event either resigns or retires from employment or service with the Company (or a successor if applicable) or is terminated for Cause shall not be entitled to any portion of the Contingent Proceeds following such termination of employment or service and such Participant's Vested SARs shall not be taken into account in determining the Contingent Net Proceeds Per Share.

j) "*Disability*" means a Participant's inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, as determined in accordance with Section 409A.

k) "*Exit Event*" means the first to occur of any of the following:

　　a. the consummation of a purchase or other acquisition by any Person, entity or group of Persons (within the meaning of Section 13(d) or 14(d) of the Exchange Act or any comparable successor provisions, other than an acquisition by an Affiliate of the Company), of "beneficial ownership" (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more of the outstanding Shares or the combined voting power of the Company's then outstanding securities entitled to vote generally;

　　b. the consummation of a reorganization, merger, consolidation, acquisition, share exchange or other corporate transaction of the Company, in each case, with respect to which Persons who were Shareholders immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than 50% of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated company's then outstanding securities; or

c. the sale or conveyance of all or substantially all of the assets of the Company to a Person who is not an Affiliate.

provided, if an Exit Event would give rise to a payment or settlement event with respect to any SAR that constitutes "nonqualified deferred compensation" (within the meaning of Section 409A), the transaction or event constituting the Exit Event must also constitute a "change in control event" (as defined in Treasury Regulation §1.409A- 3(i)(5)) in order to give rise to the payment or settlement event for such SAR, to the extent required by Section 409A. Notwithstanding the foregoing, no Exit Event shall be deemed to occur as a result of any transaction between or among two or more of the Persons who own the Shares as of the Effective Date of this Plan.

l) "***Grant Date***" means the date specified as the Grant Date in the applicable Award Agreement.

m) "***Grant Date Fair Market Value Per Share***" means the fair market value per Share on the Grant Date (determined on a fully diluted basis), as determined by the Board in its sole discretion based on the reasonable application of a reasonable valuation method.

n) "***Net Proceeds***" means the cash proceeds and Specified Non-Cash Proceeds received by the Company or its Shareholders, as applicable, as the Exit Event consideration, net of all transaction costs as determined by the Board, including, for example, taxes (other than income taxes incurred by Shareholders), legal fees, investment banking fees, accounting fees, and employee retention payments. There shall be subtracted from Net Proceeds the amount of any proceeds used or reserved by the Company to pay any liabilities of the Company as of the Exit Event that are not assumed by the acquirer in connection therewith. "Net Proceeds" does not include any non-cash consideration other than publicly tradeable securities and Specified Non-Cash Proceeds. All decisions and actions by the Board with respect to the determination of Net Proceeds shall be final, binding and conclusive on all Participants and other interested parties.

o) "***Participant***" means any officer, employee, non-employee director, consultant or advisor of the Company and its Affiliates of the Company or an Affiliate to whom the Board determines, in its sole discretion, to make a grant of SARs pursuant to an Award Agreement.

p) "***Person***" means an individual, a partnership, a joint venture, a corporation, a limited liability company, an association, a trust, an estate or other entity or organization, including a government or any department or agency thereof.

q) "***Restrictive Covenants***" means the restrictions imposed by the Company or any of its Affiliates in an employment or consulting agreement or other agreement applicable to a Participant between the Participant and the Company or any of its Affiliates or otherwise on the ability of the Participant to disclose confidential information of the Company or its Affiliates; compete with the Company or its Affiliates; disparage the Company or its Affiliates or their officers, directors, or employees; solicit employees, customers, vendors, or suppliers; use or disclose inventions; or other similar restrictions.

r)  "**Section 409A**" means Section 409A of the Code and the rules and regulations promulgated thereunder, as they may be amended from time to time.

s)  "**Share**" means a share of Stock.

t)  "**Shareholder**" means a holder of a Share.

u)  "**Specified Non-Cash Proceeds**" means (i) amounts, if any that the Company's selling Shareholders agree to re-invest in the new or surviving entity following an Exit Event, and (ii) the amount of any consideration payable in connection with an Exit Event to the Company or its Shareholders in the form of one or more promissory notes.

v)  "**Stock**" means the Common Stock, par value $0.01 per share, of the Company.

