**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>IMPAC MORTGAGE HOLDINGS, INC.,<br>*et al.*,[1]<br><br>         Debtors. | Chapter 11<br><br>Case No. 26-10593 (CTG)<br><br>(Joint Administration Requested) |

**DECLARATION OF ERIC J. HELD IN SUPPORT OF CONFIRMATION OF THE JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION OF IMPAC MORTGAGE HOLDINGS, INC. AND AFFILIATES THEREOF**

I, Eric J. Held, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.    I am a Senior Managing Director at Development Specialists, Inc. ("DSI"), financial advisor to Impac Mortgage Holdings, Inc. ("IMHI") and the above-referenced affiliated debtors and debtors in possession (collectively, the "Debtors") under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in these chapter 11 cases (the "Chapter 11 Cases"). I submit this Declaration in support of confirmation of the *Joint Prepackaged Chapter 11 Plan of Reorganization of Impac Mortgage Holdings, Inc. and Affiliates Thereof* [Docket No. 13] (as amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan") (unless otherwise defined herein, all capitalized terms used in this Declaration shall have the meanings ascribed to them in the Plan) filed by the Debtors.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Impac Mortgage Holdings, Inc. (5505); Copperfield Financial, LLC (7513); Copperfield Capital Corporation (4920); Impac Funding Corporation (4495); Impac Commercial Capital Corporation (0090); Impac Secured Assets Corp. (5871); IMH Assets Corp. (5301); Integrated Real Estate Service Corp. (2263); Impac Mortgage Corp. (3937); Impac Warehouse Lending, Inc. (0541); Synergy Capital Mortgage Corp. (9071); and Impac Warehouse Lending Group, Inc. (3488). The Debtors' mailing address is 19800 MacArthur Blvd., Suite 500, Irvine, CA 92612.

**Background and Qualifications**

2.    I am authorized to execute this declaration (the "Declaration"). Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein or I have acquired such knowledge through officers of the Debtors or employees of DSI acting under my supervision in the ordinary course of business, and if called upon to testify, I would testify competently to all of the facts set forth herein.

3.    I bring more than two decades of experience in investment banking, private equity and management consulting, with a focus on crisis management, financial advisory and restructuring services in complex insolvency matters. Over the course of my career, I have been involved in significant restructuring engagements, bankruptcy proceedings and general assignments for the benefit of creditors, and have served as a financial advisor and expert witness to fiduciaries, investment firms, creditors and other stakeholders across a wide range of industries.

4.    Prior to joining DSI, I advised on numerous capital raising, corporate advisory and turnaround engagements. I also served as an Associate at GESD Capital Partners, a private equity firm, where I pursued new acquisition opportunities and assisted in the successful turnaround of portfolio companies, and as an Associate in the investment banking division of Citigroup Global Markets, where I participated in more than $10 billion of mergers and acquisitions transactions and capital markets offerings.

5.    I am a Certified Insolvency and Restructuring Advisor and a Certified Fraud Examiner. I hold a Master of Business Administration from the University of Chicago Booth School of Business and a Bachelor of Science from California Polytechnic State University, San Luis Obispo. My extensive transactional, advisory and restructuring experience underscores my

qualifications to provide authoritative financial and restructuring advisory services in the context of debtor-in-possession and related fiduciary proceedings.

6.     DSI was retained by the Debtors prepetition to assist in evaluating the Debtors' liquidity constraints and preparing the Debtors for their potential entry into chapter 11. DSI's engagement included evaluating the Debtors' RSA, business plan, budgets and financial projections, and advising on measures necessary to preserve value for stakeholders during the contemplated restructuring process, including executing the transformative transactions contemplated in the Restructuring Support Agreement, including the Debtors' proposed exit financing.

7.     DSI played a central role in the Debtors' preparation for these chapter 11 cases, including assisting with the proposed debtor-in-possession financing, budget and cash-management strategy, and first-day pleadings. DSI also advised on formulation of the plan and operational continuity during the transition to chapter 11 governance. The Debtors' retention of DSI prepetition ensured continuity of restructuring oversight and institutional knowledge at the outset of these cases and positioned the Debtors to pursue an orderly restructuring process immediately upon filing, as contemplated by the RSA.