w)  "**Stock Appreciation Right**" or "**SAR**" means a right to receive on an Exit Event, subject to the terms and conditions of the Plan and the applicable Award Agreement, in cash, the excess, if any, of (i) the sum of Closing Date Net Proceeds Per Share and Contingent Proceeds Per Share, over (ii) the Grant Date Fair Market Value Per Share (the "**Spread Amount**"); provided, however, that if an Exit Event provides for Contingent Proceeds, a Participant's right to receive payment in respect of Vested SARs with respect to such Contingent Proceeds shall be subject to Section 5(h) of the Plan.  For avoidance of doubt, if the Closing Date Net Proceeds Per Share alone (without taking into account the Contingent Proceeds Per Share) does not exceed the Grant Date Fair Market Value Per Share, than no amount shall be payable to a Participant upon the Closing Date but the Participant remains eligible to share in Contingent Proceeds if and when the sum of Closing Date Net Proceeds Per Share and Contingent Proceeds Per Share exceed the Grant Date Fair Market Value Per Share.

x)  "**Termination Date**" means the first day occurring on or after the Grant Date of any SARs on which the Participant is not employed by the Company or any of its Affiliates or in the case of a non-employee, the Participant's termination of service with the Company and each of its Affiliates, regardless of the reason for the termination of employment or service; provided that a termination of employment shall not be deemed to occur by reason of a transfer of the Participant between the Company and an Affiliate of the Company or between two (2) Affiliates of the Company; provided, further, that the Participant's employment shall not be considered terminated while the Participant is on a bona fide leave of absence from the Company or an Affiliate of the Company approved by the Company or other Person for which the Participant provides services; provided, further, if a Termination Date would give rise to a payment or settlement event with respect to any SAR that constitutes "nonqualified deferred compensation" (within the meaning of Section 409A), the event constituting the Termination Date must also constitute a "separation from service" (as defined in Treasury Regulation §1.409A-1(h)) in order to give rise to the payment or settlement event for such SAR, to the extent required by Section 409A.

y)  "**Unvested SARs**" means, as of any date, the number of SARs which have not vested as of such date pursuant to Section 5.

-4-

z) "*Vested SARs*" means, as of any date, the number of SARs which have vested as of such date pursuant to Section 5.

aa) "*Vesting Date*" has the meaning assigned to such term in Section 5.

3. **Administration.**

a) The Plan shall be interpreted and administered by the Board, provided that the Board may delegate such administrative duties to a compensation committee or any other committee (and all references to the Board in the Plan shall include any authorized delegate of the Board), whose actions shall be final and binding on all Persons, including the Participants, and shall be given the maximum deference permitted by law.

b) The Board (or applicable committee), in its sole discretion, shall have the power, subject to and within the limitations of the express provisions of the Plan, to:

   a. Determine from time to time which officers, employees, non-employee directors, consultants and advisors of the Company or its Affiliates shall be designated as Participants entitled to participate in the Plan and the number and terms of the SARs granted;

   b. Make determinations and interpretations required under the Plan, including the amount of any payments to Participants;

   c. Establish rules and regulations it deems necessary or desirable for the administration of the Plan;

   d. Exercise all authority with respect to the Plan granted to it hereunder and otherwise; and

   e. Correct any defect, supply any omission and/or reconcile any inconsistency in the Plan or any Award Agreement.

c) No member of the Board (or the applicable committee) shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or any payment paid hereunder, and all members of the Board (or the applicable committee) shall be fully indemnified and held harmless by the Company or its successor in respect of any such action, determination or interpretation.

d) Nothing contained in the Plan shall restrict the Company's ability or authority to issue Shares, rights to purchase Shares or award SARs, and such issuances of Shares, rights to purchase Shares and awards of SARs shall dilute the value of SARs then outstanding.

4. **Awards Subject to the Plan.** The maximum number of SARs that may be granted under the Plan is 15,000. Any SARs granted that are subsequently forfeited or cancelled under the Plan, due to a failure to vest, termination of employment or otherwise, shall again become available for grant under the Plan. In the event of a transaction involving the Company that is not an Exit Event (including, without limitation, any distribution, stock split, extraordinary cash distribution,

recapitalization, reorganization, merger, amalgamation, consolidation, stock exchange split-up, spin-off, sale of assets or subsidiaries, combination or exchange of shares of stock), the Board may, in the manner it determines equitable in its sole discretion, adjust the number of SARs available under the Plan and granted to Participants to reflect the transactions.