8.     DSI assisted the Debtors in preparing the Liquidation Analysis attached as Exhibit "B" to the Disclosure Statement and worked collaboratively with management and the Plan Sponsor to develop the Financial Projections attached as Exhibit "C" to the Disclosure Statement.

9.     Based on my work with the Debtors and my oversight of the work that DSI has performed for the Debtors, my review of relevant documents, and my discussions with members of the Debtors' management team, I am familiar with the Debtors' operations and business and

financial affairs. I have reviewed and am familiar with the terms and provisions of the Plan, the Disclosure Statement, and the other related documents.

10.     Except as otherwise indicated, all facts set forth in this Declaration are based on: (a) my direct personal knowledge of the Debtors' assets, operations, and finances; (b) information learned from my review of relevant documents and discussion with the Debtors and their professionals, including DSI employees acting under my supervision in the ordinary course of business; and/or (c) opinion based on my experience, investigation and knowledge.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

**The Plan**

11.     Prior to the Petition Date, the Debtors, with the assistance of their advisors, including DSI, engaged in extensive, good-faith, arm's-length negotiations with their key financial stakeholders and prospective partners regarding a comprehensive restructuring and recapitalization of the Debtors' capital structure.  These discussions focused principally on the Debtors' obligations under the Senior Loan Agreement and the Subordinated Notes Indentures. The negotiations culminated in the RSA among the Debtors, the Plan Sponsor, the DIP Lender, and the Consenting Subordinated Noteholders, which provides the framework for the Plan.

12.     The RSA and the Plan will effectuate a restructuring of the Debtors, pursuant to which, among other things: (a) the Plan Sponsor, as the holder of the Senior Indebtedness Claims (estimated at approximately $23,950,000 in principal plus fees and interest), will convert its debt under the Senior Loan Agreement into 100% of the Plan Sponsor Common Stock of the Reorganized Debtors; (b) the DIP Lender will provide necessary funding for the administration of these Chapter 11 Cases and the Debtors' emergence from bankruptcy through a DIP Facility and an Exit Loan Facility; (c) Holders of Subordinated Notes Claims (estimated as of the Petition Date at approximately $77,000,000 of combined principal and interest) will receive their pro rata share

of a newly issued Contingent Payment Certificate, which will mature one-hundred twenty (120) days following the end of the third taxable year following the Effective Date (including the taxable year in which the Effective Date occurs); and (d) Holders of Allowed General Unsecured Claims will receive their Pro Rata share of the GUC Consideration, consisting of $300,000 less any GUC Expenses, which is to be funded from the Exit Loan Facility.

13.     In addition, the Plan provides for the reinstatement of the Enterprise Obligations. The Enterprise Claims arise under certain prepetition promissory notes issued by Impac Mortgage Holdings, Inc., as trustee of certain trusts for former executives of the Debtors, in favor of Enterprise, and are secured by life insurance policies covering such former executives and other related collateral. Under the Plan, the Enterprise Obligations will be reinstated pursuant to section 1124 of the Bankruptcy Code, subject to a consensual extension of the maturity date on the Enterprise Obligations to April 30, 2031.  The terms and conditions of the amended notes will be materially consistent with the prepetition notes.

14.     The Plan provides for adequate means of implementation, including: (a) the use of the proceeds of the Exit Loan Facility to refinance the DIP Claims and provide working capital for the Reorganized Debtors; (b) the issuance of the Plan Sponsor Common Stock to the Plan Sponsor in satisfaction of the Senior Indebtedness Claims; (c) the issuance of the Contingent Payment Certificate to Holders of Allowed Subordinated Notes Claims; (d) the funding of the GUC Consideration from the proceeds of the Exit Loan Facility and the funding of the Administrative and Priority Claims Reserve from Cash on hand on the Effective Date and the proceeds of the Exit Loan Facility; (e) the adoption of the Management Incentive Plan, which provides for the issuance of stock appreciation rights to management and employees as described in the Plan Supplement; (f) various corporate governance actions, including the appointment of the initial board of directors

of the Reorganized Debtors as designated by the Plan Sponsor; (g) the vesting of the Debtors' assets in the Reorganized Debtors free and clear of Claims, Liens, and Interests, except as otherwise provided in the Plan; (h) the cancellation of existing securities and agreements, including the Subordinated Notes and all Interests in Impac; and (i) subsequent to the Effective Date, the amendment of the Debtors' charters, as applicable, to prohibit the issuance of non-voting securities and to otherwise comply with the terms and conditions of section 1123(a)(6) of the Bankruptcy Code.