5.   **Terms and Conditions of the Awards; Vesting; Exercise.**

a)   <u>Award Agreements</u>. Each SAR granted under the Plan shall be evidenced by an Award Agreement, specifying the number of SARs granted, vesting conditions, Grant Date, the Grant Date Fair Market Value Per Share, and such other terms and conditions as specified by the Board, in its sole discretion, consistent with the Plan. Each Award Agreement shall be subject to the applicable terms of the Plan. By agreeing to participate in the Plan and executing an Award Agreement, the Participant acknowledges and agrees that he or she (i) has reviewed and understands the terms of the Plan and (ii) shall be bound by the terms of the Plan.

b)   <u>Vesting Provisions</u>. Subject to the terms and conditions of the Plan and except as otherwise provided in the Award Agreement, twenty percent (20%) of the Participant's SARs issued pursuant to an Award Agreement shall become Vested SARs on each of the first, second, third and fourth anniversary of the Grant Date; thereafter, twenty percent (20%) of such SARS shall become Vested SARs upon the occurrence of an Exit Event (each such date or event upon which SARS granted pursuant to such Award Agreement shall become vested a "***Vesting Date***"); provided that the Participant is employed with the Company on the respective Vesting Date; provided, further, that if an Exit Event occurs prior to the Participant's Termination Date, then all of such Participant's SARs shall become Vested SARs upon such Exit Event.  Notwithstanding anything contained herein to the contrary, except as otherwise provided in the Award Agreement, if the Participant's Termination Date occurs prior to an Exit Event, the Participant's SARs shall be treated as follows:

i.   <u>Termination for Cause or Voluntary Termination</u>. If a Participant's Termination Date occurs at any time due to a termination for Cause or resignation or retirement prior to an Exit Event, the Participant shall immediately forfeit all of his or her SARs (including any Vested SARs).

ii.   <u>Termination without Cause, Death or Disability</u>. If a Participant's Termination Date occurs at any time due to a termination without Cause, by reason of the Participant's Death, or due to a termination by reason of Disability, the Participant's Unvested SARs shall be automatically forfeited without consideration.

c)   Each SAR granted under the Plan shall be nontransferable, other than by will or the laws of descent and distribution.

d)   <u>Automatic Exercise</u>. Vested SARs shall be automatically exercised without any action on the part of the Participant on an Exit Event that occurs prior to the 7th anniversary of the Grant Date.  If no Exit Event shall occur prior to the 7th anniversary of the Effective

Date, all SARs (whether or not vested) shall be automatically forfeited without consideration.  SARs shall not be exercisable other than pursuant to this Section 5(d).  Upon exercise pursuant to this Section 5(d), the SARs shall terminate, provided that, except as provided in Section 5(h), a Participant shall remain entitled to payments, if any, in accordance with the Plan with respect to Vested SARs outstanding on the Exit Event.

e) <u>Amount Payable</u>. The amount payable to a Participant upon the closing of an Exit Event in settlement of the Participant's exercise of his or her Vested SARs shall be equal to the Spread Amount times the number of Vested SARS held by the Participant (the "***Payment Amount***").

f) <u>Time of Payment</u>. Upon a Participant's automatic exercise of Vested SARs (determined after applying the provisions of this Section 5), the Payment Amount shall be paid a single sum payment and shall be made within sixty (60) days following the Exit Event; provided that any Contingent Proceeds shall be paid in accordance with Section 5(h) below. All payments in settlement of a Participant's automatic exercise of Vested SARs shall be made in cash (or, if the consideration received on an Exit Event is property, payment may be made in the same combination of cash and/or property as received by the Shareholders).

g) <u>Payment Conditioned on a Release</u>. Any payment due to a Participant shall be subject to the execution and non-revocation of a general release of claims, in a form provided by the Company.  The Company may require a Participant who has a Termination Date prior to an Exit Event to execute such a general release within 90 days following such Termination Date and may further require such Participant to re-execute such release following the Exit Event.