15.     The Plan (i) is a product of extensive, good-faith and arm's-length negotiations among key constituencies in these Chapter 11 Cases, (ii) provides a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, and maximizes all creditor recoveries, and (iii) provides adequate means for its implementation within the meaning of section 1123(a)(5) of the Bankruptcy Code.

**Good Faith, Arm's-Length Negotiations and the Value of the Reorganized Debtors**

16.     Based on my involvement in and familiarity with the restructuring process and the negotiations leading up to the Plan, the Plan has been proposed in good faith with the legitimate and honest purpose of reorganizing the Debtors' ongoing businesses, enhancing the financial viability of the Debtors, and maximizing the ultimate recoveries for all of the Debtors' stakeholders. The Plan is the result of robust negotiations among sophisticated parties and their professionals with the goal of deleveraging the Debtors and preserving the Debtors' ability to continue operating.

17.     In the context of these negotiations, no party requested a formal valuation of the Reorganized Debtors as a going concern, nor does the RSA require such a formal valuation.  The Debtors and the RSA Parties understand and agree that the going-concern value of the Reorganized Debtors remains speculative, based in large part on future performance, the contributions available

6

under the Secondment Agreement, and larger macroeconomic factors outside of the parties' control.  Nonetheless, the Debtors and the Plan Sponsor agree that the Plan is feasible based on the Financial Projections, as well as the funding availability under the Exit Loan Facility.  The Debtors' ability to obtain the DIP Facility and the Exit Facility is a strong indication of the market's view of the Plan's feasibility and the value of the Debtors' restructured business.

18.     Under these circumstances, and given the consensual nature of the Plan with respect to the RSA Parties, who are the only parties who will receive distributions of value under the Plan tied to the Reorganized Debtors' future performance, the Debtors and the Plan Sponsor have determined that it would be unnecessarily burdensome and wasteful to undertake a formal going-concern valuation. Consequently, the economic terms of the Plan reflect a market-based resolution reached through the negotiations of the RSA, which is more reliable than a forward-looking prediction of theoretical value. Apart from the RSA Parties who are supporting the Plan, other holders of Claims entitled to distributions under the Plan (most notably, holders of Class 5 General Unsecured Claims) will receive their Pro Rata distribution of the GUC Consideration, which will be funded in Cash from the Exit Loan Facility on or shortly after the Effective Date, without regard to future performance of the Reorganized Debtors.

**Financial Projections and Plan Feasibility**

19.     In connection with the Plan, DSI worked collaboratively with management and the Plan Sponsor as they developed Financial Projections, which run through the fourth quarter of 2028. I am personally familiar with the methodologies, assumptions, and conclusions set forth therein, and the Financial Projections are reasonable within the context of the Debtors' ongoing operations.

20.     The Financial Projections were based on information provided by the Debtors and made available to DSI and rely on certain key assumptions.  The projections contemplate modest

originations and negative operating cash flows in the initial quarters, bridged by the DIP Facility and the Exit Loan Facility, with sustained positive cash flow achieved as monthly volume and margins normalize and scale. Importantly, the RSA stakeholders understand both the near-term headwinds and the time required to reach profitability and have structured the Plan timeline and financing to provide the necessary runway.

21.     As is typical, given that the Financial Projections were developed over a month ago, DSI undertook to review the projections in light of actual performance since they were prepared, plus any notable event that may have impacted them.  For instance, the conversion of the Enterprise Obligations, plus the original fee, did change the projections, but the management team has determined, with DSI's support that this and other changes based on actual performance have not altered the Financial Projections in any material way.