h) <u>Payment of Contingent Proceeds</u>. If an Exit Event provides for Contingent Proceeds, each Participant entitled to participate in such Contingent Proceeds shall be paid an amount per Vested SAR equal to the amount of Contingent Net Proceeds Per Share received by the Company or its shareholders, paid at the same time(s) as such Contingent Proceeds are paid to the Company or its Shareholders, provided, however, that payments of Contingent Proceeds that are not otherwise exempt from Code Section 409A shall only be made in accordance with Code Section 409A and Treasury Regulation Section 1.409A- 3(i)(5)(iv), and, notwithstanding anything herein to the contrary, a Participant shall not have a legally binding right to receive such payments to the extent that such payments would constitute deferred compensation subject to Code Section 409A and would not otherwise satisfy the requirements of Treasury Regulation Section 1.409A- 3(i)(5)(iv).  Notwithstanding anything contained herein to the contrary, in no event shall a Participant be entitled to any payment in respect of Contingent Proceeds if the aggregate amount payable to such Participant per Vested SAR in respect of the Spread and Contingent Proceeds is equal to or less than the Grant Date Fair Market Value Per Share.

i) In the sole discretion of the Board, if a Participant violates in a material respect a Restrictive Covenant prior to any payment date for any amount pursuant to this Plan, then, in the sole discretion of the Board, the Participant shall forfeit all of the Participant's

SARs (including any Vested SARs) and the Participant shall have no further rights under or with respect to, any such SARs pursuant to the Plan.

j)  In connection with, and as a condition to receiving, any payment with respect to SARs, the Board may require a Participant to (i) bear a pro rata share of any post-closing indemnity obligations, and be subject to the same or similar post-closing purchase price adjustments, escrow terms, offset rights, holdback terms and similar conditions as holders of Shares; and (ii) execute and deliver such documents and instruments as the Board may reasonably require for the Participant to be bound by such obligations.

k)  Clawback. Notwithstanding anything in the Plan to the contrary, all SARs granted under the Plan and any payments made with respect to such SARs pursuant to the Plan shall be subject to clawback or recoupment as permitted or mandated by applicable law, rules, regulations or Company policy as enacted, adopted or modified from time to time (any of the foregoing, a "***Clawback Policy***"). By accepting an award of SARs under the Plan, each Participant agrees and consents to the Company's application, implementation and enforcement of any Clawback Policy and expressly agrees that the Company may take such actions as are necessary to effectuate the Clawback Policy or applicable law with respect to any SARs without further consent or action being required by the Participant.

6.  **Amendment or Termination of the Plan.** Notwithstanding anything herein to the contrary, the Board may at any time terminate or amend, modify or suspend the Plan, including, without limitation, any related documents, in whole or in part; provided, however, that without the consent of the affected Participant (or his or her Beneficiary) no termination, amendment, modification or suspension of the Plan or any related documents shall materially and adversely alter or impair the rights of a Participant (or his or her Beneficiary) under or with respect to any SARs then outstanding under the Plan. The Board may also, without the consent of any Participant, make such amendments or modifications to the Plan, any related documents, or any outstanding SARs as the Board determines, in its sole discretion, are reasonably necessary in order for the Plan or such SARs to (a) comply with, or avoid being subject to, Section 409A and (b) comply with, or take into account changes in, applicable tax laws, accounting rules and other applicable laws, rules and regulations.

7.  **Securities Compliance.** The Plan is intended to be a written compensatory benefit plan within the meaning of Rule 701 promulgated under the Securities Act of 1933. A SAR shall not be effective unless such SAR is in compliance with all applicable federal and state securities laws, rules and regulations of any governmental body, as they are in effect on the date of grant of the SAR and also on the date of exercise or other issuance. The Company shall be under no obligation to register any securities with respect to the Plan with the Securities and Exchange Commission or to effect compliance with the exemption, registration, qualification or listing requirements of any state securities laws, stock exchange or automated quotation system, and the Company shall have no liability for any inability or failure to do so.

8.  **No Implied Rights**. Neither a Participant nor any other Person shall, by reason of participation in the Plan, acquire any right in or title to any assets, funds or property of the Company or any of its Affiliates whatsoever, including, without limitation, any specific funds, assets, or other property which the Company or any of its Affiliates, in their sole discretion, may

set aside in anticipation of a liability under the Plan. Neither a Participant nor any other Person shall, by reason of participation in the Plan, acquire any rights of a Shareholder, including, without limitation, any voting rights, information rights, rights to dividends or distributions or any other rights associated with shareholders in a Delaware corporation. A Participant shall have only a contractual right to any payment under the Plan, unsecured by any assets of the Company or any of its Affiliates, and nothing contained in the Plan shall constitute a guarantee that the assets of the Company or any of its Affiliates shall be sufficient to pay any benefits to any Person. The grant and holding of SARs shall not represent the grant or holding of an ownership interest in the Company or any of its Affiliates.