22.     As set forth in the Financial Projections, the Reorganized Debtors will be able to make all payments required under the Plan while conducting ongoing business operations. Implementation of the Plan is not likely to be followed by liquidation or the need for further reorganization. The Plan is feasible.

**II.     Liquidation Analysis and Best Interest of Creditors**

23.     In connection with the Disclosure Statement and the Plan, DSI assisted the Debtors in preparing an unaudited liquidation analysis, which is attached as Exhibit "B" to the Disclosure Statement (the "Liquidation Analysis"). I directed and supervised DSI's involvement in the preparation of the Liquidation Analysis, am personally familiar with the methods used and the conclusions reached therein, and the Liquidation Analysis was prepared in good-faith and reflects the best estimate of projected recoveries based on currently available information.

24.     The Liquidation Analysis was prepared on a consolidated basis and compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case

under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of April 24, 2026 (the "Conversion Date") and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation on or about the Conversion Date under the supervision of a single court-appointed chapter 7 trustee.[2] The Liquidation Analysis assumes the chapter 7 case would be filed on April 24, 2026 and would span three months. The Liquidation Analysis assumes no debtor-in-possession financing facility would be available. A potential chapter 7 case with the consent of the Plan Sponsor and DIP Lender is assumed to be funded by cash on hand and by the liquidation of available assets.

25.     Based on these assumptions, the Liquidation Analysis estimates total recoverable asset value of approximately $3,295,000. The Liquidation Analysis relies on estimated potential cash distributions to Holders of Allowed Claims in a hypothetical chapter 7 liquidation of the Debtors' assets. The key asset categories and related assumptions are summarized below.

26.     The Liquidation Analysis assumes estimated unrestricted cash in the Debtors' bank accounts as of April 24, 2026 of approximately $385,000. In addition, restricted cash of approximately $1,150,000 relates to funds currently held as collateral for surety bonds. The cash will be released once states receive confirmation of license surrender, unless state law requires a tail period for the surety bond to remain effective. There can be no assurance as to when states will allow release of funds. The estimated recovery from these asset categories is $1,535,000.

---

[2] The determination of the proceeds and costs of a hypothetical liquidation of the Debtors' assets in chapter 7 cases is an uncertain process involving the extensive use of significant estimates and assumptions that, although developed and considered reasonable by management and the Debtors' professionals, are inherently subject to significant economic, business, regulatory, and competitive uncertainties and contingencies beyond the control of the Debtors or their management. Therefore, actual results could vary materially from the analysis.

27.     The Liquidation Analysis assumes estimated wind-down costs of approximately $1,420,000, consisting of:

a.      chapter 7 trustee fees of approximately $130,000, based on estimated disbursements of $3,300,000;

b.      U.S. Trustee fees of approximately $30,000, based on estimated disbursements of $3,300,000 over two quarters;

c.      professional fees of approximately $340,000, including trustee counsel at $175,000, financial advisor at $85,000, claims agent at $60,000, and other costs at $20,000;

d.      and other wind-down costs of approximately $920,000, including payroll, insurance, data preservation and storage, and miscellaneous items.

These estimated fees and expenses are in line with DSI's experience for similar wind-down efforts.

28.     After deducting estimated wind-down costs ($1,420,000) from total recoverable asset value ($3,295,000), the Liquidation Analysis estimates approximately $1,875,000 of funds available for distribution. This represents approximately 7% of the combined Senior Indebtedness Claims held by the Plan Sponsor and the secured claims under the Bridge Loan held by the DIP Lender. The Liquidation Analysis therefore assumes that all such funds would be applied to satisfy these secured claims, which are secured by first-priority liens on the same collateral and share *pari passu* priority.

29.     The Class 2(a) Enterprise Claims (approximately $16,400,000), which arise under certain prepetition promissory notes issued by Impac Mortgage Holdings, Inc., as trustee of certain trusts for former executives of the Debtors, and which are secured by life insurance policies and related collateral held in pledged accounts, are expected to be satisfied in full from such collateral in the event of a liquidation.