9.   **Successors**. The Plan shall be binding upon, and inure to the benefit of, the Company and its successors and assigns, and upon any Person acquiring, whether by merger, consolidation, purchase of assets or otherwise, all or substantially all of the Company's assets and business.

10.   **No Guarantee of Future Service.** Selection of an individual as a Participant under the Plan shall not provide any guarantee or promise of continued employment or service of the Participant with the Company or any of its Affiliates, and the Company retains the right to terminate the employment of any employee, and the service of any non-employee director, consultant and advisor, at any time, with or without Cause, for any reason or no reason, except as may be restricted by law or contract.

11.   **Withholding.** The payment of all amounts in respect of SARs under the Plan are subject to withholding of all applicable taxes. The Company and its Affiliates shall have the right to deduct from all cash distributions made pursuant to the Plan any federal, state or local taxes required to be withheld with respect to such distributions. Except as otherwise provided by the Board and subject to applicable law, in the event of a distribution of Shares or other equity or property, such withholding obligations may be satisfied (i) through cash payment by the Participant; or (ii) through the surrender of Shares or other equity or property which the Participant is otherwise entitled under the Plan (including Shares otherwise distributable pursuant to Plan); provided, however, that such Share under this clause (ii) may be used to satisfy not more than the maximum individual tax rate for the Participant in applicable jurisdiction for such Participant (based on the applicable rates of the relevant tax authorities (for example, federal, state, and local), including the Participant's share of payroll or similar taxes, as provided in tax law, regulations, or the authority's administrative practices, not to exceed the highest statutory rate in that jurisdiction, even if that rate exceeds the highest rate that may be applicable to the specific Participant). In no event whatsoever shall the Company or any Affiliate be liable for any taxes, penalties or interest that may be imposed on a Participant under Section 409A or under any other similar provision of state tax law in connection with such Participant's participation in the Plan or otherwise. By agreeing to participate in the Plan, the Participant acknowledges and agrees that he or she shall be liable for all taxes imposed on him or her as a result of participation in the Plan and in relation to payments received pursuant to the Plan, including, but not limited to, Section 409A and any other similar provision of state tax law.

12.   **Funding.** Nothing in the Plan shall be construed to create a trust or to establish or evidence any Participant's claim of any right other than as an unsecured general creditor with respect to any payment to which he or she may be entitled.

13. **Non-assignability.** Subject to Section 5(c) of the Plan, to the maximum extent permitted by law, a Participant's rights or benefits under the Plan shall not be subject to anticipation, alienation, sale, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, assign, pledge, encumber or charge the same shall be void.

14. **Section 409A.** The payments due under the Plan are intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of the Plan, payments of "nonqualified deferred compensation" provided under the Plan may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. If a payment window spans two calendar years, the payment will be made in the second year. Any payments under the Plan that may be excluded from Section 409A as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For the avoidance of doubt, each payment provided under the Plan, shall be treated as separate payments. Notwithstanding any other provision in the Plan to the contrary, if the Participant is a "specified employee" on his or her Termination Date, any payment payable under the Plan that constitute a "deferral of compensation" within the meaning of Treas. Reg. § 1.409A-1(b) (that are not otherwise exempt from the provisions of Section 409A) that would otherwise be paid or provided hereunder during the six-month period commencing on the Termination Date of the Participant, will be deferred until the first day of the seventh month following the separation from service if such deferral is necessary to avoid the additional tax under Section 409A.

15. **Effective Date; Term of Plan.** The Plan shall become effective on the Effective Date. The Plan shall remain in effect until it is revised or terminated by further action of the Board (or applicable committee).

16. **No Restriction on Right of Company to Effect Corporate Changes**. Neither the Plan nor the grant of SARs hereunder shall affect in any way the right or power of the Company or its Shareholders to make or authorize any or all adjustments, recapitalizations, reorganizations or other changes in the Company's capital structure or its business.