30.     After payment of these secured Claims, there would be no funds available for administrative claims, priority claims, or general unsecured claims. Holders of Administrative

10

Claims, Priority Tax Claims, Class 1 Priority Non-Tax Claims, and Class 5 General Unsecured Claims would receive no distribution from unencumbered estate assets; (d) Holders of Class 4 Subordinated Notes Claims (with a stated outstanding principal balance of $62 million as of December 31, 2025, plus fees and accrued interest) would receive no distribution; and (e) Holders of Class 8(a) Interests in Impac would receive no distribution.

31.     Under the Plan, however, Holders of Allowed Claims in Classes 1 through 5 will receive the treatment described in the Plan, including: (a) Holders of Priority Non-Tax Claims will be paid in full in Cash; (b) Holders of Enterprise Claims will have their claims reinstated; (c) Holders of Senior Indebtedness Claims will receive their pro rata share of the Plan Sponsor Common Stock; (d) Holders of Subordinated Notes Claims will receive their Pro Rata share of the Contingent Payment Certificate, which ties recoveries to the performance of Reorganized Impac, provided that such amount shall not exceed $5 million or be less than $250,000; and (e) Holders of General Unsecured Claims will receive their Pro Rata share of the GUC Consideration. Therefore, Holders of Allowed Claims will receive at least as much under the Plan as they would receive in a liquidation under chapter 7 of the Bankruptcy Code. Indeed, based on the Liquidation Analysis, creditors will likely receive more under the Plan. Accordingly, the Plan satisfies the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code.

**Other Plan Matters**

32.     The Plan (a) complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code; (b) satisfies the other relevant confirmation requirements of section 1129(a) of the Bankruptcy Code; and (c) complies with sections 1129(c) and 1129(d) of the Bankruptcy Code.

33.     <u>Reasonableness of Payments and Identification of Management</u>. All payments made or to be made by the Debtors for services or costs and expenses in connection with the Plan

have been approved by, or are subject to approval of, the Plan Sponsor, which will own the Reorganized Debtors and is funding such amounts through the Exit Loan Facility it is providing. These payments are reasonable in light of employees' historical compensation. The Plan Supplement identifies the proposed officers and directors of the Reorganized Debtors, in accordance with section 1129(a)(5) of the Bankruptcy Code.

34.     Settlements and Compromises. The settlements and compromises incorporated in the Plan are appropriate under the circumstances. The terms of those settlements and compromises were negotiated extensively among the Debtors, the Plan Sponsor, and other key constituencies. In my business judgment, it is in the best interests of all creditors to obtain these resolutions and attendant certainty and to avoid further litigation and associated expense, delay, and uncertainty.

35.     Releases, Exculpations, and Limitations of Liability. Article 10 of the Plan includes certain release, exculpation, and limitation of liability provisions. I am not aware of any viable Causes of Action against the Released Parties. The Released Parties have provided valuable contributions to the progress of the Chapter 11 Cases, including stewarding the Debtors through the bankruptcy process, negotiating and implementing the terms of the Plan, and otherwise preserving estate assets for the benefit of all stakeholders. The Third Party Release set forth in the Plan is an essential element of the RSA. The Third Party Release is being implemented on a voluntary, opt-in basis. Holders of Claims or Interests may elect to grant such releases and become Releasing Parties by affirmatively opting in through the Ballot (for Holders in the Voting Classes) or the Release Opt-In Election Form (for all other Holders of Claims or Interests). Only those parties who affirmatively opt in will be bound by the Third Party Release. In light of the foregoing, including the contributions of the Released Parties and the integral role of the releases in securing

the support of the RSA Parties, the releases and exculpations included as part of the overall compromise and settlement embodied by the Plan are fair, equitable, and reasonable.

36.    <u>Executory Contracts</u>. Based on my consultation with management and my understanding of the Debtors' current business operations, the executory contracts and unexpired leases that the Debtors have chosen to assume are those that may be necessary for the Reorganized Debtors to carry out their duties under the Plan and effectuate the Debtors' emergence from chapter 11, and those which the Debtors have chosen to reject are no longer necessary for those purposes and would otherwise be a net burden on the Estates. Accordingly, the Debtors have exercised sound business judgment in identifying the executory contracts and unexpired leases to be assumed or rejected pursuant to the Plan.

37.    <u>Classification</u>. Claims and Interests have been separately classified under the Plan based on differences in the economic nature, legal rights, or priority of such Claims and Interests. Claims and Interests under the Plan were <u>not</u> separately classified with the intent to create an impaired accepting class.

38.    <u>Non-Solicitation of GUC Claims</u>.  Under the Plan, the votes of Holders of Class 5 General Unsecured Claims are not being solicited and the Plan deems this Class to reject the Plan. As set forth in the Liquidation Analysis, there would be no funds available for distribution for these Claims in a Chapter 7 Liquidation.  Notwithstanding this result, the Plan provides Holders of Allowed General Unsecured Claims with their Pro Rata share of the GUC Consideration funded entirely from the proceeds of the Exit Loan Facility pursuant to the RSA.  The administrative costs and burdens of soliciting votes from  these creditors would not improve the process or benefit such creditors and would only serve to delay and burden the Debtors' goal of a prompt emergence from Chapter 11.

39.     <u>Deemed Consolidation for Voting and Distribution Purposes Only.</u>  The Plan deems the Debtors consolidated for voting and distribution purposes.  The Debtors consist of twelve affiliated entities, and the Debtors' operations have historically been managed on a consolidated basis.   Likewise, the Liquidation Analysis was prepared on a consolidated basis.   The Plan's voting and distribution provisions are consistent and eliminate the need for entity-by-entity allocation of assets, claims, and administrative expenses across twelve separate estates.  The Plan reduces the administrative burden and costs that would otherwise be borne by the estates and their creditors without prejudice to creditors.

40.     <u>Preservation of Subsidiary Structure for Administrative Convenience.</u>  Under the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate or limited liability company entity, and the Interests in the Debtor Subsidiaries shall be Reinstated.  The preservation of the subsidiary corporate structure is necessary to preserve the Debtors' various regulatory licenses, designations, and tax attributes.  This treatment has no economic effect on distributions to creditors or on the treatment of any Claim or Interest under the Plan.

41.     <u>Inapplicability of Certain Bankruptcy Code Provisions</u>. The Debtors (a) do not provide retiree benefits; (b) are not required by any judicial or administrative order, or by statute, to pay any domestic support obligation; (c) are not individuals; and (d) are not nonprofit corporations.

42.     <u>Bankruptcy Code Section 1129(d)</u>. The principal purpose of the Plan is to maximize distributable value to the Debtors' stakeholders and not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

43.     <u>Prompt Emergence from Chapter 11</u>. It is critical that the Debtors emerge from chapter 11 promptly following entry of the Confirmation Order. The RSA requires entry of the

Confirmation Order no later than 45 days following the Petition Date, and satisfaction of this milestone is a condition to the continued effectiveness of the RSA. Any delay in the implementation of the Plan would risk undermining counterparty and customer confidence in the Debtors' businesses, which could erode the going-concern value of the Debtors' estates. In addition, although the DIP Facility and Exit Loan Facility provide the Debtors with sufficient liquidity to operate during the Chapter 11 Cases, an extended stay in bankruptcy would impose significant costs and expenses on the estates — including professional fees, administrative expenses, and other restructuring costs — that would harm stakeholders and erode recoveries. Given the broad support for the Plan and the risks associated with any delay, it is in the best interests of the Debtors' estates and their stakeholders for the Confirmation Order to be effective immediately upon its entry.

44.    The Plan, together with the settlements, compromises, and agreements embodied therein, has been structured to accomplish the Debtors' goal of maximizing the estates' value while preserving the Debtors' businesses as a going concern. The Plan is fair and reasonable, has been proposed in good faith and for proper purposes, and will maximize value for stakeholders. Accordingly, the Plan is in the best interests of creditors and should be confirmed by this Court.

45.    I hereby reserve my right to amend the testimony set forth herein as necessary at the hearing to consider confirmation of the Plan.


*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

15

Executed this 26th day of May, 2026, at Los Angeles, California.

/s/ Eric J. Held
Eric J. Held
Senior Managing Director
Development Specialists, Inc.