17. **Governing Law.** The Plan and any Award Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to the conflict of laws provisions thereof that would require the application of laws of another jurisdiction. Nothing in the Plan or any Award Agreement should be interpreted as restricting or prohibiting Participants from filing a charge or complaint with the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board, the Department of Labor, the Occupational Safety and Health Commission, or any other federal, state, or local administrative agency charged with investigating and/or prosecuting complaints under any applicable federal, state or municipal law or regulation (except that each Participant acknowledges that he or she may not recover any monetary benefits in connection with any such claim, charge or proceeding). A federal, state, or local agency would also be entitled to investigate the charge in accordance with applicable law.

18. **Notices.** Except as expressly set forth to the contrary in the Plan, all notices, requests or consents provided for or required to be given hereunder shall be in writing and shall be deemed to be duly given if personally delivered or mailed by certified mail, return receipt requested, or nationally recognized overnight delivery service with proof of receipt maintained, if to the

Company, at its principal office and, if to a Participant, at the last known address for the Participant on the Company's records (or such address as the Company or Participant, may designate in writing). Any such notice shall, if delivered personally, be deemed received upon delivery; shall, if delivered by certified mail, be deemed received upon the earlier of actual receipt thereof or five (5) days after the date of deposit in the United States mail, as the case may be; and shall, if delivered by nationally recognized overnight delivery service, be deemed received upon the first (1st) business day after the date of deposit with the delivery service. The Company or a Participant, as applicable, may waive any required notice by written waiver.

19. **Severability.** Each provision of the Plan shall be considered severable and, if for any reason any provision or provisions herein is determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of the Plan which are valid, enforceable and legal.

20. **Dispute Resolution.**

    a) In exchange for the benefits of the speedy, economical, and impartial dispute resolution of arbitration and subject to Section 20 of the Plan, the and Company and the Participants choose to waive their right to resolution of disputes in a court of law by judge or jury, and instead agrees that any controversy, dispute or claim ("Dispute") arising out of or relating to the Plan or any Award Agreement will be settled by confidential, expedited, final and binding arbitration having a seat in New York, New York and administered in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "Arbitration Rules") then in effect. Any Dispute with respect to the enforceability of this Section 20 or whether a Dispute is subject to this Section 20 of the Plan shall be resolved by arbitration. The obligation to arbitrate survives the termination of the Plan or any Award Agreement.

    b) The Company and the Participants shall maintain the confidential nature of the arbitration proceeding, except as may be necessary in connection with a court application for a preliminary remedy, a court action to challenge or enforce the arbitration award, or as otherwise required by applicable law, including any judicial decision. The Company and the Participants further agree that the arbitrator shall render the arbitration award in writing and explain the decision which, to the extent possible, shall not include confidential information.

    c) The Company and the Participants waive to the fullest extent permitted by applicable law any rights to appeal or to review of the arbitration award by any court or tribunal. The Company and the Participants consent to exclusive jurisdiction of, and agree that sole venue will lie in, any state or federal court sitting in the State of New York, for any allowable judicial proceeding relating to any arbitration under the Plan or any Award Agreement, including entry of a judgment on the arbitration award.

    d) Notwithstanding anything to the contrary in this Section 20 of the Plan, any party to a Dispute may file an action in any state or federal court sitting in the State of New York to obtain provisional injunctive or equitable relief in accordance with Section 20 of the Plan to prevent immediate and irreparable harm and to ensure that the relief sought by

the aggrieved party is not rendered ineffectual pending the arbitration. Each of the Company and the Participants waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other party thereto with respect to such defense. The Company and the Participants may make service on each other by sending or delivering a copy of the process to the party to be served at the address and in the manner provided for the giving of notices in Section 20 of the Plan. Nothing in Section 20 of the Plan, however, shall affect the right of the Company and the Participants to serve legal process in any other manner permitted by applicable law or at equity.

e)  In the event of a conflict between this Section 20 of the Plan and the Arbitration Rules, this Section 20 of the Plan shall control.

In accordance with the authorizations and directions of the Board of Directors of the Company, the Plan is hereby adopted effective as of the date signed below.

**IMPAC MORTGAGE HOLDINGS, INC.**

By:

Name:

Title:

Date